**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

ANISHA MEHTA,

                  Plaintiff,

        v.

DLA PIPER LLP

                Defendant.

---------------------------------------------------------X

Charge No.:

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Anisha Mehta ("Plaintiff" or "Mehta"), hereby alleges through her counsel Wigdor LLP, against Defendant DLA Piper LLP (US) ( "DLA," "Firm" or "Defendant") as follows:

## PRELIMINARY STATEMENT

1.      On October 4, 2022, DLA ruthlessly fired Mehta, a seventh-year associate in its Intellectual Property & Technology group ("IPT"), who was six months pregnant with her first child.

2.      Mehta was blindsided.  Just six days earlier, even though she was under no obligation to place DLA on formal notice of her pregnancy at the time, she submitted her formal request for maternity leave.  As part of the submission, she estimated her leave would begin sometime in late January 2023.

3.      At the time, DLA was experiencing downward pressure from clients on its billing rates, and less billable work was coming through the Firm's door to IPT.  DLA did not want to pay a seventh-year associate salary when that lawyer would not be working.  Aware that such a basis was unlawful, DLA attempted to say that Mehta's performance was the reason for her termination.  Notwithstanding DLA's false explanation for Mehta's sudden exit, as set forth below, there is no

doubt about the actual motive to terminate her just days before she became eligible for leave under the FMLA.

4.      First, between October 18, 2021 when Mehta began her employment at DLA and October 4, 2022 when Mehta was notified about her termination, DLA increased Mehta's base compensation not once, not twice, but three times.  In fact, Mehta's performance was so exemplary that her base salary was increased by 21% in the six months between October 2021 and March 2022.  Second, DLA awarded Mehta a six-figure bonus amount for year-end 2021 that was 30% of her base salary.  Third, the partners who supervised Mehta never provided a warning about her alleged performance issues, never provided a performance review, and never placed her on a performance improvement plan.

5.      As detailed *infra*, when Mehta's boss Gina Durham, a 20-year DLA partner and Deputy Practice Group Leader for the IPT group fired Mehta, she knew that over the course of the previous year, she had praised Mehta's legal work and continued to assign her greater responsibility.  In an effort to manufacture a basis for firing Mehta, Durham feigned her disappointment with Mehta, and when pressed for an actual reason, Durham initially offered generalizations about Mehta's ability to handle client matters and her billable hours.  When Mehta asked for specific examples, Durham only offered two examples of minor issues and refused to allow Mehta to respond.

6.      Caring only about its bottom line, DLA was unwilling to incur the costs of paying an experienced associate while on her maternity leave because the Firm would not reap the benefit of her billable hours.  This is an insidious sentiment that has cursed child-bearing women for decades and necessitated federal, state and municipal laws to enforce such unfair and discriminatory treatment.

7.      Despite DLA's countless marketing materials devoted to a work culture which claims to value women, including pregnant women, what happened to Mehta is a disgraceful illustration of a law firm that is desperate to be seen as a top-tier player, but that continues to trample the rights of its employees to increase its bottom line.

8.      Currently, DLA markets that 21% of all partners are female, while conveniently omitting the most important fact about such data.  Specifically, DLA fails to inform the public, and even lawyers at the Firm, what percentage out of the 21% are equity partners versus contract partners.  Of course, if a majority were in fact equity partners, such data would be broadcast by DLA at every opportunity.  The reality is that most women at DLA with the title of partner are contract partners, which essentially means they are senior to associates, but nothing more.

9.      Knowing that it was tossing out Mehta at six months pregnant when she was visibly showing and her chances of new employment for the foreseeable future were nonexistent, DLA did so regardless, and thereby flouted all compliance with the very laws enacted to protect pregnant employees like Mehta.

10.     Adding to DLA's false message of "progress" for female employees, the Firm has a "Leadership Alliance for Women," and its current "leader," Cara Edwards ("Edwards") says, "Having a voice, being a part of a community, and feeling a sense of belonging are essential to retention."[1]

11.     Notably, Edwards is also the New York office co-managing partner who Mehta personally told that she was pregnant.

12.     Mehta certainly had no voice when Durham called her and fired her without any warning or legitimate basis.

---

[1]      https://www.dlapiper.com/en-us/about-us/diversity-and-inclusion

13.     No one from the Leadership Alliance for Women was there to help Mehta, who is brown-skinned and of South Asian descent, when she was fired unlawfully at six months pregnant.

14.     Sadly, Mehta joins the line of female employees who have experienced discriminatory treatment while working at DLA.  By filing this lawsuit, Mehta intends to hold DLA responsible.

