**GIBSON DUNN**

Molly T. Senger
Partner
T: +1 202.955.8571
M: +1 202.734.9424
msenger@gibsondunn.com

May 1, 2024

VIA ECF

The Honorable Robyn F. Tarnofsky
U.S. District Court for the Southern District of New York
500 Pearl Street, Courtroom 9B
New York, NY 10007

Re:    *Mehta v. DLA Piper LLP*, Case No. 1:23-cv-04757-AT (S.D.N.Y.)

Dear Judge Tarnofsky:

I am writing on behalf of Defendant DLA Piper LLP (US) ("DLA Piper" or the "Firm") in response to Your Honor's April 24th Order, directing the parties to meet and confer and submit letters on the docket by Wednesday, May 1, 2024, "outlining any remaining discovery disputes and proposing a new deadline for the close of fact discovery, if necessary." ECF No. 52. Unfortunately, while the parties were able to resolve certain disputes through the meet and confer process, several disputes remain, as outlined below. In addition, to meet Plaintiff's demands for additional documents and information, DLA Piper seeks a brief extension of the fact discovery deadline – up to and including **May 15, 2024**. DLA Piper respectfully requests that discovery not be extended past that date, and that DLA Piper not be required to respond to the flurry of new discovery that Plaintiff's counsel has attempted to serve as recently as Monday, April 29th.

**I.    DLA Piper Has Offered Eminently Reasonable Compromises With Respect To Each Of The Issues That Plaintiff Raised In Her April 16th Letter to the Court.**

With respect to the issues that Plaintiff raised to the Court in her April 16th letter, *see* ECF No. 49, the parties have continued to meet and confer since the teleconference last week. Unfortunately, however, the parties have not been able to fully resolve their disputes.

*The 200 Additional ESI Search Terms That Plaintiff Proposed Are Not Reasonable Or Proportional To The Needs Of This Case*

During the teleconference on April 24, 2024, the Court instructed the parties to meet and confer regarding potential additional ESI search terms and custodians, but noted that "there has to be some kind of proportionality." Hr'g. Tr. at 3:7–8. On April 25th, DLA Piper provided Plaintiff's counsel with the search terms, date ranges, and custodians that it had used to identify documents responsive to Plaintiff's discovery requests at the outset of this case. Plaintiff did not provide DLA Piper with any proposed additional search terms or custodians until the evening of Saturday, April 27th. At that point, Plaintiff's counsel requested that DLA Piper collect documents from one additional custodian, and run **more than 200** additional search strings on six custodians' ESI.[1]

---

[1] In particular, Plaintiff proposed 41 new ESI searches for existing custodian Keith Medansky; 41 new searches for existing custodian Heather Dunn; 45 new searches for existing custodian Gina Durham; 48 new searches for Plaintiff (43 search strings, plus requests for **all** of Plaintiff's emails with five different

# GIBSON DUNN

The Hon. Robyn F. Tarnofsky  May 1, 2024
Page 2

DLA Piper promptly ran Plaintiff's proposed ESI search terms on its existing custodians on Sunday, April 28th. The application of those search terms yielded more than **738,000 previously unreviewed documents**. Plaintiff's proposed search strings included, for example, Plaintiff's initials – "AM" – which resulted in the identification of every email that had been sent or received in the morning and therefore had an "AM" time-stamp. DLA Piper provided a hit report to Plaintiff's counsel on Monday, April 29th, and explained that it would not be reasonable or proportional to the needs of this case to require DLA Piper to review more than 738,000 additional documents on the eve of the close of fact discovery. DLA Piper therefore suggested adjustments to the new, proposed search strings, which would result in DLA Piper having to review approximately 1,100 additional emails. DLA Piper made clear that it was not conceding that its initial search terms were in any way deficient, or that any additional ESI searches (or custodians) were relevant or proportional to the needs of this case. Nevertheless, DLA Piper offered to review these approximately 1,100 additional documents in the spirit of compromise, and to produce from that set any nonprivileged documents responsive to Plaintiff's discovery requests. *See* **Ex. A** (Apr. 30, 2024 Email from M. Senger to J. Christensen).[2] Plaintiff's counsel responded today, May 1st, with comments on the hit report, and it appears based on those comments that Plaintiff is likely to agree to the modified additional search terms that DLA Piper has proposed.

