

**Jeanne M. Christensen**
jchristensen@wigdorlaw.com

May 1, 2024

**VIA ECF**

The Honorable Robyn F. Tarnofsky
U.S. District Court for the Southern District of New York
500 Pearl Street, Courtroom 9B
New York, NY 10007

Re: Anisha Mehta v. DLP Piper LLP; Case No.: 1:23-cv-04757 (AT) (RFT)

Dear Judge Tarnofsky,

We represent Plaintiff Anisha Mehta ("Plaintiff" or "Mehta") in the above-captioned matter against Defendant DLA Piper LLP ("DLA"). We write pursuant to Your Honor's April 24, 2024 Order for the Parties to submit letters to the Court about the remaining discovery disputes in this matter and our proposal for a discovery extension.

## I. OVERVIEW OF ACTION

This action was commenced on June 6, 2023. Dkt. No 1. The case involves a single plaintiff-employee against a single defendant-employer. Plaintiff, a 2105 law school graduate was hired as a sixth-year associate into DLA's Intellectual Property & Technology Group ("IPT"). She alleges that DLA unlawfully terminated her based on her pregnancy status and anticipated paid leave of 18-weeks. Plaintiff started on October 18, 2021. On October 4, 2022, she learned she was fired. DLA told her to keep working which she did until October 13, 2022, when her access was cut-off. This was three business days before her 12-month anniversary. Her claims of pregnancy related discrimination and retaliation are asserted under Title VII and the New York State and City Human Rights Law. She also asserts a claim for interference pursuant to the Family and Medical Leave Act ("FMLA"). On July 21, 2023, DLA filed its answer to the complaint. Dkt. No. 16. A Court ordered mediation session was held on October 16, 2023, but was not successful. Dkt. No. 27.

## II. OUTSTANDING DISCOVERY DISPUTES

### A. DLA's Redactions to Documents

Going forward, we agree with DLA that any future emails should be produced without attachments. This will eliminate the need for a substantial number of unnecessary pages and redactions. In the event an email appears to have a relevant attachment, Plaintiff can notify DLA and the parties can discuss the specific email.



Further to the redacted document examples Plaintiff submitted on April 29, 2024, while Plaintiff understands that redactions require additional work, DLA is in the business of providing legal advice. Plaintiff is entitled to the protection of the anti-discrimination laws just like any other employee and the status of being a lawyer does not entitle DLA to produce less than other employers must produce. Yet this is essentially DLA's argument. It wants to deny Plaintiff the information she needs because confidentiality requires extra work. DLA had options when it made its redactions, yet it never even asked Plaintiff's counsel for input on the process – it simply went ahead and did it and then claimed that anything more was too burdensome. As for as options, DLA was in possession of the Complaint filed in this action. The 19 companies in the Complaint were referred to anonymously using "Client A" through "Client S." DLA easily could have created a similar process for the redactions in discovery. Instead, it completely redacted the names and never created a privilege log to identify the companies in the thousands of pages of emails.[1]

DLA repeatedly says Plaintiff "should know" who says what in the emails and what they are about for thousands of pages. It is Plaintiff's counsel not Plaintiff, asking questions at depositions and showing documents to witnesses – DLA is essentially saying that Plaintiff and her lawyers are the individuals who should guess at whose names are redacted in the thousands of pages and create their own internal index for figuring it out, without being able to refer to a privilege log. There is simply no basis for not having created a privilege log to, at a minimum, identify the finite number of companies redacted throughout the production.

Also in the Complaint, in-house lawyers for companies whose names were redacted, were referred to "John Doe 1," John Doe 2," and "Jane Doe 1." Plaintiff did not disclose any names and DLA similarly could do this for the emails it produced. It is extremely difficult and at times impossible, to understand the nuanced references about Plaintiff's work that DLA claims is "obvious." We respectfully disagree. We do not know which emails are related to specific assignments, for which client, and who is writing what, in many of the emails. There must be a way to refer to the people in the "to" and "from" lines in produced emails as well as disclosing the full subject matter in the reference lines of emails – it is the only way to have a chance at actually using these emails in the litigation. Thus, at a minimum we request that DLA assign identifiers for all to/from and reference lines in emails.

