UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANISHA MEHTA,

|  | x |  |
|---|---|---|
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | Case No. 1:23-cv-04757-AT |
| | : | |
| | : | |
| DLA PIPER LLP, | : | |
| | : | |
| | : | |
| | : | |
| | x | |
| Defendant. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## <u>DEFENDANT DLA PIPER LLP (US)'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

    I.    Mehta's Performance Falls Short Of Expectations "From the Very Beginning" ...................................................................................................... 3

    II.    Shortly After Joining The Firm, Mehta Receives Generous Compensation Increases And Bonuses—None Of Which Were Based On Her Performance ............................................................................................... 7

    III.    Mehta Announces Her Pregnancy—And The Response Is Uniformly Positive ...................................................................................................... 8

    IV.    Mehta's Performance Problems Continue Unabated ................................ 9

    V.    Durham Terminates Mehta's Employment Because of Her Performance Issues ........................................................................................................... 12

    VI.    Mehta Steals Thousands Of DLA Piper's Privileged And Confidential Documents ................................................................................................. 13

LEGAL STANDARD .................................................................................................... 14

ARGUMENT .................................................................................................................. 14

    I.    Mehta Cannot Prove That Her Termination Was Discriminatory ...................... 14

        A.    DLA Piper Terminated Mehta's Employment For A Legitimate, Nondiscriminatory Reason—She Was A "Shockingly Poor" Performer ....................................................................................... 17

        B.    There Is No Evidence That DLA Piper's Justification For Mehta's Termination Was Pretextual Or That Her Pregnancy Was A Motivating Factor ................................................................ 18

    II.    Mehta Cannot Establish A Prima Facie Case That Her Termination Was Retaliatory Under Title VII, NYSHRL, Or NYCHRL ........................................ 24

    III.    Mehta Cannot Prove That Her Termination Was Related To Her Intent To Take FMLA Leave ................................................................................. 25

        A.    DLA Piper Did Not Interfere With Mehta's FMLA Rights ..................... 26

        B.    DLA Piper Did Not Terminate Mehta's Employment In Retaliation For Her Intent To Take FMLA Leave ...................................... 27

    IV.    DLA Is Entitled To Summary Judgment On Mehta's Claims For Reinstatement And Front-Pay, And Any Claims For Back-Pay Beyond January 4, 2024 ......................................................................................... 30

CONCLUSION .............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Bart v. Golub Corp.*,
  96 F.4th 566 (2d Cir. 2024) ...................................................................................18

*Beers v. NYNEX Material Enterprises Co.*,
  1992 WL 8299 (S.D.N.Y. Jan. 13, 1992) .............................................................19

*Bentley v. AutoZoners, LLC*,
  935 F.3d 76 (2d Cir. 2019)....................................................................................24

*Boston v. McFadden Publ'g*,
  2010 WL 3785541 (S.D.N.Y. Sept. 29, 2010).......................................................19

*Brown v. City of N.Y.*,
  622 F. App'x 19 (2d Cir. 2015) .............................................................................16

*Di Giovanna v. Beth Israel Med. Ctr.*,
  651 F. Supp. 2d 193 (S.D.N.Y. 2009)..............................................................28, 29

*E.E.O.C. v. Bloomberg L.P.*,
  967 F. Supp. 2d 816 (S.D.N.Y. 2013)....................................................................14

*Emanuel v. Oliver, Wyman & Co., LLC*,
  85 F. Supp. 2d 321 (S.D.N.Y. 2000)......................................................................20

*Fitzgerald v. We Co.*,
  2022 WL 952963 (S.D.N.Y. Mar. 30, 2022) (Torres, J.) .....................................29

*Fleming v. MaxMara USA, Inc.*,
  371 F. App'x 115 (2d Cir. 2010) ...........................................................................22

*Forde v. Beth Israel Med. Ctr.*,
  546 F. Supp. 2d 142 (S.D.N.Y. 2008)...............................................................16, 18

*Forte v. Liquidnet Holdings, Inc.*,
  2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015)........................................................19

*Gambello v. Time Warner Commc'ns, Inc.*,
  186 F. Supp. 2d 209 (E.D.N.Y. 2002) ...................................................................21

*Golden Pac. Bancorp v. F.D.I.C.*,
  375 F.3d 196 (2d Cir. 2004)...................................................................................15

*Golden v. Syracuse Reg'l Airport Auth.*,
  2024 WL 4116427 (2d Cir. Sept. 9, 2024) ............................................................24

*Goonewardena v. N.Y. State Workers' Comp. Bd.*,
  788 F. App'x 779 (2d Cir. 2019) ...........................................................................21

*Govori v. Goat Fifty, L.L.C.*,
  519 F. App'x 732 (2d Cir. 2013) ......................................................................18, 21

*Greene v. Coach, Inc.*,
  218 F. Supp. 2d 404 (S.D.N.Y. 2002)....................................................................30

*Griffin v. Ambika Corp.*,
  103 F. Supp. 2d 297 (S.D.N.Y. 2000)....................................................................21

*Hall v. Urban Assembly, Inc.*,
  2022 WL 19708 (S.D.N.Y. Jan. 3, 2022) ..............................................................26

*Hardekopf v. Sid Wainer & Son*,
  2004 WL 2199502 (S.D.N.Y. Sept. 29, 2004).................................................18, 21

*Iverson v. Verizon Commc'ns*,
  2009 WL 3334796 (S.D.N.Y. Oct. 13, 2009) ........................................................20

*James v. N.Y. Racing Ass'n*,
  233 F.3d 149 (2d Cir. 2000)..................................................................................17

*Lambert v. McCann Erickson*,
  543 F. Supp. 2d 265 (S.D.N.Y. 2008)....................................................................22

*Larkin-Gallagher v. Champlain Valley Physicians Hosp. Med. Ctr.*,
  2020 WL 7061022 (N.D.N.Y. Dec. 2, 2020)..........................................................27

*Lievre v. JRM Construction Mgmt., LLC*,
  2019 WL 4572777 (S.D.N.Y. Sept. 20, 2019)........................................................26

*Lipton v. Nature Co.*,
  71 F.3d 464 (2d Cir. 1995)....................................................................................18

*Mattera v. JPMorgan Chase Corp.*,
  740 F. Supp. 2d 561 (S.D.N.Y. 2010)....................................................................20

*McKennon v. Nashville Banner Publ'g Co.*,
  513 U.S. 352 (1995)..............................................................................................30

*Mercado v. Mount Sinai Beth Israel*,
  2023 WL 5975322 (S.D.N.Y. Sept. 14, 2023)........................................................24

*Pearson v. Unification Theological Seminary*,
  785 F. Supp. 2d 141 (S.D.N.Y. 2011)....................................................................27

*Peters v. Mount Sinai Hosp.*,
  2010 WL 1372686 (S.D.N.Y. Mar. 30, 2010) ...................................................2, 23

*Potash v. Fla. Union Free Sch. Dist.*,
  972 F. Supp. 2d 557 (S.D.N.Y. 2013)....................................................................17

*Reichman v. City of N.Y.*,
  179 A.D.3d 1115 (N.Y. App. Div. 2020) ...............................................................24

*Rinsler v. Sony Pictures Ent., Inc.*,
  2003 WL 22015434 (S.D.N.Y. Aug. 25, 2003).......................................................16

iii

*Shah v. Eclipsys Corp.*,
  2010 WL 2710618 (E.D.N.Y. July 7, 2010) .................................................................28

*Shimanova v. TheraCare of N.Y., Inc.*,
  2017 WL 980342 (S.D.N.Y. Mar. 10, 2017) ................................................................29

*Sista v. CDC Ixis N. Am., Inc.*,
  445 F.3d 161 (2d Cir. 2006) .................................................................................25, 29

*Soderberg v. Gunther Int'l, Inc.*,
  124 F. App'x 30 (2d Cir. 2005) .................................................................................22

*Stinson v. Morningstar Credit Ratings, LLC*,
  2024 WL 3848515 (S.D.N.Y. Aug. 16, 2024) ............................................................23

*Taylor v. Polygram Records*,
  1999 WL 124456 (S.D.N.Y. Mar. 8, 1999) ...............................................................22

*Tieu v. N.Y.C. Economic Dev. Corp.*,
  --- F. Supp. 3d ----, 2024 WL 580063 (S.D.N.Y. Feb. 13, 2024) ...................2, 14, 15, 17, 22,
  24, 25, 26, 27, 28

*Tolleson v. Unity Health Sys.*,
  2012 WL 1834206 (W.D.N.Y. May 18, 2012) ............................................................25

*Townsend v. Benjamin Enters., Inc.*,
  679 F.3d 41 (2d Cir. 2012) ........................................................................................24

*Visco v. Cmty. Health Plan*,
  957 F. Supp. 381 (N.D.N.Y. 1997) .......................................................................20, 23

