UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANISHA MEHTA,              :

                    :

            Plaintiff,     :

                    :

        v.              :    Case No. 1:23-cv-04757-AT

                    :

DLA PIPER LLP,          :

                    :

                    :

          Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEFENDANT DLA PIPER LLP (US)'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendant DLA Piper LLP (US)[1] ("DLA Piper" or "the Firm") hereby submits this statement of undisputed material facts in support of its motion for summary judgment. The following undisputed material facts justify granting summary judgment in favor of DLA Piper on all claims asserted by Plaintiff Anisha Mehta ("Plaintiff" or "Mehta"), including Mehta's claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") (Counts 1–2), the New York State Human Rights Law ("NYSHRL") (Counts 5–6), and the New York City Human Rights Law ("NYCHRL") (Counts 7–8), and her claims of interference and retaliation under the Family and Medical Leave Act ("FMLA") (Counts 3–4).

**Mehta Works At Three Different Law Firms In Six Years**

1.     Anisha Mehta graduated from The John Marshall Law School in 2015. *See* Declaration of Molly Senger (August 7, 2024) (Senger Decl.), Ex. 1 (Mehta Dep. Tr. 16:12–17:7)

---

[1] Plaintiff's Complaint incorrectly refers to Defendant as DLA Piper, LLP. The proper entity is DLA Piper LLP (US).

(hereinafter, "Mehta Dep. Tr."); *see also* Declaration of Kelly Neiman (August 6, 2024) (Neiman Decl.), Ex. 2 (DLA_Mehta_00000054).

2.      After graduating, Mehta worked for Niro McAndrews LLC in Chicago, Illinois, first as a summer associate from June 2015 to October 2015 and then as an associate from October 2015 to July 2016.  *See* Mehta Dep. Tr. 108:19–24; *see also* Neiman Decl., Ex. 2 (DLA_Mehta_00000054).

3.      Mehta worked for Ulmer & Berne LLP in Chicago as an associate from November 2016 to July 2018.  *See* Mehta Dep. Tr. 113:18–114:2; *see also* Neiman Decl., Ex. 2 (DLA_Mehta_00000054).

4.      Mehta worked for K&L Gates LLP in Chicago as an associate from July 2018 until October 2021.  *See* Mehta Dep. Tr. 115:19–23; *see also* Neiman Decl., Ex. 2 (DLA_Mehta_00000054).

### DLA Piper Hires Mehta As A Sixth-Year IPT Associate

5.      In the summer of 2021, a legal recruiter submitted Mehta as an associate candidate for consideration by DLA Piper.  *See* Neiman Decl., Ex. 2 (DLA_Mehta_00000053).

6.      DLA Piper Chief Human Resources Officer Kelly Neiman testified that during the latter half of 2021, "the market for talent was in a frenzy," and "[l]aw firms were seeing huge spikes in demand . . . and we were trying to hire at such a pace to keep up with client demand." Neiman Decl., Ex. 1 (Neiman Dep. Tr. 30:2–8).

7.      Gina Durham, the Deputy Practice Group Leader of the Intellectual Property and Technology ("IPT") Group, recommended extending an offer to Mehta to join the Firm because she believed there was not "enough capacity" among existing IPT associates to handle the amount of work that the IPT Group was generating.  Declaration of Gina Durham (August 5, 2024) (Durham Decl.), Ex. 2 (DLA_Mehta_00007034).

8.    Keith Medansky, the co-chair of DLA Piper's Chicago intellectual property practice, and Heather Dunn, an IPT partner in DLA Piper's San Francisco office, also approved the decision to extend Mehta an offer to join the Firm.  *See* Senger Decl., Ex. 2 (Defendant's Response to Plaintiff's First Interrogatory No. 3) (stating that Durham, Medansky, and Dunn "approved Plaintiff's offer of employment with DLA Piper"); Durham Decl., Ex. 1 (Durham Dep. Tr. 14:22–25, 18:8–11); Durham Decl. ¶ 10; Declaration of Keith Medansky (August 6, 2024) (Medansky Decl.) ¶ 6; Senger Decl., Ex. 44 (Dunn Dep. Tr. 11:23–12:7).

9.    Mehta received an offer to join the Firm "as an Associate in the Intellectual Property & Technology group, Trademark, Copyright & Media subgroup in the Firm's San Francisco Office."   Neiman Decl., Ex. 3 (DLA_Mehta_00000001); *see also* Mehta Dep. Tr. 125:3–7.

10.    Mehta's offer letter stated that "[u]nder the Firm's Associate Talent Management program, [Mehta] will be considered Level 2 with a Firm Class Year of 2015" and her "annual compensation will be $330,000."  Neiman Decl., Ex. 3 (DLA_Mehta_00000002).

11.    DLA Piper has "three professional levels . . . that are part of the framework for which associates are classified.  Level 1 are the junior associates and level 2 are those mid levels and level 3 is senior [associates]."  Neiman Decl., Ex. 1 (Neiman Dep. Tr. 23:21–24:3); *see also* Neiman Decl., Ex. 8 (DLA_Mehta_00000121).

12.    Mehta's offer letter further stated that Mehta would "receive a full 2021 year-end bonus . . . payable at the time when Firm associates receive their year-end bonuses in early 2022[,] provided [Mehta was] employed at the Firm on the bonus payment date and [had] met or exceeded the Firm's Expectations, as summarized" in the offer letter.   Neiman Decl., Ex. 3 (DLA_Mehta_00000002).

13.     In a section titled "Firm Expectations," the offer letter stated that the "Firm's present expectation of [Mehta's] billable hour commitment as a full-time Associate is a minimum of 2,000 hours per year (which may include up to 100 hours of pro bono time), pro-rated for Associates who join the Firm after the beginning of the year."   Neiman Decl., Ex. 3 (DLA_Mehta_00000003–4).

14.     The offer letter further stated that DLA Piper was "prepared to offer [Mehta] a signing bonus of $54,600."  Neiman Decl., Ex. 3 (DLA_Mehta_00000003).

15.     The offer letter made clear that Mehta would "be employed on an 'at-will' basis, which means [her] employment [was] not for any specified term," and "[e]ither [Mehta] or the Firm [could] terminate the employment relationship at any time, without cause or advance notice." Neiman Decl., Ex. 3 (DLA_Mehta_00000006–7); *see also id.*, Ex. 5 (DLA_Mehta_00011086) (DLA Piper's At-Will Employment Policy); Mehta Dep. Tr. 25:6–8 (Mehta "believe[d]" her employment with DLA Piper was at-will).

16.     Mehta electronically accepted the Firm's offer on September 8, 2021.  Neiman Decl., Ex. 3 (DLA_Mehta_00000015).

17.     Mehta began working for DLA Piper on October 18, 2021.  Neiman Decl., Ex. 4 (DLA_Mehta_00000083).

**Mehta Meets Her Prorated Hours Target For The 2021 Calendar Year**

18.     Pursuant to the Firm's Associate Compensation and Bonus Policy, associates are expected to "work at least 2,000 bonus hours" in order to "be eligible to receive a bonus."  Neiman Decl., Ex. 6 (DLA_Mehta_00009775).

19.     "Bonus-[e]ligible [h]ours" include a minimum of 1,850 client-billable hours, as well as up to 200 non-billable hours, including for time spent on the following categories of work, subject to specific guidelines: pro bono, job shadowing, mentoring, recruiting, training and

development, "knowledge management," diversity and inclusion or charitable and community service, and business development.  Neiman Decl., Ex. 6 (DLA_Mehta_00009776).

20.    Based on Mehta's October 18, 2021 start-date, her prorated "bonus hours" target for 2021 was 411 hours—386 of which needed to be client-billable.  Senger Decl., Ex. 3 (DLA_Mehta_00008238–8239).

21.    Mehta ultimately recorded 387 client-billable hours and 39 bonus-eligible hours in 2021, for a total of 426 "bonus hours."  Senger Decl., Ex. 6 (PL000001).

22.    Mehta therefore met her bonus hours target based on her October 18, 2021 start-date for the 2021 calendar year.  Senger Decl., Ex. 3 (DLA_Mehta_00008238–8239); *id.*, Ex. 6 (PL000001).

**Mehta Receives Bonuses Based On Her Hours Alone**

23.    Pursuant to the Firm's Associate Compensation and Bonus Policy, in general, "[t]o be bonus eligible, an associate must meet the annual billable hour production target, meet the Firm's and the practice group's performance standards, comply with all Firm policies, and be employed in good standing with the Firm on the date that bonuses are paid to associates."  Neiman Decl., Ex. 6 (DLA_Mehta_00009775).

24.    The year-end evaluation process is based on a "performance year" lasting from "October 1 [to] September 30."  Neiman Decl., Ex. 7 (DLA_Mehta_00011082).

25.    Typically, the Firm's "year-end evaluation process will begin in early October with associate self-evaluations and evaluator designations."   Neiman  Decl.,  Ex.  7 (DLA_Mehta_00011082).

26.    The review period lasts from mid-October to mid-November, and feedback is delivered in early January to mid-February.  Neiman Decl., Ex. 7 (DLA_Mehta_00011083).

27.    "All associates who were working at the firm as of June 30 during the year's performance cycle are included in the year-end process."    Neiman Decl., Ex. 7 (DLA_Mehta_00011083).

28.    Mehta joined the Firm in October 2021, which was after the conclusion of the 2021 performance cycle.  Neiman Decl. ¶ 39; *see also id.*, Ex. 7 (DLA_Mehta_00011082).

29.    Mehta therefore did not receive a formal performance review for her work in the 2021 calendar year.  Neiman Decl. ¶ 39.

30.    Mehta's offer letter made clear that Mehta would "receive a full 2021 year-end bonus" so long as she met the Firm's "pro-rated" hours expectation for "Associates who join the Firm after the beginning of the year."  Neiman Decl., Ex. 3 (DLA_Mehta_00000001–3).

31.    On December 1, 2021, the Firm announced its 2021 Associate Bonus Program, which included a $105,000 "market level bonus" for associates with a Firm class year of 2015. Senger Decl., Ex. 7 (DLA_Mehta_00006300).  The Firm further indicated that bonuses would be paid to associates on January 28, 2022. *Id.*

32.    On December 14, 2021, the Firm announced that "[a]ssociates in good standing and who [had already] met the minimum production qualifications, based on time entered and finalized through Friday, December 17, 2021, w[ould] receive 50 percent of the base market bonus [early,] on December 30, 2021."  Senger Decl., Ex. 8 (DLA_Mehta_00009473).  Associates who had not met the minimum production by December 17 but ultimately met their target by December 31 would receive their full market bonus on January 28, 2022. *Id.*

33.    As of December 17, 2021, Mehta had not met her pro-rated hours target. *See* Senger Decl., Ex. 4 (DLA_Mehta_00008843) (Mehta confirming that, as of December 29, 2021, she had

not yet met her pro-rated hours target); *see also id.*, Ex. 5 (DLA_Mehta_00002629) (photograph of Mehta's December 2021 recorded hours).

34.     Nevertheless, Mehta received an accelerated payment of 50% of her $105,000 market-level bonus on January 2, 2022 as a courtesy.   Neiman Decl. ¶ 25; *id.*, Ex. 4 (DLA_Mehta_00000083).

35.     Also on December 14, 2021, the Firm announced that "associates who [were] meeting the firm's high expectations with a performance rating of three or higher" would receive an additional bonus, which was $21,000 for associates with a Firm class year of 2015.  Senger Decl., Ex. 8 (DLA_Mehta_00009473).

