**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

ANISHA MEHTA.,                                        :
                                                     :        Civil Case No.: 1:23-cv-04757 (AT)
                          Plaintiff,                 :
                                                     :
            v.                                       :
                                                     :
DLA PIPER LLP                                        :
                                                     :
                          Defendant.                 :
                                                     :
                                                     :
                                                     :
-------------------------------------------------------------X

**PLAINTIFF ANISHA MEHTA'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**WIGDOR LLP**

Jeanne M. Christensen
Monica Hincken

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
mhincken@wigdorlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

LEGAL ARGUMENT ....................................................................................................... 4

I.      THE SUMMARY JUDGMENT STANDARD .................................................... 4

II.    UNDER RECENT SECOND CIRCUIT PRECEDENT, MEHTA'S
PREGNANCY DISCRIMINATION CLAIMS MUST PROCEED TO TRIAL ............... 5

      A.  Plaintiff Offered Substantial Evidence That Her Firing Was Motivated by
Discrimination .......................................................................................................... 5

      B.  Under *Bart* "Conflicting Evidence" Is Enough To Defeat Summary Judgment ........... 7

III.   DLA FIRED MEHTA FOR DISCRIMINATORY REASONS ........................................... 8

      A.  No Documentation of Mehta's Alleged Performance Deficiencies ............................ 8

      B.  Defendant Rewarded Mehta for Excellent Work Through Bonuses and Raises ......... 10

      C.  Plaintiff Was an Excellent Performer and Rewarded for Her Performance ............... 12

      D.  Durham Never Told Mehta That She Considered Her an Underperformer ................. 16

      E.  Medansky Assigned Mehta the Cases Previously Handled By a Lawyer Who
Was "Of Counsel" And Who Had Graduated Law School in 2005 ............................ 17

      F.  Medansky Did Not Decide to Fire Mehta .................................................................. 19

      G.  DLA Failed to Follow Any of Its Own Policies for Underperforming
Associates Because Mehta Was a High Performer ..................................................... 19

      H.  Temporal Proximity Is a Significant Indicator of Discriminatory and
Retaliatory Intent ..................................................................................................... 21

      I.  Comparative Evidence Supports an Inference of Discrimination .............................. 23

IV.   DLA VIOLATED MEHTA'S FMLA RIGHTS ............................................................. 25

      A.  DLA Violated the Interference Clause ...................................................................... 25

      B.  DLA Violated the FMLA Retaliation Provision ........................................................ 27

V.     DLA'S FLAGRANT AND ONGOING RETALIATORY TACTICS
       SHOULD BE DISREGARDED ..................................................................................29


CONCLUSION.................................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

Abdu-Brisson v. Delta Air Lines, Inc.,
  239 F.3d 456 (2d Cir. 2001)......................................................................................23

Albertini v. Summit Tech. Servs., Inc.,
  287 F. Supp. 2d 92 (D. Mass. 2003) ....................................................................29, 30

Banks v. Gen. Motors, LLC,
  81 F.4th 242 (2d Cir. 2023)......................................................................................21

Bart v. Golub Corp.,
  96 F.4th 566 (2d Cir. March 26, 2024) ............................................................ passim

Beers v. NYNEX Material Enterprises Co.,
  No. 88 Civ. 0305 (MBM), 1992 WL 8299 (S.D.N.Y. Jan. 13, 1992)........................12

Bennett v. Health Mgmt. Sys., Inc.,
  92 A.D.3d 29 (1st Dep't 2011)....................................................................................6

Brown v. Crowdtwist,
  No. 12 Civ. 6110 (HB), 2014 WL 1468145 (S.D.N.Y. Apr. 15, 2014) ......................6

Carini v. Jacobs Eng'g Grp., Inc.,
  No. 3:22 Civ. 787 (JAM), 2024 WL 4226911 (D. Conn. Sept. 18, 2024)..................7

Carter v. Syracuse City School Dist.,
  850 Fed. App'x 22 (2d Cir. 2021)..............................................................................15

Carter v. TD Bank, N.A.,
  No. 23 Civ. 950 (SVN), 2024 WL 2828470 (2d Cir. 2024).......................................27

Colon v. Fashion Inst. of Tech. (State Univ. of New York),
  983 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................................26

Cromartie v. Dep't of Correction,
  No. 3:21 Civ. 1236 (JAM), 2024 WL 1344598 (D. Conn. Mar. 29, 2024) ................7

Di Diovanna v. Beth Israel Med. Ctr.,
  651 F. Supp. 2d 193 (S.D.N.Y. 2009)........................................................................26

Ferrante v. American Lung Ass'n,
  230 A.D.2d 685 (1st Dep't 1996)..........................................................................11, 20

Friedman v. Swiss Re America Holding Corp.,

643 F. App'x 69 (2d Cir. 2016)..............................................................................................4

Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.,
   252 F.3d 545 (2d Cir. 2001)................................................................................................21

Gorzynski v. JetBlue Airways Corp.,
   596 F.3d 93 (2d Cir. 2010)..............................................................................................5, 21

Graham v. Long Island R.R.,
   230 F.3d 34 (2d Cir. 2000)....................................................................................................23

Grant v. Bethlehem Steel Corp.,
   622 F.2d 43 (2d Cir. 1980)....................................................................................................21

Graziadio v. Culinary Inst. Of Am.,
   817 F.3d 415 (2d Cir. 2016)..............................................................................................25, 27

Green v. Town of East Haven,
   952 F.3d 394 (2d Cir. 2020)....................................................................................................4

In re Dana Corp.,
   574 F.3d 129 (2d Cir. 2009)..................................................................................................15

Kaytor v. Elec. Boat Corp.,
   609 F.3d 537 (2d Cir. 2010)....................................................................................................4

Kessler v. Westchester Cnty. Dep't of Social Svcs.,
   461 F.3d 199 (2d Cir. 2006)....................................................................................................4

Lenzi v. Systemax, Inc.,
   944 F.3d 97 (2d. Cir. 2019)....................................................................................................21

Luo v. AIK Renovation, Inc.,
   No. 23 Civ. 5878 (LJL) 2024 WL 4444283 (S.D.N.Y. Oct. 8, 2024)........................................8

McDonnell Douglas Corp. v. Green,
   411 U.S. 792 (1973)................................................................................................................5

McHenry v. Fox News Network, LLC,
   510 F. Supp. 3d 51 (S.D.N.Y. 2020)......................................................................................6

Mihalik v. Credit Agricole Cheuvreux, N.A, Inc.,
   715 F.3d 102 (2d Cir. 2013)....................................................................................................6

Milea v. Metro-N. R. Co.,
   658 F.3d 154 (2d Cir. 2011)..................................................................................................27

Nagle v. E. Greenbush Cent. Sch. Dist.,

No. 1:16 Civ. 00214 (BKS) (ATB), 2018 WL 4214362 (N.D.N.Y. Feb. 21, 2018)....................5

Natofsky v. City of N.Y.,
    921 F.3d 337 (2d Cir. 2019)........................................................................................28

Patrick v. LeFevre,
    745 F.2d 153 (2d Cir. 1984)..........................................................................................5

Peterson v. Town of Waterford,
    No. 3:21 Civ. 332 (SVN), 2023 WL 2742343 (D. Conn. Mar. 31, 2023) ....................9

Potenza v. City of New York,
    365 F.3d 165 (2d Cir. 2004)........................................................................................25

Ramos v. Marriott Int'l, Inc.,
    134 F. Supp. 2d 328 (S.D.N.Y. 2001)........................................................................23

Rasmy v. Marriott Int'l, Inc.,
    952 F.3d 379 (2d Cir. 2020)..........................................................................................4

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) ............................................................................................15, 28

Rodriguez v. Vill. Green Realty, Inc.,
    788 F.3d 31 (2d Cir. 2015)............................................................................................5

Rule v. Brine, Inc.,
    85 F.3d 1002 (2d Cir. 1996)........................................................................................15

