UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANISHA MEHTA,

                            Plaintiff,

            -against-

DLA PIPER LLP,

                            Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/29/2025

23 Civ. 4757 (AT)

<u>**ORDER**</u>

ANALISA TORRES, District Judge:

Plaintiff, attorney Anisha Mehta, brings this action against Defendant, DLA Piper LLP

("DLA" or the "firm"), a law firm where she worked from October 2021 to October 2022,

alleging that the firm violated federal, state, and local antidiscrimination laws when it fired her

two months after she told the firm that she was pregnant.  *See generally* Compl., ECF No. 1.

Before the Court are DLA's motion for summary judgment, ECF No. 112, and two motions to

seal documents submitted in connection with the firm's summary judgment motion, ECF

Nos. 111, 130.  For the reasons stated below, DLA's motion for summary judgment is

GRANTED IN PART and DENIED IN PART and its sealing motions are GRANTED.

**BACKGROUND**[1]

I.    <u>Factual Background</u>

In September 2021, Mehta accepted an offer to join DLA's Intellectual Property and

Technology Group as a sixth-year associate on an "'at-will' basis."  ECF No. 117-3 at

DLA_Mehta_1, 2, 6, 15; Mehta Decl. ¶ 27, ECF No. 133.  The attorneys who hired her described

Mehta as "[c]learly qualified" for the job, "very competent," and "accustomed to a fast-paced

---

[1] These facts are taken from the parties' Rule 56.1 statements, the opposing party's responses, and the parties'
declarations and accompanying exhibits, unless otherwise noted.  Citations to a paragraph of a party's Rule 56.1
statement include the other party's response.

practice." 56.1 ¶ 131, ECF No. 132. They anticipated that she "could hit the ground running with little training" but "would need development in the due diligence and advertising/marketing areas" of the firm's intellectual property practice. *Id.*

Mehta started working at the firm on October 18, 2021. *Id.* ¶ 17. Consistent with her law school graduation year, DLA made her a member of the "Firm Class Year of 2015," resulting in an annual compensation of $330,000. *Id.* ¶¶ 1, 10. Although the firm hired her to start in the fall, her offer letter stated that she would "receive a full 2021 year-end bonus . . . provided [she was] employed at the [f]irm on the bonus payment date and ha[d] met or exceeded the [f]irm's [e]xpectations." ECF No. 117-3 at DLA_Mehta_2. As outlined in the offer letter, DLA's expectations required Mehta to meet the minimum billable hour commitment of 2,000 hours per year (pro-rated based on her start date), "spend a significant number of hours on non-billable marketing, educational, and administrative activities," and adhere to "all applicable employment and other policies of DLA." *Id.* at DLA_Mehta_3–4; *see also id.* at 2 ("Receipt of bonus payments are subject to the terms of the [f]irm's policies."). Under the firm's associate compensation and bonus policy, an associate may be "eligible" to receive a bonus only if, among other requirements, the associate is "meet[ing] the [f]irm's and the [associate's] practice group's performance standards." 56.1 ¶ 23.

In mid-December, the firm announced that associates "in good standing" who had met their annual billable requirement "would receive 50 percent of the base market [annual] bonus early, on December 30." *Id.* ¶ 32 (alterations adopted). DLA also announced that associates in the firm class of 2015 "who were meeting the firm's high expectations with a performance rating of three or higher" would receive an additional $21,000 bonus on top of the annual market bonus of $105,000. *Id.* ¶¶ 34–35 (alteration adopted). Although Mehta had not yet met her pro-rated

annual billable hours requirement by the time of the announcement, and she had not yet received any formal performance evaluation from the firm (and, therefore, had not formally received a performance rating of three or higher), DLA paid her 50 percent of the $105,000 market bonus early and the full $21,000 additional bonus. *Id.* ¶¶ 29, 33–34. Mehta exceeded her pro-rated billable hours requirement by the end of December and the firm ultimately paid her the remaining 50 percent of the $105,000 market bonus at the end of January. *Id.* ¶ 38. About eighteen percent of DLA associates in the firm's class of 2015 did not receive a bonus in 2021. *Id.* ¶ 44; *see* ECF No. 135-9.

Effective January 1, 2022, at least some members of the firm's 2015 class, including Mehta, received a raise from $330,000 to $350,000 per year. 56.1 ¶ 44. According to an email sent by the firm, only associates "who continue[d] to meet [the firm's] minimum performance standards" were eligible for the raise. *Id.* On January 25, the firm announced another raise for "associates who continue[d] to meet [the firm's] minimum performance standards," this time from $350,000 to $370,000, which Mehta also received. *Id.* ¶ 45; ECF No. 115-10 at PL3. About two months later, on March 15, DLA's managing partners announced that associates "in good standing and who [were meeting] the firm's performance standards [would] be eligible for [a new] base salary increase" that would apply retroactively to January 1. ECF No. 115-10 at PL23. Following that announcement, the firm increased Mehta's salary to $400,000, retroactive to the beginning of the year. 56.1 ¶ 48.

During her year at the firm, Mehta worked with more than 50 attorneys, including DLA partners Gina Durham and Keith Medansky. Mehta Decl. ¶ 45; 56.1 ¶ 53. On August 5, Mehta informed Durham that she was pregnant. 56.1 ¶ 171. Mehta testified that Durham was "supportive" and "positive" about the news. *Id.* ¶ 176. According to Mehta's notes from the

call, Durham—who had previously taken two parental leaves while at DLA—encouraged Mehta to take the "whole time off" that was available to her.  *Id.* ¶ 173; *see id.* ¶ 178.  She also suggested that Mehta "discuss [her] [anticipated] leave with HR because they would have the most accurate updated policy."  *Id.* ¶ 174.  That day, Mehta emailed the firm's HR department, writing that she was pregnant and "wanted to get a better idea of what to expect" and the "length of time provided for maternity leave."  *Id.* ¶ 180.  An HR representative replied that Mehta would need "to be compliant with [DLA's] leave of absence requirements."  *Id.* ¶ 181.  On August 26, Mehta told Medansky about her pregnancy.  *Id.* ¶ 182.  She testified that Medansky was "excited" to hear the news and "congratulate[d]" her.  *Id.* ¶ 183.

As the summer wore on, work in Durham's Intellectual Property and Technology practice group began to "slow[] down" and "didn't pick up as much in the fall as it normally does." Bouwer Dep. at 117:7–10, ECF No. 124-1.  In contrast to the "particularly hectic period" during which Mehta was hired into the practice group as a lateral associate, by the fall of 2022, Durham's practice group was not hiring any new attorneys other than the first-year associates who had received offers the previous year.  *Id.* at 116:5–7; *see* Dunn Dep. at 120:2–122:16, ECF No. 116-21.

