**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
                        :

ANISHA MEHTA,                   :

                        :     Case No.: 1:23-cv-4757 (AT) (RFT)

              Plaintiff,      :

                        :

        v.                 :

                        :

DLA PIPER LLP,            :

                        :

             Defendant.     :

                        :
------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION IN LIMINE NO. 10 TO EXCLUDE EVIDENCE, TESTIMONY OR**
**ARGUMENT REGARDING DLA'S *PRO SE* REPRESENTATION**

Recognizing the impropriety of what it is trying to do, DLA submits a motion in limine to restrict Plaintiff Anisha Mehta ("Plaintiff") from discussing exactly this fact. After Gibson Dunn & Crutcher LLP ("Gibson Dunn") has represented DLA for almost three years and has not withdrawn and thus continues to represent Defendant, DLA announced that under no uncertain terms, **at trial** DLA Partner Brett Ingerman ("Ingerman") is "lead counsel" and Partners Jessica Masella ("Masella") and Jonathan Kinney ("Kinney") will be right behind him. Despite what DLA wants to happen, the cases relied upon by DLA in its own motion support an order that Gibson Dunn continue to serve as lead counsel, especially at trial.

DLA suggests that law firms "regularly represent themselves in similar cases." ECF No. 261 at 28. This is not true. DLA cites four cases for this proposition. In the first one, the *pro se* law firm quickly retained an outside law firm, *Woods v. Cravath*, 11 Civ. 4643 (S.D.N.Y.). *See* Ex. 1, Docket Report. In the second case, *Clark v. Cravath*, 03 Civ. 5662 (E.D.N.Y.), the case did not go to trial and was voluntarily dismissed by the plaintiff within months of filing the lawsuit.

1

Ex 2, Docket Report. In *Adejumo v. Proskauer Rose*, 10 Civ. 4447 (S.D.N.Y.), the case did not go to trial, and a stipulation of dismissal was filed seven months after the lawsuit was initiated. Ex. 3, Docket Report. Finally, in *Bertram v. Proskauer Rose*, 1:17 Civ. 901 (D.D.C.), the case did not go to trial, and a stipulation of dismissal was filed within the year that the lawsuit was filed. Ex. 4, Docket Report.

These cases are not analogous to the circumstances here, where the case is about to go before a jury. DLA failed to provide any authority that a defendant law firm using its own attorneys to represent the firm's other attorneys at trial is proper or would not mislead a jury such that the trial process is at risk. Because there is a serious risk that the credence an average juror will give to Ingerman, Masella, and Kinney and their statements about the practices of the firm where they have all worked for years, if they are permitted to represent DLA as lead trial counsel, the Court will have to take particular care in explaining (likely, numerous times) what the difference is between admitted evidence and/or a party admission by DLA attorney-witnesses versus what is advocacy or legal argument by Ingerman, Masella, and Kinney. That is an unavoidable reality if DLA is permitted to represent itself at trial.

Ignoring this truth, DLA's motion in limine asks the Court to gag Plaintiff from making "any mention" of DLA's self-representation. Allowing the representation would be unduly prejudicial to Plaintiff, but placing an additional layer of prejudice on her by restricting what can be said about it will jeopardize the trial process itself. A host of practical, procedural, and evidentiary issues will unnecessarily arise if the self-representation at trial is permitted to continue. All of this can be eliminated if Gibson Dunn continues to represent DLA and is lead counsel at trial. *See* ECF No. 252.

DLA's self-representation would certainly create confusion and mislead the jury. As Partners, Ingerman, Masella and Kinney are agents for DLA. They have the ability to bind the law firm legally and their statements are party admissions. Undoubtedly, because of Ingerman's, Masella's, and Kinney's insider information regarding DLA's business practices as well as unfettered access to internal records, at trial, they will make representations to the jury about these practices and records. In these circumstances, there is a significant risk that the jury may give undue credibility to the testimony or advocacy of DLA's own Partners.

