UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANISHA MEHTA,

|  |  |  |
|---|---|---|
| | x | |
| Plaintiff, | : | |
| | : | |
| | : | No. 1:23-cv-04757 (AT) (RFT) |
| v. | : | |
| | : | |
| | : | |
| DLA PIPER LLP, | : | |
| | : | |
| | : | |
| | : | |
| | x | |
| Defendant. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## **DEFENDANT DLA PIPER LLP (US)'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD......................................................................................................... 3

ARGUMENT..................................................................................................................... 4

    I.    DLA Piper is Entitled to Judgment as a Matter of Law on Mehta's
        NYCHRL Claim. ............................................................................................ 4

    A.    There Is No Direct Evidence of Discrimination. ...................................... 4

    B.    There is No Circumstantial Evidence of Discrimination. ........................ 5

    II.    DLA Piper is Entitled to Judgment as a Matter of Law on Mehta's FMLA
        Claims. ...................................................................................................... 16

    III.    DLA Piper is Entitled to Judgment as a Matter of Law on Mehta's Claim
        for Punitive Damages.................................................................................. 18

CONCLUSION............................................................................................................... 22

## TABLE OF AUTHORITIES

### Cases

*Beers v. NYNEX Material Enterprises Co.*,
  1992 WL 8299 (S.D.N.Y. Jan. 13, 1992) ...............................................................................11

*Brown v. City of N.Y.*,
  622 F. App'x 19 (2d cir. 2015) .................................................................................................8

*Forde v. Beth Israel Med. Ctr.*,
  546 F. Supp. 2d 142 (S.D.N.Y. 2008)......................................................................................8

*Forte v. Liquidnet Holdings, Inc.*,
  2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015)........................................................................11

*Gambello v. Time Warner Commc'ns, Inc.*,
  186 F. Supp. 2d 209 (E.D.N.Y. 2002) ..............................................................................14, 15

*Goonewardena v. N.Y. State Workers' Comp. Bd.*,
  788 F. App'x 779 (2d Cir. 2019) ............................................................................................15

*Govori v. Goat Fifty, L.L.C.*,
  519 F. App'x 732 (2d Cir. 2013) ..............................................................................................8

*Griffin v. Ambika Corp.*,
  103 F. Supp. 2d 297 (S.D.N.Y. 2000)....................................................................................15

*Hall v. Urban Assembly, Inc.*,
  2022 WL 19708 (S.D.N.Y. Jan. 3, 2022) .................................................................................1

*Hardekopf v. Sid Wainer & Son*,
  2004 WL 2199502 (S.D.N.Y. Sept. 29, 2004).....................................................................8, 14

*Lamber v. McCann Erickson*,
  543 F. Supp. 2d 265 (S.D.N.Y. 2008)...............................................................................15, 16

*Lenzi v. Systemax, Inc.*,
  944 F.3d 97 (2d Cir. 2019).......................................................................................................8

*Mattera v. JPMorgan Chase Corp.*,
  740 F. Supp. 2d 561 (S.D.N.Y. 2010).....................................................................................12

*Peters v. Mount Sinai Hosp.*,
  2010 WL 1372686 (S.D.N.Y. Mar. 30, 2010) ........................................................................16

*Tieu v. N.Y.C. Econ. Dev. Corp.*,
  2024 WL 580063 (S.D.N.Y. Feb. 13, 2024).............................................................................1

*Visco v. Cmty. Health Plan*,
  957 F. Supp. 381 (N.D.N.Y. 1997)........................................................................................13

*Woolf v. Bloomberg L.P.*,
  2019 WL 1046656 (S.D.N.Y. Mar. 5, 2019) ............................................................................5

**TABLE OF AUTHORITIES (cont'd).**

*Wright v. Storch, Amini & Munves, P.C.*,
2014 WL 1663125 (S.D.N.Y. Apr. 25, 2014)...........................................................................11

Defendant DLA Piper LLP (US) ("DLA Piper" or the "Firm") hereby moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on Plaintiff Anisha Mehta's claims under the New York City Human Rights Law ("NYCHRL"), her interference and retaliation claims under the Family and Medical Leave Act ("FMLA"), and her request for punitive damages.

## INTRODUCTION

Plaintiff Anisha Mehta claims that she was terminated from her employment as an associate at DLA Piper because she was pregnant and intended to take parental leave. She has brought discrimination claims under the NYCHRL, as well as interference and retaliation claims under the FMLA. In order to prevail on her NYCHRL claim, Mehta must demonstrate by a preponderance of the evidence that DLA Piper terminated her *because of* her pregnancy. *See, e.g.*, *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *Bivens v. Inst. for Cmty. Living*, 2016 WL 11701799, at *1 (S.D.N.Y. Feb. 3, 2016). Likewise, to prevail on her FMLA claims, Mehta must establish by a preponderance of the evidence that her request to take FMLA leave was a motivating factor in DLA Piper's decision to terminate her. *Hall v. Urban Assembly, Inc.*, 2022 WL 19708, at *3 (S.D.N.Y. Jan. 3, 2022); *Tieu v. N.Y.C. Econ. Dev. Corp.*, 717 F. Supp. 3d 305, 328 (S.D.N.Y. 2024). Even viewing all the evidence in the light most favorable to Mehta, no reasonable juror could find that Mehta has met her burden on any of her claims.