## NATURE OF CLAIMS

15.     Mehta brings this action to remedy pregnancy discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 e, *et seq*., ("Title VII") as amended by the Pregnancy Discrimination Act of 1974 ("PDA"), the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.,* ("FMLA"), the New York State Human Rights Law, Executive Law § 290 *et seq.* (the "Executive Law"), and the Administrative Code of the City of New York § 8-107 *et seq.* (the "City Law").

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.  This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## **ADMINISTRATIVE PROCEDURES**

18.     On December 14, 2022, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, as amended by the PDA.

19.     On May 16, 2023, the EEOC issued Plaintiff a notice of right to sue ("Right to Sue") upon request.

20.     Plaintiff filed this Complaint within 90 days of the EEOC's issuance of the Right to Sue under all relevant laws.

21.     Pursuant to City Law § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of this action.

22.     Plaintiff has complied with any and all other prerequisites to the filing of this action.

## **PARTIES**

23.      Plaintiff Anisha Mehta is a former associate in the IPT group at DLA.

24.     At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

25.     At all relevant times, Plaintiff was a resident of New York, New York.

26.     Defendant DLA Piper LLP (US) is a limited liability partnership organized and existing under and by virtue of the laws of the State of Maryland with a principal place of business in Baltimore, Maryland.  DLA Piper LLP (US) operates in cities throughout the United States, including New York, Chicago, and San Francisco.

27.     At all relevant times, DLA has met the definition of an "employer" of Plaintiff under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.      DLA Advertises That it Values Female Employees

28.     Presently, as part of its marketing and promotional efforts, DLA represents that it is a goal of the Firm to make "at least half of all future internal partner promotions … from underrepresented groups from now on."[2]

29.     The Firm claims that it is a "strategic priority" to have female partners represent thirty (30) percent of all partners by 2025.  It states that currently that percentage is twenty-one (21) percent, but importantly, there is no clarification about the numbers of non-equity partners versus equity partners broken down by percentages.

30.     These marketing and promotional efforts, in addition to the representations made during Mehta's interview process, persuaded Mehta to accept a job offer with Defendant.  Yet, as Mehta would soon learn, the insincerity of DLA's representations is overwhelming.

31.     Marketing to potential clients aside, the bottom line is what matters at DLA, and the facts of what happened to Mehta show that the Firm is willing to violate fundamental employee rights to increase profit.  Compounding the hollowness of the Firm's stated commitment to diversity and inclusion is the fact that Mehta is brown-skinned and of South Asian descent. Based on her experiences, the value placed on retaining lawyers such as Mehta is mere lip service.

---

[2]      https://www.dlapiper.com/en-ie/about-us/diversity-and-inclusion

II.   **Claimant's Background**

32.    A graduate of Kent State University in 2012 and University of Illinois Chicago School of Law, formerly known as The John Marshall Law School, in 2015, Mehta's work as an associate began at Niro McAndrews, a boutique IP litigation firm started by two former partners of a prominent law firm in Chicago, Raymond Niro Jr. and Matthew McAndrews.

33.    The partners stated she played an integral role in helping their biggest client win a $54 million jury award for Black & Decker for its DeWalt line of power tools – one of the largest trademark infringement jury verdicts in history.

34.    Mehta moved to Ulmer & Berne LLP as a young associate and was employed there for about two years, where she had the chance to work on a broader set of trademark and copyright matters, including prosecution and portfolio management, clearances, domain name disputes, and enforcement matters as well as continue gaining experience on IP litigation matters.

35.    Finally, she was sought out by recruiters to join K&L Gates LLP where she spent more than three and half years as a mid-level associate, in which she managed large-scale trademark portfolios and provided counseling and enforcement strategies for global companies, including Client A, a Fortune 10 technology company, Client B, a Fortune 500 food and beverage company, Client C, an international medical diagnostics company, and Client D, a Fortune 700 clothing retailer, among others.

36.    A K&L Gates partner invited Mehta to join the February 2020 outside counsel's summit for trademark attorneys held by one of the Firm's largest clients, Client A.  Here, Mehta was one of the only associates in attendance amongst a sea of trademark partners from other firms that also work with Client A.  Durham from DLA was also at the summit and it was here that she met Mehta.

III.     **DLA Recruits and Hires Plaintiff**

37.     Mehta was looking for a firm that had more female, diverse leadership or at least plans to promote such women into leadership positions and provided transparency and support on the path to partnership.  Because Mehta already had a handful of clients herself, she intentionally looked for a firm that would encourage and advance her desires and opportunities for business development.