However, Plaintiff's counsel also wrote that she was struggling with "trying to define terms that are searchable that would retrieve examples of partners telling other associates to go back and re-edit or find more information about a topic, clarify a research issue, consider other strategies or advice, or other such feedback." **Ex. B** (May 1, 2024 Email from J. Christensen to J. Ruckert). But DLA Piper already has agreed to produce formal performance evaluations for the two "comparator" associates identified by Plaintiff, as discussed below. Further, DLA Piper already crafted and applied ESI search terms designed to yield documents responsive to Plaintiff's discovery requests at the outset of discovery, and now has agreed to supplement its prior ESI searches in an eminently reasonable fashion. As a result, DLA Piper should not be required to review any more than the 1,100 additional documents that it has offered to review.[3]

---

partners, totaling 48 searches); 16 new searches for existing custodian Carissa Bouwer, and 16 new searches for new custodian Hilary Remijas, for a total of 41 + 41 + 45 + 48 + 16 + 16 = 207 searches.

[2] Plaintiff also requested all emails between her and five DLA Piper partners (Matt Gruenberg, Craig Lang, Tim Lowry, David Mendelson, and Mark Radcliffe). DLA Piper agreed to *review* every such email (without applying any search terms) and to *produce* any emails that were responsive to Plaintiff's discovery requests. Plaintiff's counsel responded: "This is not acceptable and we do not agree." **Ex. B** (Apr. 30, 2024 Email from J. Christensen to J. Ruckert). Instead, Plaintiff's counsel insisted that <u>all</u> emails between Plaintiff and these five partners be produced, irrespective of responsiveness. However, as this Court already explained, DLA Piper need only "produce anything that falls within the scope of what was requested in plaintiff's discovery requests," Hr'g. Tr. at 3:21–22, and Plaintiff is "not entitled to every e-mail that . . . comes from one of those . . . custodians with her name on it," as "[t]hat would be disproportionate," *id.* at 9:6–9.

[3] Because Hilary Remijas was only just identified as a new ESI custodian over the weekend, DLA Piper was not able to run search terms over Ms. Remijas's ESI until today, May 1st. DLA Piper is still in the process of running those search terms, and reserves the right to suggest modifications to the search terms for Ms. Remijas's documents to the extent modifications are necessary to yield a reasonable number of documents for review.

# GIBSON DUNN

The Hon. Robyn F. Tarnofsky                                                                                              May 1, 2024
                                                                                                                          Page 3

*Plaintiff Has Failed To Explain What She Is Seeking In Terms Of The "Decision-Making" Process Regarding Her Salary And Bonus*

Plaintiff persists in seeking documents regarding DLA Piper's supposed "decision" to increase her salary and award her bonuses, even though DLA Piper has explained there are no documents evidencing this alleged "decision-making" process because Plaintiff benefitted from the same salary increases and standard bonuses as all other DLA Piper associates within her law school class year who met their annual productivity target for the 2021 performance year.  *See* ECF No. 51 at 5.  This Court already noted that in a law firm with "lockstep associate compensation," a "lack of paper" regarding associate compensation decision-making "is not unexpected." Hrg. Tr. at 4:12-17.  The Court therefore suggested that Plaintiff serve a targeted "request for admission," asking for confirmation of the Firm's lockstep compensation process.  To date, Plaintiff has not served any such targeted request for admission on this issue.  *See* **Ex. A** (Apr. 30, 2024 Email from M. Senger to J. Christensen).  Given Plaintiff's failure to follow the Court's instruction in this regard, DLA Piper should not be compelled to provide any further discovery regarding the alleged "decision-making" process that resulted in Plaintiff's salary and bonus determinations.

*DLA Piper Will Provide "Comparator" Information For Two Associates, But Should Not Be Required To Provide Plaintiff With Identifying Information For All IPT Associates In 2021–2022*

With respect to Plaintiff's request for documents and information regarding her purported "comparators," this Court instructed Plaintiff to identify two other IPT associates, and for the parties to then meet and confer about "providing some kind of information" relating to those associates' performance.  Hrg. Tr. at 13:12–14.  The Court made clear that this information should not be "broad" and that Plaintiff would *not* be permitted to conduct "a fishing expedition" into the performance of her former colleagues.  *Id.* at 14–16.