Had DLA asked us about attachments, we would have agreed to eliminate production of attachments until Plaintiff could review the emails and then meet and confer as to what if any emails needed to be produced with attachments. For the thousands of pages thus far, it appears

---

[1] DLA believes that Plaintiff cannot say the name of a company for whom she performed work for at DLA. Stating the fact that "x" is a company for whom Plaintiff worked for is not a confidentiality breach. Plaintiff used "Client A" in the Complaint only because DLA threatened her after the EEOC filings. DLA also could have marked everything attorney's eyes only with client names for added protection.



that only <u>one email chain</u> involving a draft summary judgment motion by Carissa Bouwer and Plaintiff appears to have been necessary to produce. We were not asked.

We strongly encouraged DLA to propose other suggestions to Plaintiff regarding the excessive redactions. The parties will continue to discuss this issue before tomorrow's conference with the Court.

**B. <u>ESI and Production for Other Custodians</u>**

**i. Recent Progress on Search Terms for Mehta, Durham, Medansky and Dunn**

Last Thursday evening, April 25, 2024, Plaintiff received DLA's search terms. <u>See</u> Ex. 1. Over the weekend, Plaintiff proposed additional search terms for Plaintiff, Gina Durham ("Durham"), Keith Medansky ("Medansky") and Heather Dunn ("Dunn"). Plaintiff believes that the parties have made meaningful progress in agreeing to new search terms for these individuals and Plaintiff does not anticipate needing the Court's intervention for ESI regarding them. We agree that any future emails should be searched but all attachments excluded, which will eliminate unnecessary production. Although Plaintiff did not know that DLA searched emails of partners Tamar Duvdevani and Cara Edwards until last week, we do not consider them to be custodians with potentially relevant information outside of the emails referencing Plaintiff's pregnancy which have been produced already. As such, Plaintiff does not seek any further searches from these individuals' emails.

**ii. Inability to Craft Search Terms about Nuanced Work Feedback**

We understand that as a law firm employer, DLA has an obligation to protect client confidences, but its position that it is necessary to severely restrict the number of custodians for relevant information is unpersuasive. DLA wants to deny Plaintiff relevant discovery because of the number of redactions DLA must make to emails to keep client confidences, but DLA has used this to unreasonably restrict the field of custodians and the scope of what information Plaintiff is entitled to seek to support her claims, such as communications with other partners and information about similarly situated associates in IPT. Meanwhile, DLA has spent extensive time looking at each email one by one, without regard to any search terms, to find the perfect emails to produce to show that Plaintiff's work was subpar.

DLA is a law firm with 500+ employees. Plaintiff worked with more than 60 different partners, plus numerous associates. Restricting custodians to such a narrow degree as in this case – four people including the Plaintiff, is unreasonable. <u>See</u> Ex. 1. DLA's initial search terms and custodian list (with restricted time limits of mere weeks on certain topics) was a total of <u>three</u>



partners in IPT (Durham, Medansky and Dunn) who were the three responsible for hiring Plaintiff.[2]

DLA's counsel told the Court that Plaintiff performed almost all of her work for Durham, Medansky and Dunn and therefore only their emails needed to be searched. This is not accurate as several partners billed for work far in excess of what Dunn billed for Plaintiff's work. DLA refused to even consider producing documents and information for these other partners until last week's conference. DLA's declaration that the only relevant people are Durham, Medansky and Dunn also eliminated the junior partner that worked for Durham, Blake Jackson, as well as Carissa Bouwer, a lawyer with more than 10 years of experience who works for Durham. Both of these lawyers regularly assigned tasks to Plaintiff and their email communications would include substantive work and include drafts and edits to assigned work. No documents or emails for these lawyers were searched.