*Waltman v. United Servs., Inc.*,
  635 F. Supp. 3d 86 (D. Conn. 2022) ..........................................................................27

*Woodman v. WWOR-TV, Inc.*,
  411 F.3d 69 (2d Cir. 2005) ........................................................................................16

*Woods v. START Treatment & Recovery Ctrs., Inc.*,
  864 F.3d 158 (2d Cir. 2017) ......................................................................................25

*Woolf v. Bloomberg L.P.*,
  2019 WL 1046656 (S.D.N.Y. Mar. 5, 2019) ................................................23, 24, 27, 28

*Wright v. Storch, Amini & Munves, P.C.*,
  2014 WL 1663125 (S.D.N.Y. Apr. 25, 2014) .............................................................19

*Ya-Chen Chen v. City Univ. of N.Y.*,
  805 F.3d 59 (2d Cir. 2015) ..................................................................................15, 18

**Rules**

Fed. R. of Civ. Proc. 56(a) ..........................................................................................14

## INTRODUCTION

Plaintiff Anisha Mehta is a former DLA Piper associate whose "shockingly poor" performance during her one-year tenure at the Firm led to the termination of her employment. *See* DLA Piper's Rule 56.1 Statement of Undisputed Material Facts ("SUMF") ¶¶ 131, 263–265. Although Mehta's supervisors uniformly testified that she did not meet the Firm's expectations for an associate of her seniority, *see, e.g.*, SUMF ¶¶ 131, 273, Mehta has attempted to downplay her performance failures as "goof[s]," *id.* ¶¶ 88, 92. Now, Mehta accuses DLA Piper of discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and interference and retaliation under the Family and Medical Leave Act ("FMLA").

Each of these claims is premised on a single fact: Mehta was pregnant when she was fired. But Mehta offers no evidence that she was fired *because* she was pregnant. To the contrary, Mehta concedes that the partners with whom she worked were all "supportive," "positive," "excited," and "congratulat[ory]" when they learned she was pregnant. SUMF ¶¶ 173, 176, 183. And Mehta's own notes reflect that the partner who made the decision to terminate Mehta's employment—who has taken two parental leaves during her time at the Firm—was "very encouraging" when Mehta shared her pregnancy news, telling her that she should "take the whole time off and take what [she] need[s] before transitioning back." *Id.* ¶¶ 173, 178. The undisputed evidence thus demonstrates that no DLA Piper partner discriminated against Mehta, or even did anything to suggest that they were unhappy that Mehta was pregnant or that she planned to take parental leave. *Id.* ¶ 190.

The undisputed evidence also shows that Mehta regularly turned in sloppy work product and proposed providing incorrect legal advice (that others had to correct), *see, e.g.*, SUMF ¶¶ 160, 232; she was careless and untimely in her correspondence with clients and partners, *see, e.g.*, *id.* ¶¶ 204, 206; she made embarrassing mistakes, *see, e.g.*, *id.* ¶¶ 237, 257; and she demonstrated a

poor grasp of the law and lacked good professional judgment, *see, e.g.*, *id.* ¶¶ 137, 196.  Although Mehta's performance was problematic "from the very beginning," *id.* ¶ 57, she made a series of increasingly catastrophic blunders between the time of her August pregnancy announcement and her October termination, such that her supervisors grew convinced she could no longer be trusted to represent the Firm's clients, *id.* ¶ 263.  While Mehta may "vehemently disagree[]" with this assessment of her performance, she has not adduced any evidence to suggest that the Firm's legitimate, nondiscriminatory, and nonretaliatory reason for her termination—her performance failures—was pretextual, much less that her termination had anything to do with her pregnancy or anticipated parental leave.  *Tieu v. N.Y.C. Economic Dev. Corp.*, --- F. Supp. 3d ----, 2024 WL 580063, at *5, *9 (S.D.N.Y. Feb. 13, 2024) (Torres, J.) (granting summary judgment to employer).

Mehta's claims are based solely on the fact that she was pregnant at the time of her termination, but there is ***no*** evidence raising even an inference of discrimination.  Thus, "when all is said and done, [Mehta's] evidence adds up to the fallacious syllogism seen in so many discrimination cases: I was fired; I was pregnant when I was fired; therefore, I was fired because I was pregnant."  *Peters v. Mount Sinai Hosp.*, 2010 WL 1372686, at *1 (S.D.N.Y. Mar. 30, 2010). Because such "evidence" is insufficient to raise a genuine issue of material fact, DLA Piper is entitled to summary judgment on all of Mehta's claims.  *Id.*

## FACTUAL BACKGROUND

Mehta worked as an associate in DLA Piper's Intellectual Property and Trademark ("IPT") Group from October 2021 until October 2022.  SUMF ¶¶ 17, 290.  During her short tenure at the Firm, Mehta proved incapable of meeting the Firm's expectations for an associate of her seniority. *Id.* ¶ 262.  Although Mehta's primary supervisors (partners Gina Durham and Keith Medansky)

wanted her to succeed, they eventually concluded that she "was never going to make it." *Id.* ¶ 263.[1]

**I.    Mehta's Performance Falls Short Of Expectations "From the Very Beginning"**

Mehta billed the vast majority of her time to matters for which Durham and Medansky were the supervising IPT partners. SUMF ¶ 53. Durham and Medansky soon realized that Mehta "needed to be in a different place than [where she had] sold herself to be" during the interview process. *Id.* ¶¶ 7–8, 58. Durham noticed "deficits" in Mehta's skills "from the very beginning," and Medansky "grew to be disappointed that [he] did not have a 7th year associate that was performing at a 7th year associate level." *Id.* ¶¶ 57, 59.

*Mehta's Earliest Assignments Required "Surgery" From Senior Attorneys.* In December 2021, Durham informed Mehta that a set of discovery responses she had drafted were not "compliant [with] discovery practice under the Federal Rules." SUMF ¶¶ 60–61. Durham was surprised to find that an associate of Mehta's seniority was unable to complete such a basic assignment without partner guidance. *Id.* ¶ 63. Similarly, in January 2022, Medansky asked Mehta to draft an Office Action response in connection with a client's trademark application. *Id.* ¶ 66.[2] Mehta purportedly understood that her "job" was to "understand the issues" and respond to the USPTO examiner's concerns, but it appeared to Medansky based on Mehta's draft that Mehta had not even ***read*** the underlying Office Action to which she was responding. *Id.* ¶¶ 67, 70. In an email to another DLA Piper attorney, Medansky lamented that he already "spent several hours" revising Mehta's work, but that it still required "significant additional surgery." *Id.* ¶ 71.

*Mehta Failed To Prepare For A New Client Call.* In March 2022, Durham asked Mehta to help her prepare for an intake (or "kick off") call for a new client with a "massive" trademark

---

[1] DLA Piper respectfully refers the Court to its SUMF, filed concurrently, for a full statement of material facts, but provides this condensed factual statement for ease of reference. *See* Individual Practices in Civil Cases Rule III.D.

[2] Office Actions are issued by the United States Patent and Trademark Office ("USPTO") to identify legal problems with proposed trademarks or trademark applications. *Id.* ¶ 65.

portfolio.  SUMF ¶¶ 72–73.  Because organizing such calls is a routine task for IPT associates (and Mehta did not ask for guidance), Durham assumed Mehta understood what to do.  *Id.* ¶¶ 74, 77, 83.  But when Durham asked why she had not received an agenda by the afternoon before the call, Mehta admitted that she had asked a paralegal to prepare the agenda rather than create one herself. *Id.* ¶¶ 76–77.  And when Mehta ***still*** had not sent Durham a draft agenda by the following morning, Durham expressed "concern[] that [they were] not prepared."  *Id.* ¶¶ 78–79.  Although Mehta apologized, it was already too late—Durham was "booked solid [and unable to review anything] up until the call."  *Id.* ¶¶ 79–80.  Mehta later claimed that she had failed to prepare because she had not "done a 'kick off' call in the way that [Durham] wanted before" and "didn't know what was expected of [her]."  *Id.* ¶ 82.  Durham did not think this feeble excuse "ma[d]e any sense" because she "would have expected Mehta to produce *something* to [her] before the morning of the call—even if what [Mehta] produced did not meet [her] expectations."  *Id.* ¶¶ 82–83.