36.     As of January 2, 2022, Mehta had not yet received a performance evaluation (and therefore did not have a performance rating of three or higher).  Neiman Decl. ¶ 39.

37.     Nevertheless, Mehta received the $21,000 special bonus on January 2, 2022 as a courtesy.  Neiman Decl. ¶ 23; *id.*, Ex. 4 (DLA_Mehta_00000083).

38.     Mehta received the remaining 50% of her $105,000 base-market bonus at the end of January 2022, because she met her pro-rated hours target by the end of December 2021.  Neiman Decl., Ex. 4 (DLA_Mehta_00000083).

39.     The payment of Mehta's bonuses was in no way tied to any assessment by the Firm of her performance from October through December; instead, it was based solely on the terms of her offer letter and Mehta having met the Firm's pro-rated hours requirement for the 2021 calendar year.   Durham Decl. ¶ 19; Neiman Decl. ¶ 26; Senger Decl., Ex. 9 (DLA_Mehta_00009470) (Mehta confirming her understanding that she would "be eligible to receive a full year-end bonus . . . as long as I meet my prorated hours for 2021").

**Mehta's Salary Is Increased In Lockstep With Her Class Year**

40.    Pursuant to the Firm's Associate Compensation and Bonus Policy, "[e]ach associate's salary is aligned to the current base salary scale for their assigned Firm Class Year." Neiman Decl., Ex. 6 (DLA_Mehta_00009775).

41.    Further, "[b]ase salary increases resulting from an associate's advancement in seniority will normally become effective on January 1 of the following year." Neiman Decl., Ex. 6 (DLA_Mehta_00009775).

42.    Effective January 1, 2022, Mehta became a seventh-year associate based on her Firm class year (2015). Durham Decl. ¶ 20; Neiman Decl. ¶ 30.

43.    Mehta understood that when she joined DLA Piper, she "came in with [her] class year (as a 6th year going on 7th)." Senger Decl., Ex. 10 (PL000002).

44.    All associates with a Firm class year of 2015, including Mehta, received an increase in their base compensation from $330,000 to $350,000 as of January 1, 2022. Senger Decl., Ex. 10 (PL000002); *see also* Neiman Decl., Ex. 4 (DLA_Mehta_00000083); *id.*, Ex. 1 (Neiman Dep. Tr. 16:12–21) ("Our compensation at DLA for associates moves in lockstep. And what that means is, each class year is assigned a base compensation that is very much dictated by the market.").

45.    On January 25, 2022, the Firm communicated to its associates that "DLA Piper will be matching the recently announced salary increases" that had been announced by peer firms, and that all associates with a Firm class year of 2015 would receive an increase in their base compensation from $350,000 to $370,000. Senger Decl., Ex. 10 (PL000003).

46.    This lock-step salary increase applied retroactively, effective as of January 3, 2022. Neiman Decl., Ex. 4 (DLA_Mehta_00000083).

47. This lock-step salary increase was dictated by market conditions, and the Firm's decision to increase associate salaries in this amount was in no way tied to any individual associate's performance. Neiman Decl. ¶¶ 31–32.

48. On March 15, 2022, the Firm communicated to its associates that they would receive a further increase in their base compensation, and all associates with a Firm class year of 2015, including Mehta, received an increase in their base compensation from $370,000 to $400,000, which was retroactively effective as of January 3, 2022. Senger Decl., Ex. 11 (PL000023); *see also* Neiman Decl., Ex. 4 (DLA_Mehta_00000083).

**Mehta Requests And Receives A Transfer To The New York Office**

49. Although she had been hired to work in the San Francisco office, Mehta never lived in San Francisco, Mehta Dep. Tr. 126:19–20, "never worked out of the San Francisco office," and never visited that office, *id.* 15:2–7.

50. On December 29, 2021, Mehta submitted a request to relocate from the San Francisco office to the New York office. Senger Decl., Ex. 12 (DLA_Mehta_00006377).

51. On January 24, 2022, the Firm informed Mehta that her relocation request had been approved, effective January 31, 2022. Senger Decl., Ex. 13 (DLA_Mehta_00000016).

52. The Firm's decision to approve Mehta's relocation request was not based on any assessment of her work performance between her start date in October 2021 and her move in January 2022. *See* Durham Decl. ¶ 26; *id.*, Ex. 4 (DLA_Mehta_00006379).

53. After relocating to the New York office, Mehta billed the vast majority of her time to matters for which Durham and Medansky were the supervising IPT partners. *See* Mehta Dep. Tr. 55:8–21; *see also* Senger Decl., Ex. 14 (DLA_Mehta_00009779).

**Mehta's Performance Falls Short Of Expectations "From the Very Beginning"**

54.     DLA Piper establishes written performance benchmarks for associates within the IPT Group.  *See* Neiman Decl., Ex. 8 (DLA_Mehta_00000121).

55.     During her tenure at DLA Piper, Mehta was considered a "Level 2" associate (i.e., a "4th-7th Year").  *See* Neiman Decl., Ex. 8 (DLA_Mehta_00000124).

56.     As a Level 2 associate, Mehta was expected to, among other things: "[i]ndependently counsel client[s] on basic legal issues"; "[d]raft basic substantive documents"; "[p]repare written materials for senior lawyers prior to client meeting[s]"; and "[a]pply in-depth knowledge of key substantive principles of practice."    Neiman Decl., Ex. 8 (DLA_Mehta_00000124).

57.     Durham testified that, "from the very beginning," she noticed "deficits" in Mehta's skillset.  Durham Decl., Ex. 1 (Durham Dep. Tr. 52:6–11).

58.     According to Durham, Mehta "really needed to be in a different place than [where she] sold herself to be."  Durham Decl., Ex. 1 (Durham Dep. Tr. 64:20–22).

59.     Medansky also "grew to be disappointed that [he] did not have a 7th year associate that was performing at a 7th year associate level."  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 78:5–7).

**Mehta Struggles To Draft Basic Documents**

60.     In December 2021, Mehta sent Durham draft responses and objections to an opposing party's requests for production ("RFPs") in a Trademark Trial and Appeal Board ("TTAB") action.  *See* Durham Decl. ¶ 29.

61.    On December 31, Durham told Mehta that her draft was "not really compliant [with] discovery practice under the current Federal Rules."    Durham Decl., Ex. 5 (DLA_Mehta_00000187).

62.    Durham sent Mehta RFP responses from a different case to "give [her] an idea for some better objection language."  Durham Decl., Ex. 5 (DLA_Mehta_00000187).

63.    Durham was surprised that an associate of Mehta's seniority would not be more familiar with drafting responses and objections to RFPs.  Durham Decl. ¶ 31.

**Mehta's Work Requires "Surgery" From Senior Attorneys**

64.    At her deposition, Mehta identified trademark prosecution as one of her "areas of expertise."  Mehta Dep. Tr. 184:12.

65.    Trademark prosecution work includes responding to Office Actions, which are issued by the United States Patent and Trademark Office ("USPTO") to identify legal problems with proposed trademarks or trademark applications.  *See* Mehta Dep. Tr. 185:4–12; 234:18–235:3.

66.    In January 2022, Medansky asked Mehta to draft a response to an Office Action in connection with a client's trademark application.  Medansky Decl. ¶ 15.

67.    Mehta understood that her "job" when drafting an Office Action response was to "understand the issues in the office action [and] make sure that the response was responsive [to those issues]."  Mehta Dep. Tr. 243:19–244:2.

68.    Mehta further understood that she needed to adopt "[w]hatever style of writing . . . that the partner or the client wanted."  Mehta Dep. Tr. 245:20–24.

69.    On January 31, Medansky emailed DLA Piper attorney Hilary Remijas to discuss Mehta's draft.  *See* Medansky Decl., Ex. 2 (DLA_Mehta_00009603).

70.    Medansky lamented to Remijas that he "[did] not think [Mehta] really read the office action and matched the [USPTO] examiner[']s concerns to [her] argument."  Medansky Decl., Ex. 2 (DLA_Mehta_00009603).

71.    Medansky told Remijas that he had already "spent several hours" revising Mehta's work, but it still required "significant additional surgery."    Medansky Decl., Ex. 2 (DLA_Mehta_00009603).

## Mehta Fails To Prepare For A New Client Call

72.    In March 2022, Durham asked Mehta to help her prepare for an intake (or "kickoff") call with a new client.  *See* Mehta Dep. Tr. 272:7.

73.    Mehta recalled that this client was "particularly large" and had a "massive portfolio."  Mehta Dep. Tr. 272:12; 273:12.

74.    Durham testified that organizing a client intake call was "something that [she] would have expected an associate at [Mehta's] level to have done before and to know how to do[,] [including] how to set an agenda, how to think about things that were strategic and important to the client, and to really provide some value."  Durham Decl., Ex. 1 (Durham Dep. Tr. 69:11–16); *see also id.* (Durham Dep. Tr. 69:22–25) ("[I]f you are a senior associate and you work in this area [of law], that's something that you should have been doing already, before you came to [DLA Piper].").

75.    Having not received any preparation materials from Mehta as of the afternoon before the call, Durham emailed Mehta to request an agenda.  *See* Durham Decl., Ex. 6 (DLA_Mehta_00000159).

76.    Mehta responded that she had asked a paralegal to prepare an agenda, and she promised to "follow up."  Durham Decl., Ex. 6 (DLA_Mehta_00000159).

77.    As of the day before the call, Mehta had not offered to create an agenda herself, nor had she asked Durham for guidance as to how to prepare the agenda.  *See* Durham Decl., Ex. 6 (DLA_Mehta_00000159); *see also* Durham Decl. ¶¶ 38, 47.

78.    On the morning of the call, Durham still had not received an agenda or any other preparation materials.  Durham Decl. ¶ 39; *id.*, Ex. 6 (DLA_Mehta_00000158).

79.    Durham therefore emailed Mehta *again*, writing:

> I am concerned that we are not prepared for the call later today.  I was hoping I would have an agenda to review by now, given that starting at 9:30 I am booked solid up until the call.  Have you taken a look at [the client's] portfolios relative to what seems to be going on in their business so we can offer any preliminary strategic thoughts on where coverage stands, whether there are non-traditional marks they should be thinking about, etc.?  I want them to know that we are thinking about their business not just checking the boxes.

Durham Decl., Ex. 6 (DLA_Mehta_00000158).

80.    Mehta responded, "I know I apologize."    Durham Decl., Ex. 6 (DLA_Mehta_00000158).

81.    Mehta also told Durham that the paralegal had "just sent the agenda," and she promised to "respond with some Qs [she had] been thinking of for each bucket."  Durham Decl., Ex. 6 (DLA_Mehta_00000158).

82.    Mehta told Durham that she failed to provide preparation materials until the afternoon of the call because she had not "done a 'kick off' call in the way that [Durham] wanted before."  Senger Decl., Ex. 24 (DLA_Mehta_00010723A); *id.*, Ex. 25 (DLA_Mehta_00003913); *see also* Durham Decl., Ex. 1 (Durham Dep. Tr. 69:17–20) ("That was one of those instances where [Mehta] didn't perform the way I expected and then afterwards said, 'Well, I didn't know what was expected of me.'").