Santiago v. Dep't of Transp.,
    50 F. Supp. 3d 136 (D. Conn. 2014) ..........................................................................25

Saraf v. West Publishing Corp.,
    No. 16 Civ. 1425 (VSB), 2018 WL 7107266 (S.D.N.Y. Dec. 20, 2018) ...................25

Schanfield v. Sojitz Corp. of Am.,
    663 F. Supp. 2d 305 (S.D.N.Y. 2009)........................................................................30

Siddiqua v. New York State Dep't of Health,
    No. 114 Civ. 0372 (GTS)(DJS), 2018 WL 4554491 (N.D.N.Y. Sept. 21, 2018)......27

Smith v. K & F Indus., Inc.,
    190 F.Supp.2d 643 (S.D.N.Y.2002)............................................................................9

Stern v. Trustees of Columbia Univ.,
    131 F.3d 305 (2d Cir. 1997).....................................................................................11,21

Tolbert v. Smith,

v

790 F.3d 427 (2d Cir. 2015)..................................................................................11,21

Van Brunt-Piehler v. Absolute Software, Inc.,
   504 F. Supp. 3d 175 (W.D.N.Y. 2020) ...........................................................................9

Walsh v. New York City Housing Auth.,
   828 F.3d 70..........................................................................................................................5

Weiss v. JPMorgan Chase & Co.,
   332 F. App'x 659 (2d Cir. 2009)...............................................................................11, 21

Woods v. START Treatment & Recovery Ctrs., Inc.,
   864 F.3d 158 (2d Cir. 2017)...........................................................................................27

Wright v. Storch, Amini & Munves, P.C.,
   No. 12 Civ. 2852 (LTS) (MHD), 2014 WL 1663125 (S.D.N.Y Apr. 25, 2014) .......................12

Zahorik v. Cornell University,
   729 F.2d 85 (2d Cir. 1984).........................................................................................11, 21

Zurich Am. Life Ins. Co. v. Nagel,
   590 F. Supp. 3d 702 (S.D.N.Y. 2022)...........................................................................29

**Statutes**

29 U.S.C. § 2601...................................................................................................................... 4

**Rules**

Fed. R. Civ. P. 56................................................................................................................... 1, 2

**Regulations**

29 C.F.R. § 825.220(b) ......................................................................................................... 25

Plaintiff Anisha Mehta ("Mehta" or "Plaintiff") respectfully submits this memorandum of law in support of her opposition to the Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 ("Rule 56") filed by Defendant DLA Piper LLP ("Defendant," "DLA" or "Firm").

## PRELIMINARY STATEMENT

This case presents paradigmatic violations of the federal Family and Medical Leave Act, the Pregnancy Discrimination Act, and parallel state and city laws.  Mehta, a former seventh-year associate in DLA's Intellectual Property & Technology Group ("IPT") was unlawfully fired in October 2022 because she was pregnant and had submitted her paperwork for up to 18 weeks of paid leave.  DLA's proffered excuse is that Mehta had been an underperformer "since the very beginning" of her employment that began in October 2021.  Summary judgment must be denied where the evidence is undisputed that during her 11 ½ months of employment, Mehta received (i) three discretionary raises to her base compensation, resulting in a 21% increase from her initial base at hire, (ii) received a six-figure discretionary bonus that was 30% of her base salary, and (iii) then received another five-figure discretionary bonus awarded only to associates who were "meeting the Firm's high expectations with a performance rating of three or higher," according to DLA internal documents.  This is ironclad evidence that Mehta was not underperforming.

Furthermore, until the day she was fired, not a single partner at DLA had told her she was underperforming, much less warned her about alleged deficiencies that could result in termination. The suggestion that a sophisticated global law firm would permit a highly compensated attorney to underperform <u>for an entire year</u> without one partner speaking to her about it is ludicrous.  Yet the Court would have to make such a fact determination to grant summary judgment.  Only a trier of fact can decide whether the IPT partner who hired Mehta, Gina Durham ("Durham"), and who regularly recommended her to other partners, is credible.  Only a fact finder can decide that Mehta

was fired because of the financial strain that her 18 weeks of paid leave, 2022 anticipated bonus and simultaneous lack of billable hours would have on the bottom line of the IPT subgroup. Such a credibility determination, however, cannot be made by a district court on a Rule 56 motion.

DLA has no documented performance deficiencies regarding Mehta. Because of this complete lack of documentation, DLA had nothing to offer in discovery other than emails sent in the ordinary course of business that show nothing more than back and forth exchanges between senior and junior lawyers, to try to suggest that Mehta needed extra guidance or direction as compared to other associates. Tellingly, DLA refused to produce emails in the ordinary course for Mehta's peers and had to be compelled to do so. Of course, these day-to-day email exchanges for two peers revealed that senior lawyers regularly gave more junior lawyers guidance and direction. The email exchanges used by DLA in its Rule 56 motion carry even less weight because DLA admits that during Mehta's entire employment, no attorney at DLA gave Mehta a verbal notice of an alleged performance issue either. Given that the only evidence offered is regular one-to-one communications between senior and junior attorneys, there is nothing that can remedy this glaring proof that Mehta was not a poor performer at any time during her employment.

Confoundingly, DLA filed for summary judgment anyway, even where discovery revealed that DLA has in place at least four internal policies and procedures to deal with underperforming associates, any one which could have been utilized had Mehta actually been a poor performer. Instead, demonstrating the pretext offered by DLA for its unlawful decision to fire her at 6 ½ months pregnant, DLA failed to: (1) deny Mehta a bonus or base compensation raise, (2) provide Mehta a performance review outside of the standard timeframe, either verbally or in writing (3) adjust Mehta's law school class year from 2015 to 2016 or 2017, for example, or (4) provide Mehta with a coach to increase her skill level. Despite multiple options to address an associate's alleged

2

poor performance, DLA never denied Mehta a bonus or pay raise provided to other associates based, in part, on meeting performance expectations. Instead, in 11 ½ months of employment, DLA gave her three base compensation raises, a six-figure bonus, plus another five-figure bonus. DLA failed to address Mehta's purported performance deficiencies entirely because at all times, the evidence shows that she was performing above average or better.

When fired, Mehta was the only associate in the IPT group who was pregnant. Likewise, on October 4, 2022, the day Mehta was fired, she was the only associate working for Durham who, on September 28, 2022, had submitted a written request for paid leave for up to 18 weeks, slated to begin in January. Had Mehta's employment status continued through the end of December, Durham knew that Mehta would have been eligible to receive a bonus under the Firm's compensation policies. Moreover, Durham's decision to fire Mehta was made when incoming billable work on Durham's team had slowed down and her associates had extra capacity for work which meant that there was a risk other lawyers may not meet their annual billable hour requirements for bonus eligibility. Having to pay a seventh-year associate compensation for 18 weeks when she simultaneously would not be performing billable work to add to the revenue stream, as well as the risk that Durham would have to pay Mehta a bonus for her hard work in 2022, created substantial motivation to fire Mehta before reaching the end of the Firm's fiscal year. Such facts are sufficient for a jury to find that the 6 ½ month pregnant Mehta was let go to avoid negative impact to the bottom line of Durham's subgroup. As detailed in Mehta's Counter Statement of Undisputed Material Facts ("CSUMF") and below, there is a plethora of material

facts in dispute.  Under applicable Second Circuit precent, Defendant's Motion for Summary

Judgment must be denied in its entirety.[1]

## LEGAL ARGUMENT

### I.      THE SUMMARY JUDGMENT STANDARD

Recently, the Second Circuit clarified that summary judgment should not be granted in an

employment discrimination case when, as here, there exists a genuine dispute of material fact as

to whether "the plaintiff's membership in a protected class **was at least one motivating factor** in

the employer's an adverse action."  *Bart v. Golub Corp.*, 96 F.4th 566, 567-568 (2d Cir. March 26,

2024) (emphasis added).  In deciding summary judgment, "the district court is required to resolve

all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party

opposing summary judgment."  *Green v. Town of East Haven*, 952 F.3d 394, 406 (2d Cir. 2020)

(quoting *Kessler v. Westchester Cnty. Dep't of Social Svcs.*, 461 F.3d 199, 206 (2d Cir. 2006)).