On September 29, about two months after Mehta told Durham she was pregnant, Durham told Mehta that she wanted to schedule a call to discuss Mehta's work product.  56.1 ¶ 248. Mehta sent Durham a calendar invitation for a meeting the following week "to discuss constructive feedback."  ECF No. 119-31 at DLA_Mehta_6148.  Mehta wrote in the calendar invitation that she looked forward "to address[ing] any concerns and improv[ing] upon them." *Id.*  Durham replied a few days later asking Mehta to "plan on discussing low hours and discrepancy in skillset/level."  *Id.* at DLA_Mehta_6147.

On October 4, at the scheduled time, Mehta, Durham, and an HR representative met on Microsoft Teams.  56.1 ¶ 267.  In what came as a surprise to Mehta, Durham began the call by telling Mehta that DLA was terminating her employment.  *Id.* ¶ 68; *see* Mehta Decl. ¶¶ 121, 124. According to Mehta, when she asked Durham why she was being fired, Durham told her "something vague" about "no longer being a fit," saying "she had low confidence in [Mehta's] ability to handle client matters."  Mehta Decl. ¶ 120.  Durham told Mehta that the decision to fire her was a "team decision," but Mehta recalls that Durham did not appear to be aware of some of the partners whom Mehta was working for, and Durham later testified that she made the decision to fire Mehta after speaking to only one partner, Medansky, the day prior, during a phone call in which the two did not discuss firing Mehta.  *Id.* ¶ 138; 56.1 ¶¶ 259–64; Medansky Dep. at 9:25– 10:4, 16:24–17:2, 19:3–14, ECF No. 120-1 (Q: "[W]hen [Durham] called you, did she say that she was considering terminating [Mehta]?" A: "No.").

Durham does not recall discussing Mehta's pregnancy during the meeting in which Mehta was fired.  56.1 ¶ 280.  However, Mehta's notes from the call state that she reminded Durham she was having "a rough first trimester in pregnancy," ECF No. 115-25 at DLA_Mehta_3913.  Mehta also recalls that she told Durham she believed the timing of the firing was "suspect" because she was pregnant, and "Durham got defensive and said that [the firing] had nothing to do with [her] pregnancy," Mehta Decl. ¶¶ 124–25, but was based on a "failure to meet expectations" and "[n]umerous instances [where] work [was] not up to [the firm's] standards," 56.1 ¶ 273.

When Mehta asked Durham for more information concerning her performance issues, Durham listed several items.  She mentioned the first client intake call they ever did together— about seven months earlier—where Mehta apparently did not send an agenda to Durham as far in

advance of the call as Durham was used to.  Mehta Decl. ¶ 126; *see id.* ¶¶ 50–52; 56.1 ¶¶ 78–82.

She also mentioned a summary judgment brief that Mehta worked on in April and May, about

five months earlier.  Mehta Decl. ¶ 126; 56.1 ¶ 274.  According to Durham, the draft of the

summary judgment brief that she reviewed had used the wrong legal standard for the relevant

trademark issue.  56.1 ¶¶ 104, 109; *see also id.* ¶ 111 (quoting Durham redline comment stating,

"This is [the] 9th Cir. Standard.  Needs to be Rewritten under Fed Cir analogous use authority.").

The record reflects, however, that Mehta had contributed only a few, early pages to the brief

under the supervision of an associate three years her senior.  Mehta Decl. ¶¶ 129, 132; 56.1

¶¶ 95–96.  That associate found no substantive issues with Mehta's work, passed along a

complete draft of the brief to Durham weeks later, and apologized to Durham for the brief's use

of an incorrect legal standard.  56.1 ¶¶ 100–01, 113–14; *see also* Mehta Decl. ¶¶ 130–32.  In a

performance review at the end of the year, the senior associate told the firm that the summary

judgment brief was one of that associate's "notable achievement[s]" of 2022.  56.1 ¶ 113.

Durham also mentioned concerns with Mehta's recent performance conducting

"clearance searches" for clients seeking to determine whether a new trademark is available for

use.  *Id.* ¶¶ 140, 275–76.  On September 28, Mehta drafted a search report for one of Durham's

clients in which she neglected to discuss a third-party trademark that the client had flagged as a

potential issue when the client first requested the search report.  *Id.* ¶¶ 227–28.  After Durham

pointed out the oversight, Mehta acknowledged that she hadn't "see[n] the link" to the

third-party trademark that the client had provided.  *Id.* ¶ 231.  A month earlier, while working on

a search report for another of Durham's clients, Mehta did not provide Durham with a draft of

the report until about an hour before the client's deadline.  *Id.* ¶ 193.  When Durham did not hear

back from Mehta after quickly turning back edits on the draft, Durham ended up sending the report to the client herself, after the client's deadline. *Id.* ¶¶ 194, 196–98.

After Durham mentioned these incidents, Mehta asked her whether there were "alternative ways" for them "to continue working together," for example whether Mehta could be demoted to a more recent class year and accept a lower salary, which she was aware of other associates doing at the firm. *Id.* ¶ 278; Mehta Decl. ¶ 139. Durham told Mehta that the decision was final, and that she would not consider any alternatives. 56.1 ¶ 279; Mehta Decl. ¶ 140.

After Mehta was fired, Durham did not replace her with a new associate that fall. 56.1 ¶ 266. Medansky gave his largest client's portfolio, which had previously been assigned to Mehta, to a young male associate four years Mehta's junior. *Id.*

Since Mehta filed this lawsuit, DLA has identified other instances of purportedly subpar performance by Mehta that it claims motivated Durham's decision to fire her. In April 2022, for example, after Mehta learned that a client wanted trademark applications filed in multiple locations, including Singapore and Switzerland, some of which required an urgent filing, she emailed the client's foreign counsel (copying Durham and another DLA partner, Mark Radcliffe) stating that the client would like to file trademarks "in Singapore asap" and asking that it be done same-day. 56.1 ¶ 90; Mehta Decl. ¶ 63–64. Radcliffe replied to Mehta and Durham stating that "the highest priority" was doing the filing in Switzerland (not Singapore), and the Switzerland filing needed to be done same-day. 56.1 ¶ 91. Mehta responded that this was a "big goof on [her] part (probably because [she] was doing this at 1 am [her] time, but that is no excuse)." *Id.* ¶ 92. She "immediately corrected [the] request" and ensured that the Switzerland filing was done same-day. Mehta Decl. ¶ 67. Ultimately, the client had filings done in both Switzerland and Singapore that week. *Id.* ¶ 68.

In another instance in October 2022, just two days before she was fired, Mehta emailed one of Medansky's clients regarding a third party's application to register a trademark in Switzerland.  56.1 ¶ 252.  Mehta suggested that the client could oppose the trademark application by citing its own similar marks registered in Switzerland and the European Union.  *Id.* ¶ 254. Medansky replied to Mehta, "What does EU have to do with Switzerland[?]"  *Id.* ¶ 255.  Mehta responded, "Ah you're right they're not part of the EU.  Apologies for the oversight.  Let me recall this message in case [the client] hasn't seen it and recommend we reach out based on [Switzerland] reg[istrations] only."  *Id.* ¶ 256.