Too many potential examples exist to address all of them in this opposition, but one such circumstance easily illustrates the problem. Plaintiff was fired by a Partner, Gina Durham ("Durham"). Durham claims that she spoke to another Partner, Keith Medansky ("Medansky") the Sunday night before she planned to fire Plaintiff the following day. It is not in dispute that DLA never introduced any proof that Durham, Medansky, or a single Partner at DLA in 2021 or 2022 received a copy of the anti-discrimination policies the Partners were required to follow, especially given their foreseeable supervisory roles. No proof exists in the record that Durham, Medansky, or a single Partner at DLA in 2021 or 2022 read, reviewed or acknowledged they had done so regarding any anti-discrimination policies the Partners were required to follow. Proof of annual <u>training</u> for such policies is considered basic 101 employment discrimination discovery production by employers. Here, a single page from DLA's internal files about a summary of the antidiscrimination policy at DLA is the only document relating to the issue. Presumably, to counter such a devasting evidentiary gap, Ingerman, Masella, and Kinney intend to inject into questioning or opening and closings that "all Partners" at DLA not only receive copies of antidiscrimination policies, but they annually receive trainings about the subject and otherwise take steps to ensure that the policies are adhered to. Such a representation from a Partner at DLA

will cause jurors to place undue weight on such a representation – when this is a critical fact that only Partners Durham and Medansky need to account for on the witness stand. Other possible representations about how DLA "Partners" follow anti-discrimination internal policies are easily imaginable coming from the countless opportunities Ingerman, Masella, and Kinney will have to try to mitigate. Gibson Dunn lawyers could never make such representations on behalf of all DLA Partners to jurors. Gibson Dunn is properly limited to questioning Durham and Medansky about the non-existence of their own internal trainings, acknowledgments or review of the very anti-discrimination laws they are accused of violating.

## I. DLA'S GOAL IN REPRESENTING ITSELF IS TO BLUR THE LINE BETWEEN WITNESS AND ADVOCATE

DLA is a global behemoth that constantly brags about its size. DLA's message is that as the "biggest" it is the most powerful and its sheer size is an asset to potential and existing clients.[1] There is no reason for DLA to have Ingerman, Masella, and Kinney be the ones speaking directly to the jury, questioning witnesses, and most especially Plaintiff, but for the intended purpose of influencing the jury to think that as Partners they "know" what really happened and they are there to tell their story on behalf of their firm. Unquestionably, they intend to do so in an intimidating way because that is DLA's brand.[2] These three Partners hope that Plaintiff, an individual who DLA now considers a "poor performer" can be sufficiently bullied on the witness stand when

---

[1] From a single page on its site DLA repeatedly sells itself as big in numbers, money and therefore big in power: "**With more than 1,000 corporate lawyers globally**, DLA Piper helps clients . . . The firm has been rated number one in **global M&A** volume for 14 consecutive years . . . DLA Piper's Emerging Growth and Venture Capital practice includes **more than 200 lawyers who provide strategic counsel to emerging companies** . . . Over the last three years, DLA Piper has completed more than **2,100 financings globally totaling over US$80 billion. With more than 225 global lawyers who provide strategic counsel** . . . ." https://www.dlapiper.com/en/news/2024/02/dla-piper-named-for-combined-global-deal-volume-by-pitchbook.

[2] https://www.dlapiper.com/en/about-us ("Our **bold** and dynamic culture means we think **big** and act decisively . . . **Bold**: We **stand tall** and challenge ourselves to think **big**.")

questioned by people who would have been her superiors at DLA in their effort to portray her as an insignificant outcast.  DLA hopes the institutional knowledge of Ingerman, Masella and Kinney will serve as an advantage at trial insomuch as jurors will credit what they say, and how they say it, in favor of DLA.  This risk of unfair bias simply does not exist with Gibson Dunn.