At trial, Mehta conceded that when she told the DLA Piper partners with whom she worked that she was pregnant, they were "supportive" and said "Congratulations." 4/7/26 Tr. at 166:17–18; *see also id.* at 320:6–7 ("Q. [Keith Medansky] congratulated you on being pregnant? A. Yes."). DLA Piper's Chief Human Resources Officer Kelly Neiman testified that DLA Piper provides generous parental leave benefits to its attorneys—far beyond the unpaid leave that the FMLA requires—and that DLA Piper paid more than $6 million in leave-related benefits to its attorneys during Mehta's tenure at the Firm. DX 312A. Gina Durham—the Deputy Practice Group Leader

1

of Intellectual Property & Technology ("IPT") Group and the partner who made the decision to terminate Mehta's employment—testified that she herself is a mother who took two parental leaves during her time at the Firm.  4/9/26 Tr. at 762:17–24.  Ultimately, there was *no* evidence presented at trial that anyone at DLA Piper said or did anything to suggest to Mehta that her termination had anything whatsoever to do with her pregnancy or her request for parental leave.

However, there was an abundance of evidence that Mehta—an at-will employee— performed poorly as an associate throughout her brief tenure at DLA Piper.  Mehta proposed providing incorrect legal advice to clients (that others had to correct); she was careless and untimely in her correspondence with clients and partners; she made embarrassing mistakes; and she demonstrated a poor grasp of the law.  *See, e.g.*, DX 63; DX 82; DX 95; DX 99; DX 100; DX 101; DX 106; DX 116; DX 124; DX 131; DX 132; DX 138; DX 139; DX 146; DX 148; DX 162; DX 165; DX 170; DX 172; DX 173; DX 174; DX 181; DX 182; DX 183; DX 186; DX 189; DX 284.  Ultimately, the partners with whom Mehta worked became convinced she could no longer be trusted to represent the Firm's clients.  *See* 4/8/26 Tr. at 529:24–530:5 (Medansky's "confidence was shaken" by Mehta's poor performance); 4/9/26 Tr. at 800:21–801:4 (by March 2022, significant issues were "starting to erode [Durham's] trust in [Mehta]," and eventually Durham "couldn't trust [Mehta] to do the work the right way").  Mehta may disagree with DLA Piper's assessment of her performance, but she has produced *no evidence* that the Firm's legitimate, nondiscriminatory, and nonretaliatory reason for terminating her—her poor performance—was pretextual, or that her termination had anything to do with her pregnancy or her request for parental leave.  At trial, Mehta testified that when she was terminated, she "brought up [her] pregnancy" and "said this feels wrong."  4/7/26 Tr. at 346:24–25.  But "Plaintiff's feelings do not show that Defendant's decision to terminate her employment was motivated by unlawful

2

discrimination." *Cobb v. Ellab Inc.*, 2024 WL 1963430, at *11 (E.D.N.Y. May 2, 2024).  And aside from her feelings, there is no evidence to support Mehta's claims.  Because no reasonable jury could find in favor of Mehta, DLA Piper is entitled to judgment as a matter of law.

## LEGAL STANDARD

"After the presentation of evidence, but before the case is submitted to the jury, Rule 50(a) authorizes either party to move for judgment as a matter of law." *Dupree v. Younger*, 598 U.S. 729, 731 (2023).  A district court may grant judgment as a matter of law if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  Judgment as a matter of law can be granted where "there is such a complete absence of evidence" that a finding for the non-moving party "could only have been the result of sheer surmise and conjecture, or . . . if there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Galdieri-Abrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289–90, 292 (2d Cir. 1998) (affirming judgment as a matter of law where "there was no basis for a rational finding that [the plaintiff's] belief that she was being discriminated against because she was a woman—even if genuine—was reasonable.").  Stated differently, "[j]udgment as a matter of law can be granted where there is such a complete absence of evidence that no reasonable juror could find in favor of the non-moving party." *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (citing *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir. 1993)).

3

## ARGUMENT

**I.    DLA Piper is Entitled to Judgment as a Matter of Law on Mehta's NYCHRL Claim.**

To prevail on her NYCHRL claim, Mehta must prove by a preponderance of the evidence that she was terminated "because of" her pregnancy. *Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)).  She has failed to do so.

**A.  There Is No Direct Evidence of Discrimination.**

There is no direct evidence that the decision to terminate Mehta was in any way motivated by her pregnancy.  Mehta testified that no DLA Piper partner ever said anything negative to her about her pregnancy.  4/7/26 Tr. at 316:21–317:8; *id.* at 321:25–322:2; *id.* at 350:25–351:15.  Nor did Mehta present any evidence that the decisionmaker with respect to Mehta's termination— Durham—or Keith Medansky, the co-chair of DLA Piper's Chicago intellectual property practice for whom Mehta also did substantial work—ever said anything to suggest that they were unhappy Mehta was pregnant.  To the contrary, when Mehta told Durham and Medansky that she was pregnant, Durham was "congratulatory and supportive" and Medansky was "positive" and "congratulated [her] on being pregnant."  4/7/26 Tr. at 316:23–317:1; *id.* at 319:25–320:7.  When Durham informed Mehta that she was being terminated, Durham explained that the decision was because of Mehta's poor performance and associated low billable hours, both of which were below what the Firm expected for an associate at Mehta's level of seniority.  *See* DX 195 (Mehta's contemporaneous notes from Oct. 4, 2022 meeting); 4/9/26 Tr. at 894:15–896:7.  Durham did not mention Mehta's pregnancy at any point during this meeting because it had no relevance to the Firm's decision.  DX 195; 4/7/26 Tr. at 350:16–18 ("Q. You don't recall Ms. Durham saying anything to you about pregnancy or your pregnancy on that call, correct?  A. Correct.").

4

There is no evidence that ***anyone*** at the Firm ever said or did anything to suggest to Mehta that they were unhappy that she was pregnant or that her pregnancy was an issue for the Firm. Indeed, when Mehta informed Durham of her pregnancy, Durham—who herself has taken two parental leaves during her time at the Firm—encouraged Mehta to take the maximum amount of leave available and encouraged Mehta to get the most up-to-date information from Human Resources about the Firm's generous leave policies.  DX 154 (Mehta's notes from Aug. 5, 2022 meeting); 4/7/26 Tr. at 316:21–317:8; 4/9/26 Tr. at 846:14–847:18.  Courts have made clear that there can be no inference of discriminatory animus where an employee's supervisor "strongly encourage[d] [her] to take as much leave time as possible."  *Woolf v. Bloomberg L.P.*, 2019 WL 1046656, at *18–19 (S.D.N.Y. Mar. 5, 2019)*, aff'd sub nom. Woolf v. Strada*, 792 F. App'x 143 (2d Cir. 2020)*.*  That is the case here.