38.     In connection with talks with DLA, Mehta clearly voiced the fact that these were the attributes she was looking for in an employer.  Mehta said that she would only move as a senior associate to a place she intended to eventually become a partner and hopefully a future leader.

39.     In response, the partners at DLA who interviewed her made these exact representations and more.  They touted their D&I efforts, mentoring programs, business development opportunities for senior associates, as well as tracking and supporting female associates to become successful partners at the Firm.

40.     Prior to her hire, DLA specifically said that a path to partnership was definitely in the cards for Mehta.

41.     In her interviews, Durham said that she remembered meeting Mehta at Client A's 2020 outside counsel summit in Seattle and would love to have her join DLA, as well as continue to work on Client A matters if that was of interest to Mehta.  Durham also represented to Mehta that working remotely or in any one of DLA's major offices would not be a problem if she joined the Firm.

42.     Finally, Durham said that she currently had only a junior associate on her matters, which was not working particularly well.  Durham said she would need to transition those matters to Mehta, a senior associate.

43.     Hilary Remijas ("Remijas"), a 1994 law graduate, told Mehta that she is a senior-level attorney, who works part time and is a mother.  She made the point of telling Mehta that the culture was supportive of her coming back as a part-time employee, which is just another way of saying that she is essentially "off" the partnership track and paid substantially less both in base salary and in bonus.  One more female lawyer off the leadership track allows the male-centric power at DLA to remain in control.

44.     Chicago partner Keith Medansky ("Medansky") represented that DLA is supportive of senior associates building their book of business and working up to partnership and that he would be happy to help Mehta in this process.

45.     On September 6, 2021, DLA extended an offer to Mehta to work as an associate in the IPT group, Trademark, Copyright & Media subgroup in the Firm's San Francisco office.  DLA categorized her as a "Level 2" with a class year of 2015 (a 6th-year associate) and offered Mehta a substantial base salary.

46.     Because Mehta was considering a competing firm's offer, DLA paid her a signing bonus, which was approximately 16 percent of her base salary, and told her that she would receive a full 2021 year-end bonus based on meeting performance expectations.  As per her offer letter, the Firm conveyed that she was expected to perform a minimum of 2,000 billable hours annually, which could include 100 hours of pro bono work, prorated for the remainder of 2021, and in addition, she was expected "to spend a significant number of hours on non-billable marketing, educational, and administrative activities."

**IV.    Mehta's Base Salary is Increased Three Times in Four Months and She Receives Substantial Bonuses**

47.    Mehta began work on October 18, 2021.  Although she was licensed to practice in Illinois, Mehta reported to Durham, a partner and now the IPT deputy practice group leader, based in San Francisco.

48.    Initially, Mehta performed the majority of her work for Durham.  For example, she was assigned to 8-10 of Durham's trademark portfolios; asked to handle discussions with foreign counsel, oversee paralegals, and review a junior associate's drafts of reporting emails to Durham's clients; and given several incoming trademark clearance search requests to review and draft opinions.

49.    Mehta also handled several matters for another SF-based partner, Heather Dunn ("Dunn"), including some IP agreement work, advertising work and trademark clearance work.  In the next few months, Mehta began performing work for Medansky, who was located in Chicago.

50.    Having only started on October 18, 2021, Plaintiff managed to bill 275 hours (plus additional pro bono hours) in the month of December 2021.  She also spent many non-billable marketing hours in her first few months helping Dunn with an RFP for a major prospective client.

51.    In December 2021, she received the first installment (50%) of her six-figure year-end bonus.  Notably, only those associates in good standing who met the minimum production qualifications were eligible to receive 50 percent of their base market bonus in December 2021, rather than receiving the entire bonus in January 2022.  Mehta was one of those associates who received the early payment.  Her base compensation also was raised approximately 6 percent.

52.    The 2021 year-end bonus was made to Mehta based on her performance metrics. As detailed in Mehta's offer letter, she would only be eligible to receive a 2021 bonus if she met or exceeded DLA's expectations.

53.     In January 2022, she received her second and final installment of the year-end bonus.

54.     In addition, Mehta received a five-figure "special bonus."  This extra bonus was given only to associates who were "meeting the Firm's high expectations with a performance rating of three or higher," according to Firm memorandum.

55.     Also in January 2022, Mehta learned that her base compensation was increased another 6 percent over the 6 percent increase she had already received in December 2021.  This brought her salary to a total percentage increase of approximately 12 percent from when she was hired.