Plaintiff identified two associates to DLA Piper on Friday, April 26th, for whom she requested performance information.  DLA Piper agreed to provide for those associates: (a) copies of any/all formal performance reviews they received in 2021 and 2022; and (b) information sufficient to determine their annualized hours (billable and non-billable for which they received credit) and compensation (salary and bonus).  This information will be provided as "Confidential" pursuant to the Protective Order that has been entered in this case.  *See* ECF No. 39.

However, Plaintiff *also* requested a spreadsheet reflecting DLA Piper's "categorization of associates by class year and/or level" for all associates in the IPT Group in 2021 and 2022.  *See* Request for Production No. 6.  That request is neither reasonable nor proportional to the needs of this case, especially given this Court's prior guidance that information regarding other associates' performance need only be "basic" and should be limited to "two other associates." Hrg. Tr. at 13:12–17.  DLA Piper offered to meet and confer further with Plaintiff's counsel regarding the request for this spreadsheet, but Plaintiff's counsel has not sought to do so.  *See* **Ex. A** (Apr. 30, 2024 Email from M. Senger to J. Christensen).  DLA Piper should not be required to produce information regarding any other IPT associates, other than the two "comparator" associates who Plaintiff has identified.

# GIBSON DUNN

The Hon. Robyn F. Tarnofsky
May 1, 2024
Page 4


### *DLA Piper Should Not Be Compelled To Produce "All" Documents Regarding All Other Complaints Of Pregnancy Discrimination From Anyone At The Firm Over A Six-Year Period*

With respect to other complaints of pregnancy discrimination, this Court suggested during the April 24th teleconference that the parties should meet and confer to determine whether an agreement could be reached regarding the "production of materials relating to other complaints of pregnancy discrimination." Hrg. Tr. at 5:17–18. Plaintiff has persisted in demanding that DLA Piper produce all "relevant" documents regarding any such complaints from the five years preceding Plaintiff's employment with DLA Piper through the date of her termination—*i.e.*, from October 2016 through October 2022. *See* **Ex. A** (Apr. 30, 2024 Email from M. Senger to J. Christensen); **Ex. D** (May 1, 2024 Email from J. Christensen to M. Senger).[4] This request is not reasonable or proportional to the needs of this case. *See id.* Moreover, DLA Piper has serious privacy concerns regarding the production of information pertaining to other lawyers of the Firm, especially considering how Plaintiff and her counsel have treated confidential and attorney-client privileged information in this case to date. *See* ECF No. 32; *see also* Resp. to DLA Piper RFA No. 1 (Plaintiff admitting that she took photographs of emails labeled "PRIVILEGED ATTORNEY-CLIENT COMMUNICATION," which she provided to her counsel and produced to DLA Piper in this case); *see also, e.g.*, DLA_Mehta_00000954.

Here, Plaintiff worked for the Firm for approximately one year, and she worked exclusively in the IPT Group, which has approximately 200 lawyers. The decision to terminate Plaintiff's employment was made by Gina Durham, after consultation with Keith Medansky. *See* DLA Piper Response to Interrog. No. 10. Ms. Durham and Mr. Medansky were the ***sole*** persons responsible for the decision to terminate Ms. Mehta's employment, *see id.*, and both Ms. Durham and Mr. Medansky have been deposed in this case. To the extent that other complaints of pregnancy discrimination have any relevance here, the only conceivably relevant complaints (to the extent they exist) would be those made by other attorneys in the IPT Group and/or those that implicate Mr. Medansky or Ms. Durham. No such complaints exist, as Ms. Durham made clear at her deposition, and as DLA Piper would state in response to an appropriate interrogatory. *See generally* Durham Dep. Tr. 6:1–6. (Mr. Medansky was not asked this question during his deposition).