DLA similarly eliminated Hilary Remijas as a custodian even though as a lawyer with more than 15 years' experience, who works for Medansky, she also emailed extensively with Plaintiff on a daily basis about substantive work, including drafts and edits to assigned work. Plaintiff was assigned multiple client matters by Medansky that had previously been assigned to a lawyer who left DLA named Nicole Chaudari, yet DLA produced no information about Chaudari. Notably, Plaintiff was assigned dozens of Chaudari's files by Medansky and expected to handle them even though Chaudari has more than 15 years' experience. Given that DLA claims Mehta was a poor performer, information about her performance on Chaudhari's former files is highly relevant. There is no reasonable basis for DLA to refuse to produce documents for her or anyone other than Durham, Medansky and Dunn, except its argument that it is burdensome. Importantly, the prejudice to Plaintiff based on such an argument is demonstrated from the review DLA has actually performed being the sole keeper of all relevant emails and documents. DLA is withholding information that Plaintiff needs to have a chance at leveling the field in this litigation.

**iii. Nuanced Nature of Performance Feedback in Emails**

As addressed in our April 16, 2024 letter and discussed at the conference, because DLA has no performance review for Plaintiff and never sent her any emails or documents specific to her performance, it has relied exclusively on emails that DLA believes shows that a partner was dissatisfied with Plaintiff's work. The specific work product as told to Plaintiff on October 4, 2022 when she was fired, was about two examples of poor performance. DLA's EEOC position statement attached these two examples of performance, as well as a third. All three examples are in the form of emails. We attach them here[3] so that the Court can see how difficult it would be to craft search terms that would pick up any such nuanced examples of work quality. Words such as

---

[2] As mentioned *supra*, DLA conducted a highly limited search for two other partners Tamar Duvdevani and Cara Edwards. Plaintiff never performed any work for these partners and Plaintiff added no additional search terms regarding either of them. Neither will be deposed in this action.

[3] Attached as Exs. 2, 3 and 4.



feedback, performance, good, bad, wrong, correct, for example, are not used. These three emails show how difficult search terms are in this regard.

This is why what DLA has done, however, is grossly unfair. As counsel for DLA has admitted, they have looked for any documents or emails that show Plaintiff's poor performance – including anything outside of the search terms. A simple look at Exhibit 1 as compared to Exhibits 2-4 shows that these were produced without regard to any searchable terms. It is inherently an unfair advantage that DLA has over the Plaintiff in this case because it can review all emails for nuanced content about performance while Plaintiff is greatly constricted by search terms, custodians and time frame. As the employer and in possession of all relevant evidence regarding her employment, DLA carefully looked through all emails sent to or from Plaintiff to find every possible example of something that shows Plaintiff did something "wrong." Counsel for DLA has admitted doing exactly this, saying that "I'm not sure I understand your concern here. As a threshold matter, DLA Piper is entitled to produce documents that support its affirmative defenses in this case, even if those documents were not located using ESI search terms." Only after we received the search terms recently received were we able to discern that many of the emails produced showing partner dissatisfaction with Plaintiff's work did not match a single search term. This is outrageous given DLA's defense of poor performance and the nature of the proof available to DLA but not to Plaintiff.

This is why Plaintiff asked for production of emails between these same partners, Durham, Medansky and Dunn, and other associates who regularly worked with Mehta such as Carissa Bouwer, Hilary Remijas, Angela Li, and others. Only DLA has access to these emails. Plaintiff cannot offer examples of emails between Durham and Carissa Bouwer, for example, where Durham asks her for more research, comments about missing an issue, makes extensive edits on a draft or instructs her to add or delete substantive issues. To suggest that partners do not write emails like this to other associates and Plaintiff was the sole associate who received such feedback is meritless. Yet if DLA can present email evidence to the finders of fact showing disappointment or what looks to be negative feedback in the form of excessive redlines only about Plaintiff and Plaintiff has no ability to counter such evidence and place it in context, Plaintiff will be greatly prejudiced in the pursuit of her claims.