*Mehta Repeatedly Downplayed Her Mistakes As "Goofs."*  In April 2022, Mehta attempted to prepare an Office Action response for one of Durham's clients.  SUMF ¶ 84.  When Durham reviewed Mehta's draft, she realized that Mehta had discussed the wrong company in an entirely different industry than the Firm's actual client.  *Id.* ¶ 86.  Durham conveyed her frustration with Mehta's carelessness in a redline, commenting: "THIS IS NOT OUR CLIENT.  NEEDS TO BE REVISED THROUGHOUT."  *Id.* ¶ 87.  Mehta responded: "Whoa, apologies for that goof."  *Id.* ¶ 88.  Two days later, Mehta nearly initiated an urgent trademark filing in ***Singapore***, when she was supposed to be making the filing in ***Switzerland***—an obvious, serious mistake that was corrected only because a partner caught it.  *Id.* ¶¶ 89–91.  Mehta herself admitted to Durham that there was "no excuse" for such a "big goof on [her] part."  *Id.* ¶ 92.

*Mehta Drafted A Summary Judgment Brief With "Major Issues."*  In April 2022, Mehta

wrote the initial draft of a motion for summary judgment. SUMF ¶ 94. Even after Mehta's draft had been reviewed by another associate, Durham thought the brief still required "significant work." *Id.* ¶¶ 101, 104. Durham's comments and redline edits were heaviest in the sections of the brief that appeared **verbatim** in Mehta's initial draft—*i.e.*, the sections that Mehta had written. *Id.* ¶¶ 106–111. Among other concerns, Durham was "very disappointed" that Mehta had applied the wrong legal standard—a significant mistake for a brief. *Id.* ¶ 112. Because Mehta had "done the bulk of the drafting," Durham viewed her as responsible for this "major issue." *Id.* ¶¶ 112–113.

    *Mehta's Unresponsiveness Jeopardized Client Relationships.* In addition to her poor work product, Durham and Medansky were "concerned" about Mehta's "issues [with] timeliness." SUMF ¶¶ 116–117. For example, after Mehta failed to draft a simple letter that one of Medansky's clients had been seeking for **six day**s, the client said that he could "just handle it" himself. *Id.* ¶¶ 118–121. On another occasion, a client posed questions to Mehta, and Mehta waited **two weeks** before asking Durham for her input on the questions; at that point, Durham was forced to respond to the client directly. *Id.* ¶¶ 125–128. After this incident, Durham counseled Mehta: "We need to be more timely in our correspondence." *Id.* ¶ 128. Durham was right to be worried—she later had to remove Mehta from certain matters after a client "reached out . . . and expressed" concern regarding Mehta's lack of "timeliness [on] a variety of assignments." *Id.* ¶ 130.

    *Mehta Misunderstood Basic Intellectual Property Law Concepts.* Mehta also "demonstrated a shockingly poor grasp of intellectual property principles," which is obviously problematic for a senior intellectual property attorney. SUMF ¶ 131. For example, in June 2022, Mehta incorrectly proposed advising a client that it could "certainly . . . assert" a creative commons license to a threatened copyright infringement claim. *Id.* ¶ 133. Such advice would have been "very dangerous" for the client because it is "Intellectual Property Law 101" that creative

commons licenses do **not** allow for commercial use. *Id.* ¶¶ 135–137. Durham "could not believe that Mehta did not understand such an elementary IP concept at that point in her career—or that she would propose to offer a client fundamentally incorrect legal advice on a subject she did not understand without taking steps to research the issue first." *Id.* ¶ 137. Durham does not have a "high tolerance" for mistakes that can lead to clients "get[ting] sued." *Id.* ¶ 138.

 _Mehta Required Substantial Oversight And Failed To Provide Independent Value._ Durham and Medansky had to spend far too much time fixing Mehta's error-ridden work, especially given her seniority. SUMF ¶¶ 168, 262. For example, in June 2022, Mehta drafted a trademark search report for one of Medansky's international clients and flagrantly misrepresented in the draft that she had relied on input from foreign local counsel. *Id.* ¶¶ 142–143. When Medansky questioned whether Mehta had, in fact, consulted with local counsel, Mehta admitted that she had not, and had simply copied "similar language" from another attorney's work product—apparently not noticing that it was substantively inaccurate with respect to her assignment. *Id.* ¶¶ 144–146. In July 2022, Medansky told Mehta that he did not agree with "several points" she made in a different search report, and that her draft "require[d] some work" and a "more nuanced touch." *Id.* ¶¶ 149–150. Mehta apologized and acknowledged that her draft required "several edits." *Id.* ¶ 152.

 Durham also was disappointed that Mehta "regurgitate[d]" other attorneys' work without adding independent insight. SUMF ¶ 155. In one particularly egregious example, Durham realized that Mehta had clearly "cut and paste[d]" an email from local counsel without attempting to "customiz[e]" the advice or even provide an overall recommendation. *Id.* ¶¶ 156–158. In fact, "there [were] several places where [Mehta's] email refer[red] to 'the client,'" even though the email was directed **to the client**. *Id.* ¶ 159. Mehta's repeated references to her audience "in the third person" conveyed to Durham that Mehta had not even bothered to proofread. *Id.* ¶ 160.

Mehta's inability to provide value commensurate with her seniority was also apparent in her time entries. SUMF ¶ 162. In July 2022, Durham needed to remind Mehta to "convey what [she] as an expensive hourly attorney [was] doing to advance the client's interes[t]" and "craft the time entry so that it [was] clear what value [she] personally [was] providing," as her time entries often reflected inefficiencies or administrative work. *Id.* ¶ 164. This failure to communicate value threatened client relationships—Durham and Medansky had to make "write-offs" or "write-downs" because Mehta either billed too much time to certain tasks or billed for junior- or paralegal-level work that could not justifiably be billed to a client at her high hourly rates. *Id.* ¶¶ 165–167.

## II.    Shortly After Joining The Firm, Mehta Receives Generous Compensation Increases And Bonuses—None Of Which Were Based On Her Performance

Even though Mehta's performance fell far below what was expected as a seventh-year associate at DLA Piper, she was highly compensated throughout her tenure at the Firm.

Under DLA Piper's "lockstep" compensation model, associate salaries are aligned to Firm class year. SUMF ¶¶ 40, 44. When Mehta joined the Firm in October 2021, her base compensation was set at the standard sixth-year associate salary of $330,000. *Id.* ¶ 10. On January 1, 2022, Mehta and other associates with a Firm class year of 2015 became seventh-year associates, and their base compensation automatically increased to $350,000. *Id.* ¶¶ 41–42, 44.[3] On January 25 and March 15, 2022, seventh-year associates' base compensation (including Mehta's) increased to $370,000 and then $400,000, respectively. *Id.* ¶¶ 45, 48. These lockstep salary increases were dictated by market conditions, and the Firm's decision to increase associate salaries was in no way tied to Mehta's (or any individual associate's) performance. *Id.* ¶ 47.

In December 2021, the Firm announced its year-end Associate Bonus Program. Associates

---

[3] The only exception was two attorneys with a Firm class year of 2015 who were promoted on an accelerated basis to eighth-year status and, therefore, joined the Firm class year of 2014. *See* ECF No. 108-1 Resp. to ¶ 42 (noting that "at least two of the 50 associates [with a Firm class year of 2015] were adjusted from 2015 to 2014").

like Mehta with a Firm class year of 2015 were eligible for a $105,000 market-level bonus if they met their annual billable hour target, plus an additional $21,000 "special" bonus if they received a 2021 performance rating of three (out of five) or higher. SUMF ¶¶ 31, 32, 35. Mehta's offer letter made clear that she would receive a *full* year-end bonus if she met a pro-rated billable hours target, even though she did not receive a performance evaluation for the 2021 calendar year (since she only had been at the Firm for two months of that year). *Id.* ¶¶ 30, 33, 36. Mehta met her pro-rated hours target for 2021 and therefore received the full $126,000 bonus. *Id.* ¶¶ 34, 37, 38. As with Mehta's salary increases, Mehta's bonus for 2021 was in no way tied to any assessment of Mehta's substantive performance during the 2021 performance year. *Id.* ¶ 39.

## III.    Mehta Announces Her Pregnancy—And The Response Is Uniformly Positive

On August 5, 2022, Mehta informed Durham that she was pregnant and expected to give birth in January 2023. SUMF ¶¶ 171–172. Durham's response was—according to Mehta— "positive" and "supportive"; Durham did not say anything to suggest that she was unhappy about Mehta's pregnancy. *Id.* ¶¶ 176–177. With respect to Mehta's anticipated parental leave, Durham was "very encouraging [that Mehta] take the whole time off and take what [she] need[ed] before transitioning back." *Id.* ¶ 173. Durham had taken two parental leaves during her employment with DLA Piper, but she suggested that Mehta ask HR for "the most updated [leave] policy" because she "wanted to make sure that [Mehta] had the right information." *Id.* ¶¶ 174–175, 178.

Also on August 5, Mehta emailed DLA Piper's HR Department because she had "some questions regarding [the Firm's] updated policies." SUMF ¶ 179. An HR representative congratulated Mehta, answered her questions, and explained what she needed to do "to be compliant with DLA Piper's leave of absence requirements." *Id.* ¶ 181.