83.    Durham testified that in her view, preparing an agenda for a call is a routine task that an associate should understand how to do, and that she did not think Mehta's excuse for failing to prepare an agenda "ma[d]e any sense."  Durham Decl., Ex. 1 (Durham Dep. Tr. 70:1–2); *see also* Durham Decl. ¶ 48 ("I also would have expected Mehta to produce *something* to me before the morning of the call—even if what she produced did not meet my expectations—but she did not send any agenda or questions until it was too late.").

**Mehta Repeatedly Downplays Her Mistakes As "Goofs"**

84.    In April 2022, Mehta attempted to draft an Office Action response for one of Durham's clients.  *See* Durham Decl. ¶ 49.

85.     On April 5, Durham reviewed Mehta's draft and sent a redline version with "[e]dits incorporated."  Durham Decl., Ex. 7 (DLA_Mehta_00006858).

86.    Durham explained that her "most important" edit was that Mehta's draft had discussed the *wrong company* in an entirely different industry.  Durham Decl., Ex. 7 (DLA_Mehta_00006858) ("[T]he response currently discusses a different [company] that is not our client."); *see also* Durham Decl. ¶ 50 ("Mehta wrote about a non-client company engaged in commercial real estate finance, when she should have written about the Firm's actual client, which was an investment firm in the entertainment and media industry.").

87.    Durham's redline of the draft included the comment: "THIS IS NOT OUR CLIENT.    NEEDS TO BE REVISED THROUGHOUT."    Durham Decl., Ex. 7 (DLA_Mehta_00006862).

88.    Mehta responded to Durham's email and wrote: "Whoa, apologies for that goof." Durham Decl., Ex. 8 (DLA_Mehta_00009404).

89.     Two days later (April 7), Mehta admitted to making another "goof" on a separate matter.  *See* Durham Decl., Ex. 9 (DLA_Mehta_00009406).

90.     Mehta emailed a client's foreign counsel (copying Durham and another DLA Piper partner, Mark Radcliffe) with the subject line: "URGENT – Trademark Applications for [client name redacted]."  Durham Decl., Ex. 9 (DLA_Mehta_00009407).  Mehta wrote: "Our client would like to file word marks for the below marks and services in Singapore asap.  **Can you prepare trademark filings today?**"  *Id.* (emphasis in original).

91.     Radcliffe replied to Mehta and Durham (removing the foreign attorneys) and wrote: "I thought that we were filing in Switzerland?  We need to file in Switzerland today.  Please make this the highest priority.  I would also cancel SG [i.e., Singapore]."  Durham Decl., Ex. 9 (DLA_Mehta_00009407).

92.     Shortly thereafter, Mehta forwarded Radcliffe's email to Durham and wrote: "I talked to [Radcliffe] – big goof on my part (probably because I was doing this at 1 am my time, but that is no excuse).  I am sending instructions to Switzerland now and cancelling Singapore."  Durham Decl., Ex. 9 (DLA_Mehta_00009406) (emphasis in original).

93.     Mehta's time entries for April 6 (i.e., the previous day) reflect 7.7 hours worked.  *See* Senger Decl., Ex. 5 (DLA_Mehta_00002626).

**Mehta Drafts A Summary Judgment Brief With "Major Issues"**

94.     On April 11, 2022, Mehta and Carissa Bouwer (then another DLA Piper associate) had a meeting to discuss strategy for drafting an "MSJ" (i.e., a Motion for Summary Judgment) before the TTAB for one of DLA Piper's clients.  *See* Declaration of Carissa Bouwer (August 3, 2024) (Bouwer Decl.), Ex. 2 (DLA_Mehta_00009516).

95.    On April 27, Mehta emailed Bouwer a "rough draft of the MSJ."  Bouwer Decl., Ex. 3 (DLA_Mehta_00008216).

96.    Mehta asked Bouwer to "let [her] know" if she was "missing any substantive arguments."  Bouwer Decl., Ex. 3 (DLA_Mehta_00008216).

97.    Mehta's draft contained a "Statement of Undisputed Material Facts" and three sections arguing that: (1) summary judgment was appropriate; (2) DLA Piper's client had priority in the contested trademark and did not infringe on the opposing party's trademark; and (3) the opposing party's pre-sales activities did not constitute "use" of the contested trademark.  *See* Bouwer Decl., Ex. 3 (DLA_Mehta_00008217–8226).

98.    On April 28, the opposing party filed its own motion for partial summary judgment. *See* Durham Decl., Ex. 10 (DLA_Mehta_00008227).

99.    Bouwer told Durham that Mehta had sent her a "draft MSJ" the day before, which Bouwer thought they could "easily turn into a response and counterclaim."  Durham Decl., Ex. 10 (DLA_Mehta_00008227).

100.    On May 12, Mehta, Bouwer, and Durham had a meeting to "get a game plan together" for the "MSJ."  Durham Decl., Ex. 11 (DLA_Mehta_00008190).

101.    On May 27, Bouwer emailed Durham a draft "Opposition and Cross Motion for SJ," copying Mehta and Loretta Segura (then a DLA Piper summer associate).  *See* Durham Decl., Ex. 12 (DLA_Mehta_00008288).

102.    As with Mehta's April 27 draft, the May 27 draft contained a "Statement of Undisputed Material Facts" and sections arguing that: (1) summary judgment was appropriate; (2) DLA Piper's client had priority in the contested trademark and did not infringe on the opposing

party's trademark; and (3) the opposing party's pre-sales activities did not constitute "use" of the contested trademark. *See* Durham Decl., Ex. 12 (DLA_Mehta_00008289–8309).

103.    The May 27 draft also contained one additional section that responded to arguments raised in the opposing party's April 28 motion for partial summary judgment. *See* Durham Decl., Ex. 12 (DLA_Mehta_00008300) (arguing in Section C that the opposing party's "Target Market is English Speakers in the United States and Should Not Be Limited to [a smaller segment of the population]").

104.    On May 28, Durham emailed Bouwer and Mehta (copying Segura) that the draft needed "some significant work." Durham Decl., Ex. 12 (DLA_Mehta_00008288).

105.    Durham also attached a redline of the draft, which contained revisions and comments. *See* Durham Decl., Ex. 12 (DLA_Mehta_00008289).

106.    Mehta's April 27 draft and the May 27 draft contained virtually identical paragraphs, arguing that DLA Piper's client was "entitled to a presumption of ownership and validity of the registered [trademark]." *Compare* Bouwer Decl., Ex. 3 (DLA_Mehta_00008221), *with* Durham Decl., Ex. 12 (DLA_Mehta_00008298). Both paragraphs contain quotations from two Ninth Circuit opinions. Bouwer Decl., Ex. 3 (DLA_Mehta_00008221); Durham Decl., Ex. 12 (DLA_Mehta_00008298).

107.    Durham's redline included a comment that she was "[s]urpised to see no Fed[eral] Cir[cuit] or pre[ce]dential TTAB authority here in this paragraph," explaining that the TTAB "will not like that." Durham Decl., Ex. 12 (DLA_Mehta_00008298).

108.    Mehta's April 27 draft and the May 27 draft both argued: "Without sufficient pre-sales activities as discussed herein, [the opposing party] cannot prove first use based on a theory

of analogous trademark use." Bouwer Decl., Ex. 3 (DLA_Mehta_00008222); Durham Decl., Ex. 12 (DLA_Mehta_00008299).

109.    Durham commented on this sentence and explained that: "Sufficiency of pre-sales activities is a concept under the 9th Circuit's totality of the circumstances test. It is not the appropriate standard to be discussing here [in the TTAB]." Durham Decl., Ex. 12 (DLA_Mehta_00008299).

110.    Similarly, Mehta's April 27 draft and the May 27 draft contained two nearly identical paragraphs, arguing that the opposing party's "Pre-Sales Activities Do Not Constitute Use Analogous to Trademark Use." *Compare* Bouwer Decl., Ex. 3 (DLA_Mehta_00008223), *with* Durham Decl., Ex. 12 (DLA_Mehta_00008303–8304).

111.    Durham's redline included a comment that these paragraphs discussed the "WRONG STANDARD." Durham Decl., Ex. 12 (DLA_Mehta_00008304); *see also id.* ("This is [the] 9th Cir. Standard. Needs to be Rewritten under Fed Cir analogous use authority.").

112.    Durham testified that she was "very disappointed [that] the wrong standards . . . had been used," which was "obviously [a] very major issue[]." Durham Decl., Ex. 1 (Durham Dep. Tr. 82:21–83:2).

113.    Durham further testified that she understood Mehta to have "done the bulk of the drafting." Durham Decl., Ex. 1 (Durham Dep. Tr. 85:9–12).

114.    Bouwer personally apologized to Durham for the fact that she had been unhappy with the draft and committed to Durham that she (Bouwer) would take responsibility for drafting the reply brief. Bouwer Decl. ¶ 23; Durham Decl. ¶ 71.

115.    Mehta did not apologize to Durham for the fact that the brief had applied the incorrect standards or explain why the mistakes had been made. Durham Decl. ¶ 70.

**Mehta Struggles With Time Management**

116.    Durham believed that there were not only "issues with [Mehta's] work product," but also that Mehta had "issues [with] timeliness."  Durham Decl., Ex. 1 (Durham Dep. Tr. 43:9–10).

117.    Medansky similarly testified that he was "concerned" about Mehta's ability to meet deadlines.  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 120:16–18).

118.    On April 22, 2022, one of Medansky's clients asked Mehta to draft a demand letter regarding a third party's unauthorized use of the client's trademarks and copyrighted images.  *See* Medansky Decl., Ex. 6 (DLA_Mehta_00009392).

119.    Six days later, on April 28, the client followed up on his request, writing, "Hi Anisha, Could we get an ETA on the letter?"  Medansky Decl., Ex. 6 (DLA_Mehta_00009391).

120.    Mehta apologized for her delay and promised to send a draft by the following morning.  *See* Medansky Decl., Ex. 6 (DLA_Mehta_00009391).

121.    Having not received a draft by 10:59 a.m. the next morning, the client followed up again, writing, "I need to receive the demand letter from you today so I can send it today.  If that's not possible, please let me know so I can just handle it."   Medansky Decl., Ex. 6 (DLA_Mehta_00009390–9391).

122.    Mehta apologized to the client again, explaining that she had been trying to find the recipient's email address in addition to a physical address, and attached a draft of the demand letter.  Medansky Decl., Ex. 6 (DLA_Mehta_00009390).

123.    Later, in an email to Mehta, Medansky wrote: "I like responding to clients right away.  If there is more to do/say we can say so.  But, quick response is good."  Medansky Decl., Ex. 6 (DLA_Mehta_00009388).

124.    In response to Medansky, Mehta wrote: "Noted, thanks."  Medansky Decl., Ex. 6 (DLA_Mehta_00009388).

125.    On May 24, 2022, a different DLA Piper client emailed Mehta several questions regarding a proposed trademark application.  *See* Durham Decl., Ex. 13 (DLA_Mehta_00000200).

126.    Durham and Radcliffe were copied on the email, but Mehta was the only direct recipient.  Durham Decl., Ex. 13 (DLA_Mehta_00000200).

127.    Two weeks later, on June 7, Mehta forwarded the client's questions to Durham and Radcliffe and asked for their input.  *See* Durham Decl., Ex. 13 (DLA_Mehta_00000199).

128.    Durham replied that *she* would respond to the client's questions and added: "We need to be more timely in our correspondence."  Durham Decl., Ex. 13 (DLA_Mehta_00000199).

129.    Durham testified that untimely correspondence "can obviously have a very negative impact on a client relationship."  Durham Decl., Ex. 1 (Durham Dep. Tr. 43:10–11).