Moreover, "the district court may not properly consider the record in piecemeal fashion, trusting

innocent explanations for individual strands of evidence; rather, it must review all of the evidence

in the record."  *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020) (quoting *Kaytor v.

Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (emphasis omitted) (citation and internal

quotation marks omitted)); *see Friedman v. Swiss Re America Holding Corp.*, 643 F. App'x 69, 72

(2d Cir. 2016) (reversing grant of summary judgment in age discrimination case where "the district

court filed to consider the record as a whole") (internal quotation marks and citation omitted).

---

[1]     Plaintiff's Complaint filed on June 6, 2023, alleges that DLA violated the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), Title VII as amended by the Pregnancy Discrimination Act of 1974 ("PDA"), the New York State Human Rights Law, Executive Law § 290 *et seq*. (the "State Law"), and the Administrative Code of the City of New York §8-107 *et seq*. (the "City Law").  Dkt. No. 1.

Importantly, the Second Circuit has "long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Walsh v. New York City Housing Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)). Indeed, "'where subjective issues regarding a litigant's state of mind . . . are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 49 (2d Cir. 2015) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984)); *see id.* ("'[A] sojourn into an adherent's mind set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution. Traditionally, this function has been entrusted to the jury.'") (quoting *Patrick*, 745 F.2d at 159)).

## II.   UNDER RECENT SECOND CIRCUIT PRECEDENT, MEHTA'S PREGNANCY DISCRIMINATION CLAIMS MUST PROCEED TO TRIAL

### A.   Plaintiff Offered Substantial Evidence That Her Firing Was Motivated by Discrimination

In *Bart v. Golub Corp.*, the Second Circuit issued a lengthy discussion of the familiar *McDonnell Douglas* burden-shifting framework at the summary judgment stage in discrimination cases.[2] *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024), cert. denied, No. 23 Civ. 1346, 2024 WL 4426694 (U.S. Oct. 7, 2024) citing *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-04 (1973). Specifically, the Second Circuit emphasized that it is a reversible error for a district court to grant summary judgment in favor of the employer where the employee offers evidence that the adverse employment action was motivated, even in part, by unlawful bias. *Id*. at 577-78.

---

[2]   For purposes of pregnancy discrimination under Title VII, to establish a prima facie case, Mehta must show that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See Nagle v. E. Greenbush Cent. Sch. Dist.*, No. 1:16 Civ. 00214 (BKS) (ATB), 2018 WL 4214362, at *11 (N.D.N.Y. Feb. 21, 2018).

*Bart* held that at the summary judgment stage, it is not a plaintiff's burden to prove that the defendant's proffered basis for its conduct is <u>false</u>. *Id.* In *Bart*, the former employee plaintiff was disciplined for falsifying food logs for which she admitted responsibility. *Id.* at 568. Two days later she was fired. *Id.* On summary judgment, Bart presented her testimony in which she said that her manager, Pappas, had made several remarks to her, including close in time to the firing, insinuating that he believed that a man would perform better in Bart's role than a woman would. *Id.* at 577-78. The district court held for the defendant employer, reasoning that plaintiff could not raise a genuine dispute of material fact as to whether her termination, based on violations of the food log policy, was pretextual. *Id.* at 569. Reversing, the Second Circuit held:

> But Bart did not need to address [Defendant's] showing that she took accountability for the conduct for which it claims it fired her, where she also produced sufficient evidence (which we credit at the summary judgment stage) to show that [Defendant] fired her in part due to Pappas's gender bias. Those can both be true without absolving [Defendant] of unlawful discrimination. It was therefore error to reason that Bart's acknowledgement that the reason provided for her termination was factually accurate and valid under [Defendant's] policies and procedures[ ] is dispositive of the pretext issue.

*Id.* at 577 (quotations omitted).

Under the City and State laws,[3] the employer is liable for discrimination where it merely treated the employee "less well, at least in part for a discriminatory reason." *Mihalik v. Credit Agricole Cheuvreux, N.A, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). In other words, because "discrimination shall play no role in decisions relating to employment," even "partial discrimination" (i.e., where the employer has "multiple or mixed motives for [its] actions,") is prohibited. *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 40 (1st Dep't 2011) (emphasis added) (quotations omitted); *see also Brown v. Crowdtwist,* No. 12 Civ. 6110 (HB), 2014 WL 1468145, at

---

[3]    On August 12, 2019, the State Law was amended to conform to the liberal standards of the City Law. *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).

6

*5 (S.D.N.Y. Apr. 15, 2014) ("Under the NYCHRL, when a plaintiff makes a reasonable showing that one of his employer's explanations is false or misleading, he is generally entitled to have a jury consider whether this false explanation is evidence of consciousness of guilt or a discriminatory motive").

**B.    Under _Bart_ "Conflicting Evidence" Is Enough To Defeat Summary Judgment**

Applying _Bart_ to Mehta's claims, DLA cannot satisfy its burden.  The decisions by district courts deciding summary judgment motions after _Bart_ demonstrate that summary judgment must be denied when a plaintiff puts forth evidence suggesting an inference of discriminatory bias, even where the employer offers an independent basis for the adverse action.  In _Cromartie v. Dep't of Correction_, No. 3:21 Civ. 1236 (JAM), 2024 WL 1344598, at *6 (D. Conn. Mar. 29, 2024), the district court denied summary judgment where a plaintiff was fired for allegedly displaying a hand sign that could be mistaken as a gang sign.  The plaintiff alleged, among other things, that an employee of another race displayed a similar hand sign and was not fired.  The court held that "…[Plaintiff's] evidence creates a genuine fact issue about whether [Defendant's] proffered explanation for his termination **was incomplete (even if not false)** and whether a motivating factor in the decision to terminate [Plaintiff's] employment was his race."  _Id_. at *6 (emphasis added). The Court also noted that "[a] reasonable jury could conclude that [Defendant's] more lenient treatment of this employee suggests that what made the difference in [Plaintiff's] case was his [protected category]."  _Id_.  Importantly, where there was conflicting evidence, the burden did not shift to the plaintiff to disprove the employer's offered justification.

Other decisions, relying in part on _Bart_, have made similar holdings.  In _Carini v. Jacobs Eng'g Grp., Inc._, No. 3:22 Civ. 787 (JAM), 2024 WL 4226911, at *8 (D. Conn. Sept. 18, 2024), summary judgment was denied because conflicting evidence undermined defendant's "non-

7

discriminatory" explanation that a plaintiff's shift change was in response to a staff shortage when it occurred shortly after plaintiff rejected his supervisor's invitation to dinner and complained about sexual harassment. The court found this conflicting evidence was enough to deny summary judgment and suggested that defendant's "non-discriminatory" explanation was one among other discriminatory motives. Similarly, in *Luo v. AIK Renovation, Inc.*, No. 23 Civ. 5878 (LJL) 2024 WL 4444283 (S.D.N.Y. Oct. 8, 2024), the district court denied summary judgment because the plaintiff put forth conflicting evidence about whether his race and national origin played "some part [in] the employer's motivation" for his termination.

In sum, to survive summary judgment in a Title VII disparate treatment case, a plaintiff need not show that the employer's stated reason was false and merely a pretext for discrimination; "a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Bart*, 96 F.4th at 577-58. Discussed below, Mehta was the only pregnant employee in Durham's team and in IPT in October 2022. The workflow for Durham was down and associates had extra capacity for work. Moreover, Mehta was highly compensated.