In other instances, Medansky gave Mehta feedback on search reports she prepared.  In June, Medansky told Mehta that she cannot suggest that the firm received input from foreign local counsel on a search report when the firm did not, in fact, receive such input.  *Id.* ¶¶ 140–45. In July, Medansky told Mehta that a search report she drafted "require[d] some work" and he "d[id] not agree with several points."  ECF No. 122-5.  He wrote that she "can come[]down th[e] way" she suggested in the report, but she would need to provide "more discussion" and "explain how the context" supported the conclusions she reached.  *Id.*  In September, Medansky told Mehta that a search report she drafted for one of his client's was "so cursory that [it] could be deemed insufficient to give the client a defense to willful[]" trademark infringement.  *Id.* ¶ 237.

Durham also testified that, when Mehta was fired in early October 2022, she was not on track to meet her billable hours target for the year.  *Id.* ¶ 217.  According to Mehta, however, she "never received a warning or write up about [her] billable hours."  Mehta Decl. ¶ 102.  Her contemporaneous notes from a call with Durham in August suggest that Durham told Mehta that her "billable hours [were] looking good," had "increased over the past few months," and that Mehta was "not on 'any lists' or anything."  ECF No. 135-82 at DLA_Mehta_3936; 56.1 ¶ 216.

Mehta also notes that the dashboard used by DLA partners to track billable hours does not include "billable equivalent hours," *i.e.*, non-client-based hours that count toward the annual requirement.  56.1 ¶ 216.  She further recalls that she received "several large new assignments" in the fall of 2022 and "was on track to bill a significant number of hours" through the fall and winter and would ultimately "meet [her] annual billing requirements," as she did in 2021.  Mehta Decl. ¶ 101.

Mehta also received positive feedback from Durham, Medansky, and other partners and associates at the firm throughout her employment.  Mehta Decl. ¶¶ 91, 95.  Emails show instances from December 2021 through August 2022 where Durham commended her work product, including search reports, or signed off on work product with little or no edits.  *See* 56.1 ¶ 57(i)–(xvii).  In May 2022, Durham asked Mehta to speak to DLA's national intellectual property group about Mehta's work for the International Trademark Association.  Mehta Decl. ¶¶ 19, 73.  Durham also "repeatedly" recommended Mehta to other partners.  Mehta Decl. ¶¶ 45–46.  One of those partners, Susan Acquista, for whom Mehta was working on multiple projects when she was fired, testified that she could not recall any instance where a client, a DLA partner, or a DLA associate ever said anything negative about Mehta.  56.1 ¶ 57; *see* Mehta Decl. ¶ 138; ECF No. 115-25 at DLA_Mehta_3914.  Medansky, too, gave positive feedback on Mehta's work, telling her at various times throughout her employment that her work product was "terrific," "[a]wesome," "perfectly done," and "handl[ed] promptly."  56.1 ¶ 59.  When a former "of counsel" on Medansky's team left the firm after having children, Medansky assigned "hundreds" of her matters to Mehta, although Mehta was many years her junior.  *Id.* ¶ 71; Mehta Decl. ¶ 88.  Medansky testified in this action that he found Mehta to be "very poised," "very put together" and he "always thought she was professional."  56.1 ¶ 202.  In addition, as stated

above, Mehta received every raise and bonus that was available to her, all of which were reserved for associates whom the firm believed were meeting or exceeding the firm's and the practice group's expectations. She was also "one of the first people who [] start[ed] coming back to the office and appearing in person" as the COVID-19 pandemic receded. *Id.* ¶ 49.

II.    Procedural History

Mehta filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on December 14, 2022. Compl. ¶ 18. On May 16, 2023, the EEOC issued Mehta a notice of right to sue. *Id.* ¶ 19. Mehta commenced this action on June 6, 2023, bringing claims against DLA for (1) discrimination based on pregnancy in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law. § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107; (2) interference and retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and (3) retaliation in violation of Title VII, the NYSHRL, and the NYCHRL. Compl. ¶¶ 124–65.

DLA now moves for summary judgment on all counts. ECF No. 112.

**DISCUSSION**

I.    Summary Judgment

A.  Legal Standard

A party is entitled to summary judgment if it can establish that there "is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006). The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in her favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

## B. Discrimination

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). For "Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983). Courts analyze employment discrimination claims brought under Title VII using the "burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).

Under "*McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). "Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing, through the introduction of admissible

evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (emphasis omitted) (citation omitted). "After the defendant has articulated such nondiscriminatory reasons, the plaintiff has an opportunity to show that the reason[s] [are] merely a pretext for discrimination," *id.* (citation omitted)—that is, that the employer's reasons are "false" or a "cover" for discriminatory intent, *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (citation omitted). Alternatively, the plaintiff may show that "the employer had mixed motives," some of which may have been legitimate, but at least one of which was the plaintiff's "membership in a protected class." *Id.* at 567; *see id.* at 576.

a.   Prima Facie Case

A plaintiff establishes a prima facie case of discrimination under Title VII by showing that (1) she "belonged to a protected class," (2) she "was qualified for the position [she] held," (3) she "suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citations omitted). "The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*." *Chambers*, 43 F.3d at 37 (alteration adopted) (citation omitted).

The parties do not dispute that Mehta belonged to a protected class of pregnant women, was qualified for the position she held at the firm, and suffered an adverse employment action when she was fired. DLA argues, however, that Mehta has not satisfied the fourth prong of the prima facie case. *See* Mem. at 15–16, ECF No. 113. The firm claims that, beyond evidence of temporal proximity between her pregnancy and her firing, "Mehta has identified no

12

evidence . . . to suggest that her termination was in any way causally related to her pregnancy." *Id.* at 16.

The Court disagrees.  A plaintiff's burden at the prima facie stage is "not onerous." *Bart*, 96 F.4th at 570 (citation omitted).  "In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment," courts "must be alert to the fact that employers are rarely so cooperative to include a notation in the personnel file that their actions [were] motivated by factors expressly forbidden by law." *Chambers*, 43 F.3d at 37 (citation omitted).  "Circumstances contributing to a permissible inference of discriminatory intent may include . . . the sequence of events leading to the plaintiff's discharge," "the timing of the discharge," *id.* (citations omitted), or "[t]he fact that [the] plaintiff was replaced by someone outside the protected class," *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015).