## II.    THE *PRO SE* TIMELINE SHOWS THAT DLA'S GOAL IS UNFAIR INFLUENCE OVER JURORS AT TRIAL

There is no explanation for the sudden *pro se* status of DLA except for DLA's goal that the jury unconsciously or consciously considers that what a "Partner" at this big behemoth law firm says about what happened is more likely to be true than what the younger junior associate (non-partner) who was fired when she was almost 7 months pregnant says happened.  The timeline facts speak for themselves about why DLA suddenly appeared at trial.  Gibson Dunn has represented DLA since the action was commenced in 2023.  At no time during litigation did a DLA partner or associate enter a notice of appearance in the action.  Even through the summary judgment motion and decision, no DLA Partner or associate entered an appearance in the action.  Only after expert discovery had begun, and a schedule leading to the April 6, 2026 trial date appeared confirmed, did Ingerman, Masella, and Kinney enter their appearances.  This was in mid-December 2025.  Thereafter, Ingerman, Masella, and Kinney handled the remainder of the expert discovery and pretrial submissions.

### A.    DLA's *Pro Se* Representation Does Not Include a Partner from its Labor & Employment Group

Notably, the Gibson Dunn lawyers representing DLA are partners and associates in the firm's Labor & Employment Practice Group.[3]  This is expected given that the lawsuit involves

---

[3]    Molly T. Senger, https://www.gibsondunn.com/lawyer/senger-molly-t/; Michele L. Maryott, https://www.gibsondunn.com/lawyer/maryott-michele-l/; Joe Ruckert, https://www.gibsondunn.com/lawyer/ruckert-joe/; Amalia Reiss, https://www.gibsondunn.com/lawyer/reiss-amalia/; Harris M. Mufson, https://www.gibsondunn.com/lawyer/mufson-harris-m/?rnd=56

only claims brought under the anti-discrimination laws.  In contrast, not a single Partner on DLA's lead trial team is a Labor & Employment lawyer.  If DLA had a genuine reasonable basis for its *pro se* representation other than to badger and intimidate Plaintiff to the best of its abilities and improperly blur the lines between witness and advocate, it would have assigned lawyers from its Labor & Employment department.  Instead, it is using Masella, a former narcotics prosecutor who works in DLA's white collar and corporate crime department for this trial.  Ingerman's practice "concentrates on complex commercial disputes and business litigation."  Kinney's practice focuses on "white collar defense and high-stakes complex business litigation."  Not a single connection with practicing employment law appears anywhere.  It makes no sense that DLA is using Partners that have no labor or employment background to serve as lead trial counsel in place of Gibson Dunn in this pregnancy discrimination lawsuit unless there is another motive.[4]

Given the "billions" DLA touts as annual receivables, there can be no reasonable reliance on money saving decisions behind the *pro se* status.  Again, it does not explain why employment lawyers from DLA are not involved.  Further, even if there were a hypothetical breakdown between Gibson Dunn and DLA, the simple solution is to retain another one of the dozens of capable firms to represent it.

## III.    DLA'S SELF-REPRESENTATION WOULD RAISE SERIOUS EVIDENTIARY CONCERNS

But for their *pro se* representation, under Federal Rules of Evidence ("FRE") 615, Ingerman, Masella, and Kinney would be sequestered and not be permitted in the courtroom during the trial.  Now, with their late entry *pro se* representation, these Partners are sitting at the trial table. As Partners in the law firm, they are akin to corporate representatives.  Other than a Rule 30(b)

---

[4]    At least one motive was exposed during expert discovery whereby DLA tried to identify Plaintiff as a "thief" even though this action has no connection to N.Y. Penal Code violations.  Any reference to Plaintiff using this word or a similar word would be so prejudicial that it could result in a mistrial.

representative or an assigned representative Partner, there should be no DLA Partners in the courtroom. *United States v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995) (there is "a strong presumption in favor of sequestration," and "the party opposing sequestration [ ] has the burden of demonstrating why the pertinent Rule 615 exception applies"). The Court should preclude any DLA Partners from being present in the courtroom as this undoubtably poses a greater risk that they will communicate with the law firm Partners who will testify as witnesses. Of course, the work around for Ingerman, Masella, and Kinney is that they are counsel of record, yet the risk of communicating in the way that FRE 615 was designed to prevent at trial still exists – and even more so here. DLA is taking all steps possible to prejudice Plaintiff.