### B.  There is No Circumstantial Evidence of Discrimination.

The evidence at trial confirmed that Durham, as well as Medansky and DLA Piper partner Tamar Duvdevani, believed that Mehta's performance fell far below the Firm's standards, particularly for an attorney at her seniority level who purported to have the requisite experience from her prior firm.  DX 4A (Mehta's resume).  Durham testified that she decided to terminate Mehta and did not consider ways to improve Mehta's performance primarily because of "all of these issues where she didn't know the laws and how to do things that were consistent in what she had represented to us in her resume."  4/9/26 Tr. at 891:22–24; *see also id.* at 891:25–892:1 (Mehta "was in way over her head for what she had sold herself as able to do for our firm.").  The two attorneys for whom Mehta performed the vast majority of her work, Durham and Medansky, testified that they believed Mehta's performance problems could not be cured.  Durham testified that Mehta misunderstood "basic copyright law," 4/9/26 Tr. at 830:22–25; *id.* at 831:12–19; *id.* at 830:24–840:10, that Durham "felt disappointed" in and "surprised" by Mehta's poor performance,

which was "jarring" given the experience she had represented in her resume, *id.* at 824:9–14, and that she believed permitting Mehta to continue to do work for Firm clients would put client relationships at risk, *id.* at 832:23–833:3.

Medansky similarly testified that there were "issues with [Mehta's] responsiveness" that did not improve over time, 4/8/26 Tr. at 500:23–25, and that Mehta's work was not on par with that of other senior associates, *id.* at 522:13–15. Medansky also testified that after Mehta provided him work product that required both him and another senior lawyer to do "significant additional surgery," he began assigning her only "basic," lower-level work. *Id.* at 484:1–489:2.

The evidence also showed that Mehta herself recognized at the time that her performance fell short, as she often apologized for her mistakes via email. *See* PX 88 (Mehta apologizing for failing to prepare for a client call); DX 99 (Mehta admitting she made a "goof" by writing a brief about the wrong company); DX 101 (Mehta admitting she made a "big goof" by instructing local counsel to file a trademark application in the wrong country); DX 116 (Mehta apologizing to a client for her one-week delay in drafting a letter); DX 284 (Mehta apologizing for a poorly written clearance report); DX 172 (Mehta agreeing she let a two-week-old assignment "sit longer than [she] should have"); DX 181 (Mehta responding to feedback that she ignored a client's question by writing "woops"); DX 189 (Mehta apologizing for discussing the wrong jurisdiction's law in a client email). Indeed, Mehta testified that during her termination meeting with Durham on October 4, 2022, she "was trying to offer solutions," including potentially being held back a class year, which suggests she understood she was not performing at the level expected of a seventh-year associate. 4/7/26 Tr. at 177:14–17; *see also* 4/9/26 Tr. at 897:17–898:2 (Durham was "surprised because [she] had never done a termination call with an associate where the associate immediately

6

responded with offering to be demoted," which "suggested to [Durham] that Ms. Mehta came into that call knowing that she was going to be fired").

Ultimately, the evidence demonstrates that Durham made the decision to terminate Mehta's at-will employment because Mehta was not performing at the level expected for a seventh-year associate; Mehta's performance had not improved (and indeed, had worsened with increasingly problematic mistakes) during her time at the Firm; and Durham did not believe the issues could be cured. *See* DX 310 (at-will employment policy); 4/9/26 Tr. at 892:2–4 (Durham did not "think there was any way that [she] or the firm could improve [Mehta's] performance"). Durham's trust in Mehta eroded over the course of the many mistakes that Mehta made. *See, e.g.*, 4/9/26 Tr. at 800:21–801:4; *id.* at 867:9–16; *id.* at 867:24–868:8. And Durham's (and Medansky's) inability to rely on Mehta for substantive work was reflected in Mehta's low billable hours. *See* 4/8/26 Tr. at 488:5–489:2; *id.* at 529:15–18; *id.* at 867:9–23; DX 222 (Mehta's Partner Dashboard, confirming that she was falling far short of the Firm's billable hours expectations at the time of her termination). Both Durham and Medansky testified that many of Mehta's errors, had they not been caught by more senior attorneys, could have resulted in clients receiving incorrect legal advice— an outcome that could have led to malpractice claims against the Firm and/or a loss in business. *See, e.g.*, 4/8/26 Tr. at 508:17–509:16; 4/9/26 Tr. at 832:23–833:3; DX 139 (email from Duvdevani informing Mehta and Durham that a client was "pissed" because Mehta did not notify him of a key development, and that the same mistake had led to the termination of the client's prior counsel).