56.     Further, she learned that she would receive that raise retroactively.  According to DLA internal messaging, only associates who were in good standing and who had met the Firm's performance standards were eligible for the base salary increase and retroactive payment, with one memo stating that "higher bonuses will continue to be provided to those associates who made even greater contributions to the firm's success, based on billable hours and performance evaluations." Mehta received two base salary increases and retroactive payment.

57.     In January 2022, Mehta was notified that her transfer to the New York office was approved.

58.     In February 2022, Mehta's base compensation was increased by approximately 8 percent over her already increased base salary, bringing her salary to a total percentage increase of approximately 21 percent from when she was hired.

59.     At the same time, she was promoted to the title of seventh-year associate.  Her billing rates increased respectively.

## V.    Mehta Proactively Asks for Feedback

60.    Always looking to improve, in December 2021, Mehta asked Durham for feedback on her performance. At the time, Durham's response to Mehta was that she was doing, **"exactly what [Durham] needed [Mehta] to be doing."**

61.    In addition, Mehta, not Durham, asked if they could have monthly check-in calls, including to talk about her career growth. Durham's response was that they could meet, but monthly calls were not necessary, and they could do so on an *ad hoc* basis.

62.    On or around March 9, 2022, Mehta initiated a check-in call with Durham to discuss (1) substantive matters, such as several ongoing publicly filed enforcement matters, including Mehta's strategy regarding settlement negotiations for a client (Durham agreed with Mehta's approach) and Mehta's strategy in an opposition proceeding on behalf of another client against a trademark application filed by a third party (Durham also agreed with Mehta's approach), and (2) Mehta's career progression at the Firm, including any recommendations of additional people Mehta could reach out to in order to strengthen her relationships.

63.    If Durham had any concerns about Mehta's performance, she had ample opportunity to discuss them with Mehta. Instead, during the check-in call, Mehta also raised the idea of representing DLA's trademark prosecution and portfolio management practice on the east coast because most of the east coast trademark practitioners are litigators, and growing the team there eventually was something Dunn had encouraged and expressed to Mehta when Mehta first spoke about being based out of New York.

64.    Again, Durham appreciated Mehta's initiative to be a leader and team player. Rather than bringing up any concerns she had with Mehta, Durham provided names of higher up individuals for Mehta to meet, including Rich Hans, the then-Office Managing Partner; Ann Ford,

a member of the U.S. Management Team and DLA's Global Board as well as the former U.S. Chair and Global Co-Chair of DLA's IPT practice; and Sangeetha Punniyamoorthy, a Canadian trademark partner on the east coast of South Asian descent, among others.

65.     Durham also encouraged Mehta to meet clients, prospective clients, vendors, and colleagues of DLA at the INTA conference in May 2022 and stressed that Mehta attend the DLA attorneys conference ("Americas Conference") in June 2022.

66.     Durham would not have suggested such next steps to Mehta or introductions if she truly believed Mehta was anything but an excellent addition to the IPT team.

67.     Within IPT, Mehta's work was not exclusively for Durham.  Rather, she performed work for other partners and of-counsel lawyers who reported to Durham.  In addition, Mehta handled assignments given to her from lawyers outside of the IPT group.

68.     Notably, in Spring 2022, Durham encouraged Medansky and other partners to assign more work to Mehta.  Such encouragement suggests that Durham believed Mehta capable of performing work for partners across the Firm.

69.     During her employment, several non-IP attorneys across the Firm regularly reached out to Mehta, calling her their "go-to help with IP searches" and diligence matters.  Other associates remarked to Mehta about her increased visibility and noticed that she was sought out by more partners than the other associates at her level.  Even Dunn had less exposure with lawyers outside of San Francisco and did not know as many of the other partners and of counsel that Mehta interacted with through her work.  It defies common sense that a purportedly underperforming lawyer would be sought out by more senior lawyers.

70.     Throughout her employment Durham consistently added Mehta to incoming projects and recommended to other partners that they use Mehta.  Not only was Mehta being asked

to take on more work by other partners and told such things as, if you need more hours, please let me know, but Mehta's work also earned her praise directly from clients.

71.     For example, in December 2021, contacts from "Client A,"[3] a client that Durham wanted to impress, provided overwhelming positive responses to Mehta's successful handling of a matter as Client A's in-house counsel, Jane Doe 1, said this is "GREAT news.  Well done, team DLA," and another team member said "Fantastic!" and another said "Excellent!" thanking DLA for the job well done.