In fact, even though DLA Piper has approximately 1,792 attorneys in the United States, only two other attorneys aside from Plaintiff have made complaints of pregnancy discrimination between 2016 and the date of Plaintiff's termination. Both of these complaints pre-dated Plaintiff's employment with the Firm, and were resolved prior to Plaintiff beginning her employment with the Firm. Both of these complaints were raised confidentially and were resolved confidentially (and prior to the filing of an EEOC or other administrative charge). Neither involved attorneys in the IPT Group, and neither emanated from the San Francisco or New York DLA Piper offices—the only two offices where Plaintiff was ever assigned to work.

Given the above, DLA Piper maintains its objection to producing any documents reflecting other

---

[4] While Plaintiff originally sought all documents regarding any such complaints through the present, she now appears to have limited her request to the "five-year period prior to Plaintiff beginning at DLA Piper, through her termination." **Ex. D** (May 1, 2024 Email from J. Christensen to M. Senger).

# GIBSON DUNN

The Hon. Robyn F. Tarnofsky                                                               May 1, 2024
                                                                                                                                                                                                      Page 5

complaints of pregnancy discrimination in this case—much less "all" documents regarding such complaints, as there are no such documents that bear any relevance whatsoever to Plaintiff's claims. DLA Piper would be pleased to provide a sworn statement attesting to the above, but wishes to protect the confidentiality of its attorneys who chose to utilize the Firm's complaint processes, especially given the irrelevance of their complaints to this proceeding.

*<u>DLA Piper Has Produced All Nonprivileged Documents Related To The Decision To Terminate Plaintiff's Employment That Were Located After A Reasonably Diligent Search</u>*

Plaintiff also complains that she believes DLA Piper has failed to produce documents related to the decision to terminate her employment. However, as this Court already has recognized, "[n]ot every entity papers things in the same way." Hrg. Tr. at 18:12–13. DLA Piper repeatedly has represented that it has produced all nonprivileged documents related to the decision to terminate Plaintiff's employment that were located after a reasonably diligent search. It has done so. Indeed, DLA Piper now has gone even further, and agreed to voluntarily review 1,100 additional emails for potentially responsive information related to Plaintiff's termination (or any of Plaintiff's other discovery requests). Nothing more should be required.

**II.    DLA Piper Should Not Be Required To Respond To The Inappropriate, Belated Discovery That Has Been Served By Plaintiff's Counsel Over The Past Two Weeks.**

Unfortunately, rather than meaningfully engage with DLA Piper to resolve these few remaining discovery disputes, Plaintiff's counsel has spent the past two weeks serving DLA Piper and/or its employees and partners with a variety of overly broad and unduly burdensome discovery requests, all of which are untimely, in that they do not even purport to require responses until after the close of fact discovery. These requests are clearly intended to impose additional burden and cost on DLA Piper. They also seek information that already has been provided, or that is not reasonable or proportional to the needs of this case. In addition, because the requests were served long past the deadline to do so, DLA Piper should not be compelled to respond to them.

On April 17th, two and a half weeks prior to the close of fact discovery, Plaintiff's counsel served DLA Piper with her Third Supplemental Request for the Production of Documents, adding ten new document requests to the 68 that she has previously served. *See* **Ex. E** (Pls.' Third Set of Supplemental Document Requests). Just as an example, one such request demands that DLA Piper produce "all documents" that support Ms. Durham's testimony that she had an "erosion of trust" in Ms. Mehta's work, and that DLA Piper identify each such document responsive to this request "by specific Bates number." Request No. 9. Of course, DLA Piper already has produced all documents upon which it intends to rely to support Ms. Durham's view of Ms. Mehta's work. In any event, under the Federal Rules, DLA Piper's objections and responses to these Requests are not due until May 17th—two weeks after the close of fact discovery.