For this reason, it is imperative that DLA produces more information about the performance reviews given to the other relevant associates, specifically and at a minimum, associates Nicole Chaudari, Carissa Bouwer, Hilary Remijas, Angela Li, Jordan Chisek and Eugenia Schontag – who all worked for Durham and Medansky while Plaintiff was employed and who all had at least three or more years of work experience at the time. The Court ordered that Plaintiff was entitled to two associates only, and she told counsel for DLA that she selected Carissa Bouwer and Angela Li; however, given the extremely difficult if not impossible ability to craft search terms to capture relevant information about feedback to other similarly situated associates, we believe production of performance reviews for 2021 and 2022 for additional associates is entirely reasonable.



For this same reason, we believe it is reasonable and proportionate to seek all emails between Plaintiff and at least five other partners who she performed work for. She was there less than a year and attempting to craft search terms that would yield relevant information is unlikely.[4] Meanwhile, DLA is in possession of all the emails and free to select what it wants to use or not – as it has done thus far.[5]

Subsequent to the April 24, 2024 discovery conference, Plaintiff provided the names of the five partners for whom we requested communications be produced. Given DLA's representation that Plaintiff hardly worked for any partners other than Durham, Medansky and Dunn, there should be very limited communications or documents directly between Mehta and the five partners Plaintiff identified: Matt Gruenberg, Craig Lang, Tim Lowry, David Mendelson, and Mark Radcliffe. The requests are, of course, limited to a very discrete time period from October 18, 2021 to October 14, 2022. Given this limited universe, Plaintiff requested all emails to/from the custodians during that time period. DLA has refused. Instead, on April 30, 2024, DLA said that *they agreed to review all email*s to/from Ms. Mehta and the selected partners and produce responsive documents. Once again, a dramatically unfair advantage is being given to DLA. Plaintiff continues to be concerned that without knowledge of the universe of documents at issue for all custodians, Plaintiff cannot determine whether an adequate search was performed, nor can Plaintiff determine whether it would be burdensome to DLA to produce additional documents. Plaintiff requested a hit report, but DLA has not yet responded. The parties will endeavor to discuss prior to tomorrow's conference.

### C. Status of Plaintiff's Noticed Depositions

Plaintiff has completed four depositions and has noticed three additional depositions and requested documents. Notice for these depositions were sent on April 17, 2024 (to Bob Bratt), and on April 29, 2024 (to Hilary Remijas and Carissa Bouwer). For all depositions, we agreed to work with the deponent's schedule and conduct the deposition via Zoom. We anticipate the need to take several more depositions once additional document discovery is received from DLA.

With respect to Mr. Bratt, DLA argued that Mr. Bob Bratt is not the appropriate deponent for the information being sought and that discovery requests would suffice. For several of the issues, Plaintiff asked DLA to identify the appropriate deponent to discuss the requests identified on the

---

4 Based on the single document DLA produced about Plaintiff's work for other partners, excel 00009779, it appears that that these partners billed at least the following approximate amounts for Plaintiff's work during the eleven months she was there (Tim Lowry $2800; Craig Lang $12,300; Mark Radcliffe $15,200; Matt Gruenberg $40,270; David Mendelsohn $92,660). According to this document, others billed meaningful amounts, such as partner Richard Greenstein who billed Plaintiff's work in the amount of $59,000. Plaintiff is entitled to production of her emails with the five partners she requested without DLA limiting the production.

5 Plaintiff can provide numerous examples of such production if the Court requests to see other emails.



subpoena. We have not yet received a response. Plaintiff remains understandably concerned that such discovery requests will be objected to and a deposition on those issues will still be required but is willing to work through the process to the extent possible.

For other issues identified in Mr. Bratt's subpoena, Plaintiff agreed to serve additional requests to determine whether an alternative deposition is unnecessary. In particular, subsequent to the April 24, 2024 court conference, DLA provided clarification on the issue between associate "class year" and "level" as that term was used by partners deposed to date. This clarification was provided yesterday afternoon and, therefore, by tomorrow, Plaintiff will issue specific requests for admission. We believe this will avoid further discovery disputes on the topic.