Mehta also told Medansky that she was pregnant at some point "during [her] second trimester." SUMF ¶ 182. Like Durham, Medansky was "excited" and "congratulat[ory]." *Id.*

¶ 183.  Medansky did not "say anything to suggest to [Mehta] that he was unhappy that [she] was pregnant" or to suggest that "he did not want [Mehta] to take maternity leave." *Id.* ¶ 184.  In fact, Mehta concedes that no DLA Piper partner ever said anything negative to her about either her pregnancy or her anticipated parental leave. *Id.* ¶ 190.

Approximately two months after she spoke to Durham, on September 28, Mehta submitted a claim to DLA Piper's third-party benefits administrator, Unum, requesting short-term disability coverage, pregnancy-related family medical leave, and state paid leave for newborn mothers. SUMF ¶ 221.  Mehta did not tell Durham or Medansky that she had submitted this claim, and they were not otherwise notified about it until after her employment was terminated. *Id.* ¶¶ 221, 225.

## IV.    Mehta's Performance Problems Continue Unabated

After Mehta announced her pregnancy in early August 2022, she continued to make embarrassing and potentially costly mistakes, display poor professional judgment, and demonstrate inexcusable misunderstandings of basic intellectual property law.

*Mehta "Ghosted" Durham And Missed An Important Client Deadline.*  On August 12, 2022, one of Durham's clients requested a trademark search report by close-of-business on August 19.  SUMF ¶ 191.  Despite having a full week to work on the report, Mehta did not send Durham a draft until just **one hour and four minutes** before the client's deadline. *Id.* ¶ 193.  Durham sent her comments back within that hour, noting several areas that required revision. *Id.* ¶ 194.  When Mehta did not respond, Durham called and instant-messaged her multiple times, to no avail. *Id.* ¶¶ 195, 197.  Ultimately, it became clear that Mehta had "ghosted" Durham, so Durham was left with no choice but to drop everything and revise Mehta's report herself. *Id.* ¶¶ 196, 198.  Because Mehta had been late in sending an initial (unacceptable) draft and then "disappeared for any of the feedback [needed] to put the work product [into] a final form that would have been client ready," the Firm missed an "important deadline." *Id.* ¶¶ 192, 196, 198.  The next morning, Mehta did not

acknowledge the missed deadline, emailing Durham: "Not sure if you saw my teams message last night but thanks again for sending these out!!" *Id.* ¶ 199. Durham believed Mehta's handling of the situation was "not appropriate," and emphasized that "there's really only so many times that can happen [before] the trust is completely eroded." *Id.* ¶¶ 200–201.

*Mehta's Carelessness Could Have Exposed Clients To Avoidable Legal Risk.* On September 28, 2022, one of Durham's clients asked Mehta to prepare a search report for a proposed trademark. SUMF ¶ 227. Although the client informed Mehta that he "suspect[ed] there may be an item or two to report" ***and*** provided a link to a concerning third-party trademark registration, Mehta's draft ignored these concerns. *Id.* ¶¶ 227, 228. After Durham and another associate pointed out the omission, Mehta responded: "Oh woops looking from my phone and didn't see the link." *Id.* ¶¶ 229–231. If Durham and the other associate had not caught this error, Mehta could have incorrectly advised the client the proposed trademark presented "Low" risk. *Id.* ¶¶ 232–234.

Similarly, on September 29, Mehta sent Medansky a draft search report that was "so cursory that [it] could be deemed insufficient to give the client a defense" to a claim of willful trademark infringement—which is one of the primary purposes of putting together a search report. *See* SUMF ¶¶ 235–237. Medansky was troubled to see such a poor draft from an associate of Mehta's seniority, and wondered, if Mehta did not know how to prepare a proper search report, "what else doesn't she know?" *Id.* ¶ 239.

*Mehta's Ineptitude Was Reflected In Her Low Billable Hours.* Mehta's repeated mistakes, superficial work product, and substantive knowledge gaps rendered her ineffective as a senior associate. Durham gradually "pull[ed] back" on what she trusted Mehta to do because the alternative was "having to spend too much time reviewing and correcting for . . . an associate at [her] level." SUMF ¶ 169. Medansky also moved Mehta to the "periphery" on his matters

10

because, while he felt that he could ask her to do "little things," he was "not satisfied" with Mehta's "heavy thinking" on more substantive assignments.  *Id.* ¶ 170.

Unsurprisingly, Mehta's underutilization by Durham and Medansky resulted in low billable hours.  SUMF ¶ 212.  Mehta was expected to work at least 1,850 client-billable hours each year.  *Id.* ¶ 209.  However, based on the number of billable hours that Mehta recorded between January and September 2022, she was on "pace" to work just 1,572 client-billable hours by the end of the year.  *Id.* ¶ 215.  In other words, as of the date that she was notified of her termination on October 4, the Firm estimated that Mehta would fall short of her billable hours requirement by approximately 278 hours.  *Id.* ¶ 216.  Durham was aware of this projected shortfall because she received weekly reports on the current pace of all IPT associates, including Mehta.  *Id.* ¶ 218.

<u>*Mehta Made A Mistake That "Broke The Camel's Back."*</u>  In September 2022, Mehta repeatedly instructed one of Durham's clients to gather five years' worth of **confidential** financial information in support of a **public** filing, telling the client that the information was "crucial" to the success of the client's trademark application.  SUMF ¶¶ 240–242.  However, Durham had previously explained to Mehta that it was unnecessary and inadvisable for the client to waste time gathering such sensitive information, much less file it "in the public record."  *Id.* ¶¶ 243–244, 246.  In light of these instructions, Durham was "troubl[ed]" to discover that Mehta had continued "going down that path."  *Id.* ¶ 245.  More fundamentally, however, Durham could not understand "why [Mehta] would have thought that was the right thing [to do in the first place]."  *Id.* ¶ 246.

There had already been a "building of issues" with Mehta's performance, but for Durham, this incident was a "culminating event" and "the straw that broke the camel's back."  SUMF ¶ 247.  Therefore, on September 29, Durham told Mehta that they needed to discuss the "deficits" in her training.  *Id.* ¶ 248.  In response, Mehta invited Durham to a Microsoft Teams meeting for the

following week.  *Id.* ¶ 250.  Durham replied to Mehta's invitation and wrote: "Let's please plan on discussing low hours and discrepancy in skillset/level."  *Id.* ¶ 251.

> *Mehta Made A Final "Disturbing" Mistake.*  On October 2, 2022, Mehta emailed one of Medansky's clients regarding a third party's application to register a trademark in Switzerland. SUMF ¶ 252.  Mehta advised the client to consider opposing the application based on its trademark registrations in Switzerland ***and the European Union***.  *Id.* ¶ 254.  However, Switzerland is not a member of the European Union, and Medansky was "mortified" by Mehta's apparent suggestion that Switzerland and the European Union have interchangeable trademark laws.  *Id.* ¶ 257. Medansky quickly replied to Mehta's email (removing the client) and wrote: "What does EU have to do with Switzerland[?]"  *Id.* ¶ 255.  Mehta replied: "Ah you're right they're not part of the EU. Apologies for the oversight."  *Id.* ¶ 256.  Medansky was not only "disturb[ed]" by Mehta's mistake, which could easily "shake a client's confidence," but also that Mehta would downplay the seriousness of this embarrassing, client-facing mistake as a mere "oversight."  *Id.* ¶¶ 256–257.

## V.    Durham Terminates Mehta's Employment Because of Her Performance Issues

On October 3, 2022, Durham called Medansky to ask whether he was experiencing the same "serious issues" with Mehta's work.  SUMF ¶ 260.  Medansky confirmed that there had been "consistent issues" with Mehta's work, and that she was unable to perform at the level required of a seventh-year associate.  *Id.* ¶ 262.  By the end of their discussion, Durham and Medansky agreed that Mehta's performance problems could not be "cured."  *Id.* ¶ 263.  Thus, Durham made the decision to terminate Mehta's employment.  *Id.* ¶ 264.  This decision was not based in any way on Mehta's pregnancy or her intent to take parental leave.  *Id.* ¶ 266.

On October 5, Durham, Mehta, and HR representative Amber James had a Teams meeting. SUMF ¶ 267.  During this meeting, Durham informed Mehta that DLA Piper was terminating her employment.  *Id.* ¶ 268.  According to Mehta's own notes from the meeting, Durham explained

that: (1) she had "low confidence in [Mehta's] ability to handle client matters which [was] also inhibiting staffing [her] on matters"; (2) Mehta was "not at the level of performance [she] should be at [her] year level"; and (3) Mehta's termination was "performance related" because of a "failure to meet expectations" and "[n]umerous instances with work is not up to our standards [sic]." *Id.* ¶¶ 271–273. Durham also provided multiple examples of Mehta's poor performance, including her failure to prepare for the client intake call, her disappointing performance on the summary judgment brief, and her "terrible" trademark clearance searches. *Id.* ¶¶ 274–276. Durham explained that Medansky had reported having "repeated issues as well." *Id.* ¶ 277. Durham did not mention Mehta's pregnancy or intent to take parental leave during the call, since it had no relevance to her decision. *Id.* ¶¶ 280–282.