130.    Indeed, a client "reached out to [Durham] and expressed concern" regarding Mehta's "timeliness [on] a variety of assignments."  Durham Decl., Ex. 1 (Durham Dep. Tr. 54:4–12).  Durham shared those concerns regarding Mehta's lack of timeliness and ultimately removed Mehta from that client's matters as a result.  *Id.* (Durham Dep. Tr. 54:11–12; 55:1–3).

**Mehta Misunderstands Basic Intellectual Property Law Concepts**

131.    Durham believed that Mehta "demonstrated a shockingly poor grasp of intellectual property principles."  Durham Decl., Ex. 1 (Durham Dep. Tr. 74:12–16).

132.    In June 2022, Mehta drafted an email to a client facing a copyright infringement claim regarding photographs used on its website.  *See* Durham Decl., Ex. 15 (DLA_Mehta_00000189).

133.    Mehta advised that the client could "certainly" respond to the infringement claim by "assert[ing]" that the photographs at issue had been subject to a "creative commons / free license." Durham Decl., Ex. 15 (DLA_Mehta_00000189).

134.    In response, Durham informed Mehta that "Creative Commons licenses do not allow for commercial use." Durham Decl., Ex. 15 (DLA_Mehta_00000188).

135.    Durham subsequently rewrote Mehta's draft to advise the client: "Generally speaking, creative common licenses only permit non-commercial use, and the claimant here will assert that [the client's use of the photographs on its website] was a commercial use, and therefore not permitted by a [creative] commons license." Durham Decl., Ex. 16 (DLA_Mehta_00009566).

136.    Durham testified that creative commons licenses "can be very dangerous [because] clients seem to labor under a lot of misconceptions about what a creative commons license gives [them]," and it appeared to Durham that Mehta "was actually laboring under those same misconceptions." Durham Decl., Ex. 1 (Durham Dep. Tr. 75:14–19).

137.    Durham further testified she "could not believe that Mehta did not understand such an elementary IP concept at that point in her career—or that she would propose to offer a client fundamentally incorrect legal advice on a subject she did not understand without taking steps to research the issue first." Durham Decl., ¶ 80; *see also id.* ("[I]t is 'Intellectual Property Law 101' that creative commons licenses do not allow for commercial use.").

138.    Durham does not have a "high tolerance" for mistakes that can lead to clients "get[ting] sued." Durham Decl., Ex. 1 (Durham Dep. Tr. 77:6–10) ("[O]ne time is enough if somebody gives a client . . . the wrong advice on a creative commons license.").

**Mehta's Trademark Clearance Work Requires Substantial Partner Oversight**

139.    Mehta described trademark "clearance" as another one of her "areas of expertise." Mehta Dep. Tr. 184:10–12.

140.    Mehta explained that, whenever a client was considering "a new name for their business or product," DLA Piper attorneys ran a "clearance search" to ensure that "the name [was] actually available to use."  Mehta Dep. Tr. 181:22–182:4.

141.    Durham testified that clearance work is "high-stakes" and has "very little margin for error."  Durham Decl., Ex. 1 (Durham Dep. Tr. 44:23–24); *see also id.* (Durham Dep. Tr. 44:15–22) ("[I]f we mess up the clearance . . . [t]he inhouse lawyers look bad in front of their inhouse business clients . . . And/or the company can get sued.").

142.    On June 27, 2022, Mehta drafted a clearance search report for one of Medansky's international clients.  *See* Medansky Decl., Ex. 3 (DLA_Mehta_00000171).

143.    Although Mehta had received only the results of "in-house preliminary searches," she incorrectly represented that she had "received the search results from local counsel." Medansky Decl., Ex. 3 (DLA_Mehta_00000169–170).

144.    Mehta later admitted that she had simply "used similar language" from search reports that Remijas had drafted in stating that she had received search results from local counsel. Medansky Decl., Ex. 3 (DLA_Mehta_00000170).

145.    Medansky was "confused" by Mehta's draft, explaining: "You cant write it up this way suggesting we have foreign [counsel] input when we don't."  Medansky Decl., Ex. 3 (DLA_Mehta_00000169).  Medansky explained that Mehta "need[ed] to be clear" that the report had "no local input."  *Id.*

146.    Mehta thanked Medansky for his feedback and promised to "fix" the draft. Medansky Decl., Ex. 3 (DLA_Mehta_00000168).

147.    Even after Mehta sent a "revised version," however, Medansky made additional edits.  *See* Medansky Decl., Ex. 4 (DLA_Mehta_00008269).

148.    Mehta drafted another clearance report for Medansky in July 2022.  *See* Medansky Decl., Ex. 5 (DLA_Mehta_00000191).

149.    On July 10, Medansky emailed Mehta that her draft "require[d] some work." Medansky Decl., Ex. 5 (DLA_Mehta_00000191).

150.    Medansky told Mehta that he disagreed with "several points" she had made and that her analysis required a "more nuanced touch."  Medansky Decl., Ex. 5 (DLA_Mehta_00000191).

151.    Medansky also invited Mehta to call him if she needed to discuss his "comments" or needed "more input."  Medansky Decl., Ex. 5 (DLA_Mehta_00000191).

152.    Mehta "apologi[zed] for the lack of context" and acknowledged that the draft had required "several edits."  Medansky Decl., Ex. 5 (DLA_Mehta_00000191).  She thanked Medansky for his "revisions and feedback," but she did not take him up on his offer to discuss his feedback over the phone.  *See id.*

**<u>Mehta "Regurgitates" Other Attorneys' Advice Without Adding Independent Value</u>**

153.    DLA Piper's international clients often seek legal advice regarding trademark issues in foreign countries.  Durham Decl. ¶ 84.  In these cases, DLA Piper's U.S. IPT attorneys will incorporate advice from local attorneys in the relevant jurisdictions.  *Id.*

154.    Durham testified that clients expect DLA Piper's U.S. IPT attorneys to "get local advice, think about the strategy of the client, take what [they] know about the client's goals,

objectives, [and assets], and then provide advice to the client based on all of this information." Durham Decl., Ex. 1 (Durham Dep. Tr. 67:23–68:2).

155.    Durham further testified that DLA Piper's U.S. IPT attorneys should *not* "just regurgitate something that a lawyer from another country would tell . . . the client."  Durham Decl., Ex. 1 (Durham Dep. Tr. 67:18–20); *see also id.* (Durham Dep. Tr. at 67:20–22) ("That's not what our clients pay us for.").

156.    On June 14, 2022, Mehta sent Durham a draft email to a client regarding potential trademark filings in China.  *See* Durham Decl., Ex. 17 (DLA_Mehta_00006867).

157.    In response, Durham emailed Mehta that she had not "fully customized" the advice of local Chinese counsel.  *See* Durham Decl., Ex. 17 (DLA_Mehta_00006867).

158.    Durham explained that they needed to make a recommendation "based on the advice of local counsel," but Mehta's analysis "seem[ed] like more of a cut and paste."  Durham Decl., Ex. 17 (DLA_Mehta_00006867).

159.    In fact, Durham pointed out that "there [were] several places where [Mehta's] email refer[ed] to 'the client' which should be avoided when we are writing ***to the client***."  Durham Decl., Ex. 17 (DLA_Mehta_00006867) (emphasis added); *see also id.* (DLA_Mehta_00006868) (referring to "the client" five times).

160.    Durham testified that Mehta's repeated references to the client "in the third person" indicated to Durham that Mehta had "not even [done] a careful proofreading job."  Durham Decl., Ex. 1 (Durham Dep. Tr. 68:6–7).

161.    Durham felt that permitting Mehta to continue to do work for clients under these circumstances entailed putting the client relationship at risk, and that "you can't put a client

relationship at risk when you know that those types of things are happening." Durham Decl., Ex. 1 (Durham Dep. Tr. 68:19–21).

**Mehta Struggles To Articulate The Limited Value She Provides To Clients**

162.    Durham testified that Mehta's time-entry narratives were "not what [she] would have expected for somebody playing a senior role within [her] team." Durham Decl., Ex. 1 (Durham Dep. Tr. 36:22–24).

163.    On July 19, 2022, Durham emailed Mehta several "pointers on time entries." *See* Durham Decl., Ex. 18 (DLA_Mehta_00000209).

164.    Among other things, Durham reminded Mehta that her time entries should "convey what [she] as an expensive hourly attorney [was] doing to advance the client's interests." Durham Decl., Ex. 18 (DLA_Mehta_00000209). Durham instructed Mehta to "[p]lease craft the time entry so that it is clear what value [she] personally [was] providing." *Id.*

165.    Durham testified the Firm's "client relationships" are affected when "value is not communicated on the bill." Durham Decl., Ex. 1 (Durham Dep. Tr. 37:1–4).

166.    For example, one of Durham's clients "[had] an issue with the bills because [they] couldn't understand why somebody so senior [i.e., Mehta] was basically doing what seemed like paralegal-level work." Durham Decl., Ex. 1 (Durham Dep. Tr. 53:25–54:3).

167.    In fact, both Durham and Medansky had to make "write-offs" or "write-downs" because Mehta either billed too much time to various tasks or billed for doing junior- or paralegal-level work that could not justifiably be billed to a client at her hourly rates. Durham Decl., Ex. 1 (Durham Dep. Tr. 36:19); Medansky Decl., Ex. 1 (Medansky Dep Tr. 54:20–23).

**Durham And Medansky Realize That Mehta Is Only Capable Of Low-Level Work**

168.    Durham experienced an "erosion of trust" in Mehta due to the repeated mistakes she had made.  Durham Decl., Ex. 1 (Durham Dep. Tr. 51:4); *see also id.* (Durham Dep. Tr. 51:9–10) (describing her lost confidence as "[l]ittle chips here and there" and "death by a thousand cuts."); *id.* (Durham Dep. Tr. 42:1–4) (explaining that, from her perspective, "just a couple of bad performances . . . are much more meaningful than some accolades").

169.    Durham gradually "pull[ed] back more and more" on what she trusted Mehta to do because the alternative was "having to spend too much time reviewing and correcting for . . . an associate at [Mehta's] level."  Durham Decl., Ex. 1 (Durham Dep. Tr. 73:10–13).

170.    Medansky also moved Mehta to the "periphery" on his matters because, while he felt that he could ask her to do "little things," he was "not satisfied" with Mehta's "heavy thinking" on more substantive assignments that were typical for someone of her level.  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 77:14–18); *see also id.* (Medansky Dep. Tr.  80:24–25).

**Mehta Informs Partners That She Is Pregnant And They Are Supportive And Encouraging**

171.    On August 5, 2022, Mehta had a phone call with Durham in which Mehta informed Durham that she was pregnant.  Senger Decl., Ex. 15 (DLA_Mehta_00003935).

172.    At the time of the call, Mehta had "just finished [her] 1st tri[mester]" and was "[d]ue end of [J]an[uary]."  Senger Decl., Ex. 15 (DLA_Mehta_00003935).

173.    Mehta's notes from the call reflect that Durham was "very encouraging [that Mehta] take the whole time off and take what [she] need[s] before transitioning back."  Senger Decl., Ex. 15 (DLA_Mehta_00003935); *see also* Mehta Dep. Tr. 158:22–159:2 (confirming these are Mehta's notes from the meeting).