## III.    DLA FIRED MEHTA FOR DISCRIMINATORY REASONS

### A.    No Documentation of Mehta's Alleged Performance Deficiencies

There is absolutely no evidence in the record – <u>not one</u> verbal or written performance review or warning from the more than 60 attorneys who assigned Mehta work – to support Durham's assertion that she believed Mehta to be a poor performer "from the beginning" of her employment. In litigation, DLA attempted to compensate for the complete lack of documentation by producing email exchanges that they claim show underperformance. But based on an entire year's worth of emails for Mehta, as compared to the mere three weeks of emails DLA was

compelled to produce for two peer lawyers, and whose emails were limited even further to exchanges with just two partners each, it is obvious that DLA's evidence does not come close to what is needed under Rule 56. CSUMF ¶¶ 83, 86, 147, 194, 233 (email exchanges for two associates in IPT for a three-week period). The emails between Mehta and senior lawyers and partners do not document performance deficiencies, particularly from a sophisticated international law firm with specific policies and processes in place to address performance concerns, and who failed to talk to Mehta or document a performance concern based on a single email produced. *Smith v. K & F Indus., Inc.,* 190 F.Supp.2d 643, 650 (S.D.N.Y.2002) (holding that under Title VII, "[a] lack of written warning, disciplinary action or reprimand is evidence that may rebut a defendant's asserted legitimate, non-discriminatory rationale"); *Peterson v. Town of Waterford*, No. 3:21 Civ. 332 (SVN), 2023 WL 2742343, at *8 (D. Conn. Mar. 31, 2023) ("[i]n the absence of any documentation corroborating [Mehta's] alleged performance deficiencies, there is a genuine dispute of material fact concerning whether [DLA] actually viewed [Mehta] as performing poorly; [and] resolution of this dispute will turn on the credibility of [DLA], on the one hand, and [Mehta], on the other"); *Van Brunt-Piehler v. Absolute Software, Inc.*, 504 F. Supp. 3d 175, 189 (W.D.N.Y. 2020) (Defendants argument that poor performance provided a legitimate, non-discriminatory reason for termination was "not entirely supported by the record" in part because "Plaintiff never received any verbal or written warnings prior to her termination, nor was she placed on a performance improvement plan"). Given that the only evidence offered is regular one-to-one emails, there is nothing that can remedy this absence of proof that Mehta was a poor performer. DLA's motion ignores this glaring truth and seems to believe that the email chains can overcome what are classic credibility determinations about why Mehta was fired at 6 ½ months pregnant. The evidence can only be evaluated by a jury, not a court on a Rule 56 motion.

**B.**      <u>**Defendant Rewarded Mehta for Excellent Work Through Bonuses and Raises**</u>

The record establishes that DLA failed to provide evidence of performance deficiencies, but also that DLA made a *choice* to award Mehta $126,000 in bonus money during her 11 ½ months of employment.  CSUMF ¶¶ 30-39.  According to the Firm's Compensation and Bonus Policy, an associate must **meet the Firm's and the practice group's performance standards** to be bonus eligible.  *Id*. ¶ 23 (emphasis added).  The policy determines bonus eligibility.  Confoundingly, DLA claims that Mehta was fired for her alleged below par performance, "from the very beginning" of her employment.  *See* ECF 113 at 3; Defendant's Statement of Undisputed Material Facts ("SUMF") ¶ 57, Durham Decl., Ex. 1 (Durham Dep. Tr. 52:6–11).  Directly contradicting this, emails produced in discovery show that Durham was specifically told that Mehta was not **"remotely close to bonus eligibility**" yet Durham made the discretionary decision to award the bonus regardless.  *Id*. ¶ 39.  Without ever producing evidence about "how" or "why" the decision was made, DLA merely glosses over the obvious failure to adhere to its own policies, and simply says that "[t]he payment of Mehta's bonuses was in no way tied to any assessment of her performance…" SUMF ¶ 39.  The documentary proof tells another story, and the award of bonus money is a material fact in dispute precluding summary judgment.  In addition to the six figure and five-figure bonuses awarded to Mehta, she received significant raises, including a $30,000 increase in her base compensation in March 2022 that was made retroactive to January 2022, raising Mehta's total base compensation to $400,000.  CSUMF ¶ 48.  In less than one year, Mehta's base compensation was **increased by $70,000**.  CSUMF ¶¶ 44-45, 48, 131.

DLA has no reasonable way to explain how Mehta could receive such increases and bonuses while also claiming she underperformed during her entire 11 ½ months of employment.  The evidence flatly contradicts the Firm's suggestion that all associates received automatic raises,

10

instead revealing that associate raises are subjective and discretionary, as were all three of Mehta's raises. The proof disproving DLA's claims on this point are detailed in Mehta's responses to ¶¶ 44-48; *see also* CSUMF ¶¶ 30-39. Moreover, internal policies make clear that only associates **"who continue to meet [DLA's] minimum performance standards will match the prevailing [compensation] scale"** (emphasis added). On its face, this contradicts DLA's claim that all associates automatically received raises. Tellingly, the sole associate DLA produced evidence about in discovery was Mehta. Despite demands, DLA refused to produce discovery about the compensation of Plaintiff's peer associates even narrowed to within the IPT group or for her law school class year. Because DLA refused to produce this highly relevant information, it is unknown as to what happened to other associates at the time Mehta received salary increases, but on a Rule 56 motion, all inferences must be construed in favor of Plaintiff and against DLA. *See* Christensen Decl., Ex. 13, outlining Defendant's refusal to provide comparator evidence. In sum, DLA's position, contradicting its own internal policies, supports an inference of discrimination and weighs strongly in favor of denying summary judgment. *See Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) ("Departures from procedural regularity" can also an inference of discrimination") (quoting *Zahorik v. Cornell University*, 729 F.2d 85, 93 (2d Cir. 1984); *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 664 (2d Cir. 2009) ("Where an employer's 'deviat[ion] from its normal decision making procedures' resulted in the challenged employment decision, an inference of pretext may arise.") (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313-14 (2d Cir. 1997)); *Ferrante v. American Lung Ass'n*, 230 A.D.2d 685, 686 (1st Dep't 1996), aff'd, 90 N.Y.2d 623 (1997) ("the fact that defendant admittedly did not follow its own procedures" supported plaintiff's allegation of pretext).

11

DLA also had to deviate from its own internal policies to award Mehta discretionary bonuses of $105,000 and $21,000 in December 2021, which were paid in January 2022, making it beyond dispute that its bonus policy is not objectively lockstep or that partners do not have the ability to sidestep the policy when they want to, as Durham did.  CSUMF ¶¶ 32, 24, 44.  Further, if DLA actually believed Mehta to be a poor performer from the beginning, it easily could have made the decision to not pay her a bonus.  Internal DLA documents show that in 2021, when Mehta first received a bonus, 9 out of 50 associates (18%) did not receive a bonus (*see* Christensen Decl., Ex. 10).  DLA partner Keith Medansky ("Medansky") confirmed the subjective nature of bonuses rather than lockstep when he testified, "and then you have bonuses based on people's performance."  CSUMF ¶ 32; Medansky Decl., Ex. 1 at 63:11-18.

The cases[4] relied upon by DLA to support its argument that raises and bonuses cannot support a discriminatory inference all involve plaintiffs who received negative performance reviews and/or were otherwise informed that they were performing poorly.  *See* ECF 113 at 19.  In contrast, Mehta never received a negative performance review or was told she was a poor performer.  Instead, she routinely received positive feedback about her work.

C.    **Plaintiff Was an Excellent Performer and Rewarded for Her Performance**

The evidence in discovery supports Mehta's allegations in the Complaint that she regularly was validated for her strong work performance.  In addition to her discretionary bonuses and pay increases, the evidence shows that Mehta received consistent feedback that her performance was

---

[4]    In *Beers v. NYNEX Material Enterprises Co.*, No. 88 Civ. 0305 (MBM), 1992 WL 8299 (S.D.N.Y. Jan. 13, 1992), the plaintiff received a written negative performance review, attended a meeting with his supervisors where they explained how his performance should be corrected, and was then demoted when he failed to correct the identified performance deficiencies.  In *Wright v. Storch, Amini & Munves, P.C.*, No. 12 Civ. 2852 (LTS) (MHD), 2014 WL 1663125 (S.D.N.Y Apr. 25, 2014), the plaintiff was terminated after being denied a bonus and receiving a negative performance review.