Here, the temporal proximity of about two months between Mehta's pregnancy announcement and her firing suffices to meet Mehta's "minimal" burden at the prima facie stage. *Littlejohn*, 795 F.3d at 313 (citation omitted); *see Gamble v. Fieldston Lodge Nursing & Rehab. Ctr.*, 697 F. Supp. 3d 112, 121 (S.D.N.Y. 2023) ("[T]emporal proximity alone can be sufficient to show an inference of discrimination at the prima facie stage."); *cf. Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554–55 (2d Cir. 2001) (noting, in the retaliation context, that there is no "bright line" for temporal proximity and finding, with "particular[] confiden[ce]," that a duration of five months could support a causal connection between protected activity and retaliatory action).  The fact that Mehta was replaced on Medansky's matters (which made up a significant portion of her workload) by a male associate multiple years her junior only further supports that conclusion.  *See Littlejohn*, 795 F.3d at 313 & n.11 (explaining that, "[a]t the prima facie stage, the mere fact that a plaintiff was replaced by

someone outside the protected class will suffice for the required inference of discrimination" (citation omitted)); 56.1 ¶ 53.

### b. Legitimate, Non-Discriminatory Reasons

Because Mehta has met her burden to establish a prima facie case of discrimination, she is entitled to "a temporary 'presumption' of discriminatory motivation." *Littlejohn*, 795 F.3d at 307 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)). The burden, therefore, "shifts to [DLA] to offer a legitimate, nondiscriminatory reason" for terminating Mehta. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). The firm "need not persuade the court that it was actually motivated by the proffered reason," but it must offer enough evidence to "raise[] a genuine issue of fact as to whether it discriminated against [Mehta]." *Burdine*, 450 U.S. at 254–55. If DLA can "proffer[] such a reason, the presumption of discrimination drops out of the analysis, and [DLA] will be entitled to summary judgment unless [Mehta] can point to evidence that reasonably supports a finding of prohibited discrimination." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (cleaned up).

DLA has presented evidence of a legitimate, nondiscriminatory reason for firing Mehta. Durham claims that she made the decision based solely on Mehta's "performance issues." *Id.* ¶ 145. Mehta's notes from her October 4 conversation with Durham reflect that Durham told her she was being fired based on her performance, and Durham listed a few specific incidents of purportedly subpar work product when Mehta pressed her to give examples. ECF No. 115-25 at DLA_Mehta_3913–14; Mehta Decl. ¶ 126. At her deposition, Durham stated that she noted "deficits" in Mehta's performance "from the very beginning," and she experienced an "erosion of trust" in Mehta over time due to her repeated "mistakes." 56.1 ¶¶ 57, 168. Although no attorney at the firm, including Durham, sat down with Mehta and told her that she was at risk of

losing her job or suffering some other adverse action if she did not improve her performance, there is sufficient evidence in the record to conclude that Durham's "concerns about [Mehta's performance] were longstanding and grounded in specific incidents." *Tieu v. N.Y.C. Econ. Dev. Corp.*, 717 F. Supp. 3d 305, 323 (S.D.N.Y. 2024). These specific incidents, combined with Durham's testimony that she gradually lost faith in Mehta as a trusted associate, are sufficient to raise a genuine issue of fact as to whether DLA was motivated, in whole or in part, by Mehta's pregnancy status when it fired her. *See Budine*, 450 U.S. at 254–56.

### c.   Third Step of *McDonnell Douglas*

At the third step of the *McDonnell Douglas* framework, the burden shifts back to Mehta to demonstrate that her protected status was "at least one of the motivating factors" for her termination. *Bart*, 96 F.4th at 570 (citation omitted). She may do so by showing that DLA's stated reason for her termination was "false" or pretextual, or by showing that the firm had "mixed motives," at least one of which was Mehta's "membership in a protected class," "without proving that [DLA's] proffered explanation was not some part of the [firm's] motivation." *Id.* at 567, 570 (citations omitted).

Courts must be "cautious about granting summary judgment to an employer" at the third step of the *McDonnell Douglas* framework where the primary issue is the employer's intent. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted). Although the plaintiff cannot prevail at this stage merely by relying on "conclusory allegations of discrimination," *Figueroa v. N.Y. Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (citation omitted), she may survive summary judgment by proffering evidence that, viewed in the light most favorable to her, reasonably casts doubt on any of the legitimate reasons offered by the employer, *see Chambers*, 43 F.3d at 38, 40. A plaintiff may point to additional

evidence beyond her prima facie case to show that the employer's reason is unworthy of credence, or she may "often" carry her burden "by rel[ying] on the evidence comprising the prima facie case, without more." *Bart*, 96 F.4th at 576 (citation omitted).  If the plaintiff can show that there is a "conflict between [her] evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason," that conflict "reflects a question of fact to be resolved by the factfinder . . . , precluding summary judgment." *Id.* (citation omitted).

Mehta has presented evidence that could reasonably cast doubt on DLA's purported reason for firing her.  When Durham told Mehta she was being fired, Durham framed it as a "team decision," Mehta Decl. ¶ 138, that was based on thoughtful consultation with other DLA partners, *see* ECF No. 115-15 at DLA_Mehta_3913.  In reality, Durham appears to have made the decision on her own and rather quickly—after just one phone call with Medansky the day before, in which the two did not discuss firing Mehta.  *See* 56.1 ¶¶ 259–64; Medansky Dep. at 9:25–10:4, 16:24–17:2, 19:3–14.   Durham also seemed concerned that other partners would find out that she had fired Mehta while pregnant; she told Mehta that, although Mehta could continue to briefly work at the firm—and could even continue working on all of the matters assigned to her (despite her purported performance issues)—she should not tell any other partner why she was leaving.  ECF No. 115-25 at DLA_Mehta_3914–15.  She also made the decision to fire Mehta in suspect circumstances, two months after Mehta told her that she was pregnant, about two months before annual bonuses were to be paid, and while Durham's practice group was experiencing an unusual slowdown in billable opportunities.  *See* 56.1 ¶¶ 171, 267–68; Bouwer Dep. at 117:7–10.  The evidence suggests that Durham may have been concerned about the firm paying Mehta on her maternity leave at a time when Mehta would not be bringing in new clients or billable hours.  Indeed, Durham fired Mehta without consideration of alternative employment

actions, such as increased training for Mehta or a demotion, both of which would have kept Mehta on the payroll and were contemplated by the firm's policies and practices. *See* 56.1 ¶¶ 42, 279.