It is understood that Partners often share law firm knowledge and strategy with one another. Indeed, DLA is hoping that the majority of jurors carry exactly this general understanding about law firm partners and hope to use it to prejudice Plaintiff. The case is about events and conduct that took place within DLA directly involving DLA Partners, like Durham and Medansky. Their credibility is directly in issue. Having Ingerman, Masella, and Kinney standing in front of the jury, advocating for DLA and participating in the defense as Partners along with Durham and Medansky is exactly what should not happen. If it does, the risk of improper influence through advocacy risks tainting the jury trial process. DLA is counting on the physical presence of the DLA Partners, rather than Gibson Dunn, effectively causing intimidation, distraction, or disruption, none of which facilitates the truth-seeking functions at trial to work to its advantage.

Similarly, there are serious evidentiary concerns that Plaintiff must be able to address, if necessary, pursuant to FRE 801(d)(2)(D), which allows statements made by a party's agent or employee "on a matter within the scope of that relationship and while it existed." *Id.* Ingerman, Masella, and Kinney are all DLA Partners and intend to act simultaneously as trial counsel.

7

Ingerman, Masella, and Kinney, as Partners of DLA, are "agents" of DLA and to the extent that the testimony of a DLA partner-witness contradicts a representation made by Ingerman, Masella, and Kinney to the jury, Plaintiff cannot be precluded from raising the issue and clearing it up for the jury.  DLA's solution to the real, articulable practical and evidentiary concerns that its own self-representation raises is to try to stop Plaintiff from being able to address it at all at trial.

DLA is asking the Court to provide, via a court order, a strategic advantage to secure undue deference for Ingerman, Masella, and Kinney and cut off Plaintiff's ability to address evidentiary and procedural issues that will arise from DLA's self-representation.  The Court should not be persuaded by DLA's tactics, and the Motion should be denied in its entirety.  DLA knows how highly unusual its *pro se* status will appear and the darker reasons for its desire to subject Plaintiff to the greatest possible intimidation, yet it has the audacity to seek an order from this Court that Plaintiff cannot even "mention" DLA's self-representation because of the confusion or prejudice it says it will cause.  The dispute is personal for these Partners, as agents and owners of DLA, and there is no reasonable basis for Plaintiff's counsel to be prevented from speaking to jurors about what DLA is attempting to accomplish by using its own Partners who do not even practice employment law.  DLA made the decision to engage in this charade, and it cannot now limit Plaintiff in her ability to speak freely about it.  Despite instructions from the Court, jurors may not be able to distinguish between Ingerman, Masella, and Kinney's function in the role of advocate versus the role of a Partner and agent of the Defendant law firm.

For the reasons set forth above and those set forth in Plaintiff's motion in limine (ECF No. 252), this motion should be denied, and Plaintiff should be entitled to openly and truthfully discuss the sullied business DLA has embarked upon here.[5]

---

[5]    Plaintiff incorporates by reference her arguments in support of precluding Ingerman from acting as counsel for DLA in any capacity in this action.  ECF No. 252 at 4-10.

**CONCLUSION**

For the reasons set forth herein, Plaintiff must be allowed to discuss DLA's decision to cast aside Gibson Dunn and engage in *pro se* representation.  Defendant's Motion in Limine No. 10 to Exclude Evidence, Testimony, or Argument Regarding DLA Piper Representing Itself should be denied in its entirety.

Dated: March 9, 2026
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
    Jeanne M. Christensen
    Monica Hincken
    Kassandra Vazquez

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
mhincken@wigdorlaw.com
kvazquez@wigdorlaw.com

*Counsel for Plaintiff*

9

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, Jeanne M. Christensen, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Civil Rule 7.1(c) that the annexed Memorandum of Law was prepared using Microsoft Word and the document contains 2,676 words as calculated by the application's word-counting function, excluding the parts of the Memorandum of Law exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury the forgoing statements are true and correct. Executed on this 6th day of March, 2026 in New York, New York.

_____
Jeanne M. Christensen