The ***only*** evidence that Mehta has put forth to support her claim that she was fired because she was pregnant is (1) the timing of her August 5 pregnancy announcement, which occurred about two months before she was notified of her termination on October 4; and (2) her testimony that ***she*** "alluded" to her pregnancy during her October 4 termination call and said that "this felt

7

wrong." 4/7/26 Tr. at 346:24–25. As to the purported temporal proximity between Mehta's August 5 pregnancy announcement and her October 4 termination notification, "[t]he passage of even two or three months is sufficient to negate any inference of causation." *Brown v. City of N.Y.*, 622 F. App'x 19, 20 (2d Cir. 2015) (quotation marks omitted). In other words, there can be no inference of causation based on the fact that Mehta told Durham she was pregnant two months before she was fired. With respect to the date of Mehta's formal leave request filed with Unum— which occurred on September 28, 2022—the evidence shows that *only* members of DLA Piper's HR/Benefits department were aware of that request. 4/8/26 Tr. at 614:11–22; DX 179. As a result, that request could not possibly have been a "motivating factor" in Durham's decision to terminate Mehta. Regardless, temporal proximity alone is insufficient to allow a reasonable juror to infer causation. *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019); *see also Govori v. Goat Fifty, L.L.C.*, 519 F. App'x 732, 734 (2d Cir. 2013). That is particularly true where, as here, Mehta's supervisors had serious concerns regarding her performance "shortly after her employment began and long before anyone at [DLA Piper] knew that [she] was pregnant." *Forde v. Beth Israel Med. Ctr.*, 546 F. Supp. 2d 142, 151 (S.D.N.Y. 2008); *see also Hardekopf v. Sid Wainer & Son*, 2004 WL 2199502, at *7 (S.D.N.Y. Sep. 29, 2004) (no pretext where employer's dissatisfaction with the plaintiff's performance arose "months before [her pregnancy] announcement"); *see* 4/8/26 Tr. at 481:4–489:2 (Medansky testimony regarding issue in January 2022); *id.* at 492:24–494:22 (same in April 2022); *id.* at 495:10–500:10 (same in April 2022); *id.* at 505:1–510:18 (same in June 2022); *id.* at 510: 24–515:2 (same in July 2022); 4/9/26 Tr. at 791:13–793:2 (Durham testimony regarding issue in December 2021); *id.* at 796:6–800:20 (same in March 2022); *id.* at 801:5–805:2 (same in April 2022); *id.* at 808:8–811:10 (same in April 2022); *id.* at 819:12–825:17 (same in May 2022); *id.* at 825:21–829:3 (same in June 2022); *id.* at 829:4–

8

832:15 (same in June 2022); *id.* at 833:4–835:4 (same in June 2022); *id.* at 837:15–841:3 (same in July 2022).

As to Mehta's testimony that she "alluded to" her pregnancy to Durham and HR representative Amber James on the termination call, 4/7/26 Tr. at 380:4–7, this also does not move the needle. As an initial matter, Mehta's own contemporaneous notes from the phone call include no mention of her pregnancy, *see* DX 195, despite the fact that Mehta purportedly kept meticulous notes of all meetings "because [she's] very detailed," 4/7/26 Tr. at 161:18–19. Moreover, Mehta concedes that neither Durham nor James mentioned Mehta's pregnancy when they were providing her with the reasons for her termination. *Id.* at 350:12–351:15. Instead, those reasons were exclusively performance-based. Per Mehta's own notes, the IPT Group had "[l]ow confidence in [her] ability to handle client matters"; this lack of confidence was "[i]nhibiting staffing" Mehta on additional matters; the Group believed that Mehta was not performing commensurate with her "level"; she was only annualizing in the "1500" hours range (well below the 1,850 minimum billable hours requirement); and her performance failed "to meet expectations." DX 195. The fact that Mehta herself claims to have mentioned her pregnancy on this call and said that her termination "felt wrong" does not constitute evidence sufficient for a reasonable jury to find in her favor. *See, e.g.*, *Cobb*, 2024 WL 1963430, at *12 (granting summary judgment to the defendant where the plaintiff "offered nothing but speculation that Defendant's challenged action was motivated, even in part, by unlawful discrimination or retaliation").

Nor has Mehta shown that DLA Piper's legitimate reason for her termination—her own poor performance—was pretextual.

*First*, Mehta has suggested that her receipt of three base compensation raises and two bonuses prior to March 15, 2022 is evidence of her good performance and therefore undermines

9

DLA Piper's legitimate reasons for her termination.  However, the evidence at trial showed that the payment of the bonuses to Mehta had nothing to do with her performance.  Mehta's offer letter stated that she would receive a full 2021 year-end bonus if she met her prorated billable hours requirement, which she did for that (very short) calendar year, given that she started in October.  *See* PX 3 (Mehta's offer letter); 4/7/26 Tr. at 251:4–352:2 (Mehta confirming terms of offer letter); 4/9/26 Tr. at 707:16–18 (Durham confirming that Mehta met her prorated billable hour requirement to receive full 2021 bonus).  The fact that DLA Piper adhered to the terms of this offer letter is not evidence that Mehta was performing well.  Moreover, the payment of Mehta's 2021 year-end bonuses occurred in December 2021 and January 2022—only two months after Mehta had joined the Firm, and before her most serious performance problems occurred.  PX 299 (Mehta's Person Summary showing timing of bonuses).

As for the increase in Mehta's salary in January 2022 when she graduated from a sixth-year to a seventh-year associate, this, too, was not a reflection of Mehta's individual performance.  As Neiman testified, associate base salaries at DLA Piper move in lockstep and are dictated by the market.  4/9/26 Tr. at 638:1–2.  When Mehta became a seventh-year associate and DLA Piper matched the base salary increases of other large law firms, Mehta received the same salary increase as the other associates in her class year (2015), and this increase was not based on any individualized assessment of her performance.  *Id.* at 780:7–781:19 (compensation increases were due to "feeding frenzy" and not "based on Ms. Mehta's performance").  Importantly, Mehta did not receive any compensation increases or bonuses after March 15, 2022, after which many of her most troubling performance failures occurred.  4/7/26 Tr. at 286:16–23 (Mehta conceding that she "did not receive another bonus at DLA Piper" and "did not get another increase to [her] salary at DLA Piper after March 15, 2022").