72.     In terms of the number of trademark prosecution matters, by September 2022, Mehta had been staffed on twenty-plus clients with mid-to-large trademark portfolios, resulting in more than 5,500 global trademark portfolio matters under Mehta's management.  This number does not include the hundreds of global enforcement matters under various clients for which Mehta performed work.

73.     In addition, Mehta performed clearance work, IP due diligence work, IP licensing and agreement work, handled proceedings in front of the Trademark Trial and Appeal Board (TTAB), and other counseling for clients, all of which approximated at least another fifty-plus additional clients and hundreds of additional matters that she handled during her year at the Firm.

## VI.     Plaintiff Receives Overwhelmingly Positive Feedback

74.     While performing substantial work for Durham, at no time during Mehta's tenure did Durham provide Mehta with a performance review or schedule a meeting about a performance issue.

---

[3]     DLA threatened Mehta with legal action if she includes actual client names in any litigation of her discrimination claims.  Consequently, references to specific clients, client matters, and names of individuals Mehta interacted with as part of her work are referred to herein using pseudonyms.  Should the Court order Mehta to re-file this Complaint to insert the correct and actual information as part of her allegations, she will do so promptly.

75.     To the contrary, Durham continuously messaged positive feedback to Mehta, all of which conveyed to Mehta that the work she was doing was more than satisfactory, and in fact high quality.

76.     Durham, whose tenure at DLA was more than 20 years, and was the acting deputy head of the IPT group could have given Mehta a performance review at any time during her employment.  She did not.  Even when Mehta proactively requested check-in meetings with Durham, she could have taken the time to give feedback.  Durham did not.

77.     Instead, Durham regularly recommended to other partners that they use Mehta, and Durham assigned Mehta to work on some of her most important trademark matters, such as Clients A, E, F, G, H, I, J, K, L, M, and a new major portfolio, Client N (assigned to Mehta just weeks before her termination), among others.

78.     Durham's actions speak to anything but a belief that Mehta was underperforming. To the contrary, on too many occasions to list here, Durham's responses to Mehta's proposed strategies and recommendations on matters was that Mehta's proposals were correct, and she should simply move forward with no additional input from Durham.

79.     To be clear, on a daily basis, when Mehta provided recommendations, Durham replied with "sounds good, thanks" "looks good, thanks" and "thanks, good to go."   Not surprisingly, as late as the end of August 2022, prior to Mehta's pregnancy claim filing, Durham continued to message "Looks great" with zero revisions to a clearance opinion for a company's new marketing campaign, "This looks good. Thanks," also with zero revisions regarding another clearance opinion for a different company's house brand name, both for clients brought in by other partners at the Firm that were also pleased with the results, and "Sounds great. Thanks" with zero revisions to a draft email to the Director and Assistant GC of Client F, where Mehta provided

strategic counseling and guidance for the company's important logo mark.  That Durham often signed off on Mehta sending drafts and emails to clients with little to no edits shows her level of confidence in Mehta's work.  It is clear that Mehta was anything but a poor performer.

80.     In her day-to-day practice, Mehta drafted Petitions to Cancel and Notices of Opposition to be filed with the TTAB, answers and discovery requests for TTAB proceedings, emails to clients on filing strategies, infringement assessments, cease and desist letters, takedown notices, reporting emails and recommendations to clients on foreign prosecution, emails to local counsel in several foreign jurisdictions, watch notice emails and recommendations, among other tasks.

81.     These are examples of tasks Mehta successfully performed daily, and Durham oversaw hundreds of examples of her work product.  On only a small percentage of those matters did Durham meaningfully alter or even revise the substance of Mehta's performed work, in the way that partners regularly do.  She did not say that Mehta was underperforming.

82.     In addition, throughout her employment, Medansky also repeatedly praised Mehta's performance.  In fact, other associates chided Mehta that Medansky was trying to "steal" her from Durham.  Medansky placed Mehta on top client matters, including Client O and Client P.  Medansky told his paralegal Peggy McBride and docketing to add Mehta to all of Nicole Chaudhari's (Chaudhari) matters as a timekeeper.

83.     Chaudhari was an of counsel attorney admitted to practice in 2005 who previously had handled the matters Mehta was responsible for.  From her first assignments for Medansky through her final week at DLA, Medansky's comments included "terrific job," "awesome," "this was perfectly done," "excellent," "approved," and "very good."

84.    In fact, in late August 2022, Medansky called Mehta and said he had a very high-profile, big research project and enforcement matter that he wanted Mehta to take on for Client P. Notably, Medansky said he wanted Mehta to handle it because it was highly confidential and important to the client.