Plaintiff's counsel followed up these Third Supplemental Requests by serving a subpoena for documents and testimony to Bob Bratt, DLA Piper's Senior Advisor to the Global Managing Partner. *See* **Ex. F** (Apr. 17, 2024 Subpoena to B. Bratt). While styled as a Rule 45 subpoena, this subpoena seeks documents and information regarding **DLA Piper** policies—not documents and information from Mr. Bratt in his individual capacity. In other words, to the extent that

Plaintiff's counsel sought this information, she should have done so through timely submitted requests for production or through interrogatories, not through a belated third-party subpoena to Mr. Bratt. Moreover, much of the information sought from Mr. Bratt is duplicative of discovery that Plaintiff already has sought—and that DLA Piper already has provided. And of course, there is no reason to believe that Mr. Bratt has any knowledge of Plaintiff herself or the decision to terminate her employment. Plaintiff's counsel set the subpoena compliance deadline for June 5, 2024—more than a month after the close of fact discovery. DLA Piper has pointed out these deficiencies to Plaintiff's counsel, but to date, she has failed to meaningfully respond. *See, e.g.*, **Ex. G** (Apr. 29, 2024 Email from M. Senger to J. Christensen).

The belated, onerous requests from Plaintiff's counsel have continued unabated this week. On Monday, Plaintiff's counsel served two more purported Rule 45 third-party subpoenas for documents and testimony on Carissa Bouwer and Hilary Remijas—two current DLA Piper attorneys and former colleagues of Plaintiff's, neither of whom had any involvement in the decision to terminate Plaintiff's employment. *See* **Ex. H** (Apr. 29, 2024 Subpoenas to C. Bouwer and H. Remijas). These subpoenas seek, among other things, any communications that these two individuals had "via [their] DLA Piper email address, that involve, reference or relate to the allegations in the Complaint." *Id.* Of course, such communications belong to DLA Piper—not to these attorneys in their individual capacities. And these communications could have been sought—and indeed, are currently being sought—by Plaintiff through her belated requests to DLA Piper for Ms. Remijas to be added as an ESI custodian, and for ESI search terms to be applied to both Ms. Remijas's and Ms. Bouwer's email. These subpoenas purport to require the production of documents by May 29th, and to notice Ms. Bouwer's deposition for May 13th and Ms. Remijas's deposition for May 15th. Of course, all of these dates are after the current close of fact discovery.[5]

In addition to these two subpoenas, Plaintiff's counsel also served DLA Piper with a set of 79 Requests for Admission on Monday, which include requests to "admit" characterizations of various witnesses' deposition testimony, *see, e.g.*, Request No. 17 (asking DLA Piper to "[a]dmit that Mr. Medansky testified that Ms. Mehta was 'transitioned,' not fired"), to "admit" characterizations of DLA Piper's document production in this case, *see, e.g.*, Request No. 67 (asking DLA Piper to "[a]dmit that Defendant produced no records showing that Mr. Medansky reduced the hourly rates for Ms. Mehta"), and to "admit" that every document produced by DLA Piper throughout discovery is "admissible into evidence," Request No. 79.

Enough is enough. This is a single-plaintiff case, in which discovery has been ongoing since November 2023. Plaintiff and her counsel had 4.5 months in which to serve discovery and take depositions as they saw fit. They should not be permitted to serve additional requests for production and requests for admission with less than thirty days before the close of fact discovery, nor should they be permitted to attempt to seek through third-party subpoenas and alleged "third-party" depositions what it is too late for them to seek through direct discovery.

---

[5] To be clear, Plaintiff's eleventh-hour deposition notices were not prompted by recently-produced evidence. None of the witnesses deposed have suggested that either Ms. Bouwer or Ms. Remijas has any insight into the decision to terminate Plaintiff's employment.

# GIBSON DUNN

The Hon. Robyn F. Tarnofsky

May 1, 2024
Page 7

DLA Piper therefore respectfully requests that the Court adopt DLA Piper's proposals with respect to the various discovery issues that Plaintiff timely raised to the Court, as outlined above.  DLA Piper further respectfully requests that it be provided with an additional 1.5 weeks—up to and including **May 15th**—to produce documents and information responsive to the requests about which the parties were ordered to meet and confer.  Finally, DLA Piper respectfully requests that Plaintiff not be permitted to serve further fact discovery on DLA Piper or its partners or employees absent permission from this Court, and that DLA Piper not be compelled to respond to the belated Third Supplemental Requests for Production, Requests for Admission, and "third-party" subpoenas of DLA Piper management employees that Plaintiff failed to timely serve.

We look forward to discussing these issues with you during the conference tomorrow.

Thank you for the Court's time and attention to this matter.

Respectfully submitted,

*Molly Senger*

Molly T. Senger