**D. <u>Status of Plaintiff's Discovery Requests</u>**

On December 5, 2023, Plaintiff propounded her first set of discovery requests to DLA that included 57 document requests and 26 interrogatories; on February 20, 2024, Plaintiff served 30 additional requests in her first supplemental document requests; on April 2, 2024, Plaintiff served an additional 11 requests in her second supplemental document requests; and on April 17, 2024, Plaintiff served an additional 10 requests in her third supplemental document requests. In addition, on April 29, 2024, Plaintiff sent 79 Requests for Admission. Plaintiff also sent DLA deficiency letters on March 5, 2024 and April 3, 2024.

DLA's responses to the second and third supplemental discovery requests are due on May 2, 2024 and May 17, 2024 respectively, while DLA's responses to the Requests for Admission are due on May 29, 2024. Based on prior responses by DLA, Plaintiff anticipates that an additional deficiency letter will be required.

Unfortunately, there remain numerous deficiencies in DLA's production. By way of example only, on March 21, 2024, DLA responded to Plaintiff's first supplemental requests for production of documents. It agreed to produce the following: (1) documents sufficient to show the names of non-partner attorneys who worked on matters led by Medansky from October 18, 2021 to October 21, 2022; (2) documents showing that Medansky assigned work to Plaintiff because no other associates were available, as he testified to; (3) documents showing how Medansky learned that Plaintiff was fired; (4) emails between Durham and Medanksy regarding Plaintiff's availability to take on additional work; (5) emails between Medanksy and Durham regarding the quality of Plaintiff's work; (6) documents showing the identities of the 5-10 lawyers on Medanksy's team, as he testified to; and (7) documents showing that Medanksy and Durham discussed Plaintiff's termination; documents showing that Medanksy assigned work to Plaintiff because no other associates were available, as he testified.

DLA produced additional documents with their responses, but none of the documents were responsive to any of the requests identified above. Indeed, DLA produced responsive documents for only 3 of the 30 supplemental document requests. It also gave repeated responses such as to



Request No. 13, "subject to and without waiving the foregoing objections, DLA Piper already has produced documents responsive to this Request, including but not limited to at Bates Nos. DLA_Mehta_00000206 and DLA_Mehta_00009388." This is a reference to 9182 pages of production, almost its entire production.

DLA has not produced any additional documents to date. In addition, for the vast majority of the responses, DLA included language that it "will produce non-privileged documents located after a reasonably diligent search that are responsive to this Request, to the extent such documents exist and have not already been produced." This type of qualifying language knowingly makes it impossible for Plaintiff to determine whether DLA actually intends to produce responsive documents, in addition to making it impossible for Plaintiff to determine whether any documents are being improperly withheld based on an objection. As such, Plaintiff anticipates at a future date, having to issue RFAs to force DLA to admit that it will not produce anything further to numerous requests.

**E. Prior Pregnancy Discrimination Complaints**

During the April 24, 2024, Court conference, Your Honor stated the following:

> In terms of complaints of pregnancy discrimination though, I do think that you are entitled to more. I, you know, take the point by defendants that perhaps the way the request is crafted, it's asking for more than would be proportionate, given the nature of the case. But if there are other claims of pregnancy discrimination by associates at this law firm in a relevant period of time, she should get those.

Despite this clear order, DLA has continued to refuse to produce any of the complaints and has expressed that DLA does not understand precisely what Plaintiff is seeking. This should not be controversial. These requests are routine in discrimination cases. Plaintiff has only requested complaints made in the 5-year period prior to Plaintiff's employment through her employment period. This is narrow and entirely reasonable. *See Harris v. Bronx Parent Hous. Network, Inc.*, 18 Civ. 11681 (GBD) (SN), 2020 WL 763740, at *4 (S.D.N.Y. 2020), citing *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 204 (2d Cir. 2014) ("Evidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive."). Plaintiff included six relevant cases in its letter to DLA on April 3, 2024 regarding this specific issue. DLA claims that to the extent the complaints have any relevance, the "only conceivably relevant complaints would be those made by other attorneys in the IPT group." Plaintiff reminded DLA that the Court ordered production regarding "associates at the law firm."