James then explained to Mehta that the Firm would be offering her a separation and release agreement, which would have allowed her to remain employed by the Firm for at least three months past her anticipated January 2023 due date and receive up to $100,000 in separation pay while she searched for a new job. SUMF ¶¶ 283, 325. Mehta rejected the offered agreement, so she was separated from the Firm effective October 21, 2022. *Id.* ¶¶ 289–290.

## VI.    Mehta Steals Thousands Of DLA Piper's Privileged And Confidential Documents

Less than an hour after being notified of her termination on October 4, Mehta used her Firm email account to forward 16 DLA Piper emails to her personal email account. SUMF ¶ 297. All 16 of these emails contained "Confidential" information within the meaning of DLA Piper's Confidentiality and Non-Disclosure Policy—and many of them were explicitly labeled as "Attorney-Client Privileged Communication[s]." *Id.* ¶¶ 294–302. By sending these emails to an external email account, Mehta violated Firm policy. *Id.* ¶ 296; Senger Decl., Ex. 29 (DLA_Mehta_00004023); Neiman Decl., Ex. 9 (DLA_Mehta_00011089).

Apparently recognizing that she had violated Firm policy, Mehta attempted to "recall" her

email three days after she had sent it.  SUMF ¶ 303.  Shortly thereafter, Mehta took **more than 3,600 photographs** of DLA Piper emails and documents as they were displayed on her computer screen.  *Id.* ¶ 307.  These photographs included pictures of: (1) the same communications Mehta had previously emailed to her personal email address; (2) emails that were labeled as "Privileged" and "Confidential"; (3) emails that reflect DLA Piper attorneys providing legal advice to DLA Piper clients; and (4) other confidential information stored on the Firm's network.  *Id.* ¶¶ 308–311. Mehta also took a picture of DLA Piper's Confidentiality and Non-Disclosure Policy—which **itself** made clear that she was actively committing an offense for which she could be fired.  *Id.* ¶ 312.

In further violation of DLA Piper policy, Mehta proceeded to share the photographs she took with her attorneys, who failed to disclose to DLA Piper for over a year that they were in possession of the Firm's attorney-client privileged communications with its clients.  SUMF ¶ 315. After Mehta produced the photographs in discovery on January 4, 2024, this Court ordered her and her attorneys to destroy the photographs and instructed DLA Piper to reproduce them with redactions of the privileged and client-identifying information.  *Id.* ¶¶ 316–317.

## LEGAL STANDARD

The Court should grant summary judgment "when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Tieu*, 2024 WL 580063, at *5 (citing Federal Rule of Civil Procedure 56(a)).  Summary judgment "is warranted if the opposing party relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct."  *Id.* at *6 (quotation omitted).

## ARGUMENT

## I.    Mehta Cannot Prove That Her Termination Was Discriminatory

Discrimination claims under Title VII and the NYSHRL are analyzed under the *McDonnell Douglas* burden-shifting framework.  *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 833

(S.D.N.Y. 2013).  The plaintiff must first establish a prima facie case by showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) the challenged action occurred "under circumstances giving rise to an inference of discriminatory intent." *Tieu*, 2024 WL 580063, at *6 (quotation marks omitted).  If the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a "legitimate, nondiscriminatory reason" for its actions. *Id.* at *8.  "If the [employer] proffers such a reason, the presumption of discrimination drops out of the analysis, and the [employer] will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.*  A plaintiff "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [her] version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004).

Discrimination claims under the NYCHRL are analyzed "separately and independently from any federal and state law claims." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (quotation marks omitted).  But even under the NYCHRL, "the plaintiff must establish a prima facie case," the employer must "offer legitimate reasons for its actions," and "summary judgment is appropriate if no reasonable jury could conclude either that the [employer's] reasons were pretextual, or that the [employer's] stated reasons were not its sole basis for taking action [and] its conduct was based at least in part on discrimination." *Id.* at 75–76 (cleaned up).

Here, Mehta admits that she has no direct evidence of discrimination.  It is undisputed that "[n]o DLA Piper partner said anything negative to Mehta about either her pregnancy or her anticipated parental leave." SUMF ¶ 190.  Further, the decision to terminate Mehta's employment was made by Durham after consulting with Medansky, and neither of them said anything to suggest that they were unhappy that Mehta was pregnant or that she intended to take parental leave. *Id.*

15

¶¶ 178, 184. To the contrary, Durham and Medansky were "supportive," "positive," and "excited" when Mehta informed them of her pregnancy. *Id.* ¶¶ 176, 183 (quoting Mehta's testimony). Durham herself had taken two parental leaves during her employment with DLA Piper, and she was "very encouraging [that Mehta] take the whole time off and take what [she] need[ed] before transitioning back." *Id.* ¶ 173 (quoting Mehta's notes from their conversation); *see Rinsler v. Sony Pictures Ent., Inc.*, 2003 WL 22015434, at *6 (S.D.N.Y. Aug. 25, 2003) (inquiries regarding the logistics of an employee's upcoming parental leave "suggest[], if anything, that the [employer] was trying to accommodate [the employee]—not discriminate against her").

Having failed to present any other evidence supporting an inference of discrimination, Mehta "support[s] her claim[s] only with the bare fact that she was fired [two months] after she announced that she was pregnant." *Forde v. Beth Israel Med. Ctr.*, 546 F. Supp. 2d 142, 151 (S.D.N.Y. 2008). Plaintiff notified Durham that she was pregnant on August 5, 2022, and she was terminated for poor performance on October 4, 2022. SUMF ¶¶ 171, 267–278.[4] In general, "[t]he passage of even two or three months is sufficient to negate any inference of causation." *Brown v. City of N.Y.*, 622 F. App'x 19, 20 (2d Cir. 2015) (quotation marks omitted). And Mehta has identified *no* evidence aside from supposed temporal proximity to suggest that her termination was in any way causally related to her pregnancy. Nevertheless, even assuming that being terminated two months after announcing her pregnancy was sufficient to raise an inference of discrimination (it is not), the evidence shows that Mehta's employment was terminated for a legitimate, non-discriminatory reason—her poor performance—and there is no evidence that this legitimate, non-

---

[4] Although Mehta submitted a claim for leave with DLA Piper's third-party benefits administrator on September 28, 2022, neither Durham nor Medansky were made aware of Mehta's claim until after she was notified of her termination. SUMF ¶¶ 220, 225. Accordingly, the relevant date for evaluating temporal proximity is August 5. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("[D]iscriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant.").

discriminatory reason was pretextual. *Tieu*, 2024 WL 580063, at *9, *11.

A. **DLA Piper Terminated Mehta's Employment For A Legitimate, Nondiscriminatory Reason—She Was A "Shockingly Poor" Performer**

Mehta cannot genuinely dispute the "substantial evidence that [DLA Piper's] concerns about" her performance were "longstanding and grounded in specific incidents." *Tieu*, 2024 WL 580063, at *8. "Poor work performance always constitutes a legitimate and nondiscriminatory reason" for termination. *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 591 (S.D.N.Y. 2013) (cleaned up). Here, Mehta's supervisors testified that she "demonstrated a shockingly poor grasp of intellectual property principles." SUMF ¶ 131. And Mehta herself repeatedly acknowledged that her performance failed to meet partners and clients' expectations. *See, e.g.*, *id.* ¶ 80 (Mehta apologizing for failing to prepare for a client call); *id.* ¶ 88 (Mehta admitting she made a "goof" by writing a brief about the wrong company); *id.* ¶ 92 (Mehta admitting she made a "big goof" by instructing local counsel to file a trademark application in the wrong country); *id.* ¶¶ 120–122 (Mehta apologizing to a client for her one-week delay in drafting a letter); *id.* ¶ 152 (Mehta apologizing for a poorly written clearance report); *id.* ¶ 207 (Mehta agreeing she let a two-week-old assignment "sit longer than [she] should have"); *id.* ¶ 231 (Mehta responding to feedback that she ignored a client's question by writing "woops"); *id.* ¶ 256 (Mehta apologizing for discussing the wrong jurisdiction's law in a client email). Ultimately, after Mehta made a series of increasingly serious "goof[s]," *id.* ¶ 88, neither Durham nor Medansky trusted her to perform the high-level, substantive work that she had been hired to do, *id.* ¶¶ 168-170. Durham thus made the understandable decision to terminate Mehta's employment; a decision that "was not based in any way on Mehta's pregnancy or intent to take parental leave," *id.* ¶ 266. Given these undisputed facts, any presumption of discrimination "completely drops out of the picture." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (cleaned up). DLA Piper has "presented

overwhelming evidence" that Mehta was fired because of her performance—which is a legitimate and non-discriminatory reason for her termination.  *Forde*, 546 F. Supp. 2d at 152.