174.    Durham also "suggest[ed] . . . that [Mehta] should discuss [her] leave with HR because they would have the most accurate updated policy regarding leave."  Mehta Dep. Tr. 159:20–160:2; Senger Decl., Ex. 15 (DLA_Mehta_00003935).

175.    Durham told Mehta to "talk to HR about what our parental leave policies are" because she (Durham) "did not have the correct information about what [the] leave policies may have been, so [Durham] wanted to make sure that [Mehta] had the right information about that." Durham Decl., Ex. 1 (Durham Dep. Tr. 87:2–88:25).

176.    Mehta confirmed during her deposition that on her August 5, 2022 call with Durham, Durham appeared "supportive," Mehta Dep. Tr. 160:12–14, and "positive" regarding Mehta's pregnancy, Mehta Dep. Tr. 163:6–9.

177.    Durham "did [not] say anything to [Mehta] to suggest that she was unhappy that [Mehta was] pregnant."  Mehta Dep. Tr. 162:23–163:2.

178.    Durham herself is a mother of two and has taken two parental leaves during her employment with DLA Piper.  Durham Decl. ¶ 94; *id.*, Ex. 1 (Durham Dep. Tr. 87:18).

179.    Also on August 5, 2022, Mehta emailed DLA Piper's HR department because she had "some questions regarding [the Firm's] updated policies."  Senger Decl., Ex. 16 (DLA_Mehta_00004133).

180.    Mehta noted that she was "currently pregnant" and "wanted to get a better idea of what to expect and what steps [she] may need to take," and asked the "length of time provided for maternity leave."  Senger Decl., Ex. 16 (DLA_Mehta_00004133).

181.    An HR representative congratulated Mehta, answered her questions and provided information regarding what Mehta needed to do "to be compliant with DLA Piper's leave of absence requirements."  Senger Decl., Ex. 16 (DLA_Mehta_00004132).

182.    Mehta told Medansky she was pregnant at some point "during [her] second trimester."  Mehta Dep. Tr. 161:20–162:2.

183.    Medansky "g[ave] an excited response" and "congratulate[d]" Mehta.  Mehta Dep. Tr. 162:4–5; 162:14–15.

184.    Medansky did not "say anything to suggest to [Mehta] that he was unhappy that [she] was pregnant" or to suggest that "he did not want [Mehta] to take maternity leave."  Mehta Dep. Tr. 162:16–22.

185.    Mehta told Tamar Duvdevani, U.S. Chair of the Trademark, Copyright and Media practice group, that she was pregnant in September 2022.  Senger Decl., Ex. 17 (DLA_Mehta_00001726); *see also* Mehta Dep. Tr. 163:19–21; 167:6–10; Declaration of Tamar Duvdevani (August 6, 2024) (Duvdevani Decl.) ¶ 21

186.    According to Mehta, Duvdevani "asked how long [she] would be taking leave" and "what [her] plans were for having a nanny."  Mehta Dep. Tr. 164:9–12.

187.    Mehta did not recall Duvdevani "say[ing] anything in this conversation to suggest to [Mehta] that [Duvdevani] did not think [Mehta] should take maternity leave."  Mehta Dep. Tr. 166:11–14; *see also* Duvdevani Decl. ¶ 22 ("During this telephone call, I congratulated Mehta, mentioned my own experiences as a partner with a young child, and told her to let me know if she needed anything.").

188.    Mehta informed Dunn that she was pregnant in September 2022.  Mehta Dep. Tr. 167:3–5.

189.    Dunn congratulated Mehta and did not "say anything to suggest to [Mehta] that she did not want [Mehta] to take maternity leave" or to suggest that "she was unhappy [Mehta was] pregnant."  Mehta Dep. Tr. 166:24–167:2; 167:14–21.

190.    No DLA Piper partner said anything negative to Mehta about either her pregnancy or her anticipated parental leave.  Mehta Dep. Tr. 162:23–163:23; 167:14–21; 168:12–23; 174:3–20; Durham Decl. ¶ 99; Medansky Decl. ¶ 39; Duvdevani  Decl. ¶ 23.

**Mehta "Ghosts" Durham And Misses An Important Client Deadline**

191.    On August 12, 2022, one of Durham's clients requested a pair of preliminary trademark search reports by "COB PT" (i.e., Close of Business, Pacific Time) on August 19.  *See* Durham Decl., Ex. 20 (DLA_Mehta_00008882–8883); Durham Decl., Ex. 24 (DLA_Mehta_00009364).

192.    Durham believed that this was an "important deadline" for the client.  Durham Decl., Ex. 1 (Durham Dep. Tr. 65:18).

193.    Mehta did not send Durham a draft of one of the search reports until 3:56 p.m. Pacific Time on the afternoon of August 19—approximately one hour before the deadline.  *See* Durham Decl., Ex. 20 (DLA_Mehta_00008881) (email sent at 10:56 p.m. Coordinated Universal Time, which is seven hours ahead of Pacific Time); *see also id.*, Ex. 1 (Durham Dep. Tr. 66:9–11) (recalling that Mehta did not send the draft until "very late in the day, close to . . . the actual deadline").

194.    Less than an hour later, at 4:55 p.m. Pacific Time, Durham sent Mehta multiple edits and comments to the draft.  *See* Durham Decl., Ex. 21 (DLA_Mehta_00008337) (email sent at 11:55 p.m. Coordinated Universal Time).

195.    Mehta did not respond to Durham, nor did she send a finalized draft to the client. *See* Durham Decl., Ex. 21 (DLA_Mehta_00008337); Durham Decl. ¶ 105.

196.     Instead, Durham testified that Mehta "ghosted" her and "disappeared for any of the feedback [needed] to put the work product [into] a final form that would have been client ready." Durham Decl., Ex. 1 (Durham Dep. Tr. 65:17; 66:12–15).

197.     Durham called and instant-messaged Mehta "multiple times because [she] just didn't know what had happened [and] couldn't understand why there was no response at all." Durham Decl., Ex. 1 (Durham Dep. Tr. 65:17; 66:18–21).

198.     Ultimately, Durham revised the search report herself and sent it to the client at 6:41 p.m. Pacific Time—after the client's deadline.    Durham    Decl.,    Ex.    22 (DLA_Mehta_00008334) (email sent at 1:41 a.m. Coordinated Universal Time).

199.     The following morning, Mehta emailed Durham: "Not sure if you saw my teams message last night but thanks again for sending these out!!"  *See* Durham Decl., Ex. 24 (DLA_Mehta_00009363).

200.     Durham believed that Mehta's handling of the situation was "just not appropriate." Durham Decl., Ex. 1 (Durham Dep. Tr. 66:25).

201.     According to Durham, "there's really only so many times that can happen [before] the trust is completely eroded."  Durham Decl., Ex. 1 (Durham Dep. Tr. 65:19–22).

**Mehta Continues To Struggle With Basic Professionalism**

202.     Durham noted several occasions on which Mehta was "unprofessional in her communications with clients and partners."  Durham Decl., Ex. 1 (Durham Dep. Tr. 78:7–8).

203.     On September 13, 2022, Durham provided Mehta with additional feedback on the quality of her time-entry narratives.  *See* Durham Decl., Ex. 19 (DLA_Mehta_00000211).

204.    Durham reminded Mehta that "[t]he narrative to clients needs to be more professional because it is another form of important communication we have with them."  Durham Decl., Ex. 19 (DLA_Mehta_00000211).

205.    Also on September 13, Mehta sent Durham a draft of a preliminary trademark search report for one of DLA Piper's clients.  *See* Durham Decl., Ex. 14 (DLA_Mehta_00000197).

206.    Later that day, Durham provided Mehta with edits and noted: "[W]e need to have better turn around time for preliminaries.  Two weeks is just too long for a prelim, particularly when we get results like this that require some follow-up clearance."  Durham Decl., Ex. 14 (DLA_Mehta_00000196).

207.    Mehta claimed that the client told her the assignment was "not urgent at all," but she still agreed that she "let it sit longer than [she] should have."  Durham Decl., Ex. 14 (DLA_Mehta_00000196).

**Mehta's Billable Hours Are Consistently Low—And Mehta Is Nowhere Near Meeting Her Minimum Hours Threshold For The 2022 Calendar Year**

208.    Throughout Mehta's employment with DLA Piper, full-time associates (such as Mehta) were required to work at least 2,000 hours each year to receive an annual bonus.  *See* Neiman Decl., Ex. 6 (DLA_Mehta_00009776).

209.    At least 1,850 of those hours were required to be "billable" to DLA Piper clients. Neiman Decl., Ex. 6 (DLA_Mehta_00009776).

210.    Mehta received emails reminding her of the Firm's minimum billable-hours requirement on June 30 and August 17, 2022.  *See* Senger Decl., Ex. 18 (DLA_Mehta_00009348).

211.    In order to reach the 1,850 billable-hour minimum in 2022, Mehta would have needed to record an average of 154.1 billable hours each month.

212.    In 2022, there were only two months in which Mehta recorded 154.1 or more billable hours: May (163.9 billable hours) and July (161 billable hours).  *See* Senger Decl., Ex. 5 (DLA_Mehta_00002620–2632).   Mehta recorded only 84.3 billable hours in January, 103.1 billable hours in February, 124.4 billable hours in March, 135.1 billable hours in April, 142.7 billable hours in June, 132.1 billable hours in August, and 141 billable hours in September.  *Id.*

213.    During an October 27, 2021 "Professional Development Call," Mehta learned how to "look[] at [her] hours" using DLA Piper's "Partner [D]ashboard."  *See* Senger Decl., Ex. 19 (DLA_Mehta_00006246).

214.    The Partner Dashboard allowed Mehta to view the total number of billable hours she had recorded during the current year, as well as a projection of her current "pace" (an estimate as to how many hours she was "on track" to have recorded for the year based on her hours entered as of the end of previous month).  *See* Senger Decl., Ex. 20 (DLA_Mehta_00001468); Neiman Decl. ¶ 19.

215.    Based on the number of billable hours that Mehta had recorded between January and September 2022, Mehta's Partner Dashboard estimated that she was on pace to work 1,572 billable hours by the end of the year.  *See* Senger Decl., Ex. 20 (DLA_Mehta_00001468); *id.*, Ex. 21 (DLA_Mehta_00001470).

216.    In other words, as of September 30, 2022, Mehta was on pace to fall short of her billable-hours requirement by 278 hours.  *See* Senger Decl., Ex. 20 (DLA_Mehta_00001468); *id.*, Ex. 21 (DLA_Mehta_00001470).

217.    Durham testified that she was "concerned" that Mehta's hours were "not trending up toward the minimum billable [hours] that we require of associates."  Durham Decl., Ex. 1 (Durham Dep. Tr. 34:22–23).

218.    Durham received weekly "IPT Workload Reports," which indicated the current pace of all full-time and part-time associates in the IPT Group, including Mehta.  *See* Durham Decl., Ex. 28 (DLA_Mehta_00006464).

219.    For example, on August 1, 2022 (i.e., four days before Mehta and Durham's August 5 check-in meeting), Durham received an IPT Workload Report, indicating that Mehta was on pace to work 1,513 billable hours—a shortfall of 337 hours from the required 1,850 hours.  *See* Durham Decl., Ex. 28 (DLA_Mehta_00006468).

**Mehta Submits Paperwork To Unum Regarding Her Anticipated Parental Leave**

220.    On Wednesday, September 28, 2022, Mehta submitted a claim to DLA Piper's third-party benefits administrator, Unum, for short term disability coverage, pregnancy-related family medical leave, and state paid leave for newborn mothers.  *See* Senger Decl., Ex. 22 (DLA_Mehta_00004142); *id.*, Ex. 23 (PL000053).