12

excellent – throughout her 11 ½ months of employment.  CSUMF ¶¶ 57, 59, 116, 131, 152, 170; 217, 258 (providing numerous specific examples).  Bolstering the weight of this evidence is the undisputed fact that during her employment not a single partner told Mehta that there was concern about her performance level.  CSUMF ¶ 59, 82, 88, 115, 116, 131, 217, 251, 257;  Mehta Decl. ¶¶ 86, 91, 94-96.  Bolstering the inference of her being a solid performer even more is the testimony by each lawyer deposed during discovery that he/she never spoke to Durham about any concerns with Mehta's performance and Durham never spoke to them about the issue either.  *See* CSUMF ¶¶ 57, 59, 131; 261, 262; Medansky Decl., Ex. 1, 82:13-19 (Medansky never reached out to Durham or any other partner to talk about Plaintiff's performance; much less to complain or suggest any discipline or corrective action); Senger Decl., Ex. 44, 83:17-22 (partner Heather Dunn never spoke to Mehta about her performance nor could she recall a specific instance where the alleged poor performance was discussed).  As Mehta attests, the <u>first time</u> during her 11 ½ months of employment that Durham messaged a concern about her performance was immediately before she was fired.  Senger Decl., Ex. 1, 39:4-11 (immediately prior to her termination, "…[Durham] sounded concerned for the first time ever.").

It is undisputed that although Durham or any partner easily could have provided Mehta with an informal or formal performance evaluation, verbal or in writing, at any time during her employment, no one did.  CSUMF ¶ 28; Mehta Decl. ¶¶ 87, 92-96, 127. Directly contradicting DLA's claims, she received regular praise.  For example, in November 2021, Durham wrote to Mehta after she completed work in a time crunch and said, "Thank you – BTW – this is exactly what I need you to be doing."  CSUMF ¶ 116.  In December 2021, Durham approved trademark searches that Mehta drafted without any edits or revision by telling Mehta that the draft "**look[ed] great**" and were "**good to go**."  *Id*. ¶ 57.  In January 2022, Mehta drafted a "knock-out" search and

13

trademark clearance request for Durham's review; Durham responded that it was "**Perfect**." *Id*. In February 2022, in response to Mehta's work product, Durham wrote to Mehta "**[t]hese look pretty darn good**." *Id*. During that same month, Mehta drafted a brief and Durham responded that it "**look[ed] great**." *Id*. In April 2022, after Mehta sent Durham a draft of work she performed on a relatively new portfolio of Durham's, Durham responded "[t]hese look good. I added a little commentary to the discussion below but did not change the overall opinion. Thanks." *Id*. During that same month, Mehta sent Durham an email with a draft she intended to send to a client advising about risk. Mehta specifically asked Durham if there was anything additional she wanted her to add before sending the letter to the client, and Durham responded that it was "good" and did not require any revisions. *Id*. On another occasion in April, Plaintiff sent Durham a draft letter and use recommendations for a client; Durham again responded that it could be sent to the client with no revisions. *Id*. On yet another occasion in April 2022, Durham sent Mehta an email thanking her for "taking care of [work assignment] on such a tight timeline." *Id*. ¶ 116. In May 2022, after assigning Mehta to work on a draft letter with recommendations to one of Durham's most important clients, Durham agreed with Mehta's recommendations and told her to send the letter to the client. *Id*. ¶ 57. In June 2022, after Mehta sent Durham a draft letter to a client with use recommendations based on a full clearance search, Durham approved Mehta's work with no edits and wrote "[g]ood to go." *Id*. On the same day, Mehta sent Durham another draft letter with use recommendations for another client; Durham again approved Mehta's work without any edits. *Id*. In July 2022, Mehta received a successful response in an enforcement matter that she handled, and Durham wrote to Mehta: "Excellent! Please double check the website and let the client know the good news." *Id*.

14

Durham's self-serving testimony that she "noticed 'deficit' in Mehta's skills from the very beginning" (ECF 113 at 3) (emphasis added) deserves little to no weight because it is contradicted in countless examples of her repeated praise. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (holding that a court may not give credence to the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached); *see also In re Dana Corp.*, 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of an interested witness for summary judgment). In short, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Carter v. Syracuse City School Dist.*, 850 Fed. App'x 22, 26 n.2 (2d Cir. 2021) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). Whether Durham's own testimony about what she believed is to be credited or not, is a decision that only fact-finders can make at trial.

Further contradicting Durham's poor performance excuse is the fact that Durham recommended Mehta to work for other partners throughout her employment. *See* Mehta Decl. ¶ 46; CSUMF ¶ 57, Christensen Decl., Ex. 16: extracting Column C to set forth the names of more than 60 lawyers who Plaintiff performed work for despite being at DLA for 11 ½ months and Column H ("Work Date") showing the dates that Plaintiff performed such work). Even on this limited record, the document shows that Mehta's work for other partners steadily increased including through August and September. *Id*. If Mehta was truly underperforming, the evidence would show an opposite trajectory. Tellingly, if what DLA says were true, the Firm would have willingly agreed to produce the communications between Mehta and these dozens of other partners, showing their commentary and feedback about her work. Despite demands by Mehta, DLA refused to produce any emails or other communications between Mehta and the numerous other lawyers for whom she performed work. *See* Christensen Decl., Ex. 13. As a result, Plaintiff

15

was significantly impeded in obtaining discovery that shows the feedback Mehta received from other lawyers at DLA despite the fact that she worked for a significant number of them. The communications with dozens of other partners must support Mehta's testimony that it was overwhelmingly positive, and this issue and inferences therefrom will be the subject of a motion *in limine* before trial. At the Rule 56 stage, this weighs strongly against granting the Firm's motion.

**D.      Durham Never Told Mehta That She Considered Her an Underperformer**

Incredibly, DLA offers its poor performance excuse knowing that not a shred of evidence was presented to suggest that Durham actually considered Mehta's work to be underperforming such that she considered possible termination. Durham failed to tell Mehta herself that her work was not satisfactory, but tellingly, she also failed to speak to any other senior lawyer or partner who assigned work to Mehta about alleged performance concerns. CSUMF ¶¶ 116, 161, 217, 219, 251 and Mehta Decl. ¶ 77. Although Durham admitted that one of the ways to address associate underperformance is to use a performance coach, and she has done that before, she conclusively decided that such an option would not have benefited Mehta. Durham Decl., Ex. 1, 64:3-10. In discovery, billing records for Mehta showed that after Durham, Mehta billed most often on matters for partner Keith Medansky.[5] Yet, it is undisputed that like Durham, he, too, repeatedly expressed his approval with Mehta's work, and like Durham, never told Mehta that he did not believe she was performing well. *See* CSUMF ¶ 152 (Medansky sent an email dated December 13, 2021, copying a client and said, "Thanks, copying my colleagues Anisha and Eugenia who took the lead

---

[5]      Ample evidence was produced showing that Durham and Medansky are "timekeepers" for billing purposes, but no discovery was produced to discern whether Plaintiff's work was performed under the supervision of other DLA attorneys. *See* CSUMF ¶ 53. Further, DLA refused to produce any discovery to show Plaintiff's work product for the more than 60 other lawyers that she performed work for (*id.*); it is a material fact in dispute that Plaintiff performed satisfactory and good work for these other lawyers, and also did not receive any complaints about her performance, much less anything in writing about alleged poor performance. Mehta Decl. ¶¶ 94-96.

in working with me on this and did a great job"); *Id.* ¶ 59: (Medansky emailing Plaintiff: "You did a terrific job on the bench brief.  Awesome.  I/we will start to get you involved in these clients, especially [REDACTED NAME]."; *Id.*  (Medansky email dated December 22, 2021 in connection with Plaintiff's work for his largest and most important client, he wrote "This is perfectly done. I will send to [REDACTED name]. In my note I will introduce you.  Thank you for handling promptly."); *Id.*  (email dated December 12, 2021, Medansky wrote to Plaintiff, "This is a great first draft!  And, you provided extra formatting and questions for judges - thank you! The template for [redacted] has a ton of extra info in it so thank you for weeding through it.  The tone sounds like a bench memo, so it works!").