The Second Circuit has explained that at summary judgment a court may consider whether a moving witness's testimony is internally inconsistent or in tension with record evidence to the extent it could lead a reasonable juror to find the testimony lacking in credibility. *Chambers*, 43 F.3d at 39. Here, at least some of the contemporaneous and *ex post* reasons that Durham provided for firing Mehta are, at best, in tension with other evidence in the record or, at worst, plainly contradicted by it. Durham testified that were "deficits" in Mehta's performance "from the very beginning" of her employment at the firm. 56.1 ¶ 57. The record reflects, however, that for at least the first five months of Mehta's twelve-month employment, she received every discretionary raise and bonus offered by the firm—all of which were contingent on meeting or exceeding the firm's expectations, one of which was denied to nearly one fifth of all associates in Mehta's firm class year, and at least two of which were awarded to Mehta while she was, according to the firm, "bill[ing] the vast majority of her time to matters for which Durham and Medansky were the supervising [practice group] partners." *Id.* ¶ 53; *see id.* ¶ 44; *see* ECF No. 135-9; *cf. Chambers*, 43 F.3d at 39 (denying summary judgment to the employer who claimed poor performance by the employee but "in fact . . . did not discharge him until he had been on the job for nearly nine months, and he was given a three percent raise after six months"). Durham's claim that Mehta was not on track to complete her billable hours in 2022 is also genuinely disputed—not only by Mehta's own recollection of her hours and the fact that the firm's billable-hours portal did not capture all bonus-eligible hours, but also by the fact that Mehta exceeded her hours requirement the year before. *See* 56.1 ¶¶ 38, 216; ECF No. 115-25 at

DLA_Mehta_3913.  Durham's claim that Mehta was responsible for the "bulk" of the April summary judgment brief, which Durham raised for the first time at Mehta's firing in October, is also contradicted by record evidence indicating that the brief was largely drafted and supervised by an associate multiple years Mehta's senior, who signed off on Mehta's work, took credit for the brief's completion, and ultimately apologized to Durham for the errors she identified.  *See id.* ¶¶ 95–96, 100–01, 113–14; Mehta Decl. ¶¶ 129–32.  Likewise, although Durham claimed that other partners like Medansky were dissatisfied with Mehta's performance, Medansky entrusted Mehta with his largest client's portfolio, which had previously belonged to an of counsel who was significantly more experienced than Mehta; Medansky gave Mehta increased work as the summer and fall wore on; and other partners who worked closely with Mehta never complained about her performance or heard any complaints from others.  56.1 ¶¶ 57, 59, 71; Opp. at 16–17, ECF No. 131.

To be sure, there is evidence that Mehta made mistakes, some of which were more than trivial, and that she occasionally performed in ways that were below her supervisors' expectations.  But Mehta need not demonstrate that her performance played *no* role in the decision to fire her; only that the decision to fire her was also motivated, at least in part, by her pregnancy.  *Bart*, 96 F.4th at 576.  DLA argues that Mehta has not presented any direct evidence of discriminatory intent.  *See* Mem. at 1.  The purpose of the *McDonnell Douglas* framework is "to assure that the plaintiff has her day in court *despite the unavailability* of *direct* evidence." *Bart*, 96 F.4th at 569–70 (alteration adopted) (emphases in original) (citation omitted).  And Mehta has adduced sufficient circumstantial evidence to show that, even if Durham was genuinely concerned about Mehta's performance, Mehta's pregnancy and her imminent, paid leave during an economic slowdown at the firm was the factor that ultimately drove Durham to

fire her.  Mehta has, therefore, demonstrated a "conflict between [her] . . . prima facie case and the employer's evidence of a nondiscriminatory reason," which provides enough evidence for a rational juror to conclude that DLA's story that it fired Mehta solely based on her performance is not true.  *Id.* at 576 (citations omitted); *see Luo v. AIK Renovation Inc.*, No. 23 Civ. 5878, 2024 WL 4444283, at *12 (S.D.N.Y. Oct. 4, 2024) (denying summary judgment where the employer's "side of the story rests entirely on [the] statements [of its leadership], and those statements conflict" with each other and with the record evidence).

"Because 'it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation,' and [Mehta] also [has] produce[d] some circumstantial evidence that [] support[s] such an inference, the Court cannot say as a matter of law that [her pregnancy] was not 'some part of the employer's motivation.'"  *Luo*, 2024 WL 444428, at *12 (first quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 540 U.S. 133, 147 (2000); and then quoting *Bart*, 96 F.4th at 570); *see also Chambers*, 43 F.3d at 38 ("[R]ejection of the defendant's proffered reasons[] will permit the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, [n]o additional proof of discrimination is required." (fourth alteration in original) (emphases omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993))).  Mehta has adduced sufficient evidence to place DLA's intent in dispute, and the Second Circuit has "long recognized the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent."  *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (citation omitted).

Accordingly, DLA's motion for summary judgment as to Mehta's Title VII claim is denied.  Traditionally, NYSHRL claims were analyzed under the Title VII standard.  *Luo*, 2024

WL 4444283, at *15.  However, since the state law was amended in 2019 to "be construed

remedially for the accomplishment of the remedial purposes thereof," courts in this Circuit "have

interpreted the amendment as rendering the standard for claims closer to the standard of the

NYCHRL," which is "more lenient toward plaintiffs than its federal" counterpart.  *Id.* at *13, 15

(citations omitted).  Because Title VII provides "a *floor* below which the City's Human Rights

Law cannot fall," and the Court finds summary judgment inappropriate on Mehta's Title VII

claim, it follows that DLA's motion must be denied as to Mehta's NYSHRL claim whether it is

analyzed under the Title VII standard or the more lenient NYCHRL standard, and to Mehta's

NYCHRL claim.  *Loeffler v. Staten Is. Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (emphasis

in original) (citation omitted).

### C.  FMLA Claims

The FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the

exercise of or the attempt to exercise, any right provided under" the statute.  29 U.S.C.

§ 2615(a)(1).  Courts have interpreted this provision to encompass "at least two varieties" of

FMLA claims: "interference and retaliation."  *Woods v. START Treatment & Recovery Ctrs.,

Inc.*, 864 F.3d 158, 166 (2d Cir. 2017).  "In a general sense, an employee brings an 'interference'

claim when her employer has prevented or otherwise impeded the employee's ability to exercise

rights under the FMLA."  *Id.*  "'Retaliation' claims, on the other hand, involve an employee

actually exercising her rights or opposing unlawful conduct under the FMLA and then being

subjected to some adverse employment action by the employer."  *Id.*  "The two types of claims

serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights

granted by the FMLA."  *Id.*  Mehta stylizes her FMLA claim as one sounding in both

interference and retaliation.  She argues that by firing her after she announced her intent to take

FMLA leave, DLA both interfered with her rights under the FMLA and retaliated against her for announcing her intent to exercise those rights. *See* Compl. ¶¶ 134–45. Courts have generally allowed such dual interference-retaliation claims to proceed as non-duplicative. *See, e.g.*, *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287–88 (S.D.N.Y. 2013); *Drew v. Plaza Const. Corp.*, 688 F. Supp. 2d 270, 276 (S.D.N.Y. 2010) ("Plaintiffs frequently bring both interference and retaliation claims," which are "not duplicative," "in the same action.")