10

In addition, the fact that Mehta received bonuses for work performed in 2021 and received raises in early 2022 does not "erase [DLA Piper's] detailed account of [her] unsatisfactory performance . . . beginning in [2021] and continuing through [2022]." *Beers v. NYNEX Material Enters. Co.*, 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992); *see also Wright v. Storch, Amini & Munves, P.C.*, 2014 WL 1663125, at *4 (S.D.N.Y. Apr. 25, 2014) (law firm associate's receiptm of annual bonuses in the years before her termination failed to rebut evidence of subsequent performance problems). Further, "bonuses[] and salary increases [are] sufficient to establish pretext ***only*** when paired with other evidence demonstrating a discriminatory motive." *Forte v. Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *11 (S.D.N.Y. Sept. 30, 2015) (emphasis added), *aff'd*, 675 F. App'x 21 (2d Cir. 2017). No such evidence of discriminatory motive is present here.

*Second*, Mehta claims that the fact she was assigned to work on a client pitch and received positive feedback during her time at DLA Piper shows that DLA Piper's legitimate rationale for her termination is pretextual. Not so. As for the client pitch, Mehta testified that she worked on this almost immediately after joining the Firm. 4/7/26 Tr. at 83:1–7. She provided no other evidence about her role on this pitch, or why her participation in a single pitch somehow undercuts the significance of her subsequent performance failures. And the fact that Mehta received some positive feedback is not sufficient to negate her serious errors. As Medansky and Durham both testified, Mehta's mistakes were so significant that they put both clients and the Firm at risk. 4/8/26 Tr. at 498:15–499:8 (Medansky testifying that Mehta's failure to meet client expectations could have caused the Firm to be fired); 4/9/26 Tr. at 892:18–23 (Durham testifying that DLA Piper was "lucky not to get fired" after Mehta's mistake "pissed off" the client). Durham also testified that Mehta's mistakes would have warranted rating her as a "1" (the lowest rating available to DLA Piper associates) if she had remained with the Firm through the upcoming formal

11

review process—which would have led to her termination. 4/9/26 Tr. at 905:24–4. Medansky became concerned about the quality of Mehta's work and lost trust in her, and thus, gave her more routine and basic work as time went on—and less responsibility for significant, high-level tasks. 4/8/26 Tr. at 488:17–489:2. The fact that partners occasionally told Mehta that she had done a good job "does not, by itself, cast doubt on [DLA Piper's] decision to terminate [Mehta] because [her] overall performance was deficient." *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010); *see also, e.g.*, 4/9/26 Tr. at 884:21–23 (Durham testifying that "good to go" is her way of saying work product is acceptable and can be passed on to the client).

*Third*, Mehta claims that under the terms of the separation agreement she was offered, she was required to keep working after she was notified of her termination and would have been required to continue working for DLA Piper clients, thereby suggesting that DLA Piper must have had confidence in her abilities. 4/7/26 Tr. at 180:5–16. Again, this argument misses the mark. The terms of Mehta's proposed separation agreement were clear: Mehta was supposed to "either cease, finalize, or transition any current work assignments, as instructed by the partners with whom [she] work[ed]" and "respectfully and promptly decline" if she was "offered any new assignments." DX 214; 4/7/26 Tr. at 360:16–24; *id.* at 361:16–20. The separation agreement also provided, and Mehta understood, that if she accepted, "DLA Piper agreed to keep [her] termination and the terms of the separation agreement confidential." 4/7/26 Tr. at 364:25–365:4; DX 214. This was because the Firm wanted to ensure that Mehta could control the narrative about her departure from the Firm. *See* 4/8/26 Tr. at 443:11–13 (Medansky testifying that the agreement would allow Mehta to "leave with dignity" and "with her professional reputation . . . intact"). For that reason, Durham made clear to Mehta in the October 4 call that she (Durham) would not be broadcasting the fact that Mehta was being terminated for poor performance. 4/9/26 Tr. at 734:10–

12

11. As Durham testified at trial, she felt strongly that Mehta should have the option to keep her termination confidential so her colleagues and potential employers would not know she had been fired for poor performance. *Id.* at 901:3–10. Durham therefore permitted Mehta to gradually and discretely transition off her existing matters, and Durham and Medansky reviewed Mehta's work carefully as she made that transition. *Id.* at 900:19–901:23. These steps to handle Mehta's termination carefully and confidentially were taken for her own benefit—and for no other reason.

*Fourth*, Mehta has attempted to make much of the fact that she did not receive a formal warning or formal performance evaluation, and was not placed on a performance improvement plan, prior to being terminated. But DLA Piper does not have "progressive discipline" or "written warning or performance improvement plans . . . for lawyers." 4/9/26 Tr. at 615:1–16. Nor is it appropriate to infer that DLA Piper was motivated to terminate Mehta's employment by her pregnancy or intent to take leave simply because Mehta did not receive "prior written notification" that she may be terminated for poor performance. *Visco v. Cmty. Health Plan*, 957 F. Supp. 381, 389 (N.D.N.Y. 1997). As Neiman explained, DLA Piper does not provide warnings or performance improvement plans to its associates. 4/8/26 Tr. at 615:1–16. As an at-will employee, Mehta could be terminated at any time for any reason, and without notice, so long as that reason was not discriminatory. PX 3 (Mehta's offer letter); DX 310 (DLA Piper At-Will Employment Policy). The evidence at trial showed that Durham determined a demotion would not be "healthy" in Mehta's case, nor would it have done any good given the seriousness of Mehta's performance deficiencies. 4/9/26 Tr. at 898:6–7 ("I just don't know how you demote somebody and then have a healthy culture at the firm. I don't think that would have been good for her and I don't think it would have been good for us."). Durham also did not believe that Mehta's performance issues could be cured. 4/9/26 Tr. at 892:2–4; *see also* 4/7/26 Tr. at 536:25–537:13 (Medansky testifying