85.    The client was given a budget which approved Mehta's hourly rate for at least 10 to 15 hours of work that week.  Medansky said he wanted it by Friday morning to give time to review.  Mehta finished it early and within budget, giving Medansky extra time to review and ask follow-up questions if needed.

86.    Further, the response from of counsel Remijas who was also staffed on this enforcement matter to Mehta's draft was "this looks really good." Medansky had no substantive edits.  The final product was sent to the client by Medansky copying Mehta and Remijas on August 30, 2022.

87.    Medansky trusted Mehta to handle strategy discussions and recommendations for next actions for infringement matters with John Doe 1 from Client O routinely and regularly with little to no oversight from Medansky or Remijas, i.e., without running drafts by Medansky.

88.    Medansky regularly called Mehta to tell her that she did a good job on multiple occasions and to give her background on his biggest clients, specifically Client O and Client P, for the express purpose of Mehta taking on more work for these clients.

89.    In her last six months at the Firm, Medansky sent Mehta hundreds of new projects and matters to handle.  Again, such examples demonstrate confidence and trust in Mehta's abilities.

VII.   **Plaintiff Notifies DLA That She is Pregnant**

90.    Despite the regular praise and positive feedback Mehta received, on October 4, 2022, Durham called Mehta and told her she was fired.

91.     Unquestionably, Mehta was on an upward trajectory at DLA.  She was being sought out by partners to work on new matters, had to turn down offers to work on things outside of work for Durham and the IPT group, and received consistent praise.

92.     Against this backdrop, believing that she was doing the "right" thing, Mehta told Durham in early August that she was pregnant and due at the end of January 2023.  Incorrectly, Durham told Mehta to "notify HR," suggesting she do so soon, even though no federal, state or municipal law requires pregnant women to inform their employers about their medical status six months before an anticipated delivery date.

93.     Because she is a loyal employee, Mehta dutifully did what Durham told her to do, and "notified HR."

94.     She was also told by Durham to notify leadership in the New York office.  Mehta informed Tamar Duvdevani ("Duvdevani"), the newly appointed IPT Practice Group Leader sitting in New York, and Cara Edwards ("Edwards"), the newly appointed New York Office Managing Partner and Co-Chair of DLA's Leadership Alliance for Women group, of her pregnancy status.

95.     Of course, Mehta was not required to and never should have been asked by a single employee at the Firm, especially in August and September, whether she intended to take the full number of maternity leave weeks "offered" by DLA or anything else about the logistics of her childbearing.  Nevertheless, she was asked such questions by senior lawyers, including *inter alia* Durham, Duvdevani, Dunn, Medansky, and Edwards.

96.     When she told Medansky that she was pregnant, he congratulated Mehta and told her that pregnancy is the only time she will receive additional support in connection with work, if needed, and that she should communicate if things are difficult during her pregnancy.  Medansky

also urged Mehta to tell Duvdevani about her pregnancy now that Duvdevani was "the boss" in her new title as IPT national practice group leader.  Mehta followed this instruction and told Duvdevani shortly after she told Medansky.

97.     On September 28, 2022, Mehta notified DLA of her pregnancy and request for leave when she submitted her STD application to Unum.

98.     On September 29, 2022, she received notice from Unum that DLA was notified of her request for leave submission.

## VIII.   **DLA Unlawfully Terminates Plaintiff**

99.     Despite the regular praise and positive feedback Mehta received, as detailed *supra*, on October 4, 2022, **just five days** after Unum's communication that DLA was notified of her claim for leave, Mehta received her termination call from Durham.  The temporal proximity between Mehta's notice and termination is shocking.

100.     Shocked and in disbelief, Mehta managed to ask why.

101.     Durham, *for the first time*, told Mehta that she was not performing at her level or meeting her billable hour requirement.  Notably, however, Mehta just had a conversation with Durham two months earlier (prior to announcing her pregnancy) in which Durham told Mehta that she was "not on any lists" for hours or performance issues.

102.     When Mehta pushed for additional details about the reason for termination, two of the specific issues Durham identified included (1) an instance from March 2022 where the team was not prepared for a "kickoff call" for a new client and (2) a poorly written brief from July 2022, which Durham incorrectly assumed was Mehta's work product but was primarily another associate's work product.

103.    Durham conveniently failed to acknowledge that Mehta had never been asked to lead a kickoff call for one of Durham's clients at the Firm before March 2022 and it was Durham who failed to provide any guidance ahead of time, including by failing to tell Mehta what was expected.