To the extent DLA could not understand the Request, Plaintiff explained that claims of retaliation regarding pregnancy status are inherently included in such a request, that the words "pregnancy

discrimination" do not have to be used by an employee to render it a complaint about pregnancy discrimination or retaliation, the complaints do not have to be written, and that any documents the firm has regarding such complaints made to any municipal, state or federal agency that handles discrimination claims during this time frame are responsive. DLA has not yet responded.

## III. DLA ISSUED IMPROPER SUBPOENAS

### A. Former Employer and Legal Placement Agency Subpoenas

On April 23, 2024, DLA served notice of subpoenas on four of Mehta's former employers going back to Mehta's first employer after graduating from law school in 2015.

All four of the former employer subpoenas seek identical information including: (1) all documents concerning the application and hiring of Ms. Mehta including any documents completed or submitted by Mehta in connection with seeking employment, including but not limited to (a) any employment applications or resumes, or any pre-employment or pre-engagement documents completed by Mehta; (b) any documents concerning the employer's decision to hire, accept, or reject Mehta's employment application; (c) any documents concerning any position or engagement, including the duties and responsibilities associated with that position or engagement, offered to Mehta; (d) any documents constituting Mehta's acceptance or rejection of any offer of employment made by the employer; (e) any employment contracts or agreements provided to Mehta or completed or submitted by Mehta relating to her employment; and (f) any contracts or agreements between Mehta and the employer or any of its officers, directors, agents or employees; (2) documents sufficient to demonstrate the terms and conditions of Mehta's employment, including but not limited to documents sufficient to demonstrate the duties and responsibilities associated with the position Mehta occupied; (3) copies of any and all formal performance reviews or evaluations of Mehta during her employment; (4) copies of any and all warnings, disciplinary actions, or similar documentation related to any performance issues or misconduct by Mehta; and (5) documents sufficient to demonstrate the reason for Mehta's separation, including, if applicable, termination notices, resignation letters, or severance or separation agreements.

None of the information requested has any bearing on whether DLA discriminated against Mehta. DLA hired Mehta after an extensive search conducted by highly regarded recruiters. Numerous interviews of Mehta were conducted by DLA and her references and past work history was available for DLA to inquire about it and obtain information. Now that she has filed a claim, DLA believes it is entitled to go back in time to find out if she "really" was a good candidate or not. Such discovery if allowed is to harass and bully Mehta and information obtained highly prejudicial if even admissible to a finder of fact. As such this is a waste of recourses and will do nothing except create more discovery disputes. Courts routinely prohibit defendants from subpoenaing former employers because it is irrelevant, harassing, damaging, and prejudicial. *See e.g. Vuona v. Merrill Lynch & Co.*, No. 10 Civ. 6529 (PAE), 2011 WL 5553709 (S.D.N.Y. Nov. 15 2011) (in an employment dispute, quashing subpoena seeking records on former employers); *Henry v. Morgan's Hotel Grp., Inc.*, No. 15 Civ. 1789 (ER) (JLC), 2016 WL 303114 (S.D.N.Y. Jan. 25,



2016); *Walker v. H&M Henner & Mauritz, L.P.*, No. 16 Civ. 3818 (JLC), 2016 WL 4742334 (S.D.N.Y. Sept. 12, 2016) (quashing subpoena seeking records on former employers).

In *Vuona*, an employment discrimination action, the employer-defendant subpoenaed the plaintiffs' records from a former employer on the basis that the plaintiffs had "asserted they were successful at other financial institutions." *Vuona*, 2011 WL 5553709 at *8. The court stated:

> The Court is completely unconvinced that these documents are relevant to this dispute . . . An employee's performance evaluations at one job and work environment may, or may not, bear on his or her success at a future job. Simply put, the issue here is whether [defendant's] decision-making as to Plaintiffs was based on valid considerations or was influenced by gender bias. On the record before the Court, Plaintiffs' work histories have nothing to do with that. And any peripheral relevance the requested documents might conceivably have is decisively outweighed by the potential for harassment or reputational injury presented by a subpoena to such a former employer. [DLA's] request to subpoena documents from Plaintiffs' prior employers is, therefore, denied in its entirety.