**B.    There Is No Evidence That DLA Piper's Justification For Mehta's Termination Was Pretextual Or That Her Pregnancy Was A Motivating Factor**

In response to the overwhelming evidence of her performance failures, Mehta has not adduced ***any*** evidence to permit a jury to find that this reason for her termination was: (1) "nothing but a pretext for discrimination," or (2) "not the only reason, because [DLA Piper's] decision was also attributable to an impermissible consideration."  *Bart v. Golub Corp.*, 96 F.4th 566, 577–78 (2d Cir. 2024).  Instead, each of Mehta's attempts to raise a genuine dispute of material fact fall flat, leaving her with mere "speculation [and] conjecture as to the true nature of the facts."  *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quotation marks omitted).

***First***, the asserted temporal proximity between Mehta's pregnancy announcement and her termination two months later is "insufficient to satisfy [her] burden to bring forward some evidence of pretext."  *Govori v. Goat Fifty, L.L.C.*, 519 F. App'x 732, 734 (2d Cir. 2013) (affirming summary judgment because "any temporal proximity between [the plaintiff's] announcement of her IVF injections and her subsequent firing [did] not by itself raise a genuine issue of pretext"); *Ya-Chen Chen*, 805 F.3d at 77 (granting summary judgment on NYCHRL retaliation claim because temporal proximity alone was insufficient to show pretext).  Further, the undisputed evidence shows that Mehta's supervisors had serious concerns regarding her performance "shortly after her employment began and long before anyone at [DLA Piper] knew that [she] was pregnant." *Forde*, 546 F. Supp. 2d at 151; *see* SUMF ¶¶ 57–59; *see also Hardekopf v. Sid Wainer & Son*, 2004 WL 2199502, at *7 (S.D.N.Y. Sept. 29, 2004) (no pretext where employer's dissatisfaction with plaintiff's performance arose "months before [her pregnancy] announcement").

***Second***, Mehta has suggested the generous compensation she received somehow shows

she must have performed well.  But it is undisputed that Mehta's salary increases were based only on her Firm class year and not on an individualized assessment of her performance.  SUMF ¶ 40–45, 48.[5]  Likewise, Mehta offers no evidence that she received year-end bonuses due to the quality of her work; instead, as her offer letter makes clear, she was eligible to receive a bonus for 2021 as long as she met her pro-rated hours target for that two-month period, which she did.  SUMF ¶¶ 12–13, 30, 34, 37.  Of course, Mehta's "receipt of a bonus" for work performed in 2021 and her advancement in class year on January 1, 2022, do not "erase [DLA Piper's] detailed account of [her] unsatisfactory performance . . . beginning in [2021] and continuing through [2022]."  *Beers v. NYNEX Material Enterprises Co.*, 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992); *see also Wright v. Storch, Amini & Munves, P.C.*, 2014 WL 1663125, at *4 (S.D.N.Y. Apr. 25, 2014) (law firm associate's receipt of annual bonuses in the years before her termination failed to rebut evidence of subsequent performance problems).  Further, "bonuses[] and salary increases [are] sufficient to establish pretext ***only*** when paired with other evidence demonstrating a discriminatory motive."  *Forte v. Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *11 (S.D.N.Y. Sept. 30, 2015) (emphasis added).  Because Mehta presents no "additional evidence of discriminatory animus," her bonuses and salary increases—which were not tied to an assessment of her performance—"fail to raise a genuine issue of material fact sufficient to avoid a grant of summary judgment."  *Boston v. McFadden Publ'g*, 2010 WL 3785541, at *10 (S.D.N.Y. Sept. 29, 2010) (collecting cases).

***Third***, Mehta may attempt to cherry-pick emails in which she received occasional positive (or neutral) feedback to suggest that she could not possibly have been a poor performer.  But these

---

[5] Even to the extent that associates' Firm class year occasionally differs from their law school graduation year—either because they were assigned a lower year when they were hired or elevated to a higher year during their employment—Mehta offers no evidence to dispute that ***her*** advancement to seventh-year associate "occurred in the normal course," "did not require affirmative 'approval'" by her supervisors, and did not reflect any "individualized assessment of her work performance."  *See* Senger Decl., Ex. 2 (Defendant's Response to Plaintiff's First Interrogatory No. 17).

"*specific*" examples of allegedly satisfactory work do not negate Durham and Medansky's assessment that Mehta's "overall performance" failed to meet expectations. *Emanuel v. Oliver, Wyman & Co., LLC*, 85 F. Supp. 2d 321, 332 (S.D.N.Y. 2000) ("No jury could reasonably [find pretext from a supervisor's] reference letter that highlighted [the employee's] positive contributions to [the company]."); *see also Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010) ("Recognition of certain aspects of an employee's performance does not, by itself, cast doubt on an employer's decision to terminate [the] employee because [her] overall performance was deficient."). To the contrary, Durham testified that DLA Piper associates have "very little margin for error," and "just a couple of bad performances . . . are much more meaningful than some accolades." SUMF ¶¶ 141, 168. Therefore, any evidence that Mehta received occasional praise does not negate the "substantial documentation of [her] poor performance." *Iverson v. Verizon Commc'ns*, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Demonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext." (cleaned up)).

**Fourth**, Mehta tries to "manufacture a question of fact" by arguing that her performance failures were not *really* a problem because they did not lead to a written warning, placement on a performance improvement plan, or other disciplinary action. But a court may not infer pretext simply because an employee does not receive "prior written notification" that she could be terminated for poor performance. *Visco v. Cmty. Health Plan*, 957 F. Supp. 381, 389 (N.D.N.Y. 1997). That is especially true here, as it is undisputed that Mehta was an at-will employee; that she understood DLA Piper could terminate her employment without "advance notice"; and that DLA Piper does not have a progressive discipline policy for associates who perform poorly. SUMF ¶ 15; *see also* Neiman Decl., Ex. 1 (Neiman Dep. Tr.) at 59:3–7 ("performance

improvement plans" are not "used with lawyers").  Mehta's "speculation that she should have received a warning if her performance was as poor as [DLA Piper] say[s] is not sufficient to meet her burden on summary judgment to overcome [DLA Piper's] proof or to demonstrate pretext." *Govori*, 519 F. App'x at 736; *see also Hardekopf*, 2004 WL 2199502, at *7 (no pretext where employer did not implement a "corrective action" or indicate that pregnant employee might be terminated for poor performance); *Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 222 (E.D.N.Y. 2002) (no pretext where employee alleged that "no one ever informed him that he was performing poorly or that he was about to be fired prior to his termination").

Further, even without a written warning or formal performance review, there is no genuine dispute that Durham and Medansky made clear that Mehta "was not meeting expectations" based on their real-time feedback.  *Gambello*, 186 F. Supp. 2d at 222 (supervisors did not need to "spell[] it out" before terminating plaintiff); *see also Goonewardena v. N.Y. State Workers' Comp. Bd.*, 788 F. App'x 779, 781 (2d Cir. 2019) (rejecting argument that an absence of "formal warnings" before plaintiff's discharge was evidence of pretext because the decisionmaker "informally counselled [him] regarding his performance and repeatedly returned his work for corrections").  While Mehta clearly understood based on the feedback she received that she had made errors, *see, e.g.*, SUMF ¶ 92 (acknowledging a "big goof"); *see also supra* 17, her apparent inability to appreciate the gravity of her "serious mistake[s]" only confirms that "she was not functioning at the level of a 7th year associate."  SUMF ¶ 258.  In any event, "the fact that an employee was unaware of [her] employer's dissatisfaction is irrelevant to a court's inquiry on the issue [of pretext]." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 310–11 (S.D.N.Y. 2000) (quotation marks omitted).  Even if Mehta perceived her termination to be "sudden and disproportionate," "she has failed to offer a shred of evidence that [anyone at DLA Piper] had a discriminatory motive."

*Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 282 (S.D.N.Y. 2008) (quotation marks omitted).