221.    Mehta does not recall telling Durham, Medansky, or Duvdevani that she filed a claim with Unum.  Mehta Dep. Tr. 173:22–174:2; *see also* Durham Decl. ¶ 100; Medansky Decl. ¶ 40; Duvdevani Decl. ¶¶ 24–25.

222.    An email was sent by Unum's "Leave Management Center" to an email inbox for DLA Piper's Benefits and Retirement Department on September 28, 2022, as a "notification of the employee's request for leave," noting the "Leave Reason" as "Employee Health."  Declaration of Irina Smirnoff (August 6, 2024) (Smirnoff Decl.), Ex. 1 (DLA_Mehta_00011069).

223.    Lawyers do not have access to the DLA Piper Benefits and Retirement email inbox.  Neiman Decl. ¶ 61; Smirnoff Decl. ¶ 6.

224.    On Thursday, September 29, 2022, another notification from Unum was received by the Benefits and Retirement Department email inbox, showing that Mehta's claim for "STD"

33

was pending, and that FMLA "Protection" was "Pending" because Unum was awaiting certification. Smirnoff Decl., Ex. 2 (DLA_Mehta_00011070).

225.    Neither Durham nor Medansky was notified of Mehta's Unum claim submission prior to October 4, 2022. Durham Decl. ¶ 100; Medansky Decl. ¶ 40.

226.    On October 7, 2022, DLA Piper Benefits Analyst Irina Smirnoff forwarded the September 28 leave initiation notification to Eddie Raychaudhuri, the then-practice group director for the IPT Group, asking him to "pass this along to the appropriate contacts if needed." Smirnoff Decl., Ex. 3 (DLA_Mehta_00011091). This was the first time that Smirnoff communicated Mehta's leave requests to any member of the IPT group. Smirnoff Decl. ¶ 8.

**Mehta Drafted An Incorrect Trademark Clearance Search**

227.    On September 28, 2022, one of Durham's clients asked Mehta to perform a clearance search for a proposed trademark, noting that he "suspect[ed] there may be an item or two to report" and providing a link to a third party's trademark registration on the USPTO website. Durham Decl., Ex. 25 (DLA_Mehta_00009493).

228.    When Durham received Mehta's draft, she noticed that Mehta had not discussed the third-party trademark that the client had identified for review. *See* Durham Decl., Ex. 25 (DLA_Mehta_00009492); *see also* Durham Decl. ¶ 115.

229.    Durham asked Mehta: "What was the reference [i.e., third-party trademark] that [the client] was referring to when he said he suspects there would be a couple of things to report?" Durham Decl., Ex. 25 (DLA_Mehta_00009492).

230.    In response, Mehta incorrectly told Durham that the client "didn't say" which third-party trademarks he had expected the search to find. Durham Decl., Ex. 25 (DLA_Mehta_00009492).

34

231. When another DLA Piper associate pointed out that the client had provided a link to a third party's trademark registration, Mehta responded, "Oh woops looking from my phone and didn't see the link.  Thanks.  Will add it in when back at my computer[.] And will check the search results too." Durham Decl., Ex. 26 (DLA_Mehta_00000224); *see also* Durham Decl. ¶ 117.

232. Durham testified that, "if [she] had not noticed that Mehta's initial draft failed to address the client's concerns, the client would have received incorrect legal advice."  Durham Decl. ¶ 120.

233. Mehta's initial draft of the clearance search reached the conclusion that the client's proposed trademark presented "Low risk."  Durham Decl., Ex. 25 (DLA_Mehta_00009496); *see also id.*, Ex. 25 (DLA_Mehta_00009493) (explaining that the relevant analysis was written in blue font).

234. After Mehta revised the clearance search to include an analysis of the third-party trademark identified by the client, she changed her conclusion and opined that the client's proposed trademark actually presented "Moderate" risk.  *See* Durham Decl., Ex. 27 (DLA_Mehta_00009712); *see also id.*, Ex. 27 (DLA_Mehta_00009708) (explaining that the relevant analysis was written in blue font).

**Medansky Becomes Increasingly Concerned With Mehta's "Cursory" Work Product**

235. On September 29, 2022, Mehta emailed Medansky and Remijas a draft trademark search report for one of Medansky's clients.  *See* Medansky Decl., Ex. 7 (DLA_Mehta_00000234).

236. Medansky testified that an "important" purpose of a trademark search report is to allow a client to "take [the report], waive the [attorney-client] privilege, [and] present it in court as a defense to [a claim of] willful [trademark infringement]."  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 68:14–23).

237.    However, Medansky informed Mehta that her draft search report was "so cursory that [it] could be deemed insufficient to give the client a defense to willfulness if it were to be claimed that one of these marks infringes." *See* Medansky Decl., Ex. 7 (DLA_Mehta_00000233).

238.    Medansky testified that Mehta's cursory analysis was "shaking" because she was a seventh-year associate who "had practiced at another major law firm."  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 69:2–7).

239.    Medansky wondered, if Mehta did not know how to prepare a proper search report, "what else doesn't she know?"  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 69:2–7).

**Mehta Makes A Mistake That "Broke The Camel's Back"**

240.    On September 28, 2022, Mehta emailed one of Durham's clients a draft declaration supporting their planned response to a USPTO Office Action regarding the client's trademark application. *See* Durham Decl., Ex. 29 (DLA_Mehta_00008320A).

241.    Mehta explained that the declaration supported the client's argument that the trademark had "acquired distinctiveness under section 2(f) [of the Lanham Act, 15 U.S.C. § 1052(f)]".  Durham Decl., Ex. 29 (DLA_Mehta_00008320A); *see also* Mehta Dep. Tr. 256:4– 10 (explaining that "acquired distinctiveness is generally five years of continuous and exclusive use to show that your trademark has acquired a perspective by consumers in the marketplace that it is – you know, it is now a distinct mark and it's recognizable").

242.    Mehta asked the client to "**please provide** any information you can regarding sales revenue, ad $ spent, and # of projects conducted under the [trademark] in the past five years," adding that "[t]his information is crucial in establishing a strong 2(f) claim."  Durham Decl., Ex. 29 (DLA_Mehta_00008320A) (emphasis in original).

243.    However, Durham had previously instructed Mehta that she "[didn't] think [they] [would] need to submit expanded evidence of distinctiveness."    Durham Decl., Ex. 30 (DLA_Mehta_00000184).

244.    Instead, Durham had told Mehta: "We can and should just prepare a simple declaration pursuant to 37 CFR 2.41(b)(2) with the appropriate statutory language and submit that."    Durham Decl., Ex. 30 (DLA_Mehta_00000184); *see also* 37 C.F.R. 2.41(b)(2) ("[A] showing [of acquired distinctiveness] by way of verified statements in the [trademark] application may be accepted as prima facie evidence of distinctiveness.").

245.    Durham testified that Mehta's request for the client's detailed financial and advertising data was "particularly troubling" because she had already given Mehta "initial guidance on how [that] particular filing should have been put together."    Durham Decl., Ex. 1 (Durham Dep. Tr. 92:9–11); *see also id.* (Durham Dep. Tr. 92:11–12) ("We should have never even been going down that path.").

246.    Durham further explained that Mehta's request was "troubling" because the client was a privately held company and Mehta "was going to file a bunch of sensitive information in the public record."    Durham Decl., Ex. 1 (Durham Dep. Tr. 92:2; 92:6–8); *see also id.* (Durham Dep. Tr. 92:13–16) ("[N]ot only had [Mehta] asked the client to collect things that I'm sure took the client a lot of time to collect, but [Mehta] was doing that with a view towards filing it publicly. . . . I just don't know why [Mehta] would have thought that was the right thing [to do], even if I had not given her direction to do it to the contrary.").

247.    Durham testified that there had already been a "building of issues" with Mehta's performance, but this incident was a "culminating event" and "the straw that broke the camel's back."    Durham Decl., Ex. 1 (Durham Dep. Tr. 91:23–24; 93:5–6).

248.    Durham testified that she called Mehta, instructed her to remove the client's financial information from the draft declaration, and said they needed to talk about the "deficits" in her training.  Durham Decl., Ex. 1 (Durham Dep. Tr. 92:20–24); *see also* Mehta Dep. Tr. 38:8–23; 40:15–16 (Durham told Mehta that she "wanted a call" to "discuss concerns").

249.    After their phone call, Mehta sent Durham a proposed email to the client, explaining that they "decided to remove the $ amounts for ad/sales for now given that the declaration is publicly filed [and could] provide [that] additional information down the road of [*sic*] the examiner requires more evidence."  Durham Decl., Ex. 29 (DLA_Mehta_00008318A).

250.    Also after their phone call, Mehta invited Durham to a Microsoft Teams meeting for the following week.  *See* Durham Decl., Ex. 31 (DLA_Mehta_00006148).  Mehta wrote that she was "putting some time on [Durham's] calendar to discuss constructive feedback" and that she "[d]efinitely want[ed] to address any concerns and improve upon them."  *Id.*

251.    Durham responded to Mehta's invitation and wrote: "Let's please plan on discussing low hours and discrepancy in skillset/level."    Durham Decl., Ex. 31 (DLA_Mehta_00006147).

**<u>Mehta Makes A Final "Disturbing" Mistake</u>**

252.    On October 2, 2022, Mehta emailed one of Medansky's clients (copying Medansky) regarding a third-party company's application to register a trademark in Switzerland. *See* Medansky Decl., Ex. 8 (DLA_Mehta_00008262).

253.    Mehta informed the client that the third party's proposed trademark was "similar in appearance" and "create[d] a similar commercial impression" to the client's existing trademark. Medansky Decl., Ex. 8 (DLA_Mehta_00008262).

254.    Mehta further explained that the client "own[ed] a number of registrations in the

EU [i.e., European Union] for [similar] services as well as national registrations in Switzerland." Medansky Decl., Ex. 8 (DLA_Mehta_00008262).  Therefore, Mehta "recommend[ed] reaching out to local counsel to obtain an opinion and cost estimates for opposing the mark." *Id.*

255.    Medansky replied to Mehta's email (removing the client) and wrote: "What does EU have to do with Switzerland[?]"  Medansky Decl., Ex. 8 (DLA_Mehta_00008262).

256.    Mehta replied to Medansky's email and wrote: "Ah you're right they're not part of the EU.  Apologies for the oversight.  Let me recall this message in case [the client] hasn't seen it and recommend we reach out based on CH [i.e., Switzerland] reg[istrations] only."  Medansky Decl., Ex. 8 (DLA_Mehta_00008261).

257.    Medansky testified that he was "mortified" by Mehta's "disturbing" mistake in suggesting that the client could oppose a Swiss trademark application based on its existing trademarks in a different jurisdiction, noting that it was "the kind of thing that can shake a client's confidence."  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 22:21; 23:7–8; 24:11).

258.    Medansky further testified that "if [Mehta] did not know [that] this was a serious mistake, then she was not functioning at the level of a 7th year associate, which was part of the problem here."  Medansky Decl., Ex. 1 (Medansky Dep. Tr. 24:2–6).

**Durham Decides To Terminate Mehta's Employment Because Of Her Performance Issues**

259.    On October 3, 2022, Durham and Medansky spoke on the phone regarding Mehta's performance and employment.  Durham Decl. ¶ 135; Medansky Decl. ¶ 48.