**E.      Medansky Assigned Mehta the Cases Previously Handled By a Lawyer Who Was "Of Counsel" And Who Had Graduated Law School in 2005**

The more Mehta performed work for Medansky, the more assignments he gave her, increasing both in volume and responsibility.  This increase took place right up until the time she was fired.  *See* Christensen Decl., Ex. 16, Columns C and D, which show both the assignment of Plaintiff to multiple new client matters, and the fact that for her last four full months at DLA, her hours for Medansky increased, not decreased, *see* June (38 hours); July (54 hours); August (43 hours); and September (58 hours), *id.* Ex. 16, (C).  On August 23, 2022, Medansky told Mehta that he had a very high-profile big research project and enforcement matter that he wanted her to take on for one of his largest clients].  Mehta Decl. ¶ 90.  It also is undisputed that Medansky assigned Mehta *several hundred matters* that had been previously handled by a lawyer who was "of counsel" and far more senior in experience than Mehta.  *Id.* ¶ 71, Ex. 3, 13:10-20.  Another senior lawyer, Hilary Remijas ("Remijas"), confirmed this when she testified that Medansky's team had a lot of extra work when Mehta was hired because the "of counsel" was leaving after having a baby, and they needed someone to take over her cases.  *Id.*, 14:15-19; *see also*, *Id.*, Ex. 87 (showing that on

17

July 6, 2022 Medansky said that Mehta should be assigned to the matters of [redacted client] previously handled by the "of counsel"). Notably, this "of counsel" was so senior to Mehta that had she worked at DLA during Mehta's employment, she would have supervised Mehta's work. Remijas confirmed that she and the "of counsel" performed at the same level, and Remijas is a 1994 law school graduate with more than 15 years of experience. *Id.*, 14:8-15, Ex. 2, ¶¶ 63-64 (Q. When [of counsel] worked at DLA, …. yes, we were doing <u>the exact same thing</u>."). It is undisputed that Remijas supervised Mehta's work. *Id.*

On this evidence a finder of fact easily can conclude that any criticism Medansky may have had about Mehta's work product was not evidence of poor performance but rather, proof that Medansky assigned an entire caseload previously handled by a lawyer who had graduated law school a decade before Mehta, and was an "of counsel" to Mehta, who graduated law school in 2015. As with Durham, abundant evidence exists that Medansky believed Mehta to be an excellent performer, contradicting any post-termination suggestion that Medansky considered her a poor performer. *See*, *supra*, III(E).

Like Durham, Medansky never told Mehta he considered her work level to be a problem or told any other lawyer at DLA that Mehta's performance being unsatisfactory. *See* CSUMF ¶¶ 51, 59, 257; Medansky Decl., Ex. 1, 82:13-19 and 83:2-10; *see also Id*. ¶ 257, Medansky Decl., Ex. 1, 65:7-16. Not only did Medansky never communicate that message to Mehta, he also never spoke to Durham about Mehta's performance either. *Id*., *see also* Medansky Decl., Ex. 1, 82:13-19 and 83:20-84:10 (Medansky never called or wrote Durham to talk about Plaintiff's performance much less to complain, or suggest she needed discipline or corrective action, or to express "disappointment). Further, when asked if he believed that he needed to review Plaintiff's

18

performance with her *at any time* during her employment, Medansky admitted that he had not done so in writing or verbally. *Id*. ¶¶ 59, 151, 170; Medansky Decl., Ex. 1, 26:11-15; 19-24.

**F.    Medansky Did Not Decide to Fire Mehta**

Although DLA submits emails written by Medansky to suggest that he considered her an underperformer, the evidence shows that Medansky did not make or take part in the decision to fire Mehta.  Medansky testified that when Durham called him the day before she fired Mehta: (1) they did not even talk about terminating Plaintiff, (2) he did not know that Durham was going to fire Mehta, and (3) he learned she was fired only after the fact.  *See* Medansky Decl., Ex. 1, 9: 25; 10: 2-4; 18:21-25; 19: 2.  Because it is undisputed that Medansky never contacted Durham a single time to discuss Mehta's performance, it is clear that Medansky was not part of the decision to fire Mehta.  The decision to fire her was made by Durham, and only Durham.  Accordingly, Durham was not in possession of or had any knowledge about a single email exchange that DLA submits in its Rule 56 motion regarding Mehta's work for Medansky.  All of these Medansky emails offered to support its own defense of lawful conduct were gathered by the Firm only after Durham made the decision to fire Mehta and did so on October 4, 2022, and only after Mehta retained counsel and notified DLA of her intent to assert legal claims.  It is doubtful that Medansky's emails offered in this motion will be admissible at trial.  This is an issue that will briefed in motions *in limine*.

**G.    DLA Failed to Follow Any of Its Own Policies for Underperforming Associates Because Mehta Was a High Performer**

It is undisputed that DLA permits providing performance evaluations to associates outside of the Firm-wide year-end associate evaluation process.  Christensen Decl., Ex. 2, at ¶ 51 ("DLA Piper admits that Ms. Durham was not prohibited from providing Plaintiff with a performance evaluation outside of the Firmwide year-end associate evaluation process").  DLA failed to do so here.  SUMF ¶ 28.  It is further undisputed that Durham failed to give Plaintiff a performance

19

review at any time during her employment despite being aware that she could provide one at any time. CSUMF ¶ 28; Durham Decl., Ex. 1 at 40:18-41:3. Similarly, Medansky, Dunn, Remijas and Acquista all testified that they, too, failed to give Plaintiff a performance review, formal or informal, at any time. *Id.*, ¶¶ 28-29, 37; *see also* Mehta Decl. ¶ 94.

It is also undisputed that DLA could and did adjust class years of existing associates for a variety of reasons, including lack of experience or performance. *See* Christensen Decl., Ex. 11 (internal document generated by DLA for litigation showing that DLA could and did adjust class years of existing associates where at least 2 of the 50 associates were adjusted from 2015 to 2014); Mehta Decl. ¶ 139 (plaintiff knew of at least two other associates in IPT who she worked with at DLA that graduated law school earlier than the "class year" assigned to them by DLA, "[AL] told me that she was not the same level as her class year" and "I was also told by others that one of Medansky's associates, [ES], was at a different class level than the year she had graduated from law school"); Christensen Decl., Ex. 12, DLA_Mehta_00009783 (showing that AL was categorized as "Firm Class Year 2016" even though she graduated law school in 2014); Durham Decl., Ex. 1 at 61:14 (Durham admitting that "[t]here's always exceptions to the rule." Indeed, DLA's own subjective internal policy on class year placement and compensation makes it clear that only associates "**who continue to meet our minimum performance standards will match the prevailing scale set forth below**" (emphasis added). Exhibit 10 to Senger's declaration.

Accordingly, DLA had at least four policies in place to address associates with performance issues but failed to follow any of them with Mehta, including: (1) denying a bonus, (2) providing performance reviews outside of the standard timeframe, (3) adjusting class years of existing associates, and (4) providing associates with a performance coach to improve a skillset. The failure to use any of these options supports an inference of discrimination. *Ferrante v. American Lung*

20

*Ass'n*, 230 A.D.2d 685, 686 (1st Dep't 1996), aff'd, 90 N.Y.2d 623 (1997) ("the fact that defendant admittedly did not follow its own procedures" supported plaintiff's allegation of pretext); *see also Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) (quoting *Zahorik v. Cornell University*,729 F.2d 85, 93 (2d Cir. 1984) ("Departures from procedural regularity" can [ ] raise an inference of discrimination); *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 664 (2d Cir. 2009) ("Where an employer's 'deviat[ion] from its normal decisionmaking procedures' resulted in the challenge employment decision, an inference of pretext may arise.") (quoting *Stern v. Trustees of Columbian Univ.*, 131 F.3d 305, 313-14 (2d Cir. 1997)).