      1.  FMLA Interference

To create a triable issue as to interference, a plaintiff must point to evidence sufficient for a reasonable juror to find that (1) "she is an eligible employee under the FMLA," (2) the defendant is an "employer" under the FMLA, (3) "she was entitled to leave under the FMLA," (4) "she gave notice to [her employer] of her intention to take leave," and (5) she was "denied [the] benefits to which she was entitled by the FMLA." *Colon*, 983 F. Supp. 2d at 286. The plaintiff "need only prove by a preponderance of the evidence that her taking FMLA-protected leave constituted a negative factor in the decision to terminate her." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175–76 (2d Cir. 2006) (citation omitted). She may do so with "either direct or circumstantial evidence, or both." *Id.* at 176 (citation omitted). "No scheme shifting the burden of production back and forth is required." *Id.* (citation omitted).

The parties dispute only the fifth factor of Mehta's interference claim. DLA contends that there is no evidence that Mehta's intent to take leave played a role in Durham's decision to fire her, and "an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." Mem. at 26–27 (quoting *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011)). As the Court explained above, however, there is sufficient evidence for a jury to conclude that DLA

did not terminate Mehta solely based on legitimate business reasons; it is genuinely disputed whether Mehta's announcement of her pregnancy and her intent to take FMLA leave was a motivating factor in DLA's decision.  Because it is "impossible," on this record, to conclude as a matter of law that Mehta's notice of intent to take leave played no role in DLA's decision to fire her, the question of "whether [DLA] impermissibly interfered with [Mehta's] entitlement to FMLA leave is better left to a jury." *Colon*, 983 F. Supp. 2d at 287.  Accordingly, DLA's motion for summary judgment on Mehta's FMLA interference claim is denied.

### 2.   FMLA Retaliation

Unlike FMLA interference claims, retaliation claims brought under the FMLA are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).  At step one, the plaintiff must establish that she (1) exercised rights protected under the FMLA or attempted to do so, (2) was qualified for her position, (3) suffered an adverse employment action, and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* (citation omitted).  If the plaintiff makes out her prima facie case, the burden shifts to the employer to "demonstrate a legitimate, non-discriminatory reason for its actions." *Id.*  The burden then shifts back to the plaintiff to show that, in fact, her actual or attempted exercise of her FMLA rights was a "motivating factor" in the defendant's adverse employment action.[2]  *Woods*, 864 F.3d at

---

[2] In finding that "a 'motivating factor' causation standard applies to [FMLA retaliation] claims," as opposed to the stricter but-for causation standard that applies to Title VII retaliation claims under *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), the Second Circuit relied in part on *Chevron* deference to the Secretary of Labor's interpretation of the FMLA, *see Woods*, 864 F.3d at 167–69.  Since the Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), it remains an open question whether the Second Circuit would now interpret the FMLA to encompass the stricter causation standard that applies under Title VII, as at least one circuit has, *see, e.g.*, *Lapham v. Walgreen Co.*, 88 F.4th 879, 891 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 162 (2024); *see also Coleman v. Children's Hosp. of Phila.*, No. 23-3064, 2024 WL 4490602, at *3 (3d Cir. Oct. 15, 2024) (noting that it is "open to question" "whether [the Third Circuit's prior similar holding] withstands the Supreme Court's decision in *Loper Bright*").  For now, *Woods* continues to bind this Circuit, and DLA does not argue otherwise.

166.  Unlike a claim under 28 U.S.C. § 2615(a)(2), which requires a plaintiff to show that she

was fired for "*opposing* a[] practice made unlawful by [the FMLA]," a plaintiff may make an

actionable retaliation claim under § 2615(a)(1) by showing only that she was terminated for

"exercising FMLA rights by, for example, taking legitimate FMLA leave," *Woods*, 864 F.3d at

167; *see Behringer v. Lavelle Sch. for Blind*, No. 08 Civ. 4899, 2010 WL 5158644, at *14

(S.D.N.Y. Dec. 17, 2010) ("This Court also recognizes retaliation claims under § 2615(a)(1)

when an employer discriminates against an individual for exercising her right to take FMLA

leave."); *e.g.*, *Esser v. Rainbow Advert. Sales Corp.*, 448 F. Supp. 2d 574, 581–82 (S.D.N.Y.

2006).

  As explained above, DLA has provided evidence that performance issues and a failure to

meet expectations may have been motivating factors in Mehta's termination.  Mehta, however,

has also provided enough evidence to "raise an issue of fact as to whether [her intent to take]

FMLA leave was a negative factor in terminating [her]," *Esser*, 448 F. Supp. 2d at 581, or

whether her "inten[t] to take leave may have been an additional factor that [DLA] considered" on

top of any concerns related to her performance, *Colon*, 983 F. Supp. 2d at 288.  She has shown

that the allegedly retaliatory action was "close in time to [her] protected activity," which is

sufficient to make out the disputed fourth factor of her prima facie retaliation case.  *Uddin v. City

of New York*, 427 F. Supp. 2d 414, 432 (S.D.N.Y. 2006); *see Treglia v. Manlius*, 313 F.3d 713,

720 (2d Cir. 2002) (finding adverse action "within a few months" of protected activity sufficient

to establish causation).  And she has further shown that there are "discrepancies" in DLA's story

from which "a reasonable juror could infer that the explanations given by [DLA] were

pretextual," or, at the very least, not entirely worthy of credence.  *Zann Kwan v. Andalex Grp.

LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (citation omitted).  "Because there is a material issue of

fact with respect to whether [DLA] w[as] in part motivated by [its] knowledge of [Mehta's] intent to take FMLA leave, summary judgment must be denied on [Mehta's] FMLA retaliation claim." *Colon*, 983 F. Supp. 2d at 288.

> D. Title VII, NYSHRL, and NYCHRL Retaliation

Mehta also brings claims for retaliation under Title VII, the NYSHRL, and the NYCHRL. Unlike a retaliation claim under the FMLA, a Title VII retaliation claim requires the plaintiff to show that she was retaliated against because she "opposed" an unlawful employment practice or because she "'participated in any manner in an investigation, proceeding, or hearing' . . . connected with a[] formal EEOC proceeding or charge." *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48–49 (2d Cir. 2012) (quoting 42 U.S.C. § 2000e-3(a)). NYCHRL retaliation claims require a plaintiff to show that she "took an action opposing [her] discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 246 (S.D.N.Y. 2021) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)); *see Mercado v. Mt. Sinai Beth Israel*, No. 21 Civ. 10467, 2023 WL 5975322, at *16 (S.D.N.Y. Sept. 14, 2023) (noting that the same standard applies to "post-amendment NYSHRL" claims).