13

that "I didn't think she would get better" and that "at some point it becomes futile, and there's nothing that I know that can be done to improve the situation"). And Mehta received consistent and contemporaneous performance feedback during the year that she was employed. *See, e.g.*, 4/9/26 Tr. at 793:3–12; *id.* at 800:17–20; *id.* at 804:18–20; *id.* at 818:14–16; *id.* at 825:4–6; *id.* at 829:1–3; *id.* at 831:20–21; *id.* at 841:1–3; *id.* at 843:15–17; *id.* at 873:23–874:1; *id.* at 877:4–6. Under these circumstances, no reasonable jury could find that DLA Piper's failure to warn Mehta about her termination or give her the opportunity to accept a demotion somehow was reflective of pretext. *See*, *e.g.*, *Hardekopf*, 2004 WL 2199502, at *7 (no pretext where employer did not implement a "corrective action" or indicate that pregnant employee might be terminated for poor performance); *Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 222 (E.D.N.Y. 2002) (no pretext where employee alleged that "no one ever informed him that he was performing poorly or that he was about to be fired prior to his termination").

*Finally*, Mehta has attempted to show that the Firm terminated her in order to save the costs it would have incurred had she taken her parental leave. DX 214. As a threshold matter, even if there were evidence that Mehta was terminated to save money, that would not prove that she was terminated due to her pregnancy. In any event, the theory that Mehta was terminated to save money is unsupported by any evidence. DLA Piper paid over $6 million to lawyers on parental leave between October 2021 and October 2022. DX 312A; 4/9/26 Tr. at 652:18–654:5. It offered Mehta a separation package worth over $116,000. 4/8/26 Tr. 612:2–4; *id.* at 613:6–8. The "cost" of Mehta's forthcoming parental leave—18 weeks—was approximately $138,000, which is roughly equivalent to the amount that DLA Piper offered Mehta to remain employed with the Firm and not work while she searched for a new job. 4/8/26 Tr. at 612:2–4; *id.* at 613:6–8. Under these

14

circumstances, no reasonable juror could conclude that DLA Piper terminated Mehta's employment in order to avoid paying her while she was out on leave.

Instead, the evidence has shown that Mehta's pregnancy played ***no role whatsoever*** in DLA Piper's decision to terminate her employment. *See* 4/9/26 Tr. at 893:12–15. Therefore, Mehta has not satisfied her "ultimate burden of persuading the trier of fact that [DLA Piper] intentionally discriminated against her on account of her pregnancy [or anticipated leave]." *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 278 (S.D.N.Y. 2008) (quotation marks omitted); *see also id.* at 282 ("In sum, plaintiff's only evidence that [her supervisor's] stated reasons for [her] termination . . . are pretext for unlawful pregnancy discrimination [under Title VII, NYSHRL, and NYCHRL] is the fact that plaintiff was pregnant and that she was treated unfairly. This is plainly insufficient."). Instead, the evidence demonstrates that Durham, Medansky, and Duvdevani made clear to Mehta that she "was not meeting expectations" based on their real-time feedback. *Gambello*, 186 F. Supp. 2d at 222 (supervisors did not need to "spell[] it out" before terminating plaintiff); *see also Goonewardena v. N.Y. State Workers' Comp. Bd.*, 788 F. App'x 779, 781 (2d Cir. 2019) (rejecting argument that an absence of "formal warnings" before plaintiff's discharge was evidence of pretext because the decisionmaker "informally counselled [him] regarding his performance and repeatedly returned his work for corrections"). While Mehta clearly understood based on this feedback that she had made errors, *see, e.g.*, DX 100 (Mehta admitting she made a "big goof"), even if Mehta were surprised by DLA Piper's termination decision, "the fact that an employee was unaware of [her] employer's dissatisfaction is irrelevant," *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 310–11 (S.D.N.Y. 2000) (quotation marks omitted) (alteration in original). In other words, even if Mehta perceived her termination to be "sudden and disproportionate," the fact remains that she has not offered "a shred of evidence that [anyone at

15

DLA Piper] had a discriminatory motive" in deciding to fire her.  *Lambert*, 543 F. Supp. 2d at 282 (quotation marks omitted).

"[W]hen all is said and done, [Mehta's] evidence adds up to the fallacious syllogism seen in so many discrimination cases: I was fired; I was pregnant when I was fired; therefore, I was fired because I was pregnant."  *Peters v. Mount Sinai Hosp.*, 2010 WL 1372686, at *1 (S.D.N.Y. Mar. 30, 2010).  Because such "evidence" is woefully insufficient to prove by a preponderance of the evidence that DLA Piper was motivated by Mehta's pregnancy in its decision to terminate her, DLA Piper is entitled to judgment as a matter of law on Mehta's NYCHRL discrimination claim.

## II.    DLA Piper is Entitled to Judgment as a Matter of Law on Mehta's FMLA Claims.

"[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA," while a retaliation claim "involve[s] an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer."  *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017).  Where, as here, both claims are based solely on the employee's termination, she must prove that DLA Piper "considered [her] FMLA leave . . . a negative factor in its decision to terminate [her]."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006); *see also Hall*, 2022 WL 19708, at *3 (plaintiff must show that her "decision or intention to take FMLA-protected leave was at least part of the reason for [her] termination"); *Tieu*, 717 F. Supp. 3d at 328 ("Under the FMLA, the plaintiff must establish that the exercise of FMLA rights was a motivating factor in the adverse employment action." (quotation marks omitted)).

16

Here, there is no evidence that DLA Piper considered Mehta's request for or intent to take FMLA leave in its decision to terminate her employment.  DLA Piper is therefore entitled to judgment as a matter of law on both of Mehta's FMLA claims.