104.    Further, the call with the client went superbly, and Mehta developed a good working relationship with the in-house contacts there throughout 2022.  This client happens to be the same client ("Client E") whose CEO directly messaged Mehta about her excellent work on multiple occasions.

105.    Notably, thereafter Mehta led the intake and onboarding process and prepared Durham for and held successful kickoff calls for several of Durham's new clients and portfolios, including Client F, Client M and Client N. Yet, Durham claimed that the March call, which was never an issue before, was specifically a basis for her termination months later in October 2022.

106.    The only other issue Durham raised during the termination call was related to a brief drafted in July 2022.  However, this brief had been assigned to a more senior associate, not to Mehta, and the document referenced by Durham in the termination call was drafted by this senior associate, not Mehta.  Further, at no time between July 2022 and her termination had Durham spoken to Mehta about the brief. In fact, during this period, Durham assigned more projects, not less, to Mehta.

107.    Incredibly, during the October 4, 2022 termination call, Durham refused to allow Mehta to defend herself against any pretextual performance criticism.  For example, when Mehta tried to explain on the call that the brief Durham was referencing was "not predominantly [her] work product," Durham responded, "I am not going to debate this with you."

108.    Noticeably, there are a number of things that Durham did not explain to Mehta when she fired her.  First, Durham did not explain how or why in the 11.5 months that Mehta had been at the Firm, she received not one raise, not two raises, but three raises in this short span, including with retroactive effect for "raise number two."  Durham instead told Mehta that she was not at the level expected and was an underperformer.

109.    On top of the three raises in base pay during her employment, Mehta received a six-figure bonus at the end of 2021 in addition to a special bonus given to associates meeting the Firm's high expectations.  Further, Mehta was consistently receiving increases in her workload on existing clients as well as new clients from Durham and other partners as late as September 2022.  Durham never even attempted to explain how someone who received such pay increases and consistent workload increases could be labeled objectively as an associate so unproductive and devalued that she needed to be fired.

110.    Durham also failed to explain to Mehta during the termination call how or why she had recommended Mehta to work for so many partners and of counsels at the Firm, and how it was that Mehta had performed excellent work for more than a dozen such senior lawyers yet not one of them ever spoke to Mehta about her purported subpar work nor removed her from their clients.

111.    Durham also failed to explain to Mehta during the termination call how or why Durham had never spoken to Mehta about her work performance the entire year, especially as her supervising attorney and overseer of her work, except of course, to provide routine feedback in the normal course of a partner-associate relationship and to tell Mehta that she had done a great job and met expectations, which was relayed multiple times throughout their time working together.

112.    Durham also failed to explain to Mehta during the termination call, how or why it was a viable option to fire Mehta when she was hired by Durham precisely because Durham was in desperate need of a more senior associate on her team to carry the workload that Mehta in fact carried.

## IX.    DLA Continued to Provide Positive Feedback to Plaintiff After Her Termination

113.    Incredibly, on October 12, 2022, one week after Mehta was fired for her alleged poor performance, Medansky, Remijas and John Doe 2, the deputy general counsel of Client O, attended a call, in which Mehta led portions of the discussion regarding clearance results and strategies for one of Client O's urgent and global campaign launches.

114.    Mr. Doe 2 was pleased with Mehta's details, analysis and strategies on the project, and Medansky conferenced in Mehta on a call with Remijas after the client call on October 12, 2022 to tell Mehta that she did a "good job."

115.    This was not the only project Medansky assigned to Mehta after she was notified of her termination on October 4, 2022.  Medansky and his team inundated Mehta with assignments daily over the next week, requesting her review and analysis on high profile issues for Medansky's important clients and relying on her input and recommendations.   Some of these assignments demonstrated that they expected Mehta to be working on matters into 2023.

116.    Medansky and Remijas were in fact expecting multiple drafts and assignments from Mehta on the day that DLA shut off Mehta's access to her Microsoft outlook email and locked access to her DLA laptop, on October 13, 2022, which was the artificial deadline DLA imposed upon Mehta to sign a "separation agreement."  Mehta did not sign.  Notably, Mehta's rights under FMLA would have gone into effect on October 18, 2022.

117.    Further, during Mehta's final weeks, Durham failed to raise any issues to Mehta about her pending bar admission to New York State, even though she knew this was vitally important to Mehta's professional success.  Just days before she was told she was fired, the Firm had submitted paperwork to the NYS bar admission committee recommending Mehta for admission.