*See also Henry*, 2016 WL 303114 at *2 ("[plaintiff] has been prejudiced by the issuance of these subpoenas to the three former employers. . . If [he] were to seek employment at any of these [employers] his application to any of them. . . might well be adversely affected by the fact that his records had been subpoenaed in this lawsuit. This concern is even more pronounced here given that DLA also subpoenaed the legal placement agency that Plaintiff worked with post-employment with DLA and may continue working with in the future. As a result, any marginal relevance, if any, is outweighed by the potential "harassment or reputational injury" posed by the issuance of the subpoenas. *Vuona*, 2011 WL 5553709 at *9 (concluding that the "peripheral relevance the requested documents…[wa]s decisively outweighed by the potential for harassment or reputational injury presented by a subpoena to…a former employer"); *see also Gambale v. Deutsche Bank AG*, No. 02 Civ. 4791, 2003 WL 115221, at *2 (S.D.N.Y. Jan. 10, 2003) (granting motion to quash because the Rule 45 subpoenas served on executive search firms with which plaintiff worked before and after her termination because such discovery "would subject plaintiff to necessary annoyance and embarrassment within the meaning of Rule 26(c)").

**B. <u>Subpoenas on Ms. Mehta's Husband and His Former Company</u>**

DLA recently noticed a subpoena to testify to Mehta's husband, Shrey Gosalia ("Mr. Gosalia"), and a subpoena *duces tecum* on his former company, Docket Technologies, Inc. As an initial matter, it is unclear what information DLA is seeking from Mr. Gosalia. With respect to the subpoena to testify, Mr. Gosalia is not implicated in the allegations of pregnancy discrimination or DLA's stated defense that Ms. Mehta was an alleged poor performer. Further, DLA has not propounded any discovery requests related to Mr. Gosalia's knowledge of any issue in this matter other than issuing a Request for Admission to confirm his email address.



With respect to the subpoena duces tecum for Mr. Gosalia's former company, the requests are again shockingly overbroad and completely irrelevant. First, the requests improperly ask for "any and all documents concerning Mehta." This is wildly improper. In addition, Ms. Mehta already testified to, responded to requests, and produced documentation related to her role at Docket Technologies, Inc., including that she had an unpaid advisory position and never received any financial compensation, did not receive any benefits (other than health insurance as a dependent through her husband's coverage), and that the Company has since wound down. Yet, in addition to the overall request for every single document related to Ms. Mehta, the specific requests in the subpoena also include: (1) all documents concerning any financial compensation or benefits received; (2) all documents related to any benefits that were offered or provided to her; (3) all documents concerning her performance; (4) all documents concerning her separation. The fact that DLA issued a subpoena to a non-party spouse despite having ample opportunity to and actually obtaining the requested information through the discovery process simply confirms that DLA is using the subpoena for an improper purpose. *See*, e.g., *Alcon Vision, LLC v. Allied Vision Grp., Inc.*, No. 19 Misc. 384 (AT), 2019 WL 4242040, at *2 (S.D.N.Y. Sept. 6, 2019) (quashing non-party subpoena where "the party seeking discovery has ample opportunity to obtain the information by discovery in the action."); *Ameritox, Ltd. v. Millennium Labs, Inc.*, No. 12 Civ. 7493, 2012 WL 6568226, at *2–3 (N.D. Ill. Dec. 14, 2012) (granting a motion to quash nonparty subpoena "because the requests are cumulative and duplicative of discovery requests made to the party to the litigation").

As a result, Plaintiff intends to move to quash all of the non-party subpoenas DLA has noticed.

**C. <u>Proposed Discovery Extension</u>**

Given that extent of the discovery disputes and discovery that still must be completed, Plaintiff believes that the Parties will require at least 90 days to complete fact discovery.

Should you have any questions, please do not hesitate to contact us. We thank the Court for its time and attention to this matter.

Respectfully submitted,

Jeanne Christensen

Jeanne M. Christensen