      ***Fifth***, Mehta may attempt to deny the "consistent issues with her performance" (SUMF ¶ 262) by "parsing the details of selected incidents, generally disputing her supervisors' assessments, and providing her own contrary appraisal of her work," *Taylor v. Polygram Records*, 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999).  But even if Mehta "vehemently disagree[s]" with Durham and Medansky's appraisal of her performance, that "is not a viable basis for a discrimination claim." *Tieu*, 2024 WL 580063, at *9 (quotation marks omitted).  Rather, Mehta must produce evidence suggesting that their appraisal was "so implausible as to call into question its genuineness." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (summary order).  Mehta has not come close to meeting that burden.  Indeed, Mehta's acknowledgement of her mistakes during her employment—even while attempting to minimize them—undermines any argument that her supervisors' interpretations of those incidents were unreasonable.  *See supra* 17.  Likewise, Mehta's subjective belief that the "major issue[s]" within sections of a brief that she wrote (*see* SUMF ¶¶ 106–113) "should not have reflected badly on [her] because they were someone else's fault[] is not evidence that [Durham's] appraisals were a sham, invented to mask discrimination." *Taylor*, 1999 WL 124456, at *10 ("[F]aulting others for, or otherwise rationalizing, problems legitimately perceived by [an] employer does not establish pretext.").  "In short, although [Mehta] may consider [the Firm's] termination decision an over-reaction to her perceived mishaps, she can point to no evidence in the record indicating that her employer was not, in fact, displeased with her actions, much less that the real reason for her termination was [pregnancy] discrimination." *Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005).

      ***Finally***, aside from hinting at "unconvincing reasons for why [she believes DLA Piper's]

reasons were pretextual, [Mehta] does not otherwise present evidence that her [pregnancy] 'was a motivating factor' in [the Firm's] decision to terminate her." *Stinson v. Morningstar Credit Ratings, LLC*, 2024 WL 3848515, at *13 (S.D.N.Y. Aug. 16, 2024) (granting summary judgment on Title VII, NYSHRL, and NYCHRL sex-discrimination claims). Not only does Mehta concede she has no evidence of discriminatory animus (SUMF ¶¶ 177, 184, 190), she also admits Durham was "supportive" of her pregnancy and "very encouraging [that she] take the whole time off [after giving birth]" (*id.* ¶¶ 173, 176). Courts have made clear there can be no inference of discriminatory animus where an employee's supervisor "strongly encourage[d] [her] to take as much leave time as possible." *Woolf v. Bloomberg L.P.*, 2019 WL 1046656, at *18–19 (S.D.N.Y. Mar. 5, 2019).

There is also no evidence whatsoever that DLA Piper discriminates against pregnant women; to the contrary, "the record is replete with evidence that [the Firm], and in particular the [IPT Group], accommodated such employees." *Visco*, 957 F. Supp. at 388 (pregnant employee's "personal opinion" regarding her termination was "insufficient" to suggest pretext because employer "common[ly]" accommodated parental leave requests). Between 2021 and mid-2024, DLA Piper paid over $32.7 million to attorneys who took parental leave, including to 46 attorneys in the IPT Group. SUMF ¶ 323. In fact, Durham—the very partner Mehta accuses of discriminating against her—has taken two parental leaves while working for DLA Piper. *Id.* ¶ 178. Given these undisputed facts, no reasonable juror could find that DLA Piper's stated reasons for terminating Mehta—her repeated performance failures—were pretextual or that her termination was motivated *in any way* by her pregnancy. *See, e.g.*, *Peters*, 2010 WL 1372686, at *13 ("Courts often grant summary judgment in favor of an employer when the employer demonstrates that it has treated similarly situated employees in a non-discriminatory manner.").

In sum, DLA Piper presented a "well-documented record [of] criticisms and concerns"

about Mehta's poor performance that predated her pregnancy announcement and continued to escalate until her supervisors had no choice but to terminate her employment. *Woolf*, 2019 WL 1046656, at *19. "It then fell to [Mehta] to show that this reason was pretext or that [her pregnancy] was a motivating factor in [her] firing." *Golden v. Syracuse Reg'l Airport Auth.*, 2024 WL 4116427, at *2 (2d Cir. Sept. 9, 2024). Mehta's failure to offer any "evidence on either front" justifies the entry of summary judgment for DLA Piper. *Id.*

## II.    Mehta Cannot Establish A Prima Facie Case That Her Termination Was Retaliatory Under Title VII, NYSHRL, Or NYCHRL

Mehta's discriminatory retaliation claim is also analyzed under the *McDonnell Douglas* framework. *See Tieu*, 2024 WL 580063, at *12. To establish a prima facie case, Mehta must show that "(1) she engaged in protected activity, (2) the employer was aware of this activity, (3) she was subjected to an adverse employment action, and (4) a causal connection exists between the adverse action and her protected activity." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019). Protected activity under Title VII is limited to "opposing an unlawful employment practice" or "participating in any manner in an investigation, proceeding, or hearing" that "occurs in conjunction with or after the filing of a formal charge with the EEOC." *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48–49 (2d Cir. 2012) (cleaned up); *see also Mercado v. Mount Sinai Beth Israel*, 2023 WL 5975322, at *16 (S.D.N.Y. Sept. 14, 2023) ("plaintiff must at least demonstrate that she took an action opposing her discrimination" to state retaliation claim under NYSHRL and NYCHRL (cleaned up)). A "plaintiff alleging retaliation in violation of Title VII must show at the final step of the [*McDonnell Douglas*] analysis that retaliation was a but-for cause of the adverse action, not simply a substantial or motivating factor in the employer's decision." *Tieu*, 2024 WL 580063, at *12 (quotation and alteration omitted); *see also Reichman v. City of N.Y.*, 179 A.D.3d 1115, 1120 (N.Y. App. Div. 2020) (affirming summary judgment where there

was "no causal connection between the protected activity and the alleged retaliatory actions").

Mehta's retaliation claims fail at the starting gate. Mehta cannot establish even a prima facie case because there is ***no*** evidence that she engaged in ***any*** protected activity. She did not oppose any unlawful employment practice or engage in any formal process with the EEOC prior to her termination, and "[m]erely requesting disability leave or maternity leave is not protected activity under Title VII." *Tolleson v. Unity Health Sys.*, 2012 WL 1834206, at *7 (W.D.N.Y. May 18, 2012). Because Mehta cannot establish even the first prong of a prima facie retaliation claim, summary judgment is warranted. Moreover, for the reasons discussed above, Mehta cannot show that her termination was causally connected to any protected activity. The undisputed evidence shows that she was terminated for her poor performance. *See supra* 17–18. Even if Mehta could show that she engaged in protected activity prior to her termination (she cannot), there is no evidence that any protected activity was related to her termination. *See supra* 18–24.[6]

## III. Mehta Cannot Prove That Her Termination Was Related To Her Intent To Take FMLA Leave

Mehta brings two claims under the FMLA, for interference and retaliation. "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA," while a retaliation claim "involve[s] an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). Where, as here, both claims are based solely on the employee's termination, the plaintiff must show that the employer "considered [her] FMLA leave . . . a negative factor in its decision to terminate [her]." *Sista v.*

---

[6] The undisputed evidence shows that Mehta cannot prevail on her claims under the NYSHRL and NYCHRL. However, to the extent the Court finds that there are disputes of material fact with regard to those claims, it should "decline[] to exercise supplemental jurisdiction." *Tieu*, 2024 WL 580063, at *15.

*CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006).  Because there is no evidence that DLA Piper considered Mehta's request for or intent to take parental leave in its decision to terminate her employment, summary judgment is warranted on both of her FMLA claims.

### A.    DLA Piper Did Not Interfere With Mehta's FMLA Rights

"To establish a[n] FMLA interference claim, a plaintiff must show (1) that she is an eligible employee under the FMLA; (2) that [the] defendant is an employer as defined in the FMLA; (3) that she was entitled to take leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA." *Tieu*, 2024 WL 580063, at *11 (quotation marks omitted).  To prevail on an FMLA interference claim based on her termination pre-leave, Mehta must show that her "decision or intention to take FMLA-protected leave was at least part of the reason for [her] termination." *Hall v. Urban Assembly, Inc.*, 2022 WL 19708, at *3 (S.D.N.Y. Jan. 3, 2022).  She cannot do so.

Mehta can "point[] to no document or testimony suggesting that" Durham or "any other [DLA Piper] decision-maker considered [her] alleged need for FMLA leave as a negative factor in its decision to terminate [her]." *Lievre v. JRM Construction Mgmt., LLC*, 2019 WL 4572777, at *19 (S.D.N.Y. Sept. 20, 2019) (quotation marks omitted).  It is undisputed that "[n]o DLA Piper partner said anything negative to Mehta about either her pregnancy or her anticipated parental leave." SUMF ¶ 190.  It is also undisputed that Durham, the ultimate decisionmaker, "did not say anything to [Mehta] to suggest that she was unhappy that [Mehta was] pregnant." *Id.* ¶ 177. Instead, when Mehta first informed Durham of her pregnancy, Durham suggested that Mehta discuss the Firm's parental leave policies with HR because she "wanted to make sure that [Mehta] had the right information." *Id.* ¶ 175.  Neither Durham nor the HR representative on the call mentioned Mehta's pregnancy or intent to take parental leave—Mehta was the only one who raised it. *See id.* ¶¶ 280–282.  Finally, although she was aware of Mehta's pregnancy, there is no evidence

that Durham (or any other DLA Piper attorney) "had knowledge of [Mehta's] leave request" to Unum before her termination. *Woolf*, 2019 WL 1046656, at *18; *see* SUMF ¶¶ 221–226.