260.    Durham called Medansky "because [she] wanted to see if he was having the same serious issues that [she] was" having with Mehta's work.  Durham Decl., Ex. 1 (Durham Dep. Tr. 95:3–10).

261.    Medansky "explained to [Durham] what had happened" with Mehta discussing European Union trademarks in the context of an issue governed by Swiss law, and Durham "shared

that there had been several mistakes that she was concerned about as well." Medansky Decl., Ex. 1 (Medansky Dep. Tr. 11:08–13:08); *see also* Durham Decl., Ex. 1 (Durham Dep. Tr. 94:20–95:2) (testifying that Medansky told her about "an issue with incorrect advice given related to EU trademarks and geographic coverage").

262.    Medansky "mentioned that [he] did not find [Mehta] consistently responsive, and that there had been consistent issues with her performance being at the level of an associate with the level of seniority that [she] had," and that he "had to have either [him]self or other lawyers on the team fix things for [him] because the work was not being performed at the level that was required." Medansky Decl., Ex. 1 (Medansky Dep. Tr. 26:19–27:23).

263.    Ultimately, Durham and Medansky agreed that Mehta's performance problems could not be "cured." Medansky Decl., Ex. 1 (Medansky Dep. Tr. 136:7); *see also id.* (Medansky Dep. Tr. 135:20–21) ("My guess was that [Mehta] was never going to make it."); Durham Decl., Ex. 1 (Durham Dep. Tr. 52:11–14) ("I felt like [Mehta had] not been trained at her former job or jobs to do this type of work, and I just didn't know how you can catch somebody up [with] that sort of deficit.").

264.    Durham was "ultimately the person responsible for making the decision to terminate" Mehta's employment, and she made the decision after having consulted with Medansky. Durham Decl., Ex. 1 (Durham Dep. Tr. 95:23–96:1); Durham Decl. ¶ 141.

265.    Durham "decide[d] that termination was the right way to go" based on her "own experiences" as well as those that others had "during the time [Mehta] had been at the firm." Durham Decl. Ex. 1 (Durham Dep. Tr. 95:23–96:7).

266.    Durham's decision was not based in any way on Mehta's pregnancy or intent to take parental leave starting in January 2023. Durham Decl. ¶ 142.

**Mehta Is Offered A Generous Separation Agreement**

267.    At 5:00 p.m. Eastern Time October 4, 2022, Durham, Mehta, and HR representative Amber James had a Teams meeting.  Mehta Dep. Tr. 47:7–16; *see also* Durham Decl., Ex. 31 (DLA_Mehta_00006147).

268.    During this meeting, Durham informed Mehta that DLA Piper was terminating her employment.  Mehta Dep. Tr. 47:17–21.

269.    At 5:45 p.m. Eastern Time on October 4, Mehta emailed notes from this meeting to her personal email address.  *See* Senger Decl., Ex. 24 (DLA_Mehta_00010723A) (email sent at 9:45 p.m. Coordinated Universal Time).

270.    Mehta emailed purported "full notes" from the October 4 meeting to her personal email address one week later, on October 11, 2022.  *See* Senger Decl., Ex. 25 (DLA_Mehta_00003913).  These "full notes" included additional commentary from Mehta that was not present in the original October 4 meeting notes.  *Compare* Senger Decl., Ex. 24 (DLA_Mehta_00010723A), *with id.*, Ex. 25 (DLA_Mehta_00003913).

271.    According to notes Mehta took during the meeting and supplemented afterwards, Durham "said she has low confidence in [Mehta's] ability to handle client matters which is also inhibiting staffing [her] on matters."  Senger Decl., Ex. 25 (DLA_Mehta_00003913A); *id.*, Ex. 24 (DLA_Mehta_00010723); Mehta Dep. Tr. 268:10–269:5.

272.    Durham also told Mehta that "[s]he thinks [Mehta is] not at the level of performance [she] should be at [her] year level."  Senger Decl., Ex. 25 (DLA_Mehta_00003913A); *id.*, Ex. 24 (DLA_Mehta_00010723); Mehta Dep. Tr. 269:15–24.

273.    Mehta's notes make clear that Durham told her that her termination was "performance related; failure to meet expectations; More than just edits; Numerous instances with

work is not up to our standards [*sic*]."  Senger Decl., Ex. 25 (DLA_Mehta_00003913A); *id.*, Ex. 24 (DLA_Mehta_00010723).

274.    According to Mehta's notes, Durham provided multiple examples Mehta's "failure to meet expectations," including her disappointing performance on a brief and on an introductory client call.  Senger Decl., Ex. 25 (DLA_Mehta_00003913); *id.*, Ex. 24 (DLA_Mehta_00010723); *see also infra* ¶¶ 72–83, 94–115.

275.    Durham also told Mehta that "searches [Mehta] drafted and sent [on October 4] were terrible."    Senger   Decl.,   Ex.   25   (DLA_Mehta_00003914);   *id.*,   Ex.   24 (DLA_Mehta_00010723A).

276.    According to the notes Mehta took during the meeting, Durham also told Mehta that she "[m]issed a hit" on a search.  Senger Decl., Ex. 24 (DLA_Mehta_00010723A); *see also infra* ¶¶ 227–234.  However, the version of the notes that Mehta sent herself a week later omitted this example.  *See* Senger Decl., Ex. 25 (DLA_Mehta_00003913).

277.    Finally, Durham told Mehta that that "Keith [Medansky] advised that he had repeated   issues   as   well,   such   as   on   search   opinions."      Senger   Decl.,   Ex.   25 (DLA_Mehta_00003914); *id.*, Ex. 24 (DLA_Mehta_00010723A).

278.    Durham recalls Mehta "ask[ing] if she could be demoted instead of terminated," which  "suggested  to  [Durham]  that  she  [Mehta]  knew  that  there  were  issues  with  her performance."  Durham Decl., Ex. 1 (Durham Dep. Tr. 97:2–12).

279.    Durham did not feel it was "appropriate to consider" that option because it would not "have worked in a situation like this, when you have somebody [Mehta] who is . . . so . . . below what the performance level was . . . for the position that she had been hired to fill."  Durham Decl., Ex. 1 (Durham Dep. Tr. 97:13–14; 98:5–9).

280.    Durham did not mention Mehta's pregnancy or intent to take parental leave during the call, since it had no relevance to her decision.  Durham Decl. ¶ 148.

281.    The notes Mehta emailed herself immediately after the meeting do not indicate that anyone on the call discussed Mehta's pregnancy or parental leave.  *See* Senger Decl., Ex. 24 (DLA_Mehta_00010723A).

282.    The version of the notes that Mehta sent herself a week later claim that "[she] [i.e., Mehta] spoke about [her] pregnancy," but they do not indicate that Durham or James said anything about Mehta's pregnancy or intent to take parental leave.  Senger Decl., Ex. 25 (DLA_Mehta_00003913).

283.    James explained to Mehta during the meeting that the Firm would be offering her a separation agreement, which would provide her a "6 month notice period" in which she could "still hold [her]self out as a DLA att[orne]y" and "maintain employment for up to 6 months until [she] find[s] a job" (i.e., through April 4, 2023).  Senger Decl., Ex. 25 (DLA_Mehta_00003914); *see also* Mehta Dep. Tr. 289:3–13.

284.    Mehta understood that, if she had chosen to accept the severance offer, she would receive "2 months of guaranteed pay" (through December 4, 2022) at a rate of "50% of pay" ($200,000) and "then beyond that if no job, 50% of compensation by biweekly pay cycle."  Senger Decl., Ex. 25 (DLA_Mehta_00003914); Mehta Dep. Tr. 289:14–23.

285.    The Firm provided Mehta with a copy of its offered separation agreement.  Senger Decl., Ex. 26 (PL000033).

286.    Mehta understood that she would have "7 days to consider [the] agreement from the time" she received it.  Senger Decl., Ex. 25 (DLA_Mehta_00003914); *id.*, Ex. 26 (PL000033).

287.    The offered agreement stated that Mehta "may choose to remain employed until April 4, 2023 . . . or [] leave the Firm on any earlier date of [her] choosing."  Senger Decl., Ex. 26 (PL000035).

288.    "In exchange for" the payments provided for under the Agreement "and other consideration being provided to [her]," the letter included a general release of claims.  Senger Decl., Ex. 26 (PL000037).

289.    Mehta did not sign and return the offered separation agreement.  Neiman Decl. ¶ 46.

290.    Mehta's separation from the Firm was effective as of October 21, 2022.  Senger Decl., Ex. 27 (DLA_Mehta_00006149).

**Mehta Steals Thousands Of DLA Piper's Privileged And Confidential Documents**

291.    During Mehta's employment with DLA Piper, all U.S.-based associates (including Mehta) were subject to the Firm's Confidentiality and Non-Disclosure Policy.  *See* Neiman Decl., Ex. 9 (DLA_Mehta_00011089); *see also* Senger Decl., Ex. 28 (DLA_Mehta_00001452).

292.    The Confidentiality and Non-Disclosure Policy provides that: "Confidential Information may not be disclosed or transmitted outside the firm, including, for instance, verbally, via email to a non-firm email account, or via a removable storage device."  Neiman Decl., Ex. 9 (DLA_Mehta_00011089); *see also* Senger Decl., Ex. 28 (DLA_Mehta_00001452).

293.    The Confidentiality and Non-Disclosure Policy defines "Confidential Information" to include "any non-public information related to the firm's representation of a current or former client, including without limitation confidential attorney-client communications between the firm and its clients, drafts and work product created in the course of a client engagement, communications within the firm that relate to the client or a matter for which a client has engaged the firm, and information and documents that a client provides to the firm in the course of a

representation." Neiman Decl., Ex. 9 (DLA_Mehta_00011089); *see also* Senger Decl., Ex. 28 (DLA_Mehta_00001452).

294. Confidential Information is also defined to include "[n]on-public information concerning firm business and firm personnel." Neiman Decl., Ex. 9 (DLA_Mehta_00011089); *see also* Senger Decl., Ex. 28 (DLA_Mehta_00001452).

295. The Confidentiality and Non-Disclosure Policy further provides that: "Any individual who violates this policy will be subject to disciplinary action, up to and including possible separation from the firm, whether or not the individual benefits from the disclosed information." Neiman Decl., Ex. 9 (DLA_Mehta_00011089); *see also* Senger Decl., Ex. 28 (DLA_Mehta_00001452).

296. Mehta understood that sending Confidential Information to an external e-mail account was a violation of DLA Piper policy. *See* Mehta Dep. Tr. 71:23–72:4.

297. Less than an hour after Mehta was notified of her termination on October 4, she used her DLA Piper email account (Anisha.Mehta@us.dlapiper.com) to send an email containing Confidential Information to her personal email account (anisha.mehta08@gmail.com). *See* Senger Decl., Ex. 29 (DLA_Mehta_00004023) (email sent at 9:59 p.m. Coordinated Universal Time); *see also* Mehta Dep. Tr. 75:14–18.

298. This email had the subject line: "Feedback from partners," and it contained 16 emails as attachments. *See* Senger Decl., Ex. 29 (DLA_Mehta_00004023).

299. All 16 of these attachments were emails related to Mehta and DLA Piper's provision of legal advice to DLA Piper clients. *See* Senger Decl., Ex. 29 (DLA_Mehta_00004023).