> **H.      Temporal Proximity Is a Significant Indicator of Discriminatory and <u>Retaliatory Intent</u>**

A jury can infer pregnancy discrimination from the timing of events.  *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d. Cir. 2019) ("temporal proximity between the time [plaintiff] disclosed her pregnancy and her termination [sufficient] to establish an inference of unlawful discrimination").  It is well settled in the Second Circuit that a plaintiff can "indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  What is considered to be close in time is also well-settled.  *See, e.g.*, *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023) (in the Second Circuit "a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action"); *Gorman-Bakos*, 252 F.3d at 555 (four months between employment action and protected activity was sufficient to support an inference of a causal connection); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight months between EEOC complaint and retaliatory action suggested a causal relationship).

It is undisputed that Mehta gave verbal notice of her pregnancy to Durham on August 5, 2022 (CSUMF ¶ 171); to Medansky on August 26, 2022 (*id*. ¶ 182); and gave written notice to the Firm when she submitted her maternity leave paperwork on September 28, 2022 (*id*. ¶ 220), which specified her anticipated leave in January 2023 (*id*. ¶ 266). Mehta was fired on October 4, 2022, just 8 weeks after verbal notice to Durham, and 6 days after she submitted her leave request. *Id*. ¶¶ 267-68). This is squarely within the parameters in this Circuit to suggest that the adverse decision to fire her was made in proximity to her protected notice of her intention to take leave.

In addition, there is evidence that Durham's team was experiencing a slowdown in billable work at the time she was fired, inferring this was at least a motivating factor in Mehta's termination. Specifically, deposition testimony revealed that the lawyers in Durham's subgroup had extra bandwidth to take on more work, especially compared to when Mehta was hired the year before. *See* Senger Decl., Ex. 44, 118:12-15 (when asked if there "was any time in the summer of 2022 where you needed an associate to work on something and no one was available?" Dunn answered, "Not to my recollection."). When Dunn was asked if there "was ever a time that you asked Anisha to do work where she told you that she did not have the capacity, Dunn answered, "Not that I recall." *Id*., 118:16-20. Senior associate Carissa Bouwer ("Bouwer") testified that when Mehta was hired in the fall of 2021, Durham's IPT subgroup was "right in the middle of a particularly hectic period." CSUMF ¶ 266, Bouwer Decl., Ex. 1, 116:5-7. Bouwer confirmed that in the summer and into the fall of 2022, Durham's IPT subgroup was experiencing a slowdown, "I want to say sometime over the summer it slowed down, which it normally does, but then it didn't pick up as much in the fall as it normally does." *Id*., 117:7-10 (emphasis added). *See also Id*., 115:13-19 (when Bouwer was asked about her "understanding of why the trademark group was looking to hire someone" when Plaintiff was hired, she confirmed it was because they were "very

busy in 2021."). Bouwer confirmed that after Plaintiff was fired in October 2022, and into 2023, other than first-year hires from the prior summer associate program, no other associates were hired into Durham's "Northern California trademark group." *Id*., 119: 3-21. Medansky did not hire an experienced trademark associate into his group after Plaintiff was fired. Instead, Plaintiff was replaced on Medansky's team by a male associate, [GS], who graduated law school in 2019. Christensen Decl. Ex. 3, Remijas Tr. 53:3-18; 54:15-18, 55:2-3 (confirming that [GS] was assigned to all of the matters Plaintiff had handled for Medansky's largest client).

## I.    Comparative Evidence Supports an Inference of Discrimination

"[D]isparate treatment is the essence of discrimination." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). All that is needed for a juror to compare two employees is "an objectively identifiable basis for comparability," *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citations and quotations omitted); specifically, "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id*. at 40. To guide its analysis, the Court may look to whether the two employees had "the same supervisor" and "were subject to the same workplace standards." *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 339-340 (S.D.N.Y. 2001).

Here, there is evidence that Mehta, the only pregnant associate in the IPT group, was treated less well than her non-pregnant counterparts.[6] DLA alleges that Mehta providing a draft with an incorrect company name was indicative of poor performance. CSUMF ¶¶ 85-87. Yet, contradictory evidence reveals that associates, trademark paralegals, and of counsels in the IPT

---

[6]    Plaintiff was only permitted to receive three sample weeks of emails from two associates, a very narrow time frame and scope, and yet there is significant comparative evidence that shows that Mehta's non-pregnant comparators were not criticized, disciplined or terminated for the same purported mistakes. See CUSMF ¶¶ 83, 86, 147, 194, 233.

group regularly emailed each other to ask questions to figure out "who" or "which company" they were supposed to be looking up because assignments were given without this information being clarified. CSUMF ¶¶ 85-87. For example, in April 2022 alone, Bouwer sent Durham both a preliminary clearance search without knowing who the client was and a draft of an entire "full search letter" for a client without complete information about the client, not knowing "what the entity structure…will be." *Id*. at ¶ 86. In March 2022, associate Angela Li also sent an email showing that both Li and Dunn were trying to determine who the client was, and which website belonged to the client. *Id*. Despite this being a regular occurrence, DLA attempts to argue that this is somehow indicative of poor performance. *Id*. ¶¶ 85-87. DLA attempts to argue that Mehta receiving edits from a partner is somehow indicative of poor performance. *Id*. ¶¶ 145-147. Yet, the record is replete with contradictory evidence that shows that non-pregnant associates, including those significantly more senior than Mehta, regularly seek and receive feedback and edits from partners and are not accused of being poor performers for doing so. *Id*. ¶¶ 147, 194, 233.

DLA also spends a significant portion of their Motion on an issue regarding the drafting of a summary judgment motion that Durham identified in Mehta's termination meeting as one of the causes of her termination. SUMF ¶¶ 94-115. DLA alleges that Mehta was responsible for drafting the motion in question. Yet, the evidence plainly shows otherwise: Mehta sent Bouwer an email on April 27, 2022 with a 9-page draft brief. CSUMF ¶ 95. In the interim, the opposing party filed its own summary judgment motion and Bouwer then drafted the opposition and cross motion to summary judgment, which Bouwer emailed to Durham on May 27, 2022. *Id*. ¶ 101. Notably, DLA failed to produce the attachment with the brief Bouwer sent to Durham. *Id*. It is disingenuous to suggest that Bouwer's draft submitted to Durham on May 27, 2022 was the same document Mehta sent to Bouwer on April 27, 2022, especially given that DLA intentionally failed to produce

24

Bouwer's copy. *Id.* ¶ 105. Even more troubling is the fact that DLA relied upon the drafting of the brief as a reason to terminate Mehta while Bouwer identified the brief on her performance review as *one of her notable achievements for 2022* and specifically stated that she was responsible for "lead preparation and filing" of the brief. *Id.* ¶ 113. At a minimum, these contradictions infer that Mehta was not actually fired for any of these purported performance concerns, given that her non-pregnant counterparts were not only never disciplined or terminated, but also were, at times, praised for the very thing Mehta was told was a reason for termination. This is more than sufficient evidence for a jury to discredit DLA's basis for termination, and infer that Mehta's pregnancy was at least in part, a motivating factor. *Bart*, 96 F.4th at 577-78.

## IV. DLA VIOLATED MEHTA'S FMLA RIGHTS

### A. DLA Violated the Interference Clause

An employer violates the FMLA's interference clause where it has "denied or otherwise interfered with a benefit to which [an eligible employee] was entitled under the FMLA." *Graziadio v. Culinary Inst. Of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). "Denial of FMLA benefits is interpreted flexibly; '[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004) (quoting 29 C.F.R. § 825.220(b)). Thus, an employer violates the interference clause where its "acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 136, 144 (D. Conn. 2014) (internal citations omitted). In short, the plaintiff need only show "that an 'employer in some manner impeded the employee's exercise of his or her rights' protected by the FMLA." *Saraf v. West*

25

*Publishing Corp.*, No. 16 Civ. 1425 (VSB), 2018 WL 7107266, at *16 (S.D.N.Y. Dec. 20, 2018) (quoting *Di Diovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 199 (S.D.N.Y. 2009)).