DLA contends that there is no evidence that Mehta was fired after opposing or complaining about an allegedly unlawful employment practice or after filing an EEOC charge. Mem. at 25. Mehta does not respond to DLA's argument in her opposition, *see generally* Opp., and DLA argues in its reply that she has, therefore, abandoned her Title VII, NYSHRL, and NYCHRL retaliation claims, Reply at 15, ECF No. 136. The Court agrees. Although Mehta explained in detail in her opposition why the Court should not grant summary judgment to DLA

on her FMLA retaliation claim, *see* Opp. at 27–29, she did not address her retaliation claims under Title VII, the NYSHRL, and the NYCHRL, which apply a different standard and factual emphasis.  Because Mehta is represented by competent counsel and had sufficient opportunity to brief the issue, the Court finds that her abandonment of the claims was likely intentional.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that partial opposition by a counseled party to a motion for summary judgment "may imply an abandonment of some claims or defenses"); *Santiago v. Newburgh Enlarged City Sch. Dist.*, 485 F. Supp. 2d 327, 338 (S.D.N.Y. 2008) (dismissing plaintiff's retaliation claim after plaintiff failed to respond to defendant's summary judgment argument).  Accordingly, Mehta's retaliation claims brought under Title VII, the NYSHRL, and the NYCHRL are dismissed.

     E.  Damages

DLA argues that Mehta should be foreclosed as a matter of law from eligibility for reinstatement and front-pay, and should only receive limited back-pay, because of "after-acquired evidence" that she committed wrongdoing for which she would have been fired had the firm known of the misconduct while she was employed.  Mem. at 30.  Specifically, the firm argues that, by forwarding to herself and photographing privileged and confidential firm material for her own personal use after she was told she was being fired but before her employment was formally terminated, Mehta violated the firm's confidentiality and non-disclosure policy.  *Id.*; *see* 56.1 ¶¶ 292–94.  Under that policy, an employee who discloses or transmits non-public or otherwise confidential information outside the firm, including to a

non-firm email account, "will be subject to disciplinary action, up to and including possible separation from the firm[.]"  56.1 ¶¶ 292–95.

The facts are generally undisputed.  Shortly after the October 4 meeting in which Durham told Mehta she was being fired, Mehta used her DLA email account to send herself an email at her personal email address.  *Id*. ¶ 297.  The subject of the email was "Feedback from partners," and it contained 16 emails as attachments.  *Id.* ¶ 298.  Many of the attached emails reflected moments when Durham had provided positive feedback to Mehta on her work product.  *See generally* ECF No. 116-9.  According to the firm, all 16 of the emails related to DLA's "provision of legal advice to DLA [] clients," and some were labeled "Confidential" or "Attorney-Client Privileged Communication."  *Id.* ¶¶ 299, 302.

Three days later, using her DLA email account, Mehta attempted to "recall" the email she had sent to her personal email address.  *Id.* ¶¶ 303–04.  Three days after that, while she was still formally employed at the firm, Mehta began taking photographs of work emails and documents, some of which included the attachments she had originally sent to herself, and some of which were labeled "Privileged" and "Confidential."  *Id.* ¶¶ 305, 308–09; *see id.* ¶ 290.  "In total, Mehta took over 3,600 photographs of documents and emails on her DLA Piper computer . . . before her separation from the [f]irm on October 21, 2022."  *Id.* ¶ 307.  She later provided the photos to her attorneys who, on January 4, 2024, produced them in response to a DLA discovery request.  *Id.* ¶¶ 315–16.  By order dated January 18, 2024, the Honorable Robyn F. Tarnofsky, to whom this matter was referred for general pretrial management, directed DLA to reproduce redacted copies of the documents that it "contends [Mehta] should not have kept when she left her employment," and ordered Mehta to certify the destruction of all copies of such

documents after any disputes about their relevance were resolved.  ECF No. 37 at 2–3; *see* ECF No. 33.

In *McKennon v. Nashville Banner Publishing Co.*, the Supreme Court considered whether an employee who was unlawfully discharged in violation of federal antidiscrimination law should be barred from equitable remedies if the employer later discovered that the employee engaged in the sort of "wrongdoing that, in any event, would have led to the employee's termination on lawful and legitimate grounds."  513 U.S. 352, 354 (1995).  The Court held, "as a general rule," that, although such an employee should not be wholly barred from receiving damages, "neither reinstatement nor front pay is an appropriate remedy" in such circumstances, and any backpay should be limited to pay "from the date of the unlawful discharge to the date the [the evidence of wrongdoing] was discovered."  *Id.* at 361–62.  The Court emphasized, however, that "[t]he proper boundaries of remedial relief in [such cases] . . . must be addressed by the judicial system . . . from case to case."  *Id.* at 361.  And, in all cases, "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing" to limit an employee's entitlement to equitable relief, the employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  *Id.* at 362–63.

DLA has not met that standard here.  First, DLA could not have known about Mehta's conduct at the time of her discharge because the conduct did not occur until after she was told she was being fired.  *See* 56.1 ¶ 297.  The after-acquired evidence doctrine accounts for the equitable considerations at play when an otherwise unlawful discharge would have occurred lawfully had the employer known of misconduct that the employee was engaging in, or had engaged in, at the time of firing; it does not apply to alleged misconduct that occurred after the

employee was terminated.  *See McKennon*, 513 U.S. at 354, 360–61; *Erdman v. Wal-Mart Stores, Inc.*, No. 05 Civ. 202, 2007 WL 9710330, at *8 (D. Mont. Aug. 14, 2007) ("According to most courts that have addressed the issue, the after-acquired evidence doctrine is applicable only when the relevant misconduct occurred before the employee was terminated.").

The cases cited by DLA are not to the contrary.  Each concerns employee misconduct that took place before the employee was fired.  *See* Mem. at 30; *McKennon*, 513 U.S. at 355 (concerning an employee who "copied several confidential documents bearing upon the company's financial condition" and "showed them to her husband" the year before she was fired); *Greene v. Coach, Inc.*, 218 F. Supp. 2d 404, 414 (S.D.N.Y. 2002) (concerning an employee who "misrepresented information on her employment application concerning her educational history and previous employment" when she was applying to the job from which she was later fired).  Moreover, it would make little sense to conclude that DLA would have fired Mehta based on conduct that apparently only occurred because DLA had, in fact, fired Mehta.  *See Sellers v. Mineta*, 358 F.2d 1058, 1062 (8th Cir. 2004) ("[T]here cannot be misconduct that the employer did not know about prior to making its adverse decision if the misconduct did not even occur until after the adverse decision was made." (citation omitted)); *cf. Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 555 (10th Cir. 1999) (noting that in "cases in which the alleged misconduct arises as a direct result of retaliatory termination, the necessary balancing of the equities hardly mandates a *McKennon*-type instruction on after-occurring evidence"), *cert. denied*, 528 U.S. 813 (1999).  Although the Court may be permitted to consider Mehta's post-discharge conduct when fashioning any equitable relief to which she might be entitled, DLA

has not shown that she should be categorically barred or limited in pursuing those remedies based on a doctrine that applies only to pre-discharge misconduct.