Mehta has "submitted no evidence of any kind, direct or indirect – other than the timing of [her] termination – suggesting that" her request "for FMLA leave [was] a 'negative factor' in [DLA Piper's] decision to terminate" her employment.  *Lievre v. JRM Construction Mgmt., LLC*, 2019 WL 4572777, at *19 (S.D.N.Y. Sept. 20, 2019).  Mehta concedes that Durham first learned of her intent to take *paid* parental leave as early as August 5, 2022.  4/7/26 Tr. at 316:13–16.  Even assuming Durham understood this to mean that Mehta would also be requesting *unpaid* FMLA leave for the same period, Durham continued to work with Mehta for another two months before deciding to terminate her employment for poor performance.  4/9/26 Tr. at 867:9–23.  And the fact that Mehta happened to submit her formal leave request a few days before she was fired does not demonstrate the "very close" temporal proximity that would be required to support a reasonable inference that the events were connected in any way.  *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012); *see Housel v. Rochester Inst. of Tech.*, 6. F. Supp. 3d 294, 305 (W.D.N.Y. 2014) (employee's failure to present evidence that employer's decisionmaker knew he had requested FMLA leave was "fatal" to his retaliation claim).  That is because there is no evidence that Durham—or anyone else at DLA involved in the decision to terminate Mehta— was even aware of Mehta's submission of a claim to DLA Piper's third-party benefits administrator for FMLA-protected leave until *after* Mehta was terminated.  *See* 4/9/26 Tr. at 614:14–22 (Neiman confirming that no lawyers had access to the DLA Piper email inbox that received Mehta's leave request notification from Unum).  Therefore, the date of Mehta's Unum

17

submission is irrelevant—the only date that matters is Mehta's announcement of her pregnancy, which occurred *months* before she was fired.

Moreover, as discussed above, all of the evidence shows that Mehta was terminated because of her performance failures—not because she intended to take FMLA leave. The FMLA "is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." *Lievre*, 2019 WL 4572777, at *16 (quoting *Hill v. N.Y.C. Housing Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016)). Mehta's performance issues were noted as early as January 2022, *see* DX 63, long before Mehta became pregnant or anyone at DLA Piper knew that she planned to take FMLA leave, 4/9/26 Tr. at 316:13–16. She "continued to perform poorly" through 2022, *Lievre*, 2019 WL 4572777, at *18, which led to additional negative feedback from the partners who worked with her most. After "observing no improvement in [Mehta's] performance," Durham terminated Mehta's employment in October 2022. *Id.*; *see also, e.g.*, DX 189; DX 186; DX 181; DX 183. And Mehta "has failed to provide sufficient evidence from which a reasonable factfinder could conclude that [DLA Piper's] stated explanation for firing [her] was merely a pretext masking impermissible retaliatory motives." *Sista*, 445 F.3d at 176.

## III.     DLA Piper is Entitled to Judgment as a Matter of Law on Mehta's Claim for Punitive Damages.

Mehta also has not produced any evidence from which a reasonable jury could award punitive damages. Because punitive damages "differ in purpose and nature from compensatory damages," they "may only be awarded for *exceptional misconduct*." *Chauca v. Abraham*, 89 N.E.3d 475, 479 (N.Y. 2017) (emphasis added) (quoting *Sharapata v. Town of Islip*, 437 N.E.2d 1104 (N.Y. 1982)). Under the NYCHRL, a plaintiff seeking punitive damages must prove that the defendant acted with "willful or wanton negligence, or recklessness [or] conscious disregard of

18

the rights of others or conduct so reckless as to amount to such disregard." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 325 (S.D.N.Y. 2018) (quoting *Chauca*, 89 N.E.3d at 477).[1]

Here, no reasonable jury could find that DLA Piper violated the NYCHRL *at all*. Even if they could, "a defendant must do more than just violate the NYCHRL to face liability for punitive damages." *ULKU ROWE v. GOOGLE LLC*, 2026 WL 915224, at *14 (S.D.N.Y. Apr. 3, 2026) (quotation marks omitted). "The New York Court of Appeals has expressly rejected the idea that 'a punitive damages charge is automatic on a finding of liability' under the NYCHRL, instead 'requiring an appropriate showing of heightened culpability for [an award of] punitive damages.'" *Edelman v. N.Y.U. Langone Health Sys.*, 141 F.4th 28, 43 (2d Cir. 2025) (quoting *Chauca*, 89 N.E.3d at 481) ("Punitive damages differ conceptually from compensatory damages and are intended to address 'gross misbehavior' or conduct that 'willfully and wantonly causes hurt . . . to another.'").

Mehta failed to present any evidence at trial by which a reasonable jury could find that DLA Piper acted with the "high degree of moral culpability" required to recover punitive damages. *Edelman*, 141 F.4th at 43 (quoting *Home Ins. Co. v Am. Home Prods. Corp.*, 550 N.E.2d 930 (N.Y. 1990)). Durham alone made the decision to terminate Mehta's employment, 4/9/26 Tr. at 893:5–8, and Mehta testified that Durham never said anything negative to her about her pregnancy, 4/7/26 Tr. at 317:6–8. To the contrary, Durham went into "mommy mode" and "stress[ed] to [Mehta] that that time with [her] baby is very sacred." 4/9/26 Tr. at 847:14–16. Mehta herself conceded that Durham was "very encouraging" of her intent to take maternity leave. *Id.* at 316:21–25. There is

---

[1] Punitive damages are not available under the FMLA. *Cooper v. N.Y. State Nurses Ass'n*, 847 F. Supp. 2d 437, 452 (E.D.N.Y. 2012).

absolutely no contrary evidence by which a reasonable jury could find that Durham was anything but "congratulatory and supportive." *Id.* at 317:1.

Even after Durham determined that Mehta was "clearly in over her head" and needed to be fired, DLA Piper went above and beyond to soften the blow of Mehta's termination, help her "find a place where she could be successful," and work with Mehta to ensure that she "land[ed] on her feet." 4/9/26 Tr. at 899:21–24. DLA Piper offered Mehta a "generous" separation package, 4/8/26 Tr. at 608:17–22, which would have allowed Mehta to remain a Firm employee for at least another six months, DX 214; 4/9/26 Tr. at 608:23–3 (Neiman testifying that the Firm "regularly grant[s]" extensions to employees' transition periods). During this transition period, Mehta could: (1) continue holding herself out as a DLA Piper employee to potential employers, (2) "cease, finalize, or transition" her current client matters while "respectfully and promptly declin[ing]" new matters, and (3) "use work hours to search for alternative employment." DX 214; *see also* 4/9/26 Tr. at 900:7–12 (Durham testifying that "it's easier to get a job if you are employed when you are looking"). This structure would serve the dual purpose of allowing Mehta to "concentrate solely on finding a job" and avoid signaling to anyone else that she had been terminated. 4/9/26 Tr. at 11–18; *id.* at 901:4–6 (Durham testifying that, "if you drop off everything immediately, then it could like you were terminated"); *see also* 4/8/26 Tr. at 443:12–13 (Medansky testifying that Mehta could have left with her professional reputation intact). Moreover, DLA Piper would have agreed to keep the circumstances of Mehta's departure from the Firm completely confidential. DX 214; 4/9/26 Tr. at 901:3–4. Finally, DLA Piper would have continued paying Mehta a reduced salary for the duration of her six-month transition period. DX 214. All in, the value of DLA Piper's separation offer was approximately $116,000—roughly the same as what the Firm would have paid in maternity leave benefits. 4/8/26 Tr. at 612:2–4; *id.* at 613:6–8.

20

Finally, DLA Piper undertakes affirmative and comprehensive efforts to prevent discrimination based on pregnancy or parental leave. Most obviously, DLA Piper's robust Parental Leave Policy allows new mothers to take up to 18 weeks of paid leave after giving birth. DX 299. This is well beyond the 12 weeks of unpaid leave that the FMLA requires. During the period between October 2021 and October 2022, DLA Piper paid more than $6 million in parental leave benefits to 62 lawyers—12 of whom worked in the IPT practice group. DX 312A; 4/9/26 Tr. at 652:18–654:5. Moreover, the Firm enforces a thorough Non-Discrimination Policy and requires all partners and associates to attend mandatory trainings on the Policy at least every other year. DX 304; 4/9/26 Tr. at 650:21–16. Finally, the Firm requires at least two levels of review before an associate can be fired for poor performance. In such cases, the decisionmaker must first raise the issue to Human Resources, which "make[s] sure that the decision is valid and aligns with [F]irm policies," followed by the Office of General Counsel, which provides "a second check and balance." 4/8/26 Tr. at 616:16–20. The evidence also reflects that DLA Piper takes additional extensive steps to foster an inclusive and supportive environment for parents, including by providing fertility, adoption, and surrogacy benefits, allowing new parents to "ramp up" with reduced productivity expectations that can gradually increase over time (at a pace that fits their family's needs), providing dependent care benefits, offering programs to assist parents of children with disabilities, and offering "Milk Stork" services to allow breastfeeding mothers to safely ship milk back home to their baby while on business travel. 4/8/26 Tr. at 618:6–619:1. These efforts only underscore DLA Piper's commitment to supporting attorney parents and parents-to-be.

Put simply, even viewing the evidence in the light most favorable to Mehta, no reasonable jury could find that DLA Piper acted with "willful or wanton negligence, or recklessness [or] conscious disregard of the rights of others or conduct so reckless as to amount to such disregard."

*Duarte*, 341 F. Supp. 3d at 325.  Accordingly, Mehta's claims for punitive damages should be rejected as a matter of law.

## CONCLUSION

For the foregoing reasons, DLA Piper is entitled to judgment as a matter of law on Mehta's NYCHRL and FMLA claims and request for punitive damages.

Respectfully submitted,                      Date:   April 10, 2026


GIBSON, DUNN & CRUTCHER LLP        DLA PIPER LLP (US)

By:   */s/ Molly Senger*                      By:   */s/ Brett Ingerman*
Molly T. Senger, *pro hac vice*                  Brett Ingerman
Amalia Reiss, *pro hac vice*                     Brett.ingerman@us.dlapiper.com
Joseph Ruckert, *pro hac vice*                   650 S. Exeter Street, Suite 1100
1700 M Street, N.W.                              Baltimore, MD 21202
Washington, D.C. 20036                           (410) 580-3000
Telephone: (202) 955-8571
MSenger@gibsondunn.com                           Jessica A. Masella
AReiss@gibsondunn.com                            Jonathan M. Kinney
JRuckert@gibsondunn.com                          Jacob I. Chefitz
                                                 Jamie L. Brensilber
Attorneys for Defendant                          Jessica.masella@us.dlapiper.com
DLA Piper LLP (US)                               Jonathan.kinney@us.dlapiper.com
                                                 Jacob.chefitz@us.dlapiper.com
                                                 Jamie.brensilber@us.dlapiper.com
                                                 1251 Avenue of the Americas, 27th Floor
                                                 New York, NY 10020-1104
                                                 (212) 335-4500

                                                 Attorneys for Defendant
                                                 DLA Piper LLP (US)


22

23

**WORD COUNT CERTIFICATION**

Pursuant to Local Rule 7.1(c) and Rule III.D of this Court's Individual Practices, I hereby certify that the foregoing motion, exclusive of its caption, signature blocks, or any required certificates, contains 7,186 words, according to the word-processing system at DLA Piper LLP (US), upon which said memorandum of law was prepared.

/s/ *Brett Ingerman*
Brett Ingerman

## CERTIFICATE OF SERVICE

I certify that on April 10, 2026, I caused a copy of the foregoing document to be served upon plaintiff's counsel via CM/ECF.

/s/ *Brett Ingerman*
Brett Ingerman

24