118.    In addition to the associated stress from a termination, it became more stressful because Mehta's pregnancy was visibly present at the time of her unlawful termination, and such a fact was obvious to any potential employer with whom she interviewed.  Plaintiff went from what should have been one of the happiest times of her life, pregnant and working at a job she loved, with healthcare, to being unemployable and plagued by unnecessary stress during her final trimester.

119.    The emotional, physical, and financial damage to Plaintiff is obvious.

**V.    DLA Used Plaintiff When It Was Beneficial to Have a Minority Female Lawyer on the Team**

120.    DLA had no qualms about trotting out Mehta when it worked to support the Firm's exaggerated D&I efforts.  By way of example only, DLA used Mehta in connection with a client dinner during the INTA Conference in May 2022 with a global client.

121.    On or about May 3, 2022, Mehta was present in a meeting with Medansky, John Doe 1 and John Doe 2 (all white males) and the client's important foreign counsel contacts who were of Indian descent.

122.    After the meeting, Medansky called Mehta and extended a last-minute invite to Mehta to attend the dinner with the client and its foreign Indian counsel, praising her that she did a great job in the meeting, stating that she was "delightful," and insisting that she attend the dinner. No other associates were present for the dinner.

123.    Of course, Mehta cancelled her other plans for the evening, accepted Medansky's invitation and went to the client dinner on or about May 3, 2022.  It was impossible for Mehta not to notice that the DLA lawyers at the dinner all had light, white skin and in addition to being the sole associate in attendance, she was the only brown-skin attorney from DLA at the dinner.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII as amended by the PDA)

124.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

125.    By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her pregnancy in violation of Title VII as amended by the PDA by denying Plaintiff the same terms and conditions of employment available to males and/or non-pregnant employees, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

126.    As a direct and proximate result of the unlawful discriminatory conduct committed by Defendant in violation of Title VII as amended by the PDA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

127.    As a direct and proximate result of the unlawful conduct committed by Defendant in violation of Title VII as amended by the PDA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

128.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless

as to amount to such disregard of Plaintiff's protected rights under Title VII as amended by the PDA, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII as amended by the PDA)

129.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

130.    By the actions described above, among others, Defendant retaliated against Plaintiff for requesting maternity leave by terminating her employment.

131.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

132.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

133.    Defendant's unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Interference in Violation of the FMLA)

134.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

135.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA. Similarly, Defendant was a "covered employer" within the meaning of the FMLA.

136.    By the actions described above, among others, Defendant interfered with Plaintiff's rights under the FMLA and her attempt to exercise those rights.

137.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

138.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

139.    Defendant's unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of the FMLA)**

140.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

141.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA. Similarly, Defendant was a "covered employer" within the meaning of the FMLA.

142.    By the actions described above, among others, Defendant retaliated against Plaintiff for attempting to exercise her rights under the FMLA.

143.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

144.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

145.    Defendant's unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

<u>**FIFTH CAUSE OF ACTION**</u>
**(Discrimination in Violation of the Executive Law)**

146.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

147.    By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her pregnancy and familial status in violation of the Executive Law.

148.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

149.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

150.    Defendant committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the Executive Law)

151.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

152.    By the actions described above, among others, Defendant retaliated against Plaintiff in violation of the Executive Law.

153.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

154.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

155.    Defendant committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Discrimination in Violation of the City Law)

156.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

28

157.    By the actions described herein, among others, Defendant discriminated against Plaintiff on the basis of sex, caregiver status, and sexual and reproductive health decisions in violation of the City Law.

158.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

159.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

160.    Defendant committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH  CAUSE OF ACTION
### (Retaliation in Violation of the City Law)

161.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

162.    By the actions described above, among others, Defendant retaliated against Plaintiff in violation of the City Law.

163.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

164.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

165.    Defendant committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against the Defendant for the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendant complained of herein violate federal, state and city laws;

B.    An award of economic damages;

C.    An award of compensatory damages;

D.    An award of punitive damages;

E.    An award of liquidated damages;

F.    Prejudgment interest on all amounts due;

G.    An award of reasonable attorneys' fees and costs; and

H.    Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  June 6, 2023
        New York, New York                    Respectfully Submitted,

                                              **WIGDOR LLP**

                                              By: _____
                                                    Jeanne M. Christensen
                                                    Monica Hincken

                                              85 Fifth Avenue
                                              New York, NY 10003
                                              Telephone: (212) 257-6800
                                              Facsimile: (212) 257-6845
                                              jchristensen@wigdorlaw.com
                                              mhincken@wigdorlaw.com

                                              *Counsel for Plaintiff*