Further, "an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011). Here, "the record includes extensive evidence that [Mehta] was terminated for performance-based, non-pretextual reasons, and no evidence that [her] termination was motivated by [her] requests for . . . family or medical leave." *Woolf*, 2019 WL 1046656, at *18; *see supra* 18–24. Mehta has adduced no "evidence from which a reasonable fact finder could conclude that her request for leave played any role in this employment decision." *Larkin-Gallagher v. Champlain Valley Physicians Hosp. Med. Ctr.*, 2020 WL 7061022, at *8 (N.D.N.Y. Dec. 2, 2020). Because "termination for legitimate business reasons negates an interference claim," *Waltman v. United Servs., Inc.*, 635 F. Supp. 3d 86, 110 (D. Conn. 2022) (cleaned up), summary judgment is warranted.

### B.    DLA Piper Did Not Terminate Mehta's Employment In Retaliation For Her Intent To Take FMLA Leave

FMLA retaliation claims are "analyzed under the *McDonnell Douglas* burden-shifting framework." *Tieu*, 2024 WL 580063, at *12. "Under the FMLA, the plaintiff must establish that the exercise of FMLA rights was a motivating factor in the adverse employment action." *Id.* (quotation marks omitted). Mehta cannot make this showing. Even if she could establish a prima facie case of retaliation, the undisputed evidence shows that DLA Piper had a legitimate, non-discriminatory reason for Mehta's termination—her performance failures. Mehta cannot show that this reason was pretextual. *See supra* 18–24.

There "is a well-documented record of . . . criticisms and concerns about [Mehta's] performance." *Woolf*, 2019 WL 1046656, at *19. "That feedback predates" Mehta informing

DLA Piper that she was pregnant, predates her request for FMLA-protected leave in late September 2022, and "continued for the remainder of [her] tenure at [DLA Piper]."  *Id.*; *see also* SUMF ¶¶ 60–207, 227–258 (detailing performance issues spanning from December 2021 to October 2022).  Further, the "fact that the relevant decision maker was unaware that plaintiff had requested FMLA leave undercuts any argument that retaliatory intent was behind the decision to fire" her.  *Shah v. Eclipsys Corp.*, 2010 WL 2710618, at *12 (E.D.N.Y. July 7, 2010).

Mehta's primary argument that DLA Piper's reason for her termination is pretextual appears to be that she was notified of her termination approximately two months after telling Durham she was pregnant, and a few days after submitting her request for FMLA leave to Unum, DLA Piper's third-party benefits provider.  *See* SUMF ¶¶ 171, 220, 267–268.  But "[a]t this stage, temporal proximity between a protected [activity] and an adverse employment action is insufficient to satisfy plaintiff's burden to bring forward some evidence of pretext."  *Tieu*, 2024 WL 580063, at *13 (quotation omitted); *see also Woolf*, 2019 WL 1046656, at *19 (where plaintiff was "encourag[ed] . . . to take leave" and there was a "documented history of performance-related concerns, the issue of timing alone does not raise an inference of causal connection between the request for family leave and [plaintiff's] termination").

Even if Mehta argues she "was a good performer unaware of any performance problems before" she notified the Firm of her intent to take leave, that does not suffice to create a *genuine* dispute of material fact.  *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 206 (S.D.N.Y. 2009).  As in *Di Giovanna*, DLA Piper has "provide[d] a litany of examples of [Mehta's] sustained poor performance at some of the most basic functions of [her] job that long predated [her] application for FMLA leave."  *Id.*  Mehta "does not actually dispute the specific assertions of poor performance, but instead contends that [s]he was unaware at the time of the problem or criticism

alleged," or "acknowledges the asserted act but argues with [DLA Piper's] characterization of it as poor performance." *Id.* Mehta's "evasions" do not raise a genuine issue regarding pretext. *Id.*; *see also Fitzgerald v. We Co.*, 2022 WL 952963, at \*10 (S.D.N.Y. Mar. 30, 2022) (Torres, J.) (plaintiff's "subjective disagreement" with decisionmakers' "assessment of her skills and expertise—even if that assessment was wrong—does not, without more, establish pretext" for purposes of FMLA retaliation claim). Nor can Mehta rely on evidence of raises or bonuses she received at the end of 2021 or early 2022 to show pretext, as they were given "well before . . . the vast majority of the performance lapses" that led to her termination. *Di Giovanna*, 651 F. Supp. 2d at 207 ("even if [plaintiff's] version of why he received [raise] is true, [it] would not support a claim of retaliation for exercising his FMLA rights because it was too remote in time"); *see also* SUMF ¶¶ 33–39 (bonuses based "on the terms of her offer letter" or given as a "courtesy"); *id.* ¶¶ 44–48 (raises part of lockstep salary increases for associates in her Firm class year).

Finally, there is no "evidence that [DLA Piper] view[s] employees who take FMLA leave negatively." *Shimanova v. TheraCare of N.Y., Inc.*, 2017 WL 980342, at \*8 (S.D.N.Y. Mar. 10, 2017). It makes no sense to suggest that that DLA Piper would terminate an associate to avoid providing *unpaid* FMLA leave when the Firm already provides *paid* parental leave—and did so to the tune of more than \$32.7 million between 2021 and mid-2024. SUMF ¶ 323; *see also Shimanova*, 2017 WL 980342, at \*8 (no inference of retaliatory intent where "approximately 47 [of defendant's] employees applied for, qualified for and were granted FMLA leave").

Because there is no evidence in the record that Mehta's intent to take FMLA leave was a "negative factor" in DLA Piper's "decision to terminate" her employment, *Sista*, 445 F.3d at 176, summary judgment is warranted on Mehta's FMLA retaliation claim.

**IV.    DLA Is Entitled To Summary Judgment On Mehta's Claims For Reinstatement And Front-Pay, And Any Claims For Back-Pay Beyond January 4, 2024**

Even if Mehta could conceivably establish liability against DLA Piper—she cannot—her potential recovery must be limited by the after-acquired evidence doctrine.  Where, as here, an employee's wrongdoing would have provided an independent justification for her discharge, she loses any entitlement to reinstatement and front-pay and can only recover back-pay between the date of her discharge and the date on which the employer discovered her misconduct.  *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 363 (1995).

It is undisputed that Mehta violated DLA Piper's Confidentiality and Non-Disclosure Policy, first by sending 16 privileged and confidential documents from her Firm email address to her personal email address—which she attempted to recall, presumably recognizing the email could be discovered—and then by surreptitiously taking ***more than 3,600 photographs*** of privileged and confidential documents and sharing those photographs with third parties.  SUMF ¶¶ 318–319.  This misconduct was "of such severity that [Mehta] in fact would have been terminated on those grounds alone."  *McKennon*, 513 U.S. at 362–63.  Accordingly, the Court should rule as a matter of law that Mehta is ineligible for reinstatement or front-pay, and that any recovery of back-pay must be limited to the period between Mehta's termination on October 21, 2022, and DLA Piper's discovery of her theft on January 4, 2024.  *See Greene v. Coach, Inc.*, 218 F. Supp. 2d 404, 414 (S.D.N.Y. 2002) (granting summary judgment and limiting potential damages based on after-acquired evidence).

## CONCLUSION

For the foregoing reasons, DLA Piper respectfully requests that the Court grant it summary judgment on all claims.

Respectfully submitted,                  Date:   October 15, 2024

                                         GIBSON, DUNN & CRUTCHER LLP

                                         By: */s/ Michele Maryott*
                                                Michele Maryott, *pro hac vice*
                                                3161 Michelson Drive, Suite 1200
                                                Irvine, CA 92612
                                                Telephone: 949.451.3945
                                                Facsimile: 949.475.4668
                                                MMaryott@gibsondunn.com

                                                Molly T. Senger, *pro hac vice*
                                                Amalia Reiss, *pro hac vice*
                                                Joseph Ruckert, *pro hac vice*
                                                1700 M Street, N.W.
                                                Washington, DC 20036-4504
                                                Telephone: (202) 955-8571
                                                Facsimile: (202) 530-4209
                                                MSenger@gibsondunn.com
                                                AReiss@gibsondunn.com
                                                JRuckert@gibsondunn.com

                                                *Attorneys for Defendant*
                                                *DLA Piper LLP (US)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 15, 2024, I caused to be served on Plaintiff the foregoing

Memorandum of Law in Support of Motion for Summary Judgment via CM/ECF.

Dated:    October 15, 2024                           */s/ Michele Maryott*
                                                                    Michele Maryott