300.    Certain of these attachments contained drafts of legal advice to be provided to DLA Piper's clients.  *See, e.g.*, Senger Decl., Ex. 29 (DLA_Mehta_00004042); *see also* Mehta Dep. Tr. 85:5–10 ("Q: This [DLA_Mehta_00004042] was an e-mail that you proposed sending to a DLA Piper client, correct?  A: It appears so, yes.  Q: And the e-mail that you drafted here, was that providing legal advice?  A: It appears so.").

301.    Some of these attachments contained direct communications between DLA Piper attorneys and the Firm's clients.  *See, e.g.*, Senger Decl., Ex. 29 (DLA_Mehta_00004025–4036, DLA_Mehta_00004043–4046, DLA_Mehta_00004065–4069, DLA_Mehta_00004072–4076, DLA_Mehta_00004104–4105).

302.    Some of these attachments were explicitly labeled as "Confidential" and/or "Attorney-Client Privileged Communication."  *See, e.g.*, Senger Decl., Ex. 29 (DLA_Mehta_00004048, DLA_Mehta_00004051, DLA_Mehta_00004079, DLA_Mehta_00004092, DLA_Mehta_00004100, DLA_Mehta_00004106).

303.    Mehta attempted to recall the "Feedback from partners" email on October 7—three days after she sent it.  *See* Senger Decl., Ex. 30 (DLA_Mehta_00008835).

304.    Mehta testified that she attempted to recall the "Feedback from partners" email because she "didn't want any appearance [of] something improper."  *See* Mehta Dep. Tr. 77:8–11; 78:23–25; *see also id.* Mehta Dep. Tr. 79:6–7 ("I didn't want to do anything improper.").

305.    On or around October 10, 2022, Mehta began taking photographs of DLA Piper emails and documents on her computer screen.  *See, e.g.*, Senger Decl., Ex. 31 (DLA_Mehta_00000954) (photograph of an email from Mehta to DLA Piper clients displayed on a computer screen at "8:19 PM" on "10/10/2022").

306.     Mehta continued taking photographs of emails on her DLA Piper computer screen even after she retained attorneys to represent her in this litigation.  *Compare* Senger Decl., Ex. 32 (DLA_Mehta_00003896) (photograph of emails between Mehta and a Firm client displayed on a computer screen at "10:51 AM" on "10/13/2022"), *with id.*, Ex. 34 (Mehta Resp. to DLA Piper's First Request For Admission No. 55) (admitting that Mehta retained Wigdor LLP on or before October 12, 2022).

307.     In total, Mehta took over 3,600 photographs of documents and emails on her DLA Piper computer (the "Photographs") before her separation from the Firm on October 21, 2022.  *See* Senger Decl., Ex. 33 (Mehta Resp. to DLA Piper's Request For Admission No. 1) (admitting that Mehta "took any and all photographs within the Bates range DLA_Mehta_00000259–3901").

308.     The Photographs included pictures of the same communications that Mehta had previously emailed to her personal email address.  *Compare* Senger Decl., Ex. 29 (DLA_Mehta_00004042) ("Feedback from partners" email attachment with Mehta's draft of an email to a client), *with id.*, Ex. 35 (DLA_Mehta_00002399A) (photograph of Mehta's draft email to the client), *and id.*, Ex. 31 (DLA_Mehta_00000954) (photograph of Mehta's actual email to the client).

309.     The Photographs included pictures of emails that were labeled as "Privileged" and "Confidential."  *See, e.g.*, Senger Decl., Ex. 31 (DLA_Mehta_00000954); *id.*, Ex. 36 (DLA_Mehta_00000626); *id.*, Ex. 37 (DLA_Mehta_00000645); *id.*, Ex. 38 (DLA_Mehta_00000842); Ex. 39 (DLA_Mehta_00003571); Ex. 40 (DLA_Mehta_00002518).

310.     The Photographs included pictures of emails that reflect Mehta and other DLA Piper attorneys providing legal advice to DLA Piper clients.  *See, e.g.*, Senger Decl., Ex. 31 (DLA_Mehta_00000954); *id.*, Ex. 36 (DLA_Mehta_00000626); *id.*, Ex. 37

(DLA_Mehta_00000645);    *id.*,    Ex.    38    (DLA_Mehta_00000842);    *id.*,    Ex.    39

(DLA_Mehta_00003571);    *id.*,    Ex.    40    (DLA_Mehta_00002518);    *id.*,    Ex.    41

(DLA_Mehta_00000801A).

311.    The Photographs also included pictures of confidential information stored on DLA

Piper's internal network.    *See, e.g.*, Senger Decl., Ex. 42 (DLA_Mehta_00001499) (photograph

of Mehta's "2022 Billing Rates"); *id.*, Ex. 43 (DLA_Mehta_00001505) (photograph of Hilary

Remijas's "2022 Billing Rates").

312.    Mehta took a picture of DLA Piper's Confidentiality and Non-Disclosure Policy,

which expressly prohibited the unauthorized transmission of Confidential Information outside of

the Firm—and which was *itself* labeled "FIRM CONFIDENTIAL."    *See* Senger Decl., Ex. 28

(DLA_Mehta_00001452).

313.    Mehta did not seek or obtain permission from any DLA Piper clients to take

pictures of emails pertaining to their legal representation by the Firm. *See* Mehta Dep. Tr. 106:11–

15.

314.    Mehta testified at her deposition that she did not know why she decided to take

pictures of emails instead of simply forwarding them to her personal email address.    *See* Mehta

Dep. Tr. 104:17–105:8 ("Q:  Why did you decide to take pictures of e-mails instead of just

forwarding them all to yourself?  A:  I don't know.  I don't know.  Q:  Well, doesn't it take longer

to take pictures of individual e-mails than it does to forward them?  A: No, no.  I wouldn't know

that.  Q:  Really?  You think that scrolling through pages of an e-mail and taking manual photos

of each page is less time consuming than clicking a forward button?  A:  Yeah, actually.").

315.    Mehta provided all of the Photographs to her attorneys at Wigdor LLP.  *See* Mehta

Dep. Tr. 108:13–18.

316.    On January 4, 2024, Mehta's attorneys produced the Photographs as Plaintiff's Bates Nos. PL002524–PL006164 in response to DLA Piper's First Set of Requests For Production. Senger Decl. ¶ 47.

317.    On January 19, 2024, this Court ordered Mehta and her attorneys to destroy the Photographs and instructed DLA Piper to reproduce the Photographs with redactions for privileged and client-identifying information.  Dkt. No. 37.

318.    By sending 16 emails from her DLA Piper email address to her personal email address on October 4, 2024, Mehta violated the Firm's Confidentiality and Non-Disclosure Policy. *See* Neiman Decl., Ex. 9 (DLA_Mehta_00011089).

319.    By taking over 3,600 photographs of DLA Piper documents and emails and sharing those photographs with third parties, Mehta again violated the Firm's Confidentiality and Non-Disclosure Policy.  *See* Neiman Decl., Ex. 9 (DLA_Mehta_00011089).

**DLA Piper Supports Attorneys' Ability To Take Parental Leave**

320.    During Mehta's employment, DLA Piper's Parental Leave Policy for Non-Partner Lawyers provided for "up to 18 weeks' paid leave."    Neiman Decl., Ex. 10 (DLA_Mehta_00000135).

321.    The Policy required that "[a]ny lawyer anticipating taking Parental Leave must discuss his or her plans with his or her local or national Practice Group Leader well in advance" and "work closely with his or her Human Resources representative to discuss and apply for benefits that may be available at the time of the leave."  Neiman Decl., Ex. 10 (DLA_Mehta_00000136).

322.    The Policy further provided that "[d]uring any period of paid Parental Leave, the lawyer will receive compensation equal to the base salary in effect immediately prior to starting

such leave, less any state or local disability insurance benefit to which the lawyer is entitled, where applicable." Neiman Decl., Ex. 10 (DLA_Mehta_00000136).

323.    DLA Piper has paid more than $32.7 million to attorneys for parental leaves commencing between 2021 and mid-2024, including for 46 attorneys in the IPT Group.  Neiman Decl., Ex. 11 (DLA_Mehta_00011137).

324.    Had Mehta remained employed and taken parental leave, she would have been paid approximately $138,461, less any state or local disability insurance benefits to which she was entitled.  *See* Neiman Decl. ¶ 58; Senger Decl., Ex. 6 (PL000001) (showing Mehta's 2022 base compensation was $400,000).

325.    The value of the separation package that was offered to Mehta on October 4— which would have enabled her to remain employed for over three months past her due date—was approximately $100,000.   Senger Decl., Ex. 26 (PL000033).

326.    Twenty-four women in the IPT Group have taken parental leaves commencing between 2021 and mid-2024.  Twenty of those women are still employed at DLA Piper, and the other four left the Firm voluntarily.   *See* Neiman Decl. ¶ 57; Neiman Decl., Ex. 11 (DLA_Mehta_00011137).

327.    DLA Piper has a strict Non-Discrimination Policy, which states that the Firm is "committed to recruiting, hiring, training, employing, promoting, compensating and administering all terms, conditions and privileges of partnership and employment without regard to age, sex, race, color, religion, national origin, disability, veteran status, sexual orientation, gender identity or expression, or any other consideration protected by federal, state, or local laws."  Neiman Decl., Ex. 12 (DLA_Mehta_00009777).

328.    The Non-Discrimination Policy states that "[a]ny individual who believes that he or she has been the victim of discrimination must report such concerns to his or her supervisor, Human Resources or another member of firm management," and "[a]ny individual of the firm who is found to have discriminated against a person or engaged in harassment, as prohibited by this policy, will be subject to discipline, up to and including separation from the firm."  Neiman Decl., Ex. 12 (DLA_Mehta_00009777).

329.    DLA Piper has been repeatedly recognized as one of the best law firms for women by *Working Mother*.  Neiman Decl. ¶ 67.

330.    DLA Piper has been named one of the "Best Law Firms for Women and Diversity," 13 times, including most recently in 2024.  Neiman Decl. ¶ 68.

331.    The Firm has received a Gold Standard Certification from the Women in Law Empowerment Forum, based on the significant percentage of women attorneys who are among the Firm's equity partners and serve in leadership positions.  Neiman Decl. ¶ 69.

332.    DLA Piper's Leadership Alliance for Women hosts networking and professional development events in order to support women lawyers to successfully manage their practice, maximize their opportunities for business development and leadership, and promote them in the Firm.  Neiman Decl. ¶ 70.

333.    There have been no complaints of alleged pregnancy discrimination by anyone in DLA Piper's IPT Group between October 21, 2017 and October 21, 2022.  Neiman Decl. ¶ 71.

334.    There have been no EEOC charges alleging pregnancy discrimination filed by any associates at DLA Piper between October 21, 2017 and October 21, 2022.  Neiman Decl. ¶ 72.

335.    There have been no internal complaints of any kind filed against Durham or Medansky during their decades-long tenures at the Firm.  Neiman Decl. ¶ 73.

Dated:      August 7, 2024

GIBSON, DUNN & CRUTCHER LLP

By: _____

    Molly T. Senger, *pro hac vice*
    Amalia Reiss, *pro hac vice*
    Joseph Ruckert, *pro hac vice*
    1050 Connecticut Avenue, N.W.
    Washington, DC 20036-5306
    Telephone: (202) 955-8571
    Facsimile: (202) 530-4209
    MSenger@gibsondunn.com
    AReiss@gibsondunn.com
    JRuckert@gibsondunn.com

    *Attorneys for Defendant*
    *DLA Piper LLP (US)*