DLA argues only that it did not interfere with Mehta's FMLA rights because Mehta cannot show that her request for FMLA was at least in part the reason she was terminated. ECF 113 at 26. Defendant is wrong. In addition to the temporal proximity discussed, *infra*, that shows that Durham fired Mehta just two weeks before her 1-week work anniversary and shortly before her 18 weeks of paid maternity leave. For all of the reasons discussed, there is sufficient evidence for a jury to conclude that Durham's sudden decision to fire Mehta had nothing to do with her performance, but everything to do with Mehta being more than 6 months pregnant and scheduled for leave in January 2023.

The purported reasons Durham provided for Mehta's termination are vigorously disputed in this matter. In fact, the main reason Durham identified in the termination meeting – the brief – was not even written by Mehta and the admitted lead author of the brief was not only never disciplined, but also considered it to be one of her main accomplishments of the year. Further, the other purported deficiencies were commonplace in the workplace and, as shown herein, were not unique to Mehta. The only thing unique to Mehta was her pregnancy and request to leave at the same time Durham was suffering from a slowdown in work. DLA's disparate discipline would allow a jury to conclude that Mehta would not have been terminated if she had not requested leave, and it requires denial of summary judgment on Mehta's FMLA interference claim.

Further, Defendant erroneously concludes that it is not liable for interfering with Mehta's FMLA leave because she would have been terminated regardless of the leave. ECF 113 at 27. Yet, this is a circular argument at the very heart of this lawsuit. It is, in fact, exactly what is in dispute here and demonstrates just how significant the material facts in dispute are in this matter. *Colon*

26

*v. Fashion Inst. of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 286–87 (S.D.N.Y. 2013) (holding that while an employer is not liable for interference if an employee would have been terminated regardless, summary judgment must be denied when it is impossible to evaluate whether the leave notice was a factor in the decision to terminate employment); *see also Siddiqua v. New York State Dep't of Health*, No. 114 Civ. 0372 (GTS)(DJS), 2018 WL 4554491, at *17 (N.D.N.Y. Sept. 21, 2018) (holding that "because a question of fact remains" regarding whether plaintiff would have been terminated regardless of FMLA leave, "summary judgment is inappropriate").

### B.    DLA Violated the FMLA Retaliation Provision

The FMLA makes it unlawful for an employer to retaliate against an employee who seeks to exercise her FMLA rights. *Graziadio*, 817 F.3d at 429. "For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonably worker in plaintiff's position from exercising h[er] legal rights." *Milea v. Metro-N. R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011).

FMLA retaliation claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *Graziadio*, 817 F.3d at 429. They are subject to the more lenient "motivating factor" causation standard. *Carter v. TD Bank, N.A.*, No. 23 Civ. 950 (SVN), 2024 WL 2828470 at *4 (2d Cir. 2024) ("plaintiff's ultimate burden is to show that retaliation was a motivating factor for the adverse employment action."); *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) (describing the "quantum of causation" a plaintiff must prove between the exercise of FMLA rights and the adverse employment action to hold an employer liable for retaliation is a "motivating factor causation standard") (cleaned up). Under that standard, a plaintiff need only demonstrate that his exercise of his FMLA rights "was a motivating factor in

27

the defendant's adverse employment action." *Natofsky v. City of N.Y.*, 921 F.3d 337, 347 (2d Cir. 2019).

Here, there are numerous indications that a causal connection between Mehta seeking to exercise her FMLA rights and her termination exists. Defendant cannot seriously claim that the timeline is too attenuated to permit an inference of retaliation. Not only did Mehta explicitly tell Durham that she was pregnant on August 5, 2022, in that same conversation, Mehta explained to Durham that she planned to take FMLA leave.[7] On October 4, 2022, only five days after submitting her FMLA leave request via Unum, only six days after receiving notice from Unum that DLA was notified of her request for leave submission, and only two months after she informed the first of her supervisors she was pregnant, Mehta was terminated. Not only that, but Mehta was also terminated two weeks before she would have become eligible for FMLA leave.

Defendant's counter to this point is illusory: they note that "Durham was aware of Mehta's pregnancy, but [that there was] no evidence that Durham (or any other DLA attorney) "had knowledge of [Mehta's] leave request" to Unum before her termination." ECF 113 at 26-27. This is not true. Durham knew Mehta intended to file for FMLA leave. CSUMF ¶¶ 172-174.

Finally, as explained in detail *infra*, there are myriad facts in dispute that are relevant to retaliatory animus, including, *inter alia*, overwhelming evidence that Defendant's purported basis for terminating Mehta is false and was fabricated as a pretext. *See*, *e.g.*, *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 148 (2000) ("A plaintiff's prima facie case, combined with sufficient

---

[7] *See* Dkt No. 1 ¶ 95, "Mehta was not required to and never should have been asked by a single employee at the Firm, especially in August and September, whether she intended to take the full number of maternity leave weeks 'offered' by DLA… [n]evertheless, she was asked such questions by senior lawyers, including… Durham."

evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Accordingly, Mehta's FMLA interference and retaliation claims should proceed to trial.

## V. DLA'S FLAGRANT AND ONGOING RETALIATORY TACTICS SHOULD BE DISREGARDED

Allegations that Mehta engaged in wrongdoing and suggestions of criminal conduct because she took screenshots of relevant evidence and shared them only with her attorneys are blatant retaliation.  DLA intentionally included this argument in its motion for summary judgment solely to damage Mehta's reputation as much as possible.  The facts are clear: (1) DLA learned that Plaintiff had emails in her possession because she *voluntarily* produced every single one in full to DLA; (2) Plaintiff gave the emails to no one except her counsel in this action and then deleted them; (3) physical copies were never made; (4) after every email was returned to DLA, through our firm with the assistance of IT, all electronic copies on our system were permanently deleted.  It is also clear that DLA then proceeded to redact the emails to such a degree that the majority of the emails proved useless in discovery.

Notably, DLA did not file a counterclaim in this action against Mehta because it knows that no such legal basis exists.  *Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 721 (S.D.N.Y. 2022), reconsideration denied, No. 20 Civ. 11091 (JSR), 2022 WL 1173885 (S.D.N.Y. Apr. 20, 2022) ("[Plaintiff] emailing the documents to his personal account was not breach, nor was simply retaining those documents after his employment was terminated, because there is no evidence that he has shared those documents with any Zurich competitors, or with anyone other than his lawyer"); *see also Albertini v. Summit Tech. Servs., Inc.*, 287 F. Supp. 2d 92, 97 (D. Mass. 2003) (holding that a plaintiff who promptly returned all confidential documents and materials when requested to do so did not breach and was entitled to payment under the agreement at issue);

*Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 347 (S.D.N.Y. 2009) (recognizing difference between the plaintiff in *Albertini* and a plaintiff who refused to turn over confidential documents for two years and after repeated requests).

Mehta did not improperly use any of the documents at issue, nor did she provide them to anyone other than her attorneys who subsequently turned every single document over to Defendant. This is not breach of any kind and any argument that Mehta should be denied reinstatement or damages based upon this alleged "wrongdoing" is wholly misplaced and the after-acquired evidence doctrine is inapplicable.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety.

Dated: November 4, 2024
     New York, New York           Respectfully submitted,

                                     WIGDOR LLP

                                     By: _____

                                         Jeanne M. Christensen
                                         Monica Hincken

                                         85 Fifth Avenue
                                         New York, NY 10003
                                         Telephone: (212) 257-6800
                                         Facsimile: (212) 257-6845
                                         jchristensen@wigdorlaw.com
                                         mhincken@wigdorlaw.com

                                       *Counsel for Plaintiff*