Second, even assuming the doctrine did apply to Mehta's post-discharge actions, DLA has not shown that the firm *would have* fired Mehta had it discovered her misconduct while she was still employed. As DLA writes in its reply, "the issue is not whether [the firm] *could have* [fired Mehta], but rather whether the [f]irm *would have* fired Mehta for her conduct." Reply at 15 (emphases added). As the Court wrote in *McKennon*, the firm must demonstrate that Mehta's misconduct "was so grave that [her] immediate discharge would have followed its disclosure." 513 U.S. at 356. DLA has not made that showing here. It argues that Mehta appears to have violated DLA's confidentiality policy—and that may be so—but the policy provides only that violators will be subject to discipline including "possible," but not certain, "separation from the firm." 56.1 ¶ 295. Unlike in *Greene* where the employer submitted an affidavit from a human resources director substantiating that its business did, in fact, "terminate[] employees upon learning of [incidents of misconduct]" similar to the misconduct engaged in by the plaintiff, *Greene*, 218 F. Supp. 2d at 412, DLA has not pointed to any evidence to substantiate that Mehta would have been "immediate[ly] discharge[d]" had the firm discovered, while she was still employed, that she sent herself and her attorney privileged and confidential materials related to her employment at the firm, *McKennon*, 513 U.S. at 356. Accordingly, the Court declines to categorically limit Mehta's entitlement to equitable remedies at this stage.

II. <u>Motions to Seal</u>

A. Legal Standard

The public enjoys a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597

(1978).  This presumption of public access "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).  When a party moves to seal documents, it "bears the burden of showing that higher values overcome the presumption of public access." *Samsung Elecs. Co., Ltd. v. Microchip Tech. Inc.*, No. 24 Misc. 269, 2024 WL 4169353, at *2 (S.D.N.Y. Sept. 12, 2024) (quoting *Kewazinga Corp. v. Google LLC*, No. 20 Civ. 1106, 2024 WL 3442428, at *1 (S.D.N.Y. July 17, 2024)).

Courts conduct a three-step analysis to evaluate motions to seal.  First, a court determines whether the relevant material constitutes a "judicial document," *i.e.*, a document that is "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)).  The relevance of a document does not depend on "which way the court ultimately rules or whether the document ultimately in fact influences the court's decision," but rather on whether the document "would reasonably have the *tendency* to influence a district court's ruling on a motion." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (emphasis in original).

If material constitutes a "judicial document," the "common law presumption of access attaches," and a court must evaluate the "weight of that presumption." *Lugosch*, 435 F.3d at 119. "[T]he presumption of public access is at its highest when the material is relevant to a court's decision on a dispositive motion." *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 329211, at *1 (S.D.N.Y. Feb. 3, 2022).  The presumption is "weaker where the 'documents play only a negligible role in the performance of Article III duties.'" *Olson v. Major League Baseball*, 29 F.4th 59, 89 (2d Cir. 2022) (quoting *Amodeo*, 71 F.3d at 1050).

A court must balance the weight of the presumption against "competing considerations," including "the privacy interests of those resisting disclosure." *Lugosch*, 435 F.3d at 120 (quoting *Amodeo*, 71 F.3d at 1050). Such privacy interests may include protecting against the disclosure of privileged communications, *see Lugosch*, 435 F.3d at 125; *Altana Credit Opportunities Fund SPC v. Bolivarian Republic of Venezuela*, No. 20 Civ. 8402, 2023 WL 7924626, at *1 (S.D.N.Y. Nov. 16, 2023), as well as "sensitive, confidential, or proprietary business information," *Ripple*, 2022 WL 329211, at *1. Ultimately, sealing judicial documents "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124.

### B. Application

DLA seeks leave to file unredacted copies of certain documents and deposition testimony under seal and to file redacted copies of the same on the public docket. ECF Nos. 111, 130. It also seeks leave to file certain documents under seal in their entirety, without a redacted copy on the public docket, on the ground that the documents are privileged. *See* ECF No. 111 at 2–8; ECF No. 130 at 1. Because the documents and testimony encompassed by DLA's sealing requests were submitted in connection with the firm's summary judgment motion, they "are—as a matter of law—judicial documents." *Lugosch*, 435 F.3d at 121; *see also Brown*, 929 F.3d at 48 (denial of motion for summary judgment does not abrogate judicial document status). Accordingly, for each sealing request, the Court focuses on (1) the weight accorded the presumption of public access, and (2) whether DLA has met its burden to overcome that presumption by showing that its proposed nonpublic filings are narrowly tailored to promote higher interests. Mehta does not oppose the sealing requests.

The Court finds that DLA has met its burden with respect to each category of material to be filed under seal.  As the foregoing summary judgment analysis makes clear, none of the material encompassed by DLA's sealing requests is particularly relevant to the issues posed by the firm's summary judgment motion.  To understand whether triable issues exist with respect to Mehta's discrimination, retaliation, and interference claims, it is not necessary to dive into the minutiae of the firm's privileged and confidential communications—and the Court has not done so.  Accordingly, although the materials are judicial documents to which a presumption of public access attaches, the weight of that presumption in this case is low.  *See Olson*, 29 F.4th at 59.

DLA's proposed redactions and sealed filings overcome the limited presumption here. First, the Court has reviewed each of DLA's redactions and the proposed sealed filings and agrees with DLA that the requests encompass material that is privileged and/or confidential.  *See* ECF No. 111 at 3–12 (indexing the sealing and redaction requests); ECF No. 130 at 2 (same). [3] Second, DLA's proposed redactions and sealing requests are narrowly tailored.  The firm has carefully redacted only the information that is absolutely necessary to redact, leaving the bulk of the summary judgment record in a public and readable format.  Accordingly, the Court finds that DLA has met its burden to overcome the presumption of public access by showing that its proposed nonpublic filings are narrowly tailored to promote its own, legitimate privacy interests and those of its third-party clients.

## CONCLUSION

---

[3] To the extent the sealing requests include information redacted on the grounds of privilege, it is clear from the context of the communications that they concern attorney work product and attorney-client communications.  Judge Tarnofsky previously conducted an *in camera* review of a sample of these documents produced by DLA and concluded that its proposed redactions were reasonable and appropriately tailored.  ECF No. 67 at 8:21–23; *see* ECF No. 55 at 3:23–4:7.

For the foregoing reasons, DLA's motion for summary judgment, ECF No. 112, is GRANTED IN PART and DENIED IN PART.  Mehta's claims of retaliation under Title VII, the NYSHRL, and the NYCHRL are dismissed with prejudice.  DLA's motion for summary judgment is denied in all other respects.  DLA's sealing requests at ECF Nos. 111 and 130 are GRANTED.

Rule V of the undersigned's Individual Practices in Civil Cases governing pretrial submissions now applies.  By **October 10, 2025**, the parties shall indicate whether they wish to hold a settlement conference before Judge Tarnofsky or whether the parties intend to proceed to trial.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 111, 112, and 130.

SO ORDERED.

Dated:  September 29, 2025
        New York, New York

_____
ANALISA TORRES
